IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DONALD HOLDEN, BRANDON
PEKKALA, and JOHN PERRIN,

                    Plaintiffs,                          OPINION AND ORDER

        v.                                                17-cv-636-wmc

CAPSTAN CORPORATION,
FRASER SHIPYARDS, INC., and
THE INTERLAKE STEAMSHIP COMPANY,

                    Defendants.

        This is the second of four lawsuits arising from the alleged lead poisoning of workers

retrofitting the *Herbert C. Jackson* with diesel engines while in drydock. As in the first case,

*Holder v. Fraser Shipyards et al.*, 288 F. Supp. 3d 911 (W.D. Wis. 2018), plaintiffs allege

claims against the *Jackson*'s owner, Interlake Steamship Company; the shipyard where the

work was performed, Fraser Shipyards, Inc.; and Fraser's parent corporation, Capstan

Corporation. Similarly, as in *Holder*, defendant Interlake alleges crossclaims against Fraser

Shipyards for indemnity or contribution. Pending before the court for decision are:

Fraser's motion for summary judgment on plaintiffs' claims and Interlake's crossclaims

(dkt. #60); Interlake's motion for summary judgment on plaintiffs' claims (dkt. #66); and

Interlake's motion for partial summary judgment on its crossclaims against Fraser (dkt.

#68). For reasons explained below, Fraser's motion on the crossclaims is granted in part

and denied in part; Interlake's motion on the crossclaim is denied; and their motions on

plaintiffs' claims are denied.[1]

UNDISPUTED FACTS[2]

## A. Parties

Plaintiffs all worked on the *Jackson* while it was in dry dock at Fraser Shipyards in early 2016. Mississippian Donald Holden was a welder who worked on the *Jackson* in January and February 2016, although there seems to be a dispute about whether he also worked in March 2016. Iowan Brandon Pekkala was a boilermaker who worked on the *Jackson* from January 25 through July 21, 2016.[3] North Dakotan John Perrin was also a boilermaker and worked on the *Jackson* from January 18 until March 24, 2016.[4] Plaintiffs acknowledge never taking instruction from Interlake Steamship agents or employees.

---

[1] Also pending before the court are three related motions by plaintiffs which seek: (1) to strike new evidence submitted by Fraser in its reply brief (dkt. #126); (2) to strike new evidence contained in Phil Moore's declaration (dkt. #136); and (3) to expand the summary judgment record (dkt. #156). For reasons discussed briefly below, the court will deny the first two motions, but grant the third. Of course, at trial, plaintiff may contest this "new" evidence, just as defendants may contest the opinions of plaintiffs' experts.

[2] The following facts are material and undisputed for purposes of summary judgment except where noted below. At the outset, the court notes that the parties have used their responses to and replies in support of proposed findings of fact to push their legal arguments. (*See e.g.*, Interlake's Reply to Pls.' Resp. to Interlake's PFOF (dkt. #130) ¶¶ 16, 33, 44; Pls.' Resp. to Interlake's PFOF (dkt. #110) ¶¶ 16, 33, 44.) This type of response -- including the copying and pasting of text from one response to another -- is not helpful because the court's task at summary judgment is to identify areas of *factual* dispute. Responses and replies that seek to obfuscate the *facts* are simply a waste of the parties' -- and the court's -- time and effort. To their credit, however, this time around the parties' summary judgment submissions are *not* rife with pointless evidentiary objections all too prevalent in the first case, so the court will not impose monetary sanctions this time. Any recurrence of either abuse in the parties' summary judgment submissions in the third or fourth related cases, however, will likely result in sanctions.

[3] Plaintiffs note, however, that he was on paid medical leave from March 28 through April 18.

[4] Interlake notes that Perrin injured his shoulder early on in his time at Fraser Shipyards. (*See* Perrin Dep. (dkt. #56) 37:25-38:3.)

Defendant Capstan, Fraser's parent corporation, is incorporated in Wisconsin with its principal place of business in Minnesota. Todd Johnson served as Capstan's CEO and chairman, as well as Fraser's CEO, during the *Jackson's* repowering project at Fraser Shipyards. Fraser, a Wisconsin corporation with its principle place of business in Wisconsin, has been in the shipyard business for decades and had previously done work for Interlake, the *Jackson*'s owner. Before the *Jackson* repowering project, Fraser had the best achievable workers' compensation safety rating. (Johnson Dep. (dkt. #65) 89:8-18.) Defendant Interlake, a Delaware corporation with its principal place of business in Ohio, contracted with Fraser to repower the *Jackson* on September 30, 2015.

Fraser is typically busiest during the winter months (from December through late March) because that is when Great Lakes vessels undergo repair, maintenance, and modification. In order to meet the increased demand for services during this season, Fraser must increase its workforce. In late 2015, Fraser sought staffing assistance, first from Chris Jensen & Sons Co. ("CJS") and then from Tradesmen International.

### B. Client Services Agreement with Tradesmen

Fraser Shipyards and non-party Tradesmen entered a contract on February 18, 2011. Among other things, the Client Services Agreement provided that: (1) Tradesmen would assign workers to Fraser; and (2) Fraser was "solely responsible for directing, supervising and controlling Tradesmen employees as well as their work." (Client Services Agreement (dkt. #63-2) 2.) Likewise, Fraser had the right to "terminate a worker" at its "sole discretion . . . at any time for any lawful reason." (*Id.*) Fraser was also responsible for paying Tradesmen "the bill-out rate(s) per hour, multiplied by the number of hours

worked by Tradesmen workers," while Tradesmen was "responsible for the payment of wages, withholding Federal and State income taxes, paying Federal Social Security taxes, unemployment insurance and maintaining worker's compensation insurance coverage." (*Id.*) Accordingly, Tradesmen paid Holden directly after withholding for his taxes, paid social security taxes, and funded unemployment benefits and workers' compensation insurance. Even so, the Client Services Agreement did not use the term "borrowing employees." Under their contract, Tradesmen assigned workers to Fraser to work on the *Jackson*, including Holden.

While plaintiffs acknowledge that Holden was assigned by Tradesmen to Fraser, they contend that he actually worked for Tradesmen. This was also Holden's belief, such that he would have raised with Tradesmen any problems he had getting paid while working on the *Jackson*. Further, Tradesmen was the entity that notified Holden of his lead exposure.

Defendant Fraser and plaintiffs disagree about whether Timothy Pierce, Fraser's temporary foreman, "directed, supervised, controlled and monitored Holden's work." (*See* Fraser's Reply to Pls.' Resp. to Fraser's PFOF (dkt. #120) ¶ 7.) Those parties also dispute whether "Fraser closely monitored Holden's work." (*Id.* ¶ 9.) They further dispute the type of work Holden was doing on the *Jackson*, and whether that work was part of the repowering project or was performed under a separate purchase order.[5] Nevertheless, for

---

[5] Plaintiffs rely on Holden's deposition testimony that he welded in the engine room (Holden Dep. (dkt. #54) 132:2-7) while Fraser points the court to two purchase orders, which both identify the "Total Cost" as $0.00 (Purchase Order (dkt. #63-5) 7; Purchase Order (dkt. #63-6) 10), as well as the statement of CEO Farkas (Farkas Decl. (dkt. #63) ¶ 12).

his work, the parties agree that Fraser provided Holden welding rods, torches, a welding machine, sawzalls, and come alongs. (Holden Dep. (dkt. #54) 269:20-270:1, 270:8-16.) Fraser also provided safety equipment: gloves, safety glasses, and respirator filters (for Holden's personal respirator). Holden further contends that he brought other tools. (*Id.* 137:23-138:4.)

### C. Master Agreement with CJS

Since December 16, 2015, Fraser had a separate contract with CJS "to service, repair and modify vessels in [Fraser's] yards, as an independent contractor." (Master Agreement (dkt. #63-3) at 3.) That contract specified that CJS was being hired to perform work

> under [Fraser's] general direction . . ., in a reasonable and workmanlike manner, in a manner consistent with all Project plans and specifications . . ., in a manner consistent with the Project progress schedules established . . ., and in all other manners in accordance with this Agreement and the Contract Documents.

(*Id.*) The agreement also specified that CJS was hired to "provide welders and fitters to assist [Fraser] with various steel projects during the period of December, 2015 through June, 2016," with the work "primarily be[ing] steel removal and replacement in various parts of the ships as directed by [Fraser]." (*Id.* at 19.) Fraser acknowledged that it did not have the authority to terminate CJS employees under the agreement, but contends that CJS staff were all subject to its direction, control and supervision. Plaintiffs dispute this, pointing to the Master Agreement, which described CJS as "an independent contractor" and gave Fraser the right of "general direction." (Fraser Reply to Pls.' Resp. to Fraser's PFOF (dkt. #120) ¶ 18.)

The agreement required CJS to "provide adequate and sufficient labor, crews, and equipment as necessary to timely progress the Work consistent with the Schedule of Work, and to immediately advise [Fraser], in writing, of any reasons why it cannot timely proceed with its Work," as well as "all of the necessary . . . services, including, but not limited to, competent supervision . . . as are necessary for the proper and timely progress and performance of the Subcontractor's Work." (Master Agreement (dkt. #63-3) 9.) Likewise, CJS was required to provide reports "as often as required." (*Id.*) The Master Agreement required CJS to "use all Project payments to pay its Project subcontractors and suppliers, and that all such payments made by . . . Contractor to Subcontractor, are made in trust for the use and benefit of Subcontractor's project employees, subcontractors, and suppliers." (*Id.* at 4.) Fraser "agree[d] to pay [CJS] for the satisfactory performance of the Subcontractor's Work at the CURRENT CONTRACT LABOR RATES." (*Id.*)

While plaintiffs and Fraser agree that Perrin and Pekkala were employed by CJS and worked on the *Jackson*, they disagree about whether they worked for CJS or Fraser, as well as whether their work was monitored, supervised, directed and controlled by Fraser supervisors.[6] Likewise, they disagree about whether Fraser had the discretion to fire Perrin

---

[6] In response to many of Fraser's proposed facts, plaintiffs object to the affidavit of Fraser president and COO James Farkas as support without demonstrating that he had first-hand knowledge of the facts to which he attests. Fraser then countered with an additional Farkas declaration attesting generally to having "personal knowledge" in his capacity as "President and Chief Operating Officer." (Farkas Decl. (dkt. #118).) Plaintiffs' motion to strike this declaration (*see* Pls.' Mot. Strike (dkt. #126)) will be denied. While the court is skeptical that Farkas's capacity as president and COO will prove sufficient to lay a proper foundation at trial, the court will assume it is sufficient for purposes of summary judgment. If plaintiffs truly believe that Farkas was unaware of specific facts (e.g., about the supervising foremen), the best way to demonstrate that would have been by offering his deposition testimony or other evidence countering his declaration, not to object on the basis of a lack of personal knowledge. Of course, plaintiffs are free to renew objections at trial on this basis if Fraser's counsel fails to lay a proper foundation.

and Pekkala from the *Jackson* project. (*See* Fraser's Reply to Pls.' Resp. to Fraser's PFOF (dkt. #120) ¶ 27.)

Plaintiff Pekkala was a member of the International Brotherhood of Boilermakers and applied for a job with CJS on January 25, 2016. Fraser and the plaintiffs dispute whether he received his jobsite orientation from Fraser's human resources officer Rivord or a CJS employee. When Pekkala started working on January 25, 2016, Fraser asked him to fill out paperwork, and Pekkala listed himself as an employee of CJS. Rivord signed off on these documents. From January through July 2016, CJS issued Pekkala's paychecks and made his pension contributions. Similarly, Pekkala's Statement of Earnings from the Social Security Administration lists CJS as a 2016 employer, while there is no mention of Fraser as an employer. Finally, during the time that Pekkala worked on the *Jackson*, he completed daily time cards listing "Chris Jensen & Son Co." at the top. Still, as it did with Holden, Fraser provided Pekkala with the tools he needed on the *Jackson*, including a welder, grinder, torch, steel and nylon chokers, chain falls, and come alongs.

Perrin was a member of the International Brotherhood of Boilermakers Local 647. He applied and was hired for a position with CJS on January 18, 2016. Perrin testified that CJS wrote his paychecks, although he understood that "Fraser Shipyard was paying the bill." (Perrin Dep. (dkt. #56) 61:8-22.) At the same time, his pension trust contributions from January through March 2016 were made by CJS. On Perrin's Statement of Earnings, the Social Security Administration lists CJS as an employer for 2016, not Fraser. While he worked on the *Jackson*, Perrin completed daily time cards. These time cards, like those completed by Pekkala, had "Chris Jensen & Sons Co." at the

top.  While Perrin may have brought his own personal protective equipment, it appears that Fraser provided him with all his tools.  (*Compare* Perrin Dep. (dkt. #56) 190:17-22 (testifying he did not bring any of his own tools) *with* Perrin Interrogatory Resp. (dkt. #84-9) 3-4 (explaining he brought his own personal protective equipment and hand tools).)[7]

### D. The Repowering Project

In 2006, Interlake started a 10-year, $100,000,000 "fleet upgrade" program that included "major overhauls" for five of its 10 ships.  Four of these ships would be converted from steam to diesel power.  (Press Release (dkt. #101-2) 1-2.)  The *Jackson* was the fourth of these conversions.  (*Id.*)  On June 8, 2015, Interlake announced the *Jackson* repowering project, stating that it was "in discussions with potential shipyards to do the repowering work."  (*Id.* at 2.)  On June 15-16, 2015, representatives of Fraser, including Derek Tanula (the yard superintendent) and Tom Curelli (vice president of engineering and director of operations), toured the *Jackson* with Ian Sharp (Interlake's director of fleet projects) at the Port of Marquette, during which the presence of lead on the *Jackson* was discussed.

As noted above, Interlake and Fraser Shipyards entered the Shipbuilding Contract in September 2015.  The *Jackson* was "the first major repowering for Fraser since the mid-1980s."  (*Id.* at 5.)  The parties dispute whether Fraser was required to present a binder of safety procedures to Interlake.  (*See* Interlake's Resp. to Pls.' PFOF (dkt. #132) ¶ 67; Fraser's Resp. to Pls.' PFOF (dkt. #121) ¶ 47.)  Fraser's safety director, Grant Huttel,

---

[7] Since Perrin's sworn testimony is inconsistent with his interrogatory response and that response is hearsay when offered by plaintiffs for the truth of the matter asserted, his deposition testimony controls at summary judgment.

would have been responsible for compiling such a binder.[8]  While Fraser listed health and safety policies in an employee safety manual, there is a dispute whether it contained *all* of the safety policies, including whether it contained policies applicable to lead.  (Interlake's Resp. to Pls.' PFOF (dkt. #132) ¶¶ 71-72.)  Interlake and the plaintiffs also disagree whether Interlake's Quality, Safety and Environmental System Manual applied while the *Jackson* was at Fraser Shipyards, in large part because they dispute whether Interlake had control of the ship.  (Interlake's Resp. to Pls.' PFOF (dkt. #132) ¶¶ 127-129.)

As noted, the repowering project was intended convert the ship's propulsion system, replacing the steam turbine engines with two diesel engines.  This project included installing:  the two diesel engines; a new propeller, propeller blades, and tailshaft; a new control room and console; and new main and operating decks.  These installations also required updating associated electrical components, piping, structures and equipment.  Further, the *Jackson*'s safety and other systems were updated.

Before any of this could occur, however, the *Jackson*'s main propulsion boilers, propulsion turbine, propulsion controls, reduction gear, main switch gear and electrical motor controls were demolished and removed.  The *Jackson* also had its propeller and rudder blades, hub, unloading diesel, steam turbine, emergency generators, and stack removed.  Shortly after the *Jackson* arrived at Fraser Shipyards, Fraser further cut holes in the bottom of its ballast tanks, despite the ship having "docking plugs" on the bottom of its hull's shell

---

[8] Huttel served as Capstan's corporate safety director until he resigned on January 8, 2016.

plating.[9]  At times, therefore, the *Jackson* was in dry-dock with a 4-foot by 7-foot hole in the starboard-side hull below the waterline.

In early January 2016, the *Jackson*'s ballast suction manifold and the tank isolating valves were also removed, leaving the former ballast piping open.[10]  According to Sharp, Interlake's director of fleet projects, had the dry dock flooded "water would uncontrollably flow into the [*Jackson*'s] opened ballast tanks, pass through the ballast pipes, which were open to the engine room, and flood the engine room."  (Sharp Decl. (dkt. #72) ¶ 17.)  By January 2, 2016, the *Jackson*'s ballast low sea inlet valves had been removed, which Sharp contends meant that, had the dry dock flooded, "water would flow uncontrolled through the opened sea chests, flood the engine room, flood through the open ballast piping to each ballast tank . . . and flood the ballast tanks."  (*Id.* ¶ 18.)  Sharp further contends that the *Jackson* would have been incapable of navigation, because the shell plating had by then been removed from the ballast tanks, along with the docking plugs.

Still, plaintiffs contend, these conditions would not prevent the *Jackson* from floating or being used for transport because the *Jackson* kept its bow, stern, keel, anchors, decks, cargo hold, self-unloader, superstructure, lifeboats, navigation lights, mooring lines, and funnel, as well as retained the appearance of a vessel, throughout all of this work.  As a result, there remain factual disputes whether the *Jackson* was capable of navigating, whether it had been removed from navigation, and whether it could float.  (*See* Interlake's Reply to

---

[9] "Docking plugs" are used to drain water from the ballast tanks in the winter to prevent ice from forming in the tanks and associated damage, as well as repairing the ship's bottom shell structure while in dry dock.

[10] The ballast suction manifold was approximately 50-60 feet in length and 2 feet in diameter.

Pls.' Resp. to Interlake's PFOF (dkt. #130) ¶¶ 14-15.)

While the *Jackson* was at Fraser Shipyards, there was no captain or crew onboard.[11] Nevertheless, Interlake's representative Mike Wolny was onsite every work day. According to Sharp, Wolny was the only agent for Interlake onsite throughout the repowering project, and his job was "to inspect the material and workmanship of Fraser and to ensure that Fraser was installing the equipment and systems in accordance with the detailed engineering construction drawings." (Sharp Decl. (dkt. #72) ¶ 26.) While Fraser agrees with this characterization,[12] plaintiffs purport to dispute it, arguing that Wolny was an Interlake employee, who provided weekly reports to Sharp and was tasked with being Interlake's "eyes and ears." (Pls.' Resp. to Interlake's PFOF (dkt. #110) ¶ 38.)

Although plaintiffs and Interlake dispute Wolny's authority over both the workers and the work being done on the *Jackson*, they agree that the workmanship and materials were subject to inspection by Interlake's onsite representative and that Interlake's approval was needed for additional work or change orders. Likewise, Wolny *did* produce Weekly Repower Reports for Interlake's director of fleet projects, and he had weekly meetings with Fraser's VP of engineering and director of operations, Curelli, who served as the primary contact point between Fraser and Interlake. Indeed, they saw each other more often than that. Plus, Interlake has identified five other representatives who were present at Fraser

---

[11] Fraser notes that the *Jackson* did have a crew and a captain aboard in September 2016 when it was undergoing sea trials. (Fraser's Resp. to Interlake's PFOF (dkt. #102) ¶ 24.)

[12] In fact, Fraser and Interlake agree that "if Wolny had come to [Fraser's Director of Operations Curelli] and told him there was a hazardous condition, Wolny had no authority to stop work" because "Fraser would have needed to make that determination on its own." (Interlake's Reply to Fraser's Resp. to Interlake's PFOF (dkt. #135) ¶ 49.)

Shipyards between December 1, 2015, and May 1, 2016: Sharp, Kidder (Sharp's assistant), safety manager Sam Allgood, fleet engineer Dale Miller, and Moore.

The contract price for the repowering project was $9,784,295, while the total cost for the project exceeded $19 million. (*Compare* Shipbuilding Contract (dkt. #72-1) 12 *with* Sharp Decl. (dkt. #72) ¶ 4.) The work on the *Jackson* was supposed to take approximately six months. The *Jackson* entered Fraser Shipyards' flooded dry dock on December 11, 2015, and was in dry dock from December 15 until May 31, 2016.[13] During the time that the repowering project was ongoing, the *Jackson* was also undergoing winter repair work. All of this work was undertaken to keep the *Jackson* functional. When the *Jackson* ultimately departed Fraser Shipyards, Interlake announced:

> The newly repowered M/V Herbert C. Jackson departed Fraser Shipyards in Superior, Wis., yesterday giving a farewell salute to the Twin Ports where it has been undergoing its steam-to-diesel conversion since December 21.
> * * *
> "After a successful repowering at Fraser Shipyards, the Herbert C. Jackson returns to service as an extremely versatile and efficient River Class freighter with a bright new future of carrying cargoes for our Great Lakes customers for decades to come," says Interlake President Mark W. Barker.

(Press Release (dkt. #79-5) 7-8.)

Plaintiffs and Interlake agree that the *Jackson* maintained an American Bureau of Shipping ("ABS") Class Certificate throughout the repowering project,[14] although Interlake contends that the *Jackson* needed a *new* certificate after the repowering project

---

[13] The ship was not actually returned to Interlake until September 25, 2016.

[14] ABS verifies that vessels comply with requirements for construction, design, and periodic surveys, but no party adequately explains the importance of this verification at summary judgment.

because it no longer met the conditions of its prior certificate. In fact, the *Jackson* received a new interim certificate in September and final certificate in December 2016. (*See* Interlake's Reply to Pls.' Resp. to Interlake's PFOF (dkt. #130) ¶ 25.) Likewise, Interlake contends that the *Jackson* required a new certificate of inspection ("COI") from the United States Coast Guard following the repowering project because it no longer satisfied the requirements of its prior COI. Plaintiffs dispute this latter contention, arguing that the *Jackson* maintained the necessary COI throughout. (*Id.* ¶ 26.) Plaintiffs' expert John Sullivan opined that "Public Coast Guard databases show the Jackson, Primary Vessel Number 278780 . . . has maintained a Coast Guard Certificate of Inspection (COI), since April 2001," indicating that it remained in service, especially in light of the fact that Great Lakes ships -- like the *Jackson* -- normally remain unused during the winter for a few months. (Sullivan Rpt. (dkt. #94) 17.)[15] Regardless, the *Jackson* underwent extensive sea trials following the repowering project before it could receive new certifications from ABS and the Coast Guard. The failure mode effects and design load verification analyses occurred on September 22, 2016, and the Coast Guard issued an interim COI on September 23.

---

[15] Plaintiffs have sought to supplement the factual record at summary judgment "to include affidavits from the experts whose reports plaintiffs have relied on in opposing Interlake's motion for summary judgment," explaining that "[i]n these affidavits each expert swears under penalty of perjury that the opinions and bases stated in his or her report [are] true and accurate to the best of each expert's knowledge." (Mot. to Suppl. Summ. J. Record (dkt. #156) 1.) This motion was prompted by Interlake's objections that the expert reports were "unsworn." (*Id.* at 2.) Because plaintiffs' motion to supplement will be granted, the court considers those expert opinions where appropriate. Interlake's concerns, for example, about facts outside of an expert's purview or outside an expert's personal knowledge are, at times, well taken. Regardless, Interlake's objections that the proposed facts are improper because they are not based on admissible evidence and violate this court's summary judgment procedures elevate form over substance, and largely appear to be an attempt to stymie the court's role at summary judgment for reasons set forth in this opinion.

## E. Knowledge of Lead

Ships of a similar age to the *Jackson* were commonly known in the maritime industry to have lead paint. In fact, prior to the 1970s, most maritime paint coatings were lead-based because it dried quickly and held up to harsh environments. Procedures to handle and remove lead have been promulgated by federal and state governments since the 1970s. *See, e.g.*, OSHA 1910.1025 (lead removal standard for shipyard work). Nevertheless, Interlake disputes that it: (1) was actually aware of the lead paint on the *Jackson*; (2) knew that Fraser was failing to protect workers from lead paint or other harmful toxic substances; (3) maintained any control over the *Jackson* while it was in dry dock; (4) had control over other aspects of the workplace at Fraser; and (5) could stop the work being performed. Similarly, Fraser contends that it did not know about the excessive lead exposure until March 28, 2015, and took appropriate steps to protect workers after it became aware. At the same time, Fraser (1) admits that it and its subcontractors were responsible for performing all of the repowering project's work; (2) acknowledges that the Shipbuilding Contract purported to transfer active control of the *Jackson* to Fraser; and (3) understood that Wolny had "limited authority" over the repowering project. (Fraser's Resp. to Interlake's PFOF (dkt. #102) ¶¶ 42, 46, 48; Fraser's Reply to Pls.' Resp. to Fraser's PFOF (dkt. #120) ¶¶ 34-35.)

While Fraser further admits that Interlake brought concerns about lead paint to Fraser's attention, plaintiffs contend that lead abatement was *not* included in Fraser's bid to Interlake for the *Jackson* repowering project based on selective excerpts of Curelli's confusing deposition testimony. (*See* Pls.' Resp. to Fraser's PFOF (dkt. #87) ¶ 33 (citing

Curelli Dep. (dkt. #57) 68:11-15 (agreeing that the bid "did not contain a line item for lead testing or lead abatement"); Curelli OSHA Dep. (dkt. #85) 36:3-6 (testifying that the bid and contract did not address lead); *id.* 37:4-24 (testifying that he took lead into account in doing the bid, but lead was not "specifically mentioned in that bid")).) However, there is no dispute that Fraser was advised in the Shipbuilding Contract that "there may be asbestos and lead paint on or in the Herbert C. Jackson," and Fraser bore the "responsibility to safely remove any and all asbestos and lead paint that is disturbed as a result of this conversion, all to the requirements of all local, state and federal regulations." (Shipbuilding Contract (dkt. #72-1) 43.) Fraser does admit to being aware of the presence of lead aboard the *Jackson* "no later than" October 2015. (Fraser Interrogatory Resp. (dkt. #89-13) 4-5.)

A "kick off" meeting was held October 12-13, 2015, at Fraser Shipyards. Interlake's Chad Kidder organized the meeting and representatives of Bay Engineering, Benson Electric, Fraser Shipyards, Interlake, MAST, Northern Engineering, Robinson Brothers, and Toromont attended. The agenda for that meeting specifically referenced an "Asbestos Abatement Plan," but not a lead abatement plan. Fraser's engineering vice president, Curelli, however, acknowledges that at this "kick-off" meeting Interlake informed Fraser about the possibility of lead paint on the *Jackson*.

On October 23, 2015, Matt James, a Fraser production coordinator working on the *Jackson*, emailed a painting contractor for a cost quote for painting the *Jackson*'s engine room. Six days later, James further advised the contractor to "be aware that paint in this area may contain lead," and he offered to do a walk-through inspection with the contractor. James separately obtained a quote from Robinson Brothers about removing lead paint from

the *Jackson*'s engine room on November 30, 2015. Interlake acknowledges all of this activity, while contending that the contemplated engine room paint removal was not part of the winter or repowering work Interlake originally contracted to undertake, so *Interlake* never took on this remediation work. (Interlake's Resp. to Pls.' PFOF (dkt. #132) ¶ 61.) While James emailed Interlake's fleet engineer, Dale Miller, a quote for painting the *Jackson*'s engine room on December 4, 2015, Miller ultimately declined to have Fraser perform this additional task, and James testified that Interlake "decided not to pursue this because of cost. And I think more importantly, it would have delayed delivery of the ship." (James Dep. (dkt. #80) 43:22-44:9.)

On December 15, 2015, representatives of Fraser and Interlake met again. At that time, Interlake had not relinquished control of the *Jackson* for the repowering project.[16] During this meeting, Interlake specifically informed Fraser that the *Jackson* likely contained lead paint. Interlake's representatives also informed Fraser that other shipyards had policies and procedures for detecting lead paint and monitoring air quality for worker safety. In response, Interlake's Sharp maintains that Fraser's Curelli "assured Interlake that Fraser had a system in place for dealing with lead paint and other toxins." (Sharp Decl. (dkt. #72) ¶ 24.) Wolny also testified that in mid-December 2015, Curelli "stated Fraser had a procedure for testing and discovery of the lead." (Wolny Dep. (dkt. #59) 71:17-72:7.) Although plaintiffs purport to dispute that (Pls.' Resp. to Interlake's PFOF (dkt. #110) ¶ 36), Curelli testified that Fraser did have a lead remediation policy at that

---

[16] Of course, plaintiffs contend that Interlake *never* relinquished control over the *Jackson*. This is one of the major disputes remaining.

time.  (Curelli Dep. (dkt. #57) 100:9-11.)  Plaintiffs dispute this as well.  (Pls.' Resp. to Interlake's PFOF (dkt. #110) ¶ 37.)[17]

On January 6-7, 2016, an OSHA inspector visited Fraser Shipyards.  The inspector, Keriann Perna, voiced concerns to Curelli about ventilation and smoke on the *Jackson*, which he then summarized to others.  (Curelli Dep. (dkt. #57) 107:12-14, 108:15-19, 109:12-18.)  Curelli testified that he could not remember the lead testing performed after the OSHA inspector's January visits, but recalled that "it was a topic of discussion . . . a point of discussion for all the supervisors to re-emphasize using the . . . existing policy." (*Id.* at 114:7-19.)

For his part as Interlake's onsite representative, Wolny asserts that he was informed that lead remediation procedures would be handled by Fraser during a January 8, 2016, meeting.  While plaintiffs argue that this testimony is inaccurate (Pls.' Resp. to Interlake's PFOF (dkt. #110) ¶ 39), Wolny's Weekly Repower Reports beginning on January 8 specifically noted that Fraser "requires a procedure to deal with the discover[y] of lead paint."  (Weekly Repower Reports (dkt. #79-2) 14, 21, 27, 32, 36, 42, 47, 52, 57, 64, 75, 84.)  On January 14, 2016, Interlake's safety manager Sam Allgood also emailed Interlake's Senior VP Bob Dorn, advising that

> Fraser is treating areas and components of the engine room as
> if there is lead paint.  However, they do not have a written
> policy; they have not done any testing.  And it doesn't appear
> that they are monitoring as if there is lead paint.  l believe this
> a general industry requirement as per 29 CFR 1910.1025, . . . .
> I mentioned to [Curelli] that it is a valid concern and should

[17] Fraser purports to dispute these proposed facts, however its responses appear limited to challenging the materials cited as "not support[ing] the proposed fact[s]."  (*See* Fraser Resp. to Interlake's PFOF (dkt. #102) ¶¶ 35-37.)

> they start testing I would like to know the results . . . especially when our guys, including myself are onboard.
>
> [Wolny] had a progress meeting late morning today and mentioned the concern with lead, or the potential to be exposed. It is my understanding that he mentioned this topic a few weeks ago and nothing has been done to address his concern. Next week we have a follow-up meeting regarding fire emergency response items discussed on Tuesday, 1 plan on asking what steps they have taken for this as well.

(Jan. 14, 2016 Email (dkt. #94-8) 2.) Tellingly, Dorn responded: "Thanks for this information. This is all on Fraser and compliance should not be directed by us. We should ask reasonable questions and monitor[]out comes. Please keep me appraised." (*Id.*)

Beginning on January 15, 2016, Wolny's Weekly Repower Reports noted "Lead paint -- no test has been performed" and "Yard does not have a safety coordinator/manager." (Weekly Repower Reports (dkt. #79-2) 27, 32, 36, 42, 47, 52, 57, 64, 75, 84.) By January 22, 2016, Interlake's Phil Moore "had concern[s] that what the shipyard had told us was being done may not always be[] followed." (Moore Dep. (dkt. #77) 64:16-65:1.)[18] Similarly, Wolny's Weekly Repower Report #15, reported:

> Late on March 25th two workers had gone to the hospital and were tested for lead poisoning, both came back positive. The yard brushed it off stating that they were "looking for time off". March 28th more workers had gone for lead poisoning testing, their results came back positive as well, on the 29th the yard shut down all work in the engine room. (With the exception of three welders that continued welding on the reduction gear and main engine foundations). All workers that have been on the ship have now been tested for lead poisoning and a clean-up contractor has been hired to abate the lead in the areas that will be disturbed. Unfortunately, the yard did not take any advice from Interlake at the beginning of the project and many

---

[18] Phil Moore became Interlake's vice president of engineering in November 2016. (Moore Dep. (dkt. #77) 8:18-22.)

weeks after that, if they had this could have been avoided.

(Weekly Repower Report (dkt. #79-2) 93.)

The repowering project was shut down in March 2016.  Before that, Fraser never informed Interlake's Wolny that lead levels on the *Jackson* violated OSHA exposure limits, and Fraser contends that it did not know that any limits were exceeded.  (*See* Fraser's Resp. to Interlake's PFOF (dkt. #102) ¶ 40.)  Wolny did not use personal protective equipment while aboard the *Jackson* during the time period in which plaintiffs allege they were exposed to excessive amounts of lead.  (Wolny Dep. (dkt. #59) 132:23-133:8 (testifying that had he been informed about the risk of lead exposure he would have "wor[n his] PPE").  The Centers for Disease Control ultimately identified at least 357 workers who may have been exposed to lead at Fraser Shipyards between December 2015 and March 2016.  By March 28, 2016, emergency departments had informed the Minnesota and Wisconsin Departments of Health, and Minnesota Poison Control System that shipyard workers had high blood lead levels related to their work on the *Jackson*.  Before work on the *Jackson* was shut down, Fraser admits that it lacked proper protections to prevent particulates on clothing from migrating into the locker room and cafeteria.

### F.  Insurance Requirements and the Shipbuilding Contract

The Shipbuilding Contract detailed that Interlake

> shall not be responsible or liable for personal injury or death of any employee, contractor, or independent contractor of [Fraser] arising out of or in any way connected with the performance of this Contract . . . and [Fraser] shall indemnify, protect, defend (with counsel of [Interlake's] choosing) and hold harmless [Interlake] and all of [Interlake's] officers, agents, and employees and [Interlake's] vessel from any and all

> claims, suits, and judgments against [Interlake] from any and
> against all claims, costs, expenses, actions, proceedings, suits,
> demands and liabilities whatsoever arising out of or in
> connection with such personal injury or death.

(Shipbuilding Contract (dkt. #72-1) 22.)  Likewise, Fraser agreed to "maintain policies of insurance" "[d]uring the entire period of construction to and including the Redelivery Date," including "Comprehensive General Liability or Marine Liability/Ship Repairer's insurance . . . against bodily injury, death and property damage," which would "specifically cover the contractual liabilities" assumed in the Shipbuilding Contract.  (*Id.* at 19.)[19]  This insurance policy needed to "delete any provisions that might exclude coverage to [Interlake] for claims by [Fraser's] employees on the grounds of that employment relationship."  (*Id.*)

Capstan's Dave Steininger,[20] a business manager, informed Interlake on August 22, 2015, that "[w]e are working on finalizing the insurance requirements as stipulated in the contract.  As of now I do not see any issues with procuring this level of insurance."  (Aug. 22, 2015 Email (dkt. #107-1) 2.)  Steininger emailed Interlake on November 22, 2015, saying that he "hope[d] to have the certificate out the week of the 30th for you to review prior to the boat[']s arrival."  (Nov. 22, 2015 Email (dkt. #107-2) 2.)  At that time, he also expressed being "comfortable that we are fully insured."  Even so, Interlake and Fraser dispute whether Steininger was referring to owner furnished equipment or another

---

[19] The Redelivery Date was defined by the Shipbuilding Contract as a date "on or before the close of business on June 28, 2016" (Shipbuilding Contract (dkt. #72-1) 7-8), yet the *Jackson* was not returned to Interlake until September 25, 2016.

[20] Interlake contends that Steininger actually worked for Fraser, but this distinction is unlikely to be material.  The court notes that his email address has a capstancorp.com domain name.

insurance requirement. (Fraser's Resp. to Interlake's Add'l PFOF (dkt. #131) ¶ 2.) Regardless, on December 11, 2015, Interlake received a Certificate of Liability Insurance reflecting Fraser's liability insurance from October 2015 until October 2016. (*See* Certificate of Liability Ins. (dkt. 364-4) 2.) While the Certificate did not specifically include information about a lead exclusion, it did reference the insurance policy with that exclusion. Moreover, the Marine General Liability insurance policy Fraser obtained included 28 exclusions.

Interlake tendered its defense of this lawsuit to Fraser under Article 10 of the Shipbuilding Contract on October 27, 2017. Fraser denied the tender on November 3, 2017. During the repowering project, Fraser had marine general liability with Travelers Property Casualty Company of America -- Policy ZOL-13T50416-ND -- which listed Interlake as an additional insured, but contained an exclusion for "[l]oss, injury, demand or expense arising out of the actual, alleged or threatened absorption, ingestion or inhalation of asbestos, lead, biphenyl, silica or benzene . . . or existence of asbestos, lead, biphenyl, silica or benzene in any form." (Travelers Policy (dkt. #71-3) 40.) On October 27, 2017, Interlake also attempted to tender its defense of this lawsuit directly to Travelers under Fraser's insurance policy. Travelers rejected that tender as well under the lead exclusion on December 22, 2017.

OPINION

Before the court are three motions for summary judgment: (1) Interlake's motion on plaintiffs' claims; (2) Interlake's motion on its crossclaims against Fraser; and (3) Fraser's motion on plaintiffs' claims and Interlake's crossclaims. Summary judgment

is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact" and it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The district court is not "to weigh the evidence and determine the truth of the matter but [rather] to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If a reasonable factfinder could not find for the non-moving party based on the record as a whole, summary judgment is appropriate. *Tajonera v. Black Elk Energy Offshore Operations, L.L.C.*, Nos. 13-0366, 13-0550, 13-5137, 13-2496, 13-5508, 13-6022, 13-6099, 13-6413, 14-374, 2014 WL 5113322, at *7 (E.D. La. Oct. 10, 2014) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986)). As in *Holder*, there are simply too many material facts in dispute to grant summary judgment, at least as to plaintiffs' claims and Interlake's crossclaims.

## I. Claims Against Interlake

As both plaintiffs and Interlake recognize, this court already addressed in *Holder* a number of questions regarding the applicability of § 905(b) and the duties Interlake owed to those working at Fraser Shipyards. While Interlake contends that "the new evidence, authorities, and arguments" raised in this case entitle it to summary judgment (Interlake Mot. Summ. J. on Pls.' Claims Opening Br. (dkt. #67) 2), the court simply disagrees. More specifically, the factual record has not changed significantly enough to (1) remove the "vessel" question from the jury or (2) conclude that Interlake breached or lacked any duties to plaintiffs. As more fully set forth in *Holder*, 288 F. Supp. 3d at 930-32, 934-39, factual disputes precluding summary judgment include whether:

- The *Jackson* was a "vessel";[21]

- Interlake had control over the *Jackson*;

- The risks of lead exposure were inherent in Fraser's work;

- Interlake had actual knowledge of the risk posed to workers by the lead paint; and

- Fraser's handling of the lead paint was "obviously improvident."

Accordingly, Interlake's motion for summary judgment on plaintiff's claims will be denied.

## II. Claims Against Fraser

### A. Borrowed Employee Doctrine

As in *Holder*, Fraser Shipyards contends that it was plaintiffs' "borrowing employer." (Fraser Opening Br. (dkt. #62) 1.)  Plaintiffs contend that factual disputes here "should preclude summary judgment and be submitted to the ultimate trier of fact."  (Pls.' Opp'n to Fraser's Mot. Summ. J. (dkt. #88) 4.)  As in *Holder*, the parties frame their arguments under the nine-factor test from *Capps v. N.L. Baroid-NL Industries, Inc.*  (*See* Fraser Opening Br. (dkt. #62) 3 (citing to the test); Pls.' Opp'n to Fraser's Mot. Summ. J. (dkt. #88) 3-4 (same); *see also*) *Holder*, 288 F. Supp. 3d. at 940 (citing *Capps*, 784 F.2d 615, 616-17 (5th Cir. 1986)).

Of the plaintiffs in this case, Holden presents facts closest to those presented by the plaintiff in *Holder*, because both were employed by Tradesmen and assigned to Fraser under the Client Services Agreement.  Unlike *Holder*, however, where a vast majority of the nine

---

[21] In fairness, Interlake has provided more detail than in *Holder* regarding the extent of the renovations made to the *Jackson* during the repowering project, calling into greater question whether it qualified as a "vessel" for some or part of that project, but not so much that summary judgment is appropriate given the considerations required.  *See generally Holder*, 288 F. Supp. 3d at 930-32.

*Capps* factors weighed in favor of finding borrowed employee status -- making the LHWCA his only recourse against Fraser-- there are too many factual disputes here for the court to reach the same conclusion as to any of the plaintiffs.

### 1. Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

As to the most important *Capps* factor, Fraser contends that it controlled Holden and his work based on: (1) its agreement with Tradesmen, which provided that *Fraser* was "solely responsible for directing, supervising and controlling Tradesmen employees as well as their work"; and (2) the contention that "[a] Fraser foreman directed, supervised, controlled, and monitored Holden's work on a daily basis." (Fraser Opening Br. (dkt. #62) 3.) Plaintiffs do not dispute the contractual language relied upon by Fraser in (1), but they object that the affidavit of Farkas does not establish that Fraser -- through foreman Timothy Pierce or otherwise -- monitored, supervised, controlled or directed Holden's work as set forth in (2). (Pls.' Opp'n to Fraser's Mot. Summ. J. (dkt. #88) 6-7.)

As to Pekkala and Perrin, Fraser contends that: (1) "CJS was just as much a lending employer to Fraser as Tradesmen" (Fraser Reply to Pls.' Opp'n (dkt. #119) 3); and (2) it exercised control over their work, as it "controlled the general direction of workers supplied by CJS" and "exercised control-in-fact" over their work (Fraser Opening Br. (dkt. #62) 5-6, 8-9). Plaintiffs again agree that the contract gave Fraser the right of "general control," but note that the contract also characterizes CJS as an "Independent Contractor" and required CJS to provide, among other things, "competent supervision." (Pls.' Opp'n to Fraser's Mot. Summ. J. (dkt. #88) 8.) Plaintiffs further dispute the assertion that Fraser

actually did supervise these plaintiffs' work, and again they argue that the Farkas affidavit is insufficient to establish control. (*Id.* at 9.)

Because there appears to be legitimate factual disputes, this factor does not weigh in favor *or* against borrowed employee status.

### 2. Whose work is being performed?

Fraser contends that Holden was working on its behalf (Fraser Opening Br. (dkt. #62) 3), while plaintiffs contend Fraser has failed to put forward admissible evidence regarding this factor, also making it neutral or weightless. (Pls.' Opp'n to Fraser's Mot. Summ. J. (dkt. #88) 11.) In *Holder*, this court explained that "[b]ecause Tradesmen's business involved providing skilled employees to other companies, Holder was not performing work for Tradesmen, at least not directly." (*Id.* at 10-11 (quoting *Holder*, 288 F. Supp. 3d at 942).) The court sees no reason for the analysis to differ here.[22] Accordingly, this factor weighs in favor of borrowed employee status, at least as to Holden.

As to Pekkala and Perrin, there is a question about whether their work was furthering the business of Fraser or CJS. If CJS was a subcontractor instead of a company renting out laborers, then it is likely that these plaintiffs were furthering the business of CJS. Accordingly, there are facts in dispute as to Pekkala and Perrin.

### 3. Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

As to Holden, Fraser and plaintiffs agree that the court's analysis in *Holder* results

---

[22] Plaintiffs also argue that "a reasonable juror could just as easily find that the work was furthering Interlake's business, as opposed to Fraser's." (Pls.' Opp'n to Fraser's Mot. Summ. J. (dkt. #88) 11.) The court rejected a similar argument in *Holder*.

in this factor weighing in favor of borrowed employee status. (*See* Fraser Opening Br. (dkt. #62) 4; Pls.' Opp'n to Fraser's Mot. Summ. J. (dkt. #88) 11.) However, as to the remaining plaintiffs, the same factual disputes as to whose business was being furthered preclude a finding that there was a meeting of the minds between CJS and Fraser. For Pekkala and Perrin, this factor carries no weight at summary judgment.

### 4. Did the employee acquiesce in the new work situation?

Fraser argues that plaintiffs objectively acquiesced to working for or under the direction of Fraser. (Fraser Opening Br. (dkt. #62) 4, 6, 9.) In response, plaintiffs contend that they could not acquiesce to a work situation involving exposure to lead unless provided with this vital information. (Pls.' Opp'n to Fraser's Mot. Summ. J. (dkt. #88) 14 (quoting *Langfitt v. Fed. Marine Terminals, Inc.*, 647 F.3d 1116, 1126 (11th Cir. 2011) ("It plainly would be unfair, we have acknowledged, to bar an employee from bringing tort actions against a negligent principal when the employee did not have an opportunity to evaluate the risks posed by the new employment and to assume them consciously.").) [23]

As Fraser argues (Fraser Reply to Pls.' Opp'n (dkt. #119) 5), however, this factor presents an objective question: "whether [plaintiff] had an opportunity to observe the conditions under which he was working and whether, after such an opportunity, he chose to continue working." *Holder*, 288 F. Supp. 3d at 942 (quoting *Barrios v. Freeport-McMoran Res. Partners Ltd.*, Civ. A. Nos. 93-0092, 1994 WL 90456, at *4 (E.D. La. Mar. 11, 1994)).

---

[23] Plaintiffs did not make this argument in *Holder*, resulting in this court relying on other portions of *Langfitt* to find that Holder had objectively acquiesced in the conditions of his employment (that he had agreed to be lent out by agreeing to work for Tradesmen).

At Tradesmen's direction, Holden began working at Fraser Shipyards in January 2016, and he continued to work there into either February or March of 2016. Perrin worked at Fraser Shipyards from the end of January until the end of March 2016, and Pekkala worked until late July 2016. While these periods would have given them ample opportunity to observe their working conditions, Fraser offers nothing to suggest that plaintiffs were aware of the specific presence of lead. Accordingly, this factor weighs against borrowed employee status.

### 5. Did the original employer terminate his relationship with the employee?

As in *Holder*, Fraser contends that: "Tradesmen had no meaningful control over Holden during his work at Fraser." (Fraser Opening Br. (dkt. #62) 4.) Plaintiffs argue in response that "if Mr. Holden had issues with his employment, including receiving payment, he had to raise those issues with Tradesmen." (Pls.' Opp'n to Fraser's Mot. Summ. J. (dkt. #88) 16.) This is not meaningfully different from the situation in *Holder*. In both cases, Tradesmen was responsible for paying the plaintiffs, withholding taxes and paying insurance premiums. Accordingly, this factor weighs in favor of borrowed employee status as to Holden.

As to Perrin and Pekkala, Fraser contends that CJS "had no meaningful control over" their work because "Fraser directed, supervised, controlled, and monitored" their work and CJS "only" provided these plaintiffs with their paychecks. (Fraser Opening Br. (dkt. #62) 7, 10.) As plaintiffs note, however, whether Fraser supervised these plaintiffs is disputed, and the contract required CJS to provide "competent supervision." (Pls.' Opp'n to Fraser's Mot. Summ. J. (dkt. #88) 16-17.) Accordingly, this factor cannot be weighed in favor of or against Fraser on summary judgment because of factual disputes as

to Perrin and Pekkala.

### 6. Who furnished tools and place for performance?

Fraser further notes, as in *Holder*, that it provided Holden with certain safety equipment, heavy equipment, and the place for performance. (Fraser Opening Br. (dkt. #62) 4.) Plaintiffs respond that this factor is "neutral at best" because Holden "brought all of his own hand tools," and Fraser merely supplied other work supplies and equipment and Interlake provided the place of performance -- the *Jackson*. (Pls.' Opp'n to Fraser's Mot. Summ. J. (dkt. #88) 17.) Plaintiffs are correct, and this factor is neutral as to Holden.

As to Perrin, there are disputes requiring factfinding, in light of his deposition testimony that he brought none of his own tools and his interrogatory response that suggests he brought his own "hand tools" and protective gear.[24] Regardless, he was provided with heavy equipment and the jobsite. The parties agree that Pekkala did not bring his own tools. (Fraser Opening Br. (dkt. #62) 7; Pls.' Opp'n to Fraser's Mot. Summ. J. (dkt. #88) 17.) Accordingly, this factor weighs in favor of borrowed employee status for Pekkala and Perrin.

### 7. Was the new employment over a considerable length of time?

The parties agree that this factor is neutral for Holden because he worked for less than two months. (Fraser Opening Br. (dkt. #62) 4; Pls.' Opp'n to Fraser's Mot. Summ. J. (dkt. #88) 18.) Likewise, as Fraser concedes (Fraser Opening Br. (dkt. #62) 10), Perrin's slightly more than two-month employment is neutral. Finally, as to Pekkala, as noted

---

[24] See discussion *supra* n.7.

above, he worked at Fraser Shipyards for nearly six months, which is a considerable amount of time and weighs in favor of his borrowed employee status.

### 8. Who had the right to discharge the employee?

Fraser again argues that *Holder* dictates how to weigh this factor because Holden was subject to the same Fraser-Tradesmen agreement giving Fraser the "sole discretion" to release a Tradesmen employee from Fraser Shipyards. (Fraser Opening Br. (dkt. #62) 5 (citing *Holder*, 288 F. Supp. 3d at 943).) Plaintiffs concede this point. (Pls.' Opp'n to Fraser's Mot. Summ. J. (dkt. #88) 19.) Accordingly, this factor weighs in favor of borrowed employee status for Holden.

While Fraser contends that it had the right to discharge the other plaintiffs as well, its ability to do so is in fact disputed with respect to both Pekkala and Perrin. (*Compare* Fraser Opening Br. (dkt. #62) 8, 10 *with* Pls.' Opp'n to Fraser's Mot. Summ. J. (dkt. #88) 19-20.) Accordingly, for both, this factor requires factfinding and cannot be weighed.

### 9. Who had the obligation to pay the employee?

The parties agree that Fraser paid Tradesmen and Tradesmen then paid Holden as in *Holder*. (Fraser Opening Br. (dkt. #62) 5 (citing *Holder*, 288 F. Supp. 3d at 943-44); Pls.' Opp'n to Fraser's Mot. Summ. J. (dkt. #88) 20.) Accordingly, this factor also weighs in favor of borrowed employee status for Mr. Holden.

Similarly, plaintiffs Pekkala and Perrin were paid by CJS, and CJS paid their pension fund and social security contributions, but the contract required CJS to agree to "use all Project payments to pay its Project subcontractors and suppliers, and that all such

payments made by . . . Contractor to Subcontractor, are made in trust for the use and benefit of Subcontractor's project employees, subcontractors, and suppliers" after Fraser paid CJS "for the satisfactory performance of the Subcontractor's Work at the CURRENT CONTRACT LABOR RATES." (Master Agreement (dkt. #63-3) 4.) Since the money CJS ultimately used to pay the plaintiffs again came from Fraser, this factor would also weigh in favor of borrowed employee status.

### 10. Overall Weights of Factors

Unlike in *Holder*, there are too many factual disputes in applying the nine *Capps* factors for the court to conclude at summary judgment whether the borrowed employee doctrine controls, although a strong argument could be made as to Holden. Even as to Holden, the most important factor remains in dispute, two factors are neutral and one factor weighs against application of the doctrine. Therefore, the underlying factual disputes discussed above must be resolved by a jury before the court can decide the application of the doctrine as a matter of law. *See Tajonera*, 2014 WL 5113322, at *9 (explaining that "factual disputes concerning each factor should be submitted to the fact-finder prior to the Court making its ruling on whether the employee was a borrowed employee at the time of his alleged injury"). Accordingly, Fraser's motion for summary judgment on plaintiffs' status under the borrowed employee doctrine will be denied.

### B. Plaintiffs' Request for Punitive Damages

Next, Fraser seeks summary judgment on plaintiffs' claims for punitive damages. (Fraser Opening Br. (dkt. #62) 11.) As discussed above, Fraser is not entitled to summary

judgment on the borrowed employee doctrine, so the court will consider its alternative bases for precluding a punitive damages award under maritime and Wisconsin law.[25] Fraser's argument basically boils down to "the evidence of record is insufficient" to support an award of punitive damages because: (1) its "conduct does not rise to the level of deliberate indifference necessary to establish the wanton, willful, or outrageous conduct required . . . for punitive damages under general maritime law"; and (2) "the record does not establish by clear and convincing evidence a showing of the level of evil intent, maliciousness, or purposeful and intentional disregard of the plaintiffs' rights to support an award of punitive damages" under Wisconsin law. (*Id.* at 12-14.)

As both Fraser and plaintiffs note, punitive damages are generally available under maritime law where defendant's conduct is "wanton, willful, or outrageous." *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 414 n.4 (2009); *see also* Thomas J. Schoenbaum, *Admiralty & Mar. Law* § 5-10 (6th ed. 2018) ("To recover punitive damages, the claimant must show deliberate wrongdoing -- willful, wanton, grossly negligent, or unconscionable conduct that shows a callous disregard for the rights of others -- the equivalent of *mens rea* in criminal law." (citing *In re Marine Sulphur Queen*, 460 F.2d 89, 105 (2d Cir. 1972); *Collins v. A.B.C. Towing LLC*, 2016 AMC 170 (E.D. La. 2015))). Similarly, under Wisconsin law a "plaintiff

---

[25] Fraser's assertion that "[t]he LHWCA does not include a provision for punitive damages, and consequently, Fraser is entitled to summary judgment on plaintiffs' claims for punitive damages" obviously depends on its argument that Fraser was plaintiffs' borrowing employer under the LHWCA. (*See* Fraser Opening Br. (dkt. #62) 11; Fraser Reply to Pls.' Opp'n (dkt. #119) 7.) While plaintiffs spend nearly four pages addressing the appropriateness of punitive damages under the LHWCA and maritime law generally, the cases cited address § 905(b) -- vessel liability -- not § 905(a) -- employer liability -- (Pls.' Opp'n to Fraser's Mot. Summ. J. (dkt. #88) 23-26) which, according to Fraser, should apply. Accordingly, any preclusive effect of LHWCA on an award of punitive damages will have to await the jury's resolution of the factual disputes underlying application of the borrowed employee doctrine.

may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." Wis. Stat. Ann. § 895.043(3).

Here, Fraser is not entitled to summary judgment under either standard. This is because plaintiffs have "ma[d]e a prima facie case from which a jury could reasonably conclude that Fraser acted with the requisite degree of conduct to warrant the imposition of punitive damages" under either Wisconsin or Maritime law as seen by the factual background detailed above. (Pls.' Opp'n to Fraser's Mot. Summ. J. (dkt. #88) 32; *id.* at 27-32.) Assuming sufficient evidence is admitted at trial to support an inference that Fraser acted with deliberate indifference to the risks faced by plaintiffs and other workers on the *Jackson*, as would appear in the record before the court on summary judgment, then the trier of fact may have the discretion to award punitive damages.

## III. Crossclaims Against Fraser

Finally, Interlake asserts two crossclaims against Fraser Shipyards. (*See* Amend. Answer (dkt. #43) 25-28.) First, Interlake seeks a declaration that Article 10(d)(i) of the Shipbuilding Contract was valid and required Fraser to defend and indemnify Interlake. (*Id.* at 25-26.) Second, Interlake alleges that Fraser breached the Shipbuilding Contract by failing to provide insurance coverage as required. (*Id.* at 26-27.) Both Fraser and Interlake seek summary judgment on these crossclaims. (Fraser Mot. Summ. J. (dkt. #60)

1; Interlake Mot. Partial Summ. J. (dkt. #68) 1-2).[26]  For reasons already addressed and explained further below, the record here precludes entry of summary judgment on the first crossclaim, but only part of the second.

## A. Indemnification Claim

As noted previously, the Shipbuilding Contract requires Fraser to "indemnify, protect, defend (with counsel of [Interlake's] choosing) and hold [Interlake] harmless . . . from any and all claims, suits, and judgments . . . arising out of or in connection with such personal injury or death" of Fraser's "employee, contractor, or independent contractor." (Shipbuilding Contract (dkt. #72-1) 22.)  Interlake contends that this language entitles it to be indemnified for any injuries suffered by plaintiffs while working on the *Jackson*. (Interlake Partial Summ. J. Opening Br. (dkt. #69) 5-6.)  However, the LHWCA provides that "the employer shall not be liable to the vessel . . . directly or indirectly and any agreements or warranties to the contrary shall be void."  33 U.S.C. § 905(b); Schoenbaum, *supra*, § 7-19 ("Vessels, therefore, may not obtain indemnity or contribution even by contract from a stevedore or other maritime employer for amounts paid because of liability to an injured longshoreman.").  Moreover, as discussed above, whether the *Jackson* was a vessel remains a question for the jury to determine.

Fraser argues further that even if the *Jackson* was not a vessel during plaintiffs' work,

---

[26] In part, Fraser argues that it is entitled to summary judgment on the crossclaims arising from Holden's injuries because he did not work on the repowering project, but rather on work under a separate purchase order that did not contain similar provisions.  (Fraser Opening Br. (dkt. #62) 14.)  However, since the type of work Holden did is disputed for reasons discussed already, Fraser is not entitled to summary judgment on this basis, and the following will treat Holden like the other plaintiffs for purposes of considering Interlake's crossclaims against Fraser at summary judgment.

Interlake still is not entitled to indemnification under the LHWCA (Fraser Reply to Interlake's Opp'n (dkt. #128) 6-7), while Interlake disagrees, arguing that "as written," § 905(b) "does not bar contractual indemnity claims by non-vessels" (Interlake Reply to Fraser's Opp'n (dkt. #133) 6). While "[n]on-vessel third parties . . . may not maintain actions for tort-based indemnity or contribution against the employer" under the LHWCA, however, "[a] vessel may enforce an indemnity contract or contribution against a stevedore that is not the employer of the injured longshoreman" and "[a] non-vessel may also enforce an indemnity contract against a maritime employer." Schoenbaum, *supra*, § 7-19 (citations omitted); *see also Smith v. United States*, 980 F.2d 1379, 1380 (11th Cir. 1993) (holding that the employer was "not insulated from its contractual obligation to indemnify a non-vessel") (adopting *Pippen v. Shell Oil Co.*, 661 F.2d 378 (5th Cir. 1981)). Accordingly, for reasons already discussed, neither side is entitled to summary judgment on Interlake's indemnification claim because there are too many facts in dispute to resolve on summary judgment: (1) whether Fraser was the borrowing employer of the plaintiffs; *and* (2) whether the *Jackson* was a vessel at the time plaintiffs were injured. Both of these issues should be resolved in the first two phases of trial.

### B. Additional Insured Claims

To begin, Fraser argues that it is entitled to summary judgment on any other claim under the Shipbuilding Contract because liability would violate the § 905(b) prohibition on direct or indirect liability of employers to vessels. (Fraser Opening Br. (dkt. #62) 16.) As just reviewed, however, whether Fraser qualifies as an "employer" and whether the *Jackson* qualifies as a "vessel" are both in dispute. Even so, vessels *are* able to sue employers

for the breach of an additional assured contract. *See Voisin v. O.D.E.C.O. Drilling Co.*, 744 F.2d 1174, 1175 (5th Cir. 1984); *id.* at 1177 ("Neither [§ 905(b)] nor its legislative history suggest that additional assured clauses such as the one before us are a proscribed form of indirect liability."); *see also* Schoenbaum, *supra*, § 7-19. "[A]n agreement as to which party should bear the burden of procuring insurance is not an illegal contract of indemnity under section 905(b)." *Voisin*, 744 F.2d at 1178. Accordingly, Fraser would not be entitled to summary judgment on this basis, even if it were plaintiffs' borrowing employer *and* the *Jackson* were a vessel.

Turning to Fraser's insurance requirements under the Shipbuilding Contract, Interlake contends that Fraser breached "by obtaining an insurance policy that did not cover Interlake for bodily injury claims brought by Fraser's employees (i.e., Plaintiffs) on the grounds of that employment relationship." (Interlake Mot. Partial Summ. J. Opening Br. (dkt. #69) 3.) Fraser responds that it did not need to obtain insurance without a lead exclusion, rather the Shipbuilding Contract required the deletion of provisions that could exclude coverage of its employees' claims against Interlake "on the grounds of that employment relationship." (Fraser Opp'n to Interlake's Mot. for Partial Summ. J. (dkt. #101) 1, 4.) More specifically, Fraser contends that "on the grounds of that employment relationship" is limited to "claims relating to the arrangement between Fraser and its employees," and does not apply to plaintiffs' claims because: (1) plaintiffs were borrowed -- not actual -- employees; (2) the phrase referred to the Employment-Related Practices and Employee Benefits Liability Exclusions contained in the insurance policy; (3) the "employment relationship" was unrelated to lead exposure; and (4) since the Shipbuilding

Contract did not expressly require the deletion of the lead exclusion, such a requirement should not be inferred.  (Fraser Reply to Interlake's Opp'n (dkt. #128) 3-5.)  On the other hand, Interlake advocates a broader meaning:  that plaintiffs' claims qualify as "on the grounds of" their "employment relationship" because they allege lead poisoning caused by hazardous work conditions.  (Interlake Opp'n to Fraser's Mot. Summ. J. (dkt. #106) 3-4.)

Courts charged with contract construction aim "to ascertain the true intentions of the parties as expressed by the contractual language" with the purpose of "determin[ing] what the parties contracted to do as evidenced by the language they saw fit to use."  *State ex rel. Journal/Sentinel, Inc. v. Pleva*, 155 Wis. 2d 704, 711, 456 N.W.2d 359, 362 (1990).  As such, "an agreement should be given a reasonable meaning so that no part of the contract is surplusage."  *Id.*  Likewise, "[l]itigants should not be able to resort to rules of construction for the purpose of modifying the contract or creating a new contract; and a court need not resort to either construction or case law to bolster its recognition of that plain meaning."  *Garriguenc v. Love*, 67 Wis. 2d 130, 135, 226 N.W.2d 414 (1975).

Here, the court agrees with Fraser and Interlake that the language in the Shipbuilding Contract is unambiguous.[27]  Article 10(a)(i)(B) requires Fraser to "maintain policies of insurance" "[d]uring the entire period of construction," including "Comprehensive General Liability or Marine Liability/Ship Repairer's insurance . . . against bodily injury, death and property damage," which would "specifically cover the contractual liabilities" assumed therein.  (Shipbuilding Contract (dkt. #72-1) 19.)  "Such insurance"

---

[27] "Words or phrases in a contract are ambiguous when they are reasonably or fairly susceptible to more than one construction."  *Garriguenc*, 67 Wis. 2d at 135.

also "shall delete any provisions that might exclude coverage to [Interlake] for claims by [Fraser's] employees on the grounds of that employment relationship." (*Id.*)

While this last clause requires that the insurance obtained not exclude claims by employees on the grounds of their employment relationship with Fraser, it literally says nothing about the *types* of claims that Fraser's employees could bring, only that the insurance coverage could not be denied based on the claimant's *status* as a Fraser employee. The parties understandably focus on Fraser's insurance policy's exclusions for "[l]oss, injury, demand or expense arising out of the actual, alleged or threatened absorption, ingestion or inhalation of asbestos, lead, biphenyl, silica or benzene . . . or existence of asbestos, lead, biphenyl, silica or benzene in any form." (Travelers Policy (dkt. #71-3) 40.) Those exclusions are obviously not "on the grounds of" any employment relationship, and thus these exclusions did not result in a breach of the Shipbuilding Contract. Accordingly, Fraser is entitled to summary judgment on Interlake's claim that it breached the Shipbuilding Contract by failing to delete a lead exclusion on the grounds of plaintiffs' employment relationship with Fraser.

To the extent that Interlake is asserting a crossclaim for Fraser's breach of the Shipbuilding Contract by improperly handling lead paint (*see* Amend. Answer (dkt. #43) 27), Fraser contends that Interlake failed to provide timely notice. In particular, Fraser points out that "Interlake was made aware of this claimed failure by [Wolny's] weekly reports" starting in January 2016, yet provided no notice of breach until more than a year and a half later with service of its crossclaims. (Fraser Opening Br. (dkt. #62) 19-20.) Since the Shipbuilding Contract detailed that Fraser would be "in default" only if it "fails

to perform any . . . undertaking of this Contract" *and* has "failed to cure such failure or take reasonable steps to cure such failure within fifteen (30) [sic] days of delivery of written notice of such failure by [Interlake]" (Shipbuilding Contract (dkt. #72-1) 15), Fraser contends it cannot be in default.  To the contrary, Fraser maintains by providing untimely notice on October 27, 2017 (by tendering the defense of this lawsuit), Interlake denied it an opportunity to cure the default before the Shipbuilding Contract expired.  (Fraser Opening Br. (dkt. #62) 18.)

Interlake responds that: (1) it did not need to provide notice; and (2) a contractual default was not required before it could sue for a breach of contract.  (Interlake Opp'n to Fraser's Mot. Summ. J. (dkt. #106) 2, 7.)  As Interlake points out, the Shipbuilding Contract specifies remedies for a default "*in addition* to all other remedies available at law or in equity."  (Shipbuilding Contract (dkt. #72-1) 16 (emphasis added).)  Interlake adds that if default was required, that condition precedent was met because Interlake *did* provide notice to Fraser on October 27, 2017, and Fraser failed to cure.  (Interlake Opp'n to Fraser's Mot. Summ. J. (dkt. #106) 7.)  Finally, covering all its bases, Interlake points out that even if default was required and unmet, its failure would be excused because Fraser's breach is incurable.  (*Id.* at 8.)

As noted, the Shipbuilding Contract required Fraser's "Comprehensive General Liability or Marine Liability/Ship Repairers insurance" to "specifically cover the contractual liabilities" assumed by Fraser under the contract.  (Shipbuilding Contract (dkt. #72-1) 19.)  The Shipbuilding Contract's "Scope of Work" detailed that "it is the Contractor's responsibility to safely remove any and all asbestos and lead paint that is disturbed as a

result of this conversion, all to the requirements of all local, state, and federal regulations." (*Id.* at 43.)[28] Accordingly, Fraser *was* contractually bound to remove lead paint disturbed during the project safely.

Since the Shipbuilding Contract provides specific remedies for default that are "in addition to all other remedies available at law or in equity" (*Id.* at 15-16), neither default nor notice and an opportunity to cure were a prerequisite for Interlake to bring a breach of contract claim against Fraser. Because Fraser was required to have insurance to cover its "contractual liabilities," which included safely removing disturbed lead paint, and the insurance policy obtained excluded injuries "arising out of the actual, alleged or threatened absorption, ingestion or inhalation of . . . lead," Fraser appears to have breached the Shipbuilding Contract. Nevertheless, unless Fraser is found to have failed to remove disturbed lead paint safely, then there is no breach of the Shipbuilding Contract, even if it failed to obtain proper insurance. Accordingly, Interlake is not entitled to summary judgment at this point. *See Northwestern Motor Car, Inc. v. Pope*, 51 Wis.2d 292, 296, 187 N.W.2d 200 (1971) (explaining that in Wisconsin, a breach of contract claim requires a valid contract, a breach thereof *and* damages caused by the breach).[29] Accordingly, should

---

[28] The Shipbuilding Contract also "incorporate[s]" the Scope of Work as "an integral part of this Contract." (Shipbuilding Contract (dkt. #72-1) 6.)

[29] The Shipbuilding Contract provides that

> The validity, construction, performance, enforcement and interpretation of this Contract shall be governed by and determined in accordance with the General Maritime Law and statutes of the United States and, where such law and statutes are inapplicable, by the laws of the State of Wisconsin applicable to contracts made and performed in said State, without regard to conflict of law provisions.

Fraser be found negligent during the liability phase of trial, the court will consider how best to determine what damages, if any, are appropriate for Fraser's breach of contract. (Interlake Partial Summ. J. Opening Br. (dkt. #69) 6.)[30]

## ORDER

IT IS ORDERED that:

1) Defendant Interlake's motion for summary judgment on plaintiffs' claims (dkt. #66) is DENIED.

2) Defendant Fraser Shipyards' motion for summary judgment (dkt. #60) is DENIED as to plaintiffs' claims and GRANTED IN PART and DENIED IN PART as to Interlake's crossclaims, as specified above.

3) Defendant Interlake's motion for partial summary judgment on its crossclaims against Fraser (dkt. #68) is DENIED.

4) Plaintiffs' motion to strike new evidence submitted by Fraser in its reply brief (dkt. #126) is DENIED.

5) Plaintiffs' motion to strike new evidence contained in Phil Moore's declaration (dkt. #136) is DENIED.

6) Plaintiffs' motion to supplement the summary judgment record (dkt. #156) is GRANTED.

Entered this 30th day of October, 2018.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

(*Id.* at 33.)

[30] For example, the Shipbuilding Contract precludes Fraser and Interlake from being liable to each other "for any consequential, incidental, indirect or punitive damages of any kind or character." (*Id.* at 17.)