DAVID S. GIBSON, MBA, MRC, - 09/19/2018

```
1                   IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF WISCONSIN
2


3


4    DONALD HOLDEN, BRANDON PEKKALA,  )
     and JOHN PERRIN,                 )
5                                     )
                 Plaintiffs,          )
6                                     )
          vs.                         )  Case No. 17-CV-636
7                                     )
     CAPSTAN CORPORATION, FRASER      )
8    SHIPYARDS, INC., NORTHERN        )
     ENGINEERING COMPANY, LLC,        )
9    and THE INTERLAKE STEAMSHIP      )
     COMPANY,                         )
10                                    )
                 Defendants.          )
11


12


13


14              Deposition of DAVID S. GIBSON, MBA, MRC, taken

15   before NADINE J. WATTS, CSR, RPR, and Notary Public,

16   pursuant to the Federal Rules of Civil Procedure for the

17   United States District Courts pertaining to the taking

18   of depositions, at Suite 3500, 20 North Clark Street, in

19   the City of Chicago, Cook County, Illinois, at 1:00

20   o'clock p.m. on the 19th day of September, A.D., 2018.

21


22


23


24


25
```

DAVID S. GIBSON, MBA, MRC, - 09/19/2018    Pages 2..5

Page 2

```
1              There were present at the taking of this
2    deposition the following counsel:
3              RAPOPORT LAW OFFICES, P.C., by
               MR. KEVIN D. KOJS
4              20 North Clark Street
               Suite 3500
5              Chicago, Illinois  60601
               (312) 327-9880
6              kkojs@rapoportlaw.com
7                 on behalf of the Plaintiffs;
8              BORGELT POWELL PETERSON & FRAUEN, S.C. by
               MS. BARBARA A. O'BRIEN
9              1243 North 10th Street
               Suite 300
10             Milwaukee, Wisconsin  53205
               (414) 276-3600
11             bobrien@borgelt.com
12                on behalf of Defendant Capstan Corporation;
13             (Appeared via telephone)
               JOHNSON KILLEN & SELLER by
14             MR. DARYL A. FUCHIHARA
               800 Wells Fargo Center
15             230 West Superior Street
               Duluth, Minnesota  55802
16             (218) 722-6331
               dfuchihara@duluthlaw.com
17
                  on behalf of Defendant Fraser Shipyards,
18                Inc.;
19             TUCKER ELLIS, LLP by
               MR. JOSEPH A. MANNO
20             950 Main Avenue
               Suite 1100
21             Cleveland, Ohio  44113
               (216) 696-4465
22             joseph.manno@tuckerellis.com
23                on behalf of Defendant The Interlake
                  Steamship Company.
24
25
```

Page 3

```
1              DEPOSITION OF DAVID S. GIBSON, MBA, MRC
2                   TAKEN SEPTEMBER 19, 2018
3
4    EXAMINATION BY                              PAGE
5    Ms. Barbara A. O'Brien       5, 121, 168, 198
6    Mr. Joseph A. Manno              92, 148, 191
7
8                      EXHIBITS
9                                                PAGE
10   DEPOSITION EXHIBIT 1                           5
        Curriculum vitae
11
     DEPOSITION EXHIBIT 2                           8
12      Testimony Report 1-1-14 through
        8-22-18
13
     DEPOSITION EXHIBIT 3                          13
14      Gibson File Review Notes
15   DEPOSITION EXHIBIT 4                          13
        Gibson File Review Notes
16
     DEPOSITION EXHIBIT 5                          13
17      Gibson File Review Notes
18   DEPOSITION EXHIBIT 6                          36
        Evaluee Interview Form
19
     DEPOSITION EXHIBIT 7                          49
20      Uses and Limitations of CPS
        Data on Work Disability
21
     DEPOSITION EXHIBIT 8                          60
22      Evaluee Interview Form
23   DEPOSITION EXHIBIT 9                          75
        Vocational Economic Assessment
24      for John Perrin
25
```

Page 4

```
1                 EXHIBITS (Continued)
2                                                PAGE
3    DEPOSITION EXHIBIT 10                        121
        Evaluee Interview Form
4
     DEPOSITION EXHIBIT 11                        122
5       Mississippi Permanent School Record
        Grades K-12 for Donald Holden
6
     DEPOSITION EXHIBIT 12                        139
7       Vocational Economic Assessment
        For Donald Holden
8
     DEPOSITION EXHIBIT 13                        148
9       U.S. Individual Income Tax Return
        2016 for Donald Holden
10
     DEPOSITION EXHIBIT 14                        150
11      E-mail from Mary Reid of Rapoport
        Law Offices to David Gibson dated
12      July 26, 2018
13   DEPOSITION EXHIBIT 15                        158
        Memorial Medical Oncology of
14      Cedar Lake record for Donald Holden
15   DEPOSITION EXHIBIT 16                        159
        Memorial Physician Clinics Neurology
16      Pass Road office/clinical notes for
        Donald Holden
17
     DEPOSITION EXHIBIT 17                        168
18      Vocational Economics Medical Care Cost
        Summary for Donald Holden
19
     DEPOSITION EXHIBIT 18                        174
20      School District of Maple, Maple, Wisconsin
        records for Brandon Pekkala
21
22
23
24
25
```

Page 5

```
1              DAVID S. GIBSON, MBA, MRC,
2    called as a witness herein, having been first duly
3    sworn, was examined upon oral interrogatories and
4    testified as follows:
5              EXAMINATION CONDUCTED BY MS. O'BRIEN:
6         Q   Mr. Gibson, my name is Barb O'Brien.  I
7    represent Capstan Corporation in this case.  And so I
8    will be asking you questions, and I'm sure some others
9    will as well.  But, first, if we can start with your
10   name.
11        A   Okay.  My name is David S. Gibson.  That's
12   spelled G-I-B-S-O-N.
13        Q   And I know you've given a lot of testimony, so I
14   don't have to tell you about the rules of the
15   deposition, correct?
16        A   I believe that's true.
17        Q   Okay.  You've been designated as an expert in
18   this case in vocational rehabilitation?
19        A   And economics, yes.
20        Q   And economics.  And that is with regard to
21   Donald Holden, Brandon Pekkala, and John Perrin?
22        A   Correct.
23            (Document marked as Deposition
24            Exhibit 1 for identification.)
25        Q   And just for the record, I want to show you
```

DAVID S. GIBSON, MBA, MRC, - 09/19/2018    Pages 6..9

Page 6

1  what's been marked Exhibit 1.  Is that a copy of your
2  CV?
3      A   It is.  And it is the most current and
4  up-to-date version.
5      Q   Do you hold any professional licenses or
6  certifications?
7      A   No.
8      Q   I noted that in 1979 you were a certified public
9  accountant for the state of Illinois.
10     A   Yes.
11     Q   Have you ever practiced public accounting?
12     A   No.
13     Q   Do you hold any kind of academic appointments?
14     A   I do not.
15     Q   The Master's that you hold, that's from the
16  University of Kentucky, College of Education?
17     A   The second Master's, yes.
18     Q   Okay.  And that's for rehabilitation counseling?
19     A   Yes.
20     Q   You obtained that in 2007?
21     A   Yes.
22     Q   And was that attending classes at the university
23  or was that an online program?
24     A   It was a distance program; somewhat online,
25  somewhat videoconferencing, and somewhat

Page 7

1  teleconferencing.
2      Q   So it wasn't ever actually going to the
3  university for classes?
4      A   That's right.
5      Q   Was that on a part-time --
6      A   No, actually, it's a full-time program.  It's a
7  program for people that already are in the field of
8  rehabilitation counseling, and they knock out any summer
9  breaks or spring breaks and put it within about a
10  year-and-a-half instead of a two-year program.
11     Q   And so do you forego some of the classes that
12  others might be required to take because of the --
13  you're already in the business of rehabilitation
14  counseling?
15     A   No.
16     Q   Have you ever had any medical training at all?
17     A   Not that at all qualifies me as a medical
18  expert.  Rehabilitation counseling does include some
19  training in the medical and psychosocial impacts of a
20  disability, but I can't diagnose or prescribe or
21  anything like that.
22     Q   What does that allow you to do?
23     A   It just helps me to evaluate the limitations
24  that arise from a disability and how they interplay or
25  interfere with a person's ability to work.

Page 8

1      Q   And so do you actually -- As part of your
2  position with regard to this case as an expert, are you
3  actually involved in evaluating the limitations?
4      A   Only by evaluating -- It's evaluating as
5  identified by a medical professional or
6  neuropsychological professionals, as may be the case in
7  this case.  So I'm not looking at the limitations that
8  Dr. Santa Maria or others may have identified in
9  evaluating how they impact the requirements of -- within
10  a competitive job market.
11     Q   Okay.  We'll get into that a little bit further,
12  but let me just show you what has been marked Exhibit 2.
13         (Document marked as Deposition
14         Exhibit 2 for identification.)
15     Q   Is that a list of your testimony for the last
16  four years?
17     A   Yes.  Actually, it's getting close to five years
18  actually.
19     Q   So it's from January of 2014 through August of
20  2018?
21     A   Correct.
22     Q   Okay.  And this contains both depositions and
23  court testimony?
24     A   Yes, and I believe there will probably be a
25  couple of arbitrations in there too.

Page 9

1      Q   Over the years how many depositions have you
2  given?
3      A   In total, it's about 750.
4      Q   How about in the last month?
5      A   I don't know.  I would say in a typical year now
6  I give about 65 to 70 depositions, but it will vary
7  widely from month to month.
8      Q   Okay.  So can you tell me in say September how
9  many are we on now?
10     A   I don't know.
11     Q   Did you do any this week already?
12     A   Yes, I had one this morning.
13     Q   And how about any earlier this week?
14     A   Yes.  Well, this one -- Oh, this doesn't have
15  anything -- This is September.  I believe I had at least
16  two before this one.
17     Q   And how about last week?  Did you have any
18  depositions last week?
19     A   I'm sorry, yes, the two involved -- So I had one
20  today and then at least two last week is what I'm
21  saying.
22     Q   So three this month?
23     A   Yes.
24     Q   Any other ones for the Rapoport Law Firm this
25  month?

DAVID S. GIBSON, MBA, MRC, - 09/19/2018   Pages 10..13

Page 10

1    A   No.
2    Q   You have been retained by the Rapoport Law Firm
3   in the past?
4    A   I have.
5    Q   On how many occasions?
6    A   I don't know the exact number.  On an annual
7   basis it would probably range anywhere from two to five
8   times per year.
9    Q   And how long have you been working for their
10  firm?
11   A   I believe the first time I did any work with
12  them would have been in 2007.
13   Q   So about 11 years?
14   A   Approximately.
15   Q   Okay.  So somewhere between 22 and 55 times
16  you've been retained by the Rapoport firm?
17   A   Yes.
18   Q   And on each occasion is it for doing the very
19  thing that you're doing in this particular case?
20   A   No.  The majority of them do involve loss of
21  lifetime earnings.  I'm fairly sure there's a couple
22  that only involved maybe a lifecare plan, which I did in
23  Mr. Holden's case, looking at the present value of a
24  lifecare plan.  But I believe that some of their cases
25  may have involved only that and no other form of

Page 11

1   valuation.
2    Q   Currently do you have any other cases pending
3   with the Rapoport Law Firm?
4    A   I don't know.  I've done cases for them within
5   the last year, but I can't say whether those cases are
6   open or closed.
7    Q   And how many within the last year?
8    A   Probably -- Excluding these three, probably
9   another three or four.
10   Q   And so would the three that are in this case
11  constitute three cases or is it one case for you?
12   A   To me, it's three because it's three different
13  analyses.
14   Q   Do you work mainly for plaintiffs firms or
15  defense firms or how does that work?
16   A   I'm hired most of the time by plaintiff.
17  Probably about 85 percent of the time.
18   Q   Do you work for anyone else other than
19  plaintiffs or defense lawyers?
20   A   No, everything -- Excuse me.  Everything I do is
21  litigation related and it's all retained by attorneys.
22   Q   Have you worked for any firms up in Milwaukee?
23   A   I've been involved in cases in Milwaukee, but I
24  don't believe my retention was by a Milwaukee firm.
25       And I've been retained by people in the -- I

Page 12

1   take that back.  I have been retained by persons in
2   Milwaukee.  I'm trying to remember his name.  There's a
3   case I did that just settled about a month ago, but I
4   can't recall the attorney's name.
5    Q   Do you know the firm?
6    A   No.
7    Q   Have you -- strike that.
8        Was that a case that was venued in Wisconsin?
9    A   Yes.
10   Q   And what court was that?
11   A   I don't recall.  I believe -- I know he was from
12  Milwaukee, but I don't recall whether it was a Milwaukee
13  case or not.
14   Q   Did you testify in that case either by
15  deposition or court?
16   A   By deposition, but the deposition would have
17  been done here in Chicago.  I did not go to the trial.
18   Q   And so would that be listed in Exhibit No. 2?
19   A   It would.
20   Q   Do you know when you were retained in this case?
21  And when I say this case, I'm referring to all three of
22  them.  So if there's different --
23   A   All three would have been the same.
24   Q   All three would have been the same?
25   A   Yes.  And I'm just noting that the fee agreement

Page 13

1   that we generated for the cases, and it would have been
2   the same for all three, was done on June 14th of 2018.
3   So that's usually within one day after we first learn
4   about the case.
5    Q   And you are referring now to something at the
6   top called Gibson File Review Notes; is that true?
7    A   I am.
8    Q   Okay.  So can we mark that?
9    A   There's three different versions you realize.
10  So one for each of the three plaintiffs.
11   Q   Thanks.  So can we mark your copies?  Do you
12  have --
13   A   Sure.
14   Q   Let's mark your copies and then you can refer to
15  them.
16   A   So mark them each individually?
17   Q   Please.
18       (Documents marked as Deposition
19       Exhibit 3, Exhibit 4, and Exhibit 5
20       for identification.)
21   A   Shall I identify them?
22   Q   Please.
23   A   So these are -- First of all, the file review
24  notes is a cheat sheet essentially that I prepare when
25  I'm getting ready for the deposition that lists out all

DAVID S. GIBSON, MBA, MRC, - 09/19/2018   Pages 14..17

Page 14

1  the contents of my file.
2       The set that's marked Exhibit No. 3 pertains to
3  Mr. Perrin; 4 pertains to Mr. Pekkala; and 5 pertains to
4  Mr. Holden.
5       Q   Okay.  So what you've done is gone through your
6  file and come up with notes for giving this deposition
7  today?
8       A   Yes.
9       Q   Okay.  Did you prepare these Gibson file review
10 notes?
11      A   I did.
12      Q   And do you actually go through your file to pull
13 out those notes and prepare this chart that you have
14 before us in these Exhibits 3, 4, and 5?
15      A   Yes.
16      Q   Do you have any assistance with that?
17      A   No.
18      Q   When I asked you when you were retained in this
19 case, what specifically did you refer to on these review
20 notes?
21      A   I would have gone -- I'm looking at Exhibit 3
22 right now for Mr. Perrin.  All three of them will be
23 similar, but the page numbers will be different.
24      But this one, I'm going to page 5, which would
25 be the last set of documents, and in there is the fee

Page 15

1  agreement for the case.  And under the Notes section
2  you'll see a date of June 14th of 2018.  That's the date
3  that that fee agreement was generated.
4       Q   Okay.  And that fee agreement, does that specify
5  what you will be charging in this case?
6       A   Yes.
7       Q   What are your charges?
8       A   For all three of them there's a loss of earnings
9  analysis, and that will be constant for all three, at
10 $5,200 a piece.  Then for Mr. Pekkala and Mr. Perrin
11 there's a loss of pension benefits in addition to the
12 base earnings.  That was billed at $1,100 each.  And for
13 Mr. Holden there's a charge for the analysis of the
14 present value of his lifecare plan, and that was billed
15 at $2,500.
16      That any work after the dates of the reports I
17 bill at an hourly rate, which is consistent across all
18 three, at 520 per hour, with the exception of testimony
19 time, which is 720 per hour.  Oh, which reminds me, you
20 owe me.  He said you're paying for all three of them.
21      Q   I'm not.  I'm paying for two.
22      A   Take your time.
23      Q   Do you have any record of the time that you've
24 spent in this case besides the flat fees?
25      A   No.  For the generation of the report, the flat

Page 16

1  fee covers all the work up until the report goes out the
2  door.  So I don't track my time until that point.  It's
3  only after that point, which would include the
4  preparation for the deposition, that I would be billing
5  by the hour.
6       I don't believe there's been any updates.  Yes,
7  I'll correct that.  There were two small updates that we
8  generated; one for Mr. Perrin after we received Dr.
9  Leitch's report, and one for Mr. Holden after we
10 received his W2s for 2014.
11      Q   So just so I understand, is it $5,200 flat fee;
12 is that what it is for the report?
13      A   Yes.
14      Q   Okay.  So you have 5,200 for Holden?
15      A   Yes.
16      Q   And then an additional for the lifecare plan of
17 2,500?
18      A   Correct.
19      Q   So with that, we are up to, what, 7,700?
20      A   Correct.
21      Q   Okay.  And then for Mr. Perrin you have 5,200,
22 plus an additional 1,100 for doing his pension benefits.
23 And so that would be 6,300?
24      A   Correct.
25      Q   And the same for Mr. Pekkala, 6,300?

Page 17

1       A   Correct.
2       Q   And then you have spent some additional time
3  other than preparing these reports and everything that's
4  included in that 5,300 or 1,100 or 2,500, and you've
5  been billing out for that time?
6       A   Correct.
7       Q   Do you have an itemization of how much that time
8  is?
9       A   Yes, I said the accumulating time, but I've not
10 billed it yet.  So the time I spent preparing for the
11 deposition won't be billed until after the deposition is
12 over and then I'll bill it all together.
13      So the time has been accumulated.  I can't tell
14 you exactly how much it is, but I would estimate for
15 each case the preparation time was between
16 two-and-a-half and three hours.
17      Q   Okay.  And you billed that out at 580 did you
18 say?
19      A   520.
20      Q   520, okay.  So roughly another $1,500, something
21 like that, a thousand to $1,500?
22      A   Yes.
23      Q   Do you anticipate doing any other work in this
24 case?
25      A   As I sit here, I'm not aware of other work that

DAVID S. GIBSON, MBA, MRC, - 09/19/2018    Pages 18..21

Page 18

1  will be done, but it's customary that if there's
2  depositions of some of the other experts, I may be asked
3  to review that to see if it changes my opinion.
4      Q    And have you been asked to come to trial?
5      A    I haven't been explicitly asked, but that's
6  generally what I do for the vast majority of my cases.
7      Q    Are you aware when this case goes to trial?
8      A    Most likely my case manager is.  I don't control
9  my calendar myself, but I'm sure it's on the calendar.
10     Q    So what did you do for purposes of preparing for
11 your deposition today?
12     A    I basically reviewed the contents of my file
13 and, as I do so, prepare exhibits 3 through 5.
14     Q    So do you have a computer up in front of you,
15 you're looking at the file and you're putting in
16 information as you do that?
17     A    Yes.
18     Q    Okay.  I noticed when I was going through your
19 files there's certain things that are highlighted either
20 in yellow or something like that.  Is that something
21 that you've done?
22     A    It's done either by my case manager, who's also
23 my wife, Margaret Gibson, or by me.  She reviews the
24 documents usually before I do.  So she'll probably have
25 the majority of the highlighting.

Page 19

1      Q    Okay.  And so when you went through to review
2  for your deposition today, do you review the highlighted
3  portions or do you go through the whole thing?
4      A    It depends on the document.  For most of the
5  documents I will go a little bit beyond the highlighted
6  items.  I guess it depends on how detailed the document
7  is.
8           Like the -- I guess an example would be the
9  summary plan description for the pension plan that
10 Mr. Perrin and Mr. Pekkala are covered by.  That's
11 something I would have reviewed before I know the
12 boilerplate language that those plans include and I will
13 have skimmed over some of the sections that were
14 highlighted.  For things like Dr. Santa Maria's report,
15 however, I will have spent some more time going --
16 possibly reading the highlights.
17     Q    What are you looking for when you're scanning
18 the documents in your file?
19     A    Again, it depends on the document.  There's I
20 guess a few different areas I'm looking for.  One is
21 ways of quantifying their earning capacity.  And tax
22 returns I'd be looking at, information that deals with
23 their earnings and with their employee expenses that
24 they have.
25          For medical opinions, being medical reports --

Page 20

1  I don't have any depositions at this point -- I'm
2  looking for identification of permanent limitations that
3  that person has that I will use in my analysis of how it
4  impacts their worklife expectancy or earning capacity.
5           I'm trying to think.  Those are the two main
6  types of documents I'm looking at.  They deal with
7  earning capacity or with limitations.
8      Q    Did you meet with plaintiffs' counsel in this
9  case prior to your depositions?
10     A    I did.
11     Q    What -- Sorry.
12     A    I met about 30 minutes before the dep started.
13     Q    And what was the purpose for that?
14     A    Really not too much.  I'm just trying to think.
15 Just confirming that there's nothing new that either of
16 us had.  And I can't say that either of us provided
17 anything of substantive news to the other side.
18     Q    Do you do that before every deposition with the
19 Rapoport firm?
20     A    I believe so.  There are some firms where they
21 don't ask for a pre-dep, but I believe I always do for
22 the Rapoport firm.
23     Q    And do you charge them for that?
24     A    Yes, that's at the 520 per hour.
25     Q    So it would have been about 260 for your

Page 21

1  meeting?
2      A    Yes.
3      Q    Did you make any notes of your conversations?
4      A    No.
5      Q    How do you approach a case?  Explain to me when
6  a case comes in to you, what do you do?
7      A    First of all, by case I'll assume that you're
8  limiting it to a loss of earnings analysis due to
9  disability?
10     Q    Yes.
11     A    Okay.  So there I'm, first of all, looking early
12 on as to whether there's a permanent limitation that the
13 person has sustained that may impact the kind or amount
14 of work that they can do in the future.
15     Q    So what do you look for when you're looking for
16 a permanent limitation?
17     A    I'm looking for some description of what their
18 limitation is, preferably and ideally in the form of a
19 medical neuropsychological or psychiatric expert that
20 talks about the limitation.
21          And there I'm talking about a functional
22 limitation, not necessarily a work restriction, but a
23 description of like fingering, handling, cognitive
24 functions, various functions like that, that could
25 interplay or interfere with the person's ability to do

DAVID S. GIBSON, MBA, MRC, - 09/19/2018   Pages 22..25

Page 22

1 certain jobs in the labor market.

2     Shall I go on?

3     **Q   So let me just follow up with a question.  So**
4 **does that mean that you review reports that might have**
5 **that information or medical records that might have that**
6 **information?**

7     A   Usually not medical records.  Medical records
8 rarely talk about opinions on permanent limitations.  So
9 they usually document very well how the person's being
10 treated and giving me their blood pressure, their heart
11 rate, and all the other stuff, but it really doesn't
12 talk about the limitation that's evolved from the
13 subject injury.

14     So usually what I'm looking for is a medical
15 report or a deposition or sometimes a disclosure.

16     **Q   In this case did you review any medical reports**
17 **from anybody other than a hired plaintiff's doctor or**
18 **medical provider?**

19     A   I'm not sure of Dr. Leitch's affiliation,
20 whether she was retained by the plaintiff or not.

21     **Q   She has been.**

22     A   Okay.  No, I did not.

23     **Q   Okay.  So in determining at least in these three**
24 **individuals their permanent limitations, you relied upon**
25 **solely the medical reports from the hired doctors by the**

Page 23

1 plaintiffs' counsel?

2     A   Yes.

3     **Q   What is the next thing that you do?**

4     A   If that's -- if I'm confident that there is some
5 form of permanent limitation there, then I'll proceed
6 with the case, to analyze the case.  I don't know if you
7 want me to get into the minutia about getting all the
8 documents in, but I'm focusing more on developing the
9 opinion.

10     Okay.  So to analyze the case, I'm looking to
11 really ask two questions:  How much the person will make
12 and how long they will earn it.  So annual earning
13 capacity and worklife expectancy.  And I'm looking to
14 analyze both of those questions before the subject event
15 and given the limitations that have evolved from the
16 subject event and whether those two have changed.

17     Once I've got those two key pieces of
18 information, I could project lifetime earnings
19 pre-injury, lifetime earnings post-injury and state them
20 in present cash value terms and find the difference
21 between the two and project the loss.

22     **Q   In all cases is your present value the same as**
23 **what the actual value is?**

24     A   No.  I think what you're asking me is, is my
25 present value always using a pure offset --

Page 24

1     **Q   Correct.**

2     A   -- and not a discount rate of zero percent?

3     And for the loss of earnings, base earnings,
4 yes.  But for loss of pension benefits, if you'll note,
5 that's not true.  For medical care costs that's not
6 true.

7     **Q   But for loss of earnings you don't really have**
8 **to do a present value because it's actually what you**
9 **calculate for the loss of earnings?**

10     A   I could do it without computing present value,
11 but I actually do compute growth rates and discount
12 rates to come to my present value.

13     **Q   1 percent and 1 percent?**

14     A   Yes.  You've been reading my reports, or
15 depositions.

16     **Q   So you've talked about how you go about doing**
17 **the process.  What information do you like to have to**
18 **get that or to reach that process?**

19     A   On the earnings side, the how much side,
20 information that helps quantify or observe historical
21 earnings.  And here I'm assuming that we're talking
22 about a mature worker.  I do child cases also where that
23 obviously doesn't come into play.

24     But observed earnings from the past,
25 documentation that talks about the pension and/or fringe

Page 25

1 benefits that the person had, information about the
2 person's overall educational background or skills that
3 they bring into the labor market.

4     Then for the limitation side of the equation
5 that impacts how those things may change in the future,
6 I look for either medical reports, depositions of
7 medical experts, excuse me, or disclosures of expert
8 opinions.

9     **Q   You said that one of the things you look at is**
10 **the skills that they bring into the marketplace?**

11     A   Yes.

12     **Q   In these three individuals, what skills did they**
13 **bring to the marketplace?**

14     A   Well, with Mr. Pekkala and Mr. Perrin, now at
15 least, both of them being journeymen boilermakers.  So
16 they're highly skilled workers that have been trained
17 and recognized within their union as having those
18 skills, and that gives them an entry card into a lot of
19 different jobs.

20     With Mr. -- Oh, and for both of them they have
21 their level of education, which is also something that
22 leads them into that area.

23     With Mr. Holden, who is obviously the different
24 player in this arena, I have his work history that
25 demonstrates some welding abilities and being kind of a

DAVID S. GIBSON, MBA, MRC, - 09/19/2018   Pages 26..29

Page 26

1   jack-of-all trades who's done multiple different jobs
2   depending upon what's available when he's in need of
3   employment, as well as his educational history, which is
4   at a lesser degree than the other two.
5       Q   Did the skills of being a journeyman have
6   anything to do other than with the amount of money that
7   they were making?
8       A   Yes, journeymen -- Being a journeyman recognizes
9   that they've completed their apprenticeship program and
10  completed it satisfactorily.  So it shows that they're
11  not just boilermakers, welders, that they are -- It's
12  like being a licensed professional in an area rather
13  than just that professional.  It's a credential that
14  they carry with them that helps demonstrate their
15  abilities.
16      Q   So how does that play into your assessment then?
17      A   Well, for them it plays in through the
18  measurement of their earnings through the wage scale
19  that they realized through being a journeyman welder,
20  pipefitter in Boilermaker's Local 647.
21      Q   So the amount of money they make?
22      A   Yes.
23      Q   But does it play into anything else other than
24  the amount of money they make?
25      A   It plays into the overall assessment of their

Page 27

1   abilities to continue doing that work and to continue to
2   worklife expectancies along that line.
3       Q   How does it play into that?
4       A   It demonstrates that they have the entree into
5   that market, that they have ongoing employment in that
6   market, and that they're in demand in that market.
7       Q   So how do you use that in your assessment other
8   than for using their wages?
9       A   I use it two different ways, both of them with
10  regard to worklife expectancy.  One, to show that they
11  should have an unimpaired worklife expectancy without
12  injury from any source.  And then the other is that even
13  given the injury that they've sustained from the lead
14  exposure, that they still have a very high worklife
15  expectancy that is only reduced slightly from where it
16  would have been beforehand.
17      Q   So when you're assessing their worklife
18  expectancy and the fact that they're journeymen, you
19  assume that they won't have any kind of disability in
20  the future; is that what I understand?
21      A   There's -- No.  I do assume that there's no
22  ongoing disability had this not happened.  I don't
23  assume some intervening event that's come into play.
24  But that doesn't come from being a journeyman.  That
25  just comes from the fact that I don't assume an injury

Page 28

1   coming on to somebody at some point in the future.
2       Q   Do you do any kind of interview of the
3   individuals?
4       A   Yes, I interview all three of them.
5       Q   And is that a personal interview?
6       A   It's telephonic.
7       Q   Do you call them?
8       A   Yes.
9       Q   And how long do you spend talking with them?
10      A   Approximately one hour.
11      Q   How did your conversation go with Mr. Holden?
12      A   Difficult.  He was resisting answering questions
13  that he thought he already answered for other people
14  before.
15      Q   Were you able to understand him?
16      A   That was also difficult, but eventually, yes.
17  And that was another part, that he resisted repeating
18  his answers.
19      Q   Did you take longer with him?
20      A   Most likely.  I can't tell you exactly how long
21  I did, but given that difficulty, it would have taken
22  longer.
23      Q   You weren't able to observe them in person at
24  all, right?
25      A   No.

Page 29

1       Q   Do you ever do that?
2       A   Yes, in some cases.  I mean, in some cases just
3   that the person is conveniently located and then it's
4   nice to be able to sit down with them to conduct the
5   interview.  But I'm not conducting a medical
6   examination.  I don't need to see them in person.
7           There are sometimes though where it's to my
8   benefit to administer a wide range achievement test or
9   some type of test.  But in this case they all have
10  extensive neuropsychological testing that would have far
11  beyond anything that I could do.
12      Q   Would you still have liked to have done it just
13  to get your own assessment?
14      A   No, I can't say it would change my opinion at
15  all.
16      Q   Okay.  So did you do any of your own testing to
17  determine any work ability of these individuals?
18      A   No.
19      Q   All the testing that you relied upon would have
20  been done by the paid plaintiffs' experts?
21      A   Yes.
22      Q   Did you do anything to assess credibility of any
23  of these plaintiffs?
24      A   No, no.  I mean, I don't know that I'm really
25  relying on credibility that much.  I'm looking at actual

DAVID S. GIBSON, MBA, MRC, - 09/19/2018   Pages 30..33

Page 30

1  earnings that they've had in the past and their actual
2  work history and projecting that forward.
3      Q   For instance, do you ever look to see what
4  they've told you compared to what might be in the
5  records that have been provided to you to see if it's
6  credible or truthful?
7      A   I do, but, to my recollection, I didn't see
8  anything that I found incredible.  For instance, when I
9  interviewed them, there's a part -- And you've seen my
10 entire file, right?
11     Q   Yes.  And we're going to go through those forms.
12     A   So in my interview form there's a page on there
13 where I ask about their limitations.  And when I obtain
14 that information from them, I'm considering that in the
15 light of what I understand to be the medical opinions of
16 what their limitations are.
17     Q   In addition to receiving records from
18 plaintiffs' counsel, do you do any of your own kind of
19 investigation and review anybody or something like that?
20     A   No.
21     Q   No?
22     A   No, other than the statistics that I cite that I
23 utilize in my report.
24     Q   Do you ask for specific kinds of records from
25 the attorneys?

Page 31

1      A   I do.
2      Q   And what kind of records are those?
3      A   I'm trying to think.  There's a generic form
4  that I send to the attorneys that they sometimes send
5  back.  Let me see if I've got.  Yes, I do.
6          I'm looking on Mr. Holden's case.
7      Q   Okay.
8      A   And -- Oh, you kept it in administrative
9  documents?  Did you keep it how I had it?
10     Q   I don't have all of them.
11     A   There's one in there that looks like this, if
12 that helps you at all.  I print two pages per side.
13 That's it.  Yes.
14         So this would be an example of what I would
15 send.  Mr. Holden's will be slightly different than what
16 I would send for Mr. Perrin and Pekkala in that I knew
17 on the front end that the other two were members of a
18 union and I would have requested information about their
19 pension plan and things of that nature, but I didn't ask
20 for that for Mr. Holden.
21     Q   And are you satisfied that you received the
22 necessary documents to give opinions for these three
23 individuals?
24     A   Yes, with the caveat that -- as I identified in
25 Mr. Perrin's report.  I'm trying to keep all the people

Page 32

1  straight.  Mr. Perrin's report is that due to his
2  divorce, he's unable to get his tax returns currently,
3  and I'm unable to specifically quantify his general
4  spending on unreimbursed employee expenses from when
5  he's on the road, and I had to use an estimate instead.
6  So that's something, hopefully, that we'll eventually be
7  able to cure.
8          Mr. Holden's recordkeeping is -- as you know,
9  it was not fantastic.  So if he had better records, that
10 would be nice to have, but I have what he had.
11     Q   And did you get any of Mr. Perrin's tax returns?
12     A   No.
13     Q   Any W2s, anything like that?
14     A   I'm trying to remember.  I do have earnings
15 information for him through the Social Security
16 earnings.  That gives me what the W2s are.
17         So I'm comfortable with what I'm showing as his
18 gross wages, but the difficulty comes in that I know it
19 would be unfair to use those because he has to spend
20 some money when he's on the road to maintain that
21 living.  And so I have to estimate what that expenditure
22 was.
23     Q   Did you review any of their employment files?
24     A   I had some.  Let's see.  For Mr. Perrin I had a
25 number of his prior employers.  For Mr. Pekkala I also

Page 33

1  had quite a few.  For Mr. Holden I had a couple as I
2  recall.  Yes, just from Tradesmen International.
3      Q   Do you know whether any of the treating doctors
4  for these three individuals have placed any limitations
5  or restrictions on them?
6      A   I don't know.
7      Q   If that information is available, would you want
8  to know that?
9      A   Yes, possibly.  I guess it depends on the nature
10 of the treating doctor.  But if the doctor feels that
11 there are no limitations that the person has at all,
12 then I would like to know that.
13         I'm not looking for restrictions, but I'm
14 looking for the recognition that somebody has difficulty
15 with something.
16     Q   And so if there were records to that effect or
17 said that there isn't a difficulty with something, you'd
18 want those records?
19     A   Potentially.
20     Q   And when you say potentially, why?
21     A   Well, first of all, you're saying records.
22 Again, records don't tell me that much.  I'm looking for
23 opinions.  So, I mean, the treatment records rarely will
24 talk about permanent limitations that somebody has.
25         But if there's some type of opinion where the

DAVID S. GIBSON, MBA, MRC, - 09/19/2018  Pages 34..37

Page 34

1  doctor says that the hand tremors that Mr. Holden has
2  likely to continue or that Mr. Holden has hand
3  tremors, something of that nature, then that would be
4  helpful.
5      Q   How often do you handle cases where your sole --
6  the sole basis of your opinions are paid experts?
7      A   I don't know what percentage of the time it
8  would be, but it's quite possibly at 50 percent or more.
9      Q   So, in other words, treating physicians aren't
10  giving their opinions, rather, it's experts being paid
11  by the plaintiffs attorneys?
12      A   Or by another attorney, but it's not necessarily
13  the plaintiff's attorney.
14      Q   Most of your work is plaintiff's work?
15      A   Oh, yes, but there's several times where I've
16  received the IME that's been performed for a worker's
17  compensation purpose or something of that nature that is
18  not paid for by the plaintiff at all.
19      Q   And is that the same, that 50 percent of the
20  time you'd be basing your opinions solely on paid
21  experts as opposed to a combination of treating and
22  paid?  Is that a bad question?
23      A   I think I understand what you're saying.  And I
24  can't say again with certainty, but I think it could be
25  up to 50 percent of the time, yes.

Page 35

1      Q   You are not here to render opinions on
2  restrictions or lack of restrictions?
3      A   That's right.
4      Q   Nor are you here to render any opinions on the
5  cause of the claimed injuries in this case?
6      A   That's right.
7      Q   Did you talk with any of the plaintiffs about
8  any injuries they've had since their exposure that might
9  impact their ability to work?
10      A   I would have asked them for any other
11  limitations that had arisen, either pre-injury or
12  post-injury.
13          And if I knew about a particular injury -- For
14  instance, I know -- Yes, I'll have to find the record to
15  know which one had a couple of car accidents I believe
16  since the injury.  And so I would have asked them did
17  they have any ongoing limitations from that car
18  accident, and the answer was no.
19      Q   And is that something that you specifically
20  would have put in your evaluation?
21      A   Yes.  It will be in my interview notes, not
22  necessarily in the evaluation.
23      Q   Okay.  So I think that was Mr. Pekkala.
24      A   Was that it?  Okay.
25      Q   And we're going to go into each of the

Page 36

1  individuals, but while we're on the subject, why don't
2  you take a look at his.
3          (Document marked as Deposition
4          Exhibit 6 for identification.)
5      Q   On Exhibit 6 can you just confirm that that's
6  the evaluee form for Mr. Pekkala?
7      A   It is.
8      Q   Okay.  And is there a notation on there with
9  regard to his car accidents and whether he has
10  limitations from them?
11      A   Yes, there's -- I don't number these pages, but
12  up in the upper right-hand corner it will say injury
13  right below where it says evaluee interview form.  It
14  looks like this.  Yes, I think you're there.  That's it.
15          And then the very top of that page is
16  pre-existing limitations.  Even though this isn't
17  pre-existing the accident, I would also discuss anything
18  unrelated to the exposure here.  And there you'll notice
19  the August '16 fall, the March '16 lung nodule, the
20  November '17 car accident, and I guess also the May '14
21  getting something in his eye.
22      Q   Okay.  This box called pre-existing limitations
23  seems to me like it's taken directly from records.
24      A   In this case, yes.  I mean, it doesn't have to
25  be, but in this case, by reviewing I believe it was just

Page 37

1  his deposition, all this information came about from
2  that.  And so that was noted in there for me to discuss
3  with him during the deposition.
4      Q   Because I wouldn't have expected Mr. Pekkala to
5  say I was diagnosed with a lung nodule.
6      A   Right.
7      Q   Okay.  So is there anything in here that says
8  Mr. Pekkala said he has no issues with or limitations
9  with any of these pre-existing --
10      A   The very last two letters, non-limiting.
11      Q   And is that something that was put in because
12  you didn't see anything in the medical records or you
13  specifically had a conversation with him?
14      A   The latter.
15      Q   And how do we know that?
16      A   I don't.  I have no medical evidence that
17  indicates there's any limitation, and so I rely upon him
18  to say that that's true.
19      Q   But, I mean, how do I know that that's him
20  saying non-limiting rather than your case manager going
21  through it and saying non-limiting because there's
22  nothing listed in the medical record?
23      A   It's neither.  It's me saying it's non-limiting,
24  because I asked him that question and that's the answer
25  he gave me.

DAVID S. GIBSON, MBA, MRC, - 09/19/2018    Pages 38..41

Page 38

1    Q    And you recall that specifically as you sit here
2    today?
3    A    I know how I take notes, yes.
4    Q    And so are you sitting in front of a computer
5    where you enter in non-limiting?
6    A    Yes.
7    Q    So you've put in all of this information at the
8    same time that you're talking to Mr. Pekkala or you're
9    sticking in the non-limiting afterwards?
10    A    The latter.
11    Q    When did you talk with Mr. Pekkala?
12    A    That would be July 16th of this year.
13    Q    And do you remember about what time it was?
14    A    No.
15    Q    Morning?  Afternoon?
16    A    I have no idea.
17    Q    Do you have notes, any handwritten notes from
18    your conversation with Mr. Pekkala?
19    A    No.  As we indicated, I type directly into the
20    computer.
21    Q    The notes under the toxic exposure, is that
22    something that was put in there before you talked with
23    Mr. Pekkala?
24    A    I'm sorry, you're on the same page?
25    Q    I am.

Page 39

1    A    Okay.  Yes, the toxic exposure is my
2    understanding of the nature of the case.  It's not an
3    opinion of mine.
4    Q    We're going to get back to these, but I just
5    thought we'd talk about it while we were on it.
6         Did you conduct any kind of research into what
7    the requirements are for the jobs for being a welder,
8    journeyman, anything like that?
9    A    Nothing specific.  I'm familiar with the
10    requirements under the Dictionary of Occupational
11    Titles.
12    Q    Does that play at all into your opinions?
13    A    In this particular case, no, because I'm -- I
14    accept that they were journeymen welders who had
15    demonstrated their abilities, and I'm projecting that
16    they will continue to be journeymen welders, albeit at a
17    reduced level.
18    Q    What about Mr. Holden?
19    A    Mr. Holden I never projected to be a
20    boilermaker, but I do allow for earnings as a general
21    welder or in some more -- just using his past earning
22    history in 2014.
23    Q    His past earning history in 2014?
24    A    Yes.
25    Q    What about 2015?

Page 40

1    A    2015 I did not have -- Let me see here.  Yes,
2    2015 he had almost no earnings that year, at least once
3    you net it out against his expenses that he showed on
4    his tax return.  So it does not represent a full year of
5    competitive earnings.
6    Q    What about 2013?
7    A    '13 he earned very little.  He had -- Well, for
8    what I have documentation in the initial documents,
9    forgive me, he had very little.  I just need to see if
10    maybe the updated information he had more.
11         No, that was pretty much consistent with the
12    final update that we just received about a week or so
13    ago.
14    Q    And what is that, the final update?  What does
15    that mean?
16    A    We just received his Social Security
17    Administration summary of W2s about a week ago.
18    Q    Okay.  And how far do those go back?
19    A    They'll go back to -- These go back I know at
20    least to 1999.  It's quite possible they go back even
21    further.  I believe they go back to 1996.
22    Q    And so is the only year you used 2014?
23    A    Yes.
24    Q    Do you know how long he had been a welder?
25    A    He has --

Page 41

1    Q    Strike that.  Let me ask you that when we get in
2    to Mr. Holden.
3    A    Okay.
4    Q    On each of the plaintiffs I saw in your reports
5    you utilized ACS for your opinions.
6    A    To some degree, yes.
7    Q    What is that?
8    A    It's the American Community Survey, which is a
9    product of the United States Census Bureau.
10    Q    And is that like a survey that comes to my house
11    and I'd be filling it out at my house?
12    A    You could, yes.  They sample 1 percent of the
13    population each year.
14    Q    So if there's 350 million, it would be 3.5
15    million?
16    A    Yes.
17    Q    And then I would fill it out and I'd send it
18    back?
19    A    Yes.
20    Q    Okay.  I saw in your report some of the
21    questions, and I guess I had questions myself about
22    those.  So maybe if you could just grab -- I don't care
23    whose report it is -- maybe Mr. Perrin's or somebody.
24    A    Do you have Perrin's in front of you?
25    Q    I do have Perrin's in front of me.

DAVID S. GIBSON, MBA, MRC, - 09/19/2018   Pages 42..45

Page 42

1    A   Then I'll do that one.
2    Q   So it looks like on page 13 of 15 there is some
3  ACS disability criteria.  And I'm assuming that these
4  questions come from the ACS survey?
5    A   They do.
6    Q   Okay.  And it looks like there was a survey
7  before 2008 and then it changed after 2008.
8    A   Yes.
9    Q   Okay.  And at least in this figure 2 on page 13
10 of Mr. Perrin's report there's questions about hearing,
11 vision, cognitive, mobility, self-care, and go outside
12 home.
13   A   Yes.
14   Q   And one of the questions asks about because of a
15 physical, mental, or emotional condition, does this
16 person have serious difficulty concentrating,
17 remembering, or making decisions, question mark.  And
18 that's one of the questions that's asked somebody who's
19 taking this survey, perhaps a survey that came to their
20 home?
21   A   Yes.
22   Q   And if they answer yes to that, what does that
23 mean?
24   A   That would indicate that person has a cognitive
25 limitation.

Page 43

1    Q   How do you parse out the people like who -- I
2  mean, I feel like I have a problem remembering things as
3  I age and it's getting more difficult and more
4  difficult.  How do I parse that out of that?
5    A   Well, if you answer that question positively,
6  then you're going to be included in that population.
7  But what I do parse out of it are people that have any
8  other form of limitation when I'm dealing with --
9  Depending upon the case -- Yes, I only use a non-severe
10 disability at worst for Mr. Pekkala and Mr. Perrin, and
11 I used totally disabled for Mr. Holden, so it won't come
12 into play there.
13       But for a non-severe disability I will look at
14 people who have only that cognitive limitation, no other
15 form, and exclude those people, most importantly, that
16 have self-care or go-outside-the-home limitations.  So
17 those are going to be persons with severe disabilities,
18 as well as anybody who has any other form of disability.
19   Q   So I understand that if you don't say yes to any
20 of the next three, you don't fall into the severe
21 category?
22   A   It's really the last two that would be the
23 severe category.
24   Q   Okay.  So if I only answer yes to the cognitive,
25 I'm in the non-severe cognitive disability?

Page 44

1    A   Yes.
2    Q   Okay.  So --
3    A   You may be.  If you say yes to cognitive and no
4  to all five of the others, then you're not severe.
5    Q   Okay.  So potentially if I thought that because
6  I'm having difficulty remembering certain things or
7  concentrating on certain things, if I think that I, at
8  least according to the ACS, am considered not severe
9  cognitively disabled?
10   A   So if you think you have a physical or mental or
11 emotional condition that causes that and you answered
12 yes, then, yes.
13   Q   Okay.  And so potentially that will affect my
14 worklife expectancy?
15   A   Well, if you have a cognitive limitation, then,
16 yes, that would potentially impact your worklife.
17   Q   And so that criteria, disability criteria, that
18 can include people like me or others who think as they
19 age, they have trouble remembering things?
20   A   Yes.
21   Q   Is that common that people have trouble
22 remembering things as they age?
23   A   It's common that it's harder to remember.  It's
24 not common that they would identify that as having a
25 cognitive disability.

Page 45

1    Q   Well, they wouldn't identify it as a cognitive
2  disability.  They're just answering the question.
3    A   Right, but what I'm saying is it's not common
4  that they would answer that positively.
5    Q   And how do you know that?
6    A   By the testing that the Census Bureau has done
7  on those questions that verify people do accurately
8  perceive and answer those questions.
9    Q   What is that testing?
10   A   That's cited in here on the prior page in that
11 very last paragraph in an article documented by Brault,
12 Stern, and Raglin.
13   Q   Okay.  And so is it sufficient for you that it
14 says it's found to be a reliable measure of disability?
15 That's sufficient for you?
16   A   Well, it was sufficient for me as I've read
17 their study and found that their study makes sense.
18   Q   Are there limitations on the use of the ACS?
19   A   What do you mean?  Does the Census Bureau limit
20 how you can use their data?
21   Q   No.  Does the government put out some -- like
22 issue some kind of uses or limitations of uses, anything
23 like that?
24   A   No.  Well, they put out uses and they show how
25 the data is used.  It's used very similar to how I'm

DAVID S. GIBSON, MBA, MRC, - 09/19/2018  Pages 46..49

Page 46

1  doing it here, to identify the probabilities of
2  employment or likelihood of employment and the typical
3  earnings for persons with a disability.
4      **Q   Because when I pulled this up on the Internet --**
5  **And I pulled up something that talks about some of the**
6  **uses and the limitations of the uses. Have you seen**
7  **that before?**
8      A   I think you're referring to the wrong survey.
9  There's another survey called the Current Population
10 Survey, and I think that's what you're referring to.
11     **Q   So do the questions differ on the CPS versus the**
12 **ACS?**
13     A   At least they did at the time of that article
14 that I think you're thinking of.  That uses the
15 limitations of data and the annual social economic
16 supplement to the Current Population Survey.
17         And the annual social economic supplement does
18 have different questions from what is in the ACS, but
19 the monthly Current Population Survey now since that
20 article was published has the exact same questions as
21 the ACS.
22     MS. O'BRIEN:  Can I hear that back?  I was
23 busy looking.
24         THE WITNESS:  You sure you want to hear that?
25 I can repeat it or rephrase it.

Page 47

1  BY MS. O'BRIEN:
2      **Q   Okay.  Sure, rephrase it.**
3      A   There's essentially three different surveys that
4  we're talking about.  There's the ACS, then there's the
5  Current Population Survey, which is a monthly survey
6  conducted by the U.S. Census Bureau in cooperation with
7  the Bureau of Labor Statistics, Department of Labor.
8          The monthly CPS has a supplement in March of
9  every year called the Annual Social Economic Supplement,
10 or ASEC.  That supplement has some questions in it that
11 measure the presence of a work disability, which is the
12 general limitation in the kind or amount of work a
13 person can do without specification of a functional
14 limitation that causes that.
15         And so that's the survey, the ASEC, that that
16 article that you're referring to was referring to.  It's
17 referred to -- Possibly there is a Current Population
18 Survey because that was the only disability questions
19 that existed in the Current Population Survey at that
20 time, but that was only in the March supplement.
21         Since that time, starting in 2007 -- no, 2009,
22 I'm sorry, 2009 the Current Population Survey monthly
23 questions include these exact same questions you see on
24 page 13 from the ACS.
25     **Q   And that article that you're referring to, does**

Page 48

1  **it also address the CPS outside of the March supplement?**
2      A   No, because those questions that exist there now
3  didn't even exist at that time.  The person who wrote
4  that article you're talking about was the person who was
5  charged with helping to come up with these questions
6  that are in the CPS now and that are in the ACS.  And he
7  had that caveat that he wanted to put out there to say,
8  hey, these aren't as good as the questions that we're
9  going to have.  The questions that he was developing are
10 what you see here in figure 2.
11     **Q   The Brault, Stern and Raglin 2007 that you**
12 **reference, is that -- is that something that is a**
13 **recognized publication?**
14     A   It's a recognized scientific article.  The
15 Federal government doesn't necessarily have publications
16 that they count as peer-reviewed journals.  It doesn't
17 exist within the Census Bureau or Bureau of Labor
18 Statistics, but it is one of their publications.
19     **Q   Have you ever used the CPS for the basis of your**
20 **opinions?**
21     A   You mean the ASEC or the monthly CPS?
22     **Q   The CPS.**
23     A   Okay.  I don't use the monthly CPS because the
24 ACS has the same questions, but has a much larger pool
25 of information, a much larger sample size.  As we talked

Page 49

1  about, it has more than 3 million people it samples per
2  year.  The CPS only samples about a hundred thousand
3  people.
4      **Q   The same questions?**
5      A   Right.
6      MS. O'BRIEN:  Let me just mark it so that I
7  have it in the record as to what you're saying.
8          (Document marked as Deposition
9          Exhibit 7 for identification.)
10 BY MS. O'BRIEN:
11     **Q   I'm going to show you what's been marked as**
12 **Exhibit 7.  Is this the document that we've been talking**
13 **about, about the uses and limitations of the CPS data on**
14 **work disability?**
15     A   Yes.
16     **Q   And do you know when this was created?**
17     A   It was probably around 2005 or '06 would be my
18 best estimate.  It was while they were working on
19 developing the new questions that went into place in
20 2008.
21     **Q   And is there a similar document now for the 2008**
22 **ACS?**
23     A   No, because this only pertains to a totally
24 separate survey.  So this never existed for the pre-2008
25 ACS or the post-2008 ACS.

DAVID S. GIBSON, MBA, MRC, - 09/19/2018   Pages 50..53

Page 50

1    Q   Right.  And my question is, is there a similar
2  document put out by anybody with regard to the uses and
3  limitations of the ACS?
4    A   No.
5    Q   Why do you use this particular method of the
6  ACS?
7    A   Particular method?
8    Q   Yes, the model.  Why do you use this model?
9    A   I use the ACS because it provides measures of
10 some of the most common functional limitations that I
11 run up against, and, definitely in this case, matches
12 some of the limitations that I'm looking at.
13       It also has the testing behind it and has a
14 huge sample size that allows delineation of the
15 observations, the measurements of probabilities of
16 employment, and earnings changes down to a very specific
17 group.
18       MS. O'BRIEN:  Can I hear the answer back
19 please.
20       (Record read.)
21 BY MS. O'BRIEN:
22    Q   So when you're saying it uses common things that
23 you run across, are you saying that, for instance, in
24 this case, a physical, mental, or emotional condition is
25 a cognitive disability?  Is that what you're --

Page 51

1    A   That the cognitive limitation is -- I'm
2  frequently asked to examine a loss of earnings due to
3  brain injury.  And so that's a very common use that I
4  would have there.  Just as I may frequently look at
5  somebody who has various back injuries, that it might
6  impact mobility, the next question down.
7    Q   Do the tables distinguish at all between
8  professions as to potential worklife expectancies?
9    A   Not worklife.  Worklife you can't really measure
10 by profession because people may leave one profession
11 and go to another.  That doesn't mean that their
12 worklife has stopped when they leave the one profession.
13 So worklife is measured more specifically, generally, by
14 level of education and gender.
15    Q   And is that the common practice by most
16 vocational rehabilitation counselors?
17    A   It's the common practice by most economists.  A
18 lot of rehab people don't get into that because it's too
19 much statistics.
20    Q   Has your use of these tables ever been stricken
21 by a court?
22    A   No.
23    Q   Has, to your knowledge, anyone else using those
24 ACS tables been stricken by any court?
25    A   Yes.

Page 52

1    Q   On how many occasions that you are aware of?
2    A   I can't say -- give you an exact number, but
3  three to five I would say.
4    Q   Is that something that your firm has kept track
5  of?
6    A   I don't believe so.
7    Q   And how are you aware of it?
8    A   Only that it has been brought to my attention.
9  A couple of them would be by other professionals within
10 Vocational Economics and that I've learned of some
11 others.
12    Q   Why are they stricken by the courts?
13    A   It depends.  Many cases -- Well, I guess I won't
14 say many cases.  The old data that we used to use were
15 stricken because the people using them just misused
16 them.  I can't say that I know that's true for any ACS
17 times that have been stricken.
18    Q   Well, what does that mean when they used them
19 wrong?  You said you misused them.
20    A   Well, there's old data we used to use before the
21 ACS existed.
22    Q   What was that?
23    A   That was -- We used the ASEC.  And as an
24 example, there's a case in Nebraska where an economist
25 used that data to give an opinion on reduced worklife

Page 53

1  for somebody, even though the vocational expert and the
2  doctor said the person had no disability.  So it made
3  absolutely no sense to reduce the worklife for a
4  disability.
5    Q   Okay.  But in other cases has a court that
6  you're aware of found that the tables are not legitimate
7  for purposes of determining a worklife expectancy?
8    A   Let's make sure we're talking the same language.
9  You said the tables.  I'm not -- I'm using the ACS data.
10    Q   ACS data.
11    A   Okay.  So for Dr. Gamboa, who is the person that
12 I mentioned with Vocational Economics that had been
13 stricken a couple of times, I'm not sure the details
14 behind why he was stricken, other than it was just
15 general methodology, whether it was purely the ACS or
16 whether it was something else.
17       There was a gentleman in Baltimore that used
18 the tables there several times before and several times
19 since, but one court that he was in front of, they
20 determined he couldn't use the worklife tables that we
21 had produced using the data because they are too
22 general, but they allowed him to use the raw data.  So,
23 in essence, he used what I would have used.
24    Q   So when you say the raw data, what do you mean
25 by that?

DAVID S. GIBSON, MBA, MRC, - 09/19/2018   Pages 54..57

Page 54

1    A   Like in this case, when I compute the worklife
2  expectancies for any of the three people, I used the
3  information from the ACS that shows the probability
4  they're going to be employed each year rather than
5  saying -- taking a generic worklife expectancy and
6  multiplying it times their earnings.
7    Q   So had that person evaluated the worklife
8  expectancy in that way, the way you've done it in this
9  case, you don't believe that their tables would have
10 been stricken?
11   A   I can't say what the judge would have done, but
12 that's what he was allowed to do after the judge used --
13 he disallowed using the worklife in general.
14   Q   And when it was too broad, what does that mean,
15 that it was too broad?
16   A   I don't know.  Many people that criticized use
17 of the disability data do it saying it's not specific to
18 the plaintiff.  There's nothing that will be specific to
19 the plaintiff in that we're trying to predict the
20 future.  There's no measure about exactly what the
21 plaintiff will do at any point in the future.
22       But the best measure to use is from a
23 population that's most like the plaintiff.  So you're
24 much better off to use data dealing with disability, if
25 that person has that disability, than to use data from

Page 55

1  the general population because that disability data is
2  not specific.  That was the -- my understanding of why
3  the Baltimore case was stricken.
4    Q   Are your numbers always higher than other
5  vocational rehab or economists that come up with
6  worklife expectancies?
7    A   No.  By higher you mean is the loss always
8  higher?
9    Q   Yes.
10   A   No, not always.
11   Q   Most of the time?
12   A   It depends on what the other person's doing.  So
13 I can't say.  In most cases I don't see somebody on the
14 other side of me.
15   Q   You never review the other side of the reports
16 or you just don't see anybody on the other side of you?
17   A   I'm saying that in most cases the defense
18 doesn't present an expert.  They would -- Rather than
19 put a floor on the case by presenting their own expert,
20 they would rather take what I put forward.
21   Q   So is it your opinion that the use of the ACS is
22 something that's generally accepted?
23   A   Yes.
24   Q   How many people in your field use that ACS
25 system?

Page 56

1    A   I don't know.
2    Q   Do you have any estimate whatsoever?
3    A   Well, as the rationale documents, it's pretty
4  much the gold standard by anybody who does disability
5  research outside of the litigation arena where it's not
6  really a question of having two sides fighting against
7  each other on what to use.
8    Q   I want to --
9    A   It's only -- Let me answer.  It's only within
10 the litigation arena where I see people that would
11 disagree on using that, and that's when they're retained
12 by somebody that opposes -- somebody using it.
13   Q   Okay.  So tell me, though, in somebody in a
14 litigation setting, is it generally accepted to use the
15 ACS when making the determination that you did?
16   A   Yes.
17   Q   Then why is somebody on the other side always
18 criticizing or having a problem with that?  Why is that?
19   A   They're paid to.
20   Q   That's the only reason that you think?
21   A   That's the only reason I think.
22   Q   Out of the group that you rely on in this ACS
23 disability criteria, those that are surveyed, how many
24 of them are welders?
25   A   I can't say.  I would have the ability to select

Page 57

1  how many are welders, but I can't tell you what that is.
2    Q   Do you have any idea?
3    A   Not off the top of my head.
4    Q   How many are welders that have exposure to lead?
5    A   That, I would have no way of knowing.
6    Q   You don't specifically use any kind of data that
7  looks at the likelihood of a welder to continue to work
8  with a disability?
9    A   That's right.
10   Q   Do the tables that you've generated for the
11 various plaintiffs, do they assume that if someone has
12 no disability on the date of the injury, they'll
13 continue to have no disability or impairment?
14   A   Yes.
15   Q   Do you do anything to factor in the potential
16 for welders or construction workers or people doing
17 physical work to have any kind of disabilities or
18 limitations?
19   A   No.
20   Q   For instance, someone working as a lawyer might
21 have different -- the different potential for a
22 disability or an impairment versus a welder?
23   A   Yes, and that is captured in general by
24 education.  Persons with a professional degree have a
25 much higher probability of ongoing employment.  They're

DAVID S. GIBSON, MBA, MRC, – 09/19/2018    Pages 58..61

Page 58

1  not -- they're less likely to be out of a job at any
2  point in time.
3         Whereas, when you go down to lower levels of
4  education, either a high school degree for Mr. Holden or
5  some college for Pekkala and Perrin, then those
6  probabilities are much lower, and, therefore, the
7  worklife expectancies are decreased for larger gaps of
8  employment that person will have.
9     Q   Does that change -- So I noted in Perrin you
10 have him working until 66.
11    A   Not really.
12    Q   Well, your tables go to 66.
13    A   I explore the probability up to 66.  But what
14 I'm looking at out of those -- So to get him to 66,
15 you're going out 19 years in the future.  Actually, 21
16 years.  Well, yes, 19 years in the future from the date
17 of my report.  But out of those 19 years, I'm showing he
18 would only be working without a disability 13 of the
19 years.
20        So by factoring in the probabilities that he
21 would be employed in each of those 19 years, it
22 reduces -- it allows for a gap of employment by about
23 5.7 years.
24    Q   Well, he's reducing his employment, but he's
25 still continued to be employed up to 66.

Page 59

1     A   Only by the probability.  So if you'll note,
2  even at the date of my report, I reduced the likelihood
3  that he's going to be employed tomorrow to only 89
4  percent, even though he's a hundred percent employed
5  today.  I'm taking away 10 percent of all his wages that
6  he's making now because I'm allowing for that
7  probability of being out of work.
8         Similarly, I need to allow for the remote
9  probability, a much smaller probability, that he could
10 be employed up to the age of 66.  And by doing that, I
11 reduce his total number of years of work by that 6.7.
12    Q   How often do welders work until age 66?
13    A   I don't know.  I'm allowing it for -- I'm not
14 saying he would work until 66.  I'm saying that if you
15 add the numbers together, that he would work to about
16 70 -- I'm sorry, about 61 if you add the 13.3 years to
17 his current age.
18    Q   Because he gets a full pension at 61?
19    A   Well, that's not why I'm doing it.  He would get
20 a full pension at 61, but the way I'm computing 61 is by
21 adding his worklife to his current age.
22    Q   Okay.  And what information do you have that
23 welders would work until age 61?
24    A   The same probability that he would be employed
25 for any other male with some college and no disability.

Page 60

1     Q   And you don't specifically take into effect
2  welders?
3     A   As I indicated before, there's no worklife
4  expectancy by occupation.
5     Q   Is there any kind of information concerning
6  limitations that welders experience over their lifetime?
7     A   Not that I know of.
8     Q   Would you consider someone with depression or
9  anxiety to have a limitation impacting their vocational
10 assessment or is that something you can't say?
11    A   Yes, those are diagnoses and not identifications
12 of limitations.  So people with those diagnoses could
13 have no limitation or they could have limitations.  I
14 wouldn't be qualified to say just from the diagnosis.
15    Q   Okay.  Let's take a look individually at some of
16 them, and perhaps Perrin is the best one to start with
17 since we're right there.
18    A   Okay.
19    Q   The first thing I want to take a look at is the
20 evaluee information.
21        (Document marked as Deposition
22        Exhibit 8 for identification.)
23    Q   I'll show you what's been marked as Exhibit 8.
24 Is that the form that we're talking about in regards to
25 Mr. Perrin?

Page 61

1     A   It is.
2     Q   When was this form completed?
3     A   On July 16th.
4     Q   Is that the date that you had a telephone
5  interview with Mr. Perrin?
6     A   It is.
7     Q   It shows at the time that you interviewed him
8  that he's divorced from his wife and that he has three
9  boys.
10    A   Yes.
11    Q   He has a four-year boilermaker apprenticeship.
12    A   Yes.
13    Q   Do you know, is he a journeyman?
14    A   He is.
15    Q   It says high school complete.  Do you know if he
16 graduated from high school?
17    A   Yes.  So that indicates he did graduate.
18    Q   On the next page you have career vision, he
19 wanted to go to at least 63.  Is that something that he
20 provided to you?
21    A   Yes.
22    Q   Doesn't think he can go as long is what he says
23 now.
24    A   Correct.
25    Q   There's a box under job history, currently

DAVID S. GIBSON, MBA, MRC, - 09/19/2018   Pages 62..65

Page 62

1  working.  It's not checked.
2      A   Well, it should be.  He is.
3      Q   Okay.  So that should have been something that
4  was checked on the second page of your evaluee form,
5  correct?
6      A   Potentially.  I'm just trying to recall whether
7  he was employed at that particular day.  As you know, he
8  changes jobs that he's on frequently.  And -- Yes, there
9  it is.  It says currently laid off.  So he was between
10  jobs at the time.
11      Q   Okay.  Do you know when the last time he had had
12  a job?
13      A   No.
14      Q   Do you know if he had a job scheduled?
15      A   At this time he did not.
16      Q   And is that something that you specifically
17  asked him?
18      A   That would be on there.  He did have a job.  I'm
19  just noting that he's currently laid off.
20      Q   You don't have his tax returns.  You note that.
21      A   Yes.
22      Q   Okay.  And then there's impact, can't hold hand
23  steady to do as much welding, gets laid off sooner if
24  not foreman.  Welding skills have dropped significantly.
25  And you go on and on.  Is that something that he told

Page 63

1  you or you obtained from other sources?
2      A   That's pretty much all that he told me directly,
3  but indirectly some of it was mentioned in his
4  deposition.
5      Q   So do you know which was which?
6      A   I can't say without going back through the
7  deposition, so.
8      Q   You didn't observe him, so you couldn't
9  determine whether he can't hold his hand steady?
10      A   That's right.
11      Q   Did you see any information at all to show that
12  he gets laid off sooner if he's not the foreman?
13      A   No.
14      Q   Would you expect to see something like that?
15      A   No, not directly on a job-by-job basis saying
16  we're laying him off because his work isn't as good.
17  However, I would expect to see it play out in how much
18  he earns each year.
19      Q   Do you see anything wrong with laying somebody
20  off if they have some kind of disability?
21      A   If that disability interferes with a
22  significant -- with a -- I'm trying to think of the
23  right phrase now, it's skipping my mind -- with one of
24  the significant duties of that job, then, yes.
25      Q   If he's foreman, apparently he can still do the

Page 64

1  job?
2      A   He could assign some -- a lot of the physical
3  work to other people to do.
4      Q   And did you consider that when you came up with
5  your numbers?
6      A   Yes, and that -- his ability to be foreman will
7  go ahead and enhance his earnings.  And if you look at
8  his earnings now, you should be able to see a drop in
9  earnings if he's not able to maintain a job when he's
10  not foreman, and there is a drop down.
11      Q   On the next page you note that he's obese, 347
12  pounds.  Where does that come from?
13      A   One of the medical records had that.
14      Q   Then there was something about an injury to his
15  back that occurred in January.
16      A   Yes.
17      Q   And it says, did not expect any ongoing
18  limitations.  Did you talk with anybody to see whether
19  or not he had any limitations in that regard?
20      A   No.
21      Q   Do you know whether Mr. Perrin had any
22  limitations before being exposed to lead?
23      A   I see none indicated in any of the doctors'
24  opinions that I've seen, and he reported to me that
25  he -- the only limitation he had at the time of the

Page 65

1  exposure was the soreness from this injury there on
2  January 27th, but noting that it's his expectation that
3  would be taken care of.
4      Q   Do you know whether Mr. Perrin had any kind of
5  medical condition that may limit him in the future?
6      A   Not to my knowledge.
7      Q   Not anything that you saw in any of the records?
8      A   That's right.
9      Q   And if you had that information, would that
10  potentially play into your figures?
11      A   Potentially.
12      Q   Because if he was going to have problems in the
13  future based upon that medical condition, you'd want to
14  know about it?
15      A   Yes.
16      Q   Do you know whether he's had some medical
17  conditions where he's been off work which might justify
18  why his earnings are down?
19      A   You mean off work since the exposure?
20      Q   Correct.
21      A   Medical conditions other -- that are not related
22  to the exposure?
23      Q   Correct.  Thanks for clarifying that.
24      A   Not that I'm aware of.
25      Q   That also may impact your opinion as to what his

DAVID S. GIBSON, MBA, MRC, - 09/19/2018   Pages 66..69

Page 66

1  loss of earnings are?
2      A   It could.
3      Q   Work, it says he took off one week.
4      A   I'm sorry, where are you now?
5      Q   Work down at the bottom.
6      A   Oh, yes.  Yes.
7      Q   And what does that mean, took off one week?
8      A   After notification of the exposure he only
9  missed one week.
10         That page -- There will be a similar page for
11  all three.  This page is completed by my case manager as
12  a way of communicating to me what her understanding of
13  the medical opinions are.  So it's not part of the
14  interview itself.  It's just her documentation.
15     Q   So you're talking about the page that says other
16  case notes --
17     A   That's right.
18     Q   -- in the evaluee interview form, which is
19  Exhibit 6, is it?
20     A   Actually, for Mr. Perrin it's 8.
21     Q   8?
22     A   Yes.
23     Q   So it's not you putting what the opinions are
24  down from the medical reports, but rather your case
25  manager?

Page 67

1      A   Yes.
2      Q   And have you reviewed all of those reports?
3      A   I have.
4      Q   So you confirmed that what is written here on
5  this other case notes is what is in those reports?
6      A   Yes.
7      Q   One of the things you talked about is that you
8  rely upon these reports to determine limitations.  And I
9  want to take a look at the second paragraph under
10  Opinions.
11     A   Okay.
12     Q   There's a line that says, however, particularly
13  in association.  Do you see that?
14     A   Yes.
15     Q   Okay.  It says, some aspects of verbal memory,
16  he potentially will evidence diminished efficiency and
17  task completion in work and other settings and this will
18  potentially -- and this potentially will have some
19  adverse impact on overall earnings potential over time.
20     A   Yes.
21     Q   Oh, that's a rough sentence.
22         Did you use that in making your opinions in
23  this case?
24     A   I did.
25     Q   And how did you use that?

Page 68

1      A   Merely the fact that he does have cognitive
2  limitations.  She does recognize they are there to some
3  degree and they will impact his overall productivity,
4  and that's consistent with the data from the ACS that
5  shows that persons with cognitive limitations, even
6  non-severe, don't have the same rates of earnings
7  increases or the same probabilities of ongoing
8  employment.
9      Q   But how does that paragraph fit into because of
10  a physical, mental, or emotional condition, does this
11  person have serious difficulty concentrating,
12  remembering, or making decisions?
13     A   I think they're consistent.
14     Q   So this paragraph 2 to you is consistent with
15  what is in the ACS under cognitive?
16     A   Well, more specifically, Dr. Santa Maria's
17  paragraph, not the summary of her paragraph, is
18  consistent.
19         And I think I said her.  It's his.  I keep on
20  referring to Santa Maria as her.
21     Q   So what is written under opinions, this is just
22  a summary of Dr. Santa Maria's opinion?
23     A   Yes.
24     Q   Can you take a look in Dr. Santa Maria's opinion
25  and tell me how the opinion differs from what's written

Page 69

1  in this case note?
2         You don't have to wear glasses for that?
3      A   I don't have a cognitive impairment.
4         Okay.  It looks like this is -- this same
5  paragraph, it may actually be a verbatim copy.  What she
6  says here, and you can tell me if it's different,
7  particularly in association with acquired weaknesses
8  involving various aspects of cognitive and motor
9  processing speed and some aspects of verbal memory, he
10  potentially will evidence diminished efficiency in task
11  completion, in working -- in work in other settings and
12  this potentially will have some adverse impacts on
13  overall earning potential over time.
14         And then --
15     Q   That's it.
16     A   Well, it goes on.  I'm just seeing whether
17  anything else is relevant to that.  No, what's left
18  talks about independent living.  So that's fine.
19     Q   So how is what you just read equal to what is in
20  the ACS?
21     A   I see that as a limitation -- her description of
22  that as a limitation in -- forgive me -- in
23  concentrating, remembering, and making decisions that
24  impacts his overall memory and focus.
25     Q   So Dr. Santa Maria says there's the potential

DAVID S. GIBSON, MBA, MRC, - 09/19/2018   Pages 70..73

Page 70

1  for it; he doesn't say it's absolute?
2      A   True.
3      Q   You take it to the next level and say it's
4  absolute?
5      A   Yes.
6      Q   And you don't have a medical degree or any
7  ability in medical training to make that leap, so to
8  speak?
9      A   I don't know that that's true.  I do have the
10  ability to translate limitations, and, here, Dr. Santa
11  Maria's identified the limitation and to how it will
12  impact the workforce.
13     Q   Because Dr. Santa Maria says potentially.  He
14  doesn't say it will.
15     A   Well, he does say -- The potential is in how
16  it's going to impact the workforce.  That's what I'm
17  interpreting.
18         What he says without saying potential is that
19  he has acquired weaknesses and aspects of cognitive and
20  motor processing speed and verbal memory.  So he's
21  identified those limitations that exist.  My role as a
22  rehabilitation counselor is to translate the limitations
23  against requirements in the workforce.
24     Q   Is what Dr. Santa Maria said in that paragraph
25  synonymous with a serious difficulty concentrating,

Page 71

1  remembering, or making decisions?
2      A   Yes.
3      Q   And what is it in that paragraph that equates
4  with serious difficulty concentrating, remembering, or
5  making decisions?
6      A   Cognitive and motor processing has to do with
7  all three of those, motor processing speed I should say.
8  And aspects of verbal memory also had to do with this.
9      Q   Those are serious difficulties?
10     A   I believe so.
11     Q   Did you do anything to follow up with Dr. Santa
12  Maria to find out whether Mr. Perrin in fact fits into
13  this ACS disability criteria?
14     A   No.
15     Q   And what is the rate according to Dr. Santa
16  Maria of how this diminished efficiency and verbal
17  memory will affect Mr. Perrin's worklife?
18     A   I don't know what you mean by rate.
19     Q   So how fast does Dr. Santa Maria believe that
20  this is going to affect his worklife?
21     A   Worklife expectancy is an economic concept.  I
22  wouldn't expect Dr. Santa Maria to be able to quantify
23  the impact on worklife expectancy.
24     Q   So you don't think Dr. Santa Maria could say,
25  oh, I expect him to work just fine for the next 10 years

Page 72

1  and then we're going to see something going down or I
2  think he's going to work fine for the next five years
3  and then we're going to see some diminished capacity,
4  anything like that?
5      A   I wouldn't expect so.
6      Q   Going on to the next page, you talk about pain.
7      A   Yes.
8      Q   Do you see that?  And is that something that he
9  told you, Mr. Perrin?
10     A   It is.  And it's also discussed in Dr. Leitch's
11  report.
12     Q   You recently received Dr. Leitch's report?
13     A   No, Leitch we had from the date -- at the date
14  of the August 2nd report.
15     Q   Okay.  So was this copied directly from Dr.
16  Leitch's report?
17     A   No, this is taken from the interview.  But, as I
18  indicated earlier, when we're -- on this page where
19  people report limitations to me, I make sure that
20  they're consistent with any medical opinions I've seen.
21     Q   Okay.  But what you are telling me is that this
22  is something that Mr. Perrin told you?
23     A   Yes.
24     Q   And that was my first question, is that
25  something that he told you.

Page 73

1      A   And I answered yes, and I also found it
2  consistent with Dr. Leitch's report.
3      Q   Okay.  It says, can be i shoulder, back,
4  forearm, it varies.  Do you see that?
5      A   Yes.
6      Q   Is that something that he had prior to the
7  exposure?
8      A   No.
9      Q   And how do you know that?
10     A   From what he's telling me.
11     Q   Okay.  Have you reviewed any medical records to
12  make sure that that's the case?
13     A   No.
14     Q   Would you expect somebody who's a welder
15  journeyman to have pain in shoulders, back, arms?
16     A   Occasionally.  Not constant.
17     Q   And is his constant?
18     A   Well, it's daily.
19     Q   Not constant?
20     A   Right.
21     Q   Prolonged standing, it says he needs to keep
22  moving.
23     A   Yes.
24     Q   Are those movements that are put in there
25  prolonged sitting, prolonged standing?

DAVID S. GIBSON, MBA, MRC, - 09/19/2018   Pages 74..77

Page 74

1   A   I don't understand.
2       Q   Sure.  Under the Movement section it says
3   prolonged standing and prolonged sitting.  What does
4   that mean?
5       A   That means he has difficulty doing -- standing
6   or sitting for a long period of time.
7       Q   Is there any amount?  Is it hours, days?  What's
8   the --
9       A   For standing he can't quantify it.  He's saying
10  he just can't stand in one place, he needs to keep
11  moving.  For sitting he wasn't sure.
12      Q   Is that something that you asked him?
13      A   Yes.
14      Q   And had he given you an answer, would you have
15  put it in there?
16      A   Yes.
17      Q   Hunting and fishing is one of the psychological
18  social limitations.
19      A   Yes.
20      Q   He likes to hunt and fish, but he's not hunting
21  and fishing?
22      A   He's reporting that he can't do them as much as
23  he used to due to his limitations.
24      Q   And how much is that?
25      A   I don't know.  I'm asking him for examples of

Page 75

1   things that he can't do as frequently as he had as a
2   result of the limitation, and that's what he's reporting
3   to me.
4       Q   Did he have a hunting license in 2017?
5       A   I'm sorry?
6       Q   Did he have a hunting license in 2017?
7       A   I have no idea.
8       Q   How about 2016?
9       A   I have no idea.
10      Q   Did he hunt in 2016 and '17?
11      A   I have no idea.
12      Q   Let's just quickly take a look at Mr. Perrin's
13  report because I want to make sure that I understand it,
14  if we can.  So we'll mark it.
15          (Document marked as Deposition
16          Exhibit 9 for identification.)
17      Q   Showing you what's been marked Exhibit 9, is
18  that your report with regard to Mr. Perrin?
19      A   Yes, it is.
20      Q   Okay.  And, again, you haven't seen any treating
21  physicians that have placed any kind of work
22  restrictions on Mr. Perrin?
23      A   That's correct.
24      Q   Can we go back to your -- the back of your table
25  just so we can run through it.

Page 76

1   A   Which one?
2       Q   Let's take the first one.
3       A   Can you give me a page number?
4       Q   Yes, as soon as I get there.  Page 44.
5       A   Okay.
6       Q   Incidentally, what college did Mr. Perrin have?
7       A   He had one year of college at the University of
8   Marian, where at one time he was studying radiology, as
9   well as whatever training he received through his
10  apprenticeship.
11      Q   Did you see any educational records from the
12  University of Marian?
13      A   No.
14      Q   Do you know whether he put in more than a month
15  at the University of Marian?
16      A   Yes, he reported a full year there.  I don't
17  know how many credits he accrued.
18      Q   Do you know whether he passed any of his classes
19  at the University of Marian?
20      A   I don't.  Again, I haven't seen the records.  My
21  understanding is he completed his year satisfactorily.
22      Q   So if he didn't pass any of those classes, does
23  that put him in a different category other than some
24  college, no degree?
25      A   Yes and no.  It would knock him out of formal

Page 77

1   education.  I wouldn't count that if he didn't pass a
2   single class.  However, the apprenticeship itself could
3   count as some college.
4       Q   So as long as he did the apprenticeship, you
5   would put him into some college?
6       A   Yes.
7       Q   Taking a look at page 44 of 54, first of all,
8   you have under post-injury 50 percent between not
9   disabled and cognitive non-severe.  We know the
10  cognitive non-severe is because he didn't satisfy --
11  didn't answer yes to the last two in the ACS disability
12  criteria.
13      A   No, I counted him as saying no to all of the
14  other five, not just the last two.
15      Q   Okay.  So he then qualifies because you have
16  him -- you equate what Dr. Santa Maria said with the
17  disability criteria for cognitive, but answering the
18  rest of them no, he's non-severe?
19      A   Right, but that's not how I classified him.
20  That's what this indicates, where I'm using statistics
21  that say he's actually better off than the typical
22  person with a non-severe cognitive disability, and I'm
23  using statistics that are halfway between no disability
24  and non-severe.
25      Q   Where do those statistics come from?

DAVID S. GIBSON, MBA, MRC, - 09/19/2018  Pages 78..81

Page 78

1    A   The American Community Survey.
2    Q   Where do I get those?
3    A   You can download them and deal with the data
4  that's identified in the footnote at this page that goes
5  over to page 45 for the PUMS data or you can rely upon
6  the tabulations that I have.  And you should have a
7  document that's called Supporting Computations where the
8  first page looks like that.  I print two pages per side.
9    Q   Okay.  Can I just take a look at that?  And so
10 can you tell me how you get the 50 percent?
11   A   Yes.  In this document, there's going to be a
12 page -- Oh, there it is.  There will be a page further
13 back.  It will be about the fifth page in what you have.
14   Q   Okay.  I don't think I have it with me.
15   A   That's fine.  It's titled Participation in
16 Employment Rates.  And there I provide what the
17 participation employment rates would be -- I'm reading
18 upside down -- for the male, some college, with a
19 non-severe cognitive disability in what would be column
20 No. 2 here.
21       In column No. 1 is what the employment rates
22 would be for a person, male, some college, and no
23 disability.  Then in column 4 I'm merely saying I'm
24 going to -- And, actually, I should back up.  Column 3
25 is what I use for pre-injury, but then for post-injury

Page 79

1  what I do is use essentially the average of those two,
2  putting him halfway between the rates you see in column
3  2 and the rate you see in column 3, and that's what
4  provides the rates I use post-injury to column 4.
5    Q   Why do you do that?
6    A   Because I believe he is better off.  I don't
7  have a chronometer where I can say he's exactly at this
8  point on the continuum.  But it's my way to adjust it to
9  show that he is -- his likelihood of employment is
10 better than the typical person with no disability.
11   Q   When you use a percentage like that, in any of
12 your reports have you ever found anything other than 50
13 percent?
14   A   Not for quite a while.  I will use -- If I'm
15 using -- There could be that I use a continuum between
16 other points, like say between non-severe and severe.
17 But usually I think trying to come up with something
18 more precise would be folly.  It is just a professional
19 judgment that I believe he's somewhere between, but I
20 use 50 percent as the best measure.
21   Q   And that's strictly a judgment call on you
22 without any specific basis --
23   A   That's correct.
24   Q   -- to support that?
25   A   Well, specific -- There's no statistical basis

Page 80

1  to derive it.  The specific basis for doing it is that
2  his limitations aren't as profound.
3    Q   What does that mean, they're not as profound?
4    A   As we've been talking about, his limitations
5  aren't -- that Dr. Santa Maria talks about limitations
6  to the degree that she does say with Mr. Pekkala, and I
7  won't even talk about Mr. Holden, but if you compare the
8  cognitive limitations she identifies for Mr. Pekkala
9  compared to what she has for Mr. Perrin, they're
10 generally worse off.  I think that Mr. Perrin overall is
11 better off than Mr. Pekkala.
12   Q   But you have the same finding for Mr. Pekkala?
13   A   I use the same measure, yes.
14   Q   But you think Mr. Perrin's better than
15 Mr. Pekkala?
16   A   I do.
17   Q   So why don't you say 75 percent?
18   A   Again, it would be folly for me to say I can
19 measure that precisely.
20   Q   It's folly to say you can measure it at all,
21 right?
22   A   No.
23   Q   Okay.  So let's take a look.  For the growth and
24 discount you have a pure offset, right?
25   A   Yes.

Page 81

1    Q   Okay.  I just want to make sure I understand
2  your columns correctly.  So -- Well, you started at 8 of
3  2018.  So I guess you only got .02 years.  But let's
4  start at 8 of 2018, the one year.
5    A   Yes.
6    Q   Okay.  So his probable life expectancy is .992?
7    A   That's the probability that he'll live to the
8  end of that year.
9    Q   Okay.  Is .992?
10   A   That's right.
11   Q   The probability that he's going to be employed
12 is .894?
13   A   That's right.
14   Q   And the probability that he's going to work,
15 then you times those two to get to probability of work?
16   A   That's right.
17   Q   Okay.  The based earning that you came up with,
18 59,821, what is that based upon?
19   A   That starts with, for this particular analysis,
20 using his five years of earnings from 2011 through 2015.
21   Q   Where are you looking on your notes?
22   A   This is on page 1.
23   Q   Okay.
24   A   The report would have it in more detail.  But
25 that average comes to $84,190.  I subtract from that an

DAVID S. GIBSON, MBA, MRC, - 09/19/2018   Pages 82..85

Page 82

1  estimate of 30 percent for unreimbursed expenses.
2  Again, Mr. Perrin is the one that we don't have his tax
3  return.
4      Q   Is that pretty consistent with Mr. Pekkala, 30
5  percent?
6      A   Pekkala comes to about 28 percent.
7      Q   Okay. So roughly fairly similar?
8      A   Yes. So that gets me to 58,933. Then I adjust
9  that $58,000 for the typical age-related increases that
10 males with some college have as they get a little bit
11 older and initially have increases in their earnings
12 with experience, but eventually, as you'll see, they
13 start declining in the older ages.
14     Q   And how much do you adjust it by?
15     A   It will vary on an age-by-age basis. Also,
16 within the Supporting Computations document you'll find
17 a page in there called Age Earnings Profiles.
18     Q   Where does that come from?
19     A   That's, again, the American Community Survey for
20 the percentage changes that I applied to his actual
21 earnings. So here you'll see what's column No. 2 is the
22 median earnings for a male with high school -- I'm
23 sorry, with some college and no disability. From that,
24 I can discern what the typical increase is from age to
25 age.

Page 83

1      So from the age of 50 -- from 45 to 46 the
2  earnings go from 56,523 to 56,988. This tells me that's
3  a 0.8 percent increase. If I apply that 0.8 percent
4  increase against his net earnings of 58,000, I get him
5  to 59,404.
6      Q   The base earnings you're actually taking from
7  how much they've earned?
8      A   Yes.
9      Q   Okay. And then you're using the adjusted --
10 you're coming up with the adjusted earnings by applying
11 that percentage point listed in your age earnings
12 profile?
13     A   Correct.
14     Q   Do you do anything to determine whether a
15 journeyman receives an increase as listed in the age
16 earnings profile or do you strictly use the age earnings
17 profile?
18     A   Historically, you can see increases for the
19 journeyman there. But this isn't the economic increase
20 that I'm measuring here, which is the increase in the
21 scale that they have every year. This is more of an
22 increase that somebody gets by being better known in the
23 industry and being more likely to get the next job or
24 get the foreman's job, something of that nature.
25     So this isn't a measurement of how the scale

Page 84

1  changes from year to year. It's a measurement of his
2  stature within the boilermaker community.
3      Q   But if Mr. Perrin has already reached the
4  foreman position --
5      A   Only part of the time. Not all the time.
6      Q   And how often is he foreman?
7      A   About half the time.
8      Q   And so does this factor in that he's foreman
9  about half the time?
10     A   Well, that's factored in to the $58,000 I start
11 with. So that's the starting point, and I'm now just
12 taking the percentage increases from that point forward.
13     Q   I understand that, but you told me the
14 percentage of growth is -- represents when someone
15 becomes well-known and they move up into the next job
16 and it's likely that they're --
17     A   I said it represents the fact that they're
18 well-known and they can get more jobs. So they're more
19 likely to find the next job quickly when there's a
20 layoff at the last job and will increase the likelihood
21 that they'll be called on as a foreman when they are
22 called. So both of those would tend to increase how
23 much Mr. Perrin would earn.
24     Q   Did you look at all of his history? I mean, he
25 told you he's usually about 50 percent of the time. Do

Page 85

1  you expect that to increase?
2      A   Potentially, yes, that as he gets even more
3  experience, he's going to be more valued.
4      Q   So if he's been a journeyman for years and years
5  and years, do you expect that he's going to -- it's
6  going to increase above the 50 percent?
7      A   Yes.
8      Q   And what's the basis of that?
9      A   Just the nature of age earnings progressions.
10 As people progress, they get promotions, and that's why
11 you have an age earnings progression that increases.
12     Q   And that's not specific to welders and
13 journeymen?
14     A   That's right.
15     Q   Adjusted earnings then are -- you're taking --
16 you're taking the .887, you're timesing it by the base
17 earnings, and then you're adding in the fringe benefits
18 as well? So is it like a 1.--
19     A   49.
20     Q   1.49. So does 49 represent the fringe benefits?
21     A   Yes, 49 percent would be the fringe benefit
22 rate. So I add that on and multiply by 1.49.
23     Q   Okay. So you take the .887, times it by the
24 59,821, times 1.49, to get to 79?
25     A   That's right.

DAVID S. GIBSON, MBA, MRC, - 09/19/2018   Pages 86..89

Page 86

1    Q   And then you talk about post-injury, right?
2    A   Correct.
3    Q   That's the next column over.  And the .664,
4    where does that come from for probable employment?
5    A   That's also the ACS.  That now is that fourth
6    column that we looked at under the Participation of
7    Employment Rate.  So here we're at the age of 48, and if
8    you follow this down, starting at age 45, that would be
9    the participation employment rate.  So from 45 to 50 we
10   don't use the same rate.
11   Q   But he's working.
12   A   Yes, the same way.  I mean, he's working now.
13   So if I adjust it for the fact that he's working, I
14   wouldn't have the percentage reduction pre-injury or
15   post-injury.  So what I'm doing is allowing for the
16   probability of future employment.  I'm not looking at
17   what he's doing today.  And, actually, he wasn't working
18   today.  Remember, he's on layoff.
19   Q   Well, at least when you talked to him in August,
20   but he might be working now?
21   A   Right.  But this is the future probability.
22   This isn't measuring at any one point in time.  The
23   probability is whether he's on the non-disabled side or
24   the disabled side of finding and maintaining employment.
25   Q   So the probability of employment for August of

Page 87

1    2018, for that year, is only 66 percent?
2    A   That's right.
3    Q   And the probability that he's going to be
4    working is 66 percent?
5    A   Yes.  So it's the same formula there that we
6    applied pre-injury and the same probability of life.
7    That doesn't change.
8    Q   So what if you're wrong and what if he continues
9    to work full time until August of '29?  How does that
10   change things?
11   A   Then working full time now until '29 --
12   Q   Or let's go to '31.
13   A   Okay.  So '31, that would be 13 years out into
14   the future.  That would tell me that I've understated
15   his worklife both pre- and post-injury, but the overall
16   loss would go down.
17   Q   So rather than a future loss of 332, it would be
18   a lot less than that?
19   A   It would definitely be less.  I can't say
20   exactly what it would be because I'd have to consider
21   how I would change his future worklife from that day
22   forward.
23   Q   And these numbers of pre-injury probability of
24   employment and probability of work, those also come from
25   ACS?

Page 88

1    A   The probability of employment is the ACS.  The
2    probability of work combines that with data from the
3    official U.S. life tables.
4    Q   Okay.  Right, right, we multiplied that out.  So
5    the probability of employment comes from the ACS?
6    A   Correct.
7    Q   Let me ask you this.  Why do you start the
8    losses in August of 2018 as opposed to when the injury
9    allegedly occurred?
10   A   Because for this particular analysis my
11   assumption is the only thing that's been impaired is
12   future worklife.
13        However, if we flip over to the next analysis
14   that starts on page 46, you'll see there is under the
15   assumption that not only has his worklife been impacted,
16   but also his ability to earn money while he is working.
17   So this analysis I start back on the date -- start back
18   in 2016.
19   Q   Okay.  So you have him sustaining some kind of
20   loss from '16 to '18?
21   A   Yes.
22   Q   And it looks like it's, what, 20 -- less than
23   20,000?
24   A   It's 17,350.  You should be able to see that
25   over on the far right.

Page 89

1    Q   Okay, 17,350.  And that's by looking at his W2s?
2    Is that what you've used?
3    A   So this is using the same earnings, that same
4    five-year average, and using those on the pre-injury
5    side, but, yes, using the W2s on the post-injury side,
6    so showing what he actually did earn.
7    Q   Okay.  And on the pre-injury side are you using
8    his actual earnings?
9    A   No.  So there I'm saying that five-year average
10   that I used in the last analysis is also good for this
11   one going backwards.  I've just decreased it for the
12   lower -- lower wages in those prior years.  So they're
13   slightly less in 2016, '17, and '18.  But it's all based
14   upon the five-year average for -- forgive me -- for 2011
15   to 2015.
16   Q   So do you have his earnings from 2011 to 2015?
17   A   I have his wages remember.  So I've got his
18   gross wages, from which I take out an estimated expense.
19   Q   And does that include any unemployment?
20   A   It does include some periods of unemployment,
21   yes.
22   Q   Into his gross earnings?
23   A   Yes.
24   Q   And it looks like in 2017 he actually had an
25   increase in adjusted earnings from 2016?

DAVID S. GIBSON, MBA, MRC, - 09/19/2018   Pages 90..93

Page 90

1    A   Are you on post-injury?

2    Q   Yes.

3    A   Yes.  So in 2017 -- I'm trying to recall there.
4   Oh, yes, the 2016 number's a little skewed because
5   that's only for a partial year.  It's only for
6   three-fourths of the year.  2017 is for a full year.

7    Q   Why is 2016 only for a partial year?

8    A   Because I'm starting the analysis in March of
9   2016.

10   Q   Okay.  And then in 2018, do you know what
11  happened between 2017 and 2018 for there to be a
12  decrease in adjusted earnings?

13   A   There again, the role for 2018 is a partial year
14  until you get to August of 2018, which shows down below.

15   Q   Okay.  So the base earning was 59,642 pre-injury
16  and he had adjusted earnings of 51,543?

17   A   Correct.

18   Q   At post-injury he had a base earning of 53,867?

19   A   Yes.

20   Q   Is that a partial year?

21   A   That's what the value would be for a full year,
22  but then I multiply it by the fraction of a year, .58,
23  to get to what's an adjusted earnings.

24   Q   Okay.  And then it looks like you gave a range,
25  right?

Page 91

1    A   Yes, two ways, both in how much he would have
2   made beforehand and also how much he's going to make
3   now.

4       So beforehand I either do it based upon a
5   five-year average or a ten-year average, and how much
6   he'll make from now, I either say it is the same thing
7   he would have made or, instead, I use as a difference
8   the average that he actually made in 2016 and '17.

9       MR. MANNO:  Is this a good time to take a
10  bathroom break?

11      MS. O'BRIEN:  Oh, I'm sorry.  Yes, it is.  And
12  I don't know if you guys want to ask questions on Perrin
13  before I move on.

14      MR. MANNO:  I think that makes more sense.

15      MS. O'BRIEN:  Yes, me too.

16      (Recess was taken.)

17  BY MS. O'BRIEN:

18   Q   Just going back again to page 44 of Mr. Perrin.

19   A   Okay.

20   Q   At the top, the future worklife, 9.7, the
21  pre-injury is 13.3, post-injury is 9.7.  Go through that
22  calculation for me.

23   A   That's actually computed down in the detail
24  below there.  If you notice, the probability of work
25  columns have totals, and under pre-injury it shows

Page 92

1   13.331.  That's 13.3 years.  And post-injury says 9.653,
2   which is almost 9.7.  So what that means is that the way
3   I compute worklife is by summing the joint probability
4   that somebody will be alive and employed in each year.

5    Q   So that's taking the employment probability
6   times the --

7    A   Probability of life.

8    Q   Probability of life, okay.  And, again, the
9   probability of employment post-injury is the ACS?

10   A   They both are, pre and post.  It's just
11  diminished.

12      MS. O'BRIEN:  Okay.  Thanks.

13      MR. MANNO:  Are you good, Barb?

14      MS. O'BRIEN:  Yes, go ahead.

15      EXAMINATION CONDUCTED BY MR. MANNO:

16   Q   Hi, Mr. Gibson.  We've met off the record.  My
17  name is Joe Manno.  I'm going to ask some questions
18  about Mr. Perrin's report and we'll go from there.

19   A   Okay.

20   Q   Some of this will be generally applicable though
21  I think, because I'm going to start by asking some
22  questions about the worklife expectancy tables.

23      When you're forecasting or predicting whether
24  an individual will be employed in the next future time
25  period, is it beneficial to know whether or not that

Page 93

1   individual is currently employed?

2    A   Yes, it would be beneficial.  And there are
3   some -- some models that attempt to factor that in there
4   using a mark-off process.  However, there's really no
5   longitudinal data that lets you put that together.

6       The mark-off process relies on very limited
7   information that's limited to only two years.  It's not
8   a long-term longitudinal process.  And even that is
9   problematic if you're trying to then factor those
10  probabilities down to levels of disability.

11      So there's no way to come up with a significant
12  sample size that lets you factor in the employment rate
13  that varies by the current employment status.

14   Q   So if I understood your answer correctly, the
15  answer was yes to my question, correct?

16   A   Yes.

17   Q   And, similarly, when forecasting or predicting
18  whether a disabled individual will be employed in the
19  next future time period, is it beneficial to know
20  whether or not the individual is currently employed?

21   A   The same answer.

22   Q   Which was yes?

23   A   It was yes in a short one, but it needs
24  qualification as I provided already.

25   Q   Does your methodology used to construct -- Well,

DAVID S. GIBSON, MBA, MRC, - 09/19/2018   Pages 94..97

Page 94

1  strike that.  Does your methodology -- Sorry, I'm just
2  trying to see if you can answer some of these questions
3  so I can close that.
4        Does your methodology take into account when
5  forecasting if a disabled individual will be employed at
6  the next time period whether or not the individual is
7  currently employed?
8     A   No.
9     Q   In fact, under your methodology a disabled
10  person is always disabled?
11    A   Definitely.  If I have medical opinions that
12  talk about permanent disability, I don't override that
13  medical opinion and say he's going to become well.
14    Q   But as far as their worklife expectancy, they're
15  always disabled, correct?
16    A   The statistics I apply will always be to a
17  disabled person if the person has a permanent
18  disability.  I'm not going to override the medical
19  opinion and say the disability goes away.
20    Q   What I'm asking about though is as far as that
21  application to working, basically you have two buckets,
22  you have a disabled and non-disabled, correct?
23    A   Yes.
24    Q   So if somebody is disabled, they're always in
25  the disabled bucket; you're not accounting for any

Page 95

1  transition where they may no longer be disabled or work
2  the same as a non-disabled person, correct?
3     A   That's right.  If I don't have a medical opinion
4  that says that they're going to change, I will not
5  change it.
6     Q   Are you familiar with -- Well, let me ask this.
7  The Journal of Forensics Economics, is that a
8  peer-reviewed journal?
9     A   It is.
10    Q   Is that a reliable source in the field of
11  forensic economics?
12    A   It is.
13    Q   I'm sure you're familiar with the article by
14  Kruger and Skoog, Transitions In and Out of the Census
15  Disability?
16    A   Yes.
17    Q   Do these authors present a methodology that
18  takes into account when forecasting if a disabled
19  individual will be employed in the next period whether
20  or not the individual is currently employed?
21    A   They're talking about the mark-off method there,
22  but they're not talking about being able to forecast
23  future worklife expectancies that way.
24    Q   So they don't factor in any sort of transitional
25  probability?

Page 96

1     A   Are you talking about their transitions in and
2  out of disability --
3     Q   Correct?
4     A   -- or in and out of employment?  Because that's
5  not what you asked.
6     Q   I'm talking about their transitions in and out
7  of disability.
8     A   Yes, they present a farcical, nonsensical
9  discussion of somebody curing.  You know, they mention
10  somebody that's a paraplegic is likely going to be able
11  to transition out of disability, which is absolutely
12  absurd.  If you have a medical opinion that somebody has
13  a permanent disability, there's no way an economist
14  should give any opinion that's any different from that.
15    Q   Well, their criticism actually of your opinions
16  are that you're comparing a quadriplegic in a physical
17  sense.  You could potentially be comparing a
18  quadriplegic to somebody who has injured their index
19  finger, right?
20    A   No.  If they're familiar at all with the
21  methodology, there's no way that the disability
22  segregation between severe and non-severe would allow me
23  to compare such an individual.
24    Q   This article is peer reviewed, correct?
25    A   It is.

Page 97

1     Q   And it flat out concludes that your methodology
2  is empirically invalid, correct?
3     A   That's what their conclusion is, yes.
4     Q   Let me ask you.  We talked a little bit about
5  the worklife tables, and I think those are sometimes
6  called -- or maybe not even sometimes, I think they are
7  called the Gamboa-Gibson- WorkLife Tables; is that
8  right?
9     A   There are such tables.  I don't think we've
10  talked about them.
11    Q   Okay.  Well, let me go back.  The worklife
12  tables that I think were excluded in the Baltimore
13  case --
14    A   Yes.
15    Q   -- that's -- So we did talk about them in that
16  sense, right?
17    A   Yes.
18    Q   The raw data -- And you said in this case you
19  used your raw data, you didn't use the tables, right?
20    A   That's right.
21    Q   You used the raw data to come to the table -- to
22  come up with the tables at some point, correct?
23    A   You do, but it's not customized to the degree
24  that I can do it on an individual case nature, such as
25  adjusting for a couple things.  One is for putting

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 98..101

Page 98

1  somebody on a continuum. Two, for instance, as we've
2  talked about, it takes the probabilities out until
3  Mr. Perrin is 67. Normally, worklife expectancy is
4  computed until somebody is 90. And so I'm able to
5  customize that for heavier occupations where they're not
6  likely to work as long.
7      Q   **But the vast majority of substance is similar?**
8      A   The computation process is similar. The data
9  will be different.
10     Q   **And so I want to talk about -- We've been**
11 **talking about the quadriplegic example. You and I both**
12 **know what we're talking about. But, you know, in this**
13 **paper the authors say, quote -- And I can give you the**
14 **paper if you need it, but I doubt that you need it. Let**
15 **me know if you do. They say, quote, for example, the**
16 **census ambulatory disability definition treats persons**
17 **having problems walking due to foot bunions equally with**
18 **quadriplegics. Why do you -- Do you disagree with that?**
19     A   Yes.
20     Q   Okay. Why?
21     A   The classification -- First of all, there's a
22 presumption there that somebody has -- would report that
23 a foot bunion gives them -- and I'm going to the
24 mobility definition because we're not using that here --
25 gives them a serious difficulty walking or climbing

Page 99

1  stairs.
2          And so their presumption is that the foot
3  bunion -- that anybody who has a foot bunion is going to
4  apply instantly, and I would dispute that. But even
5  accepting that premises as the way that I classify the
6  data between severe and non-severe, a foot bunion does
7  not interfere with somebody's ability dressing or
8  bathing. It would not interfere with a person's ability
9  to go outside the home. Those things would not
10 obviously be -- knock somebody out of a non-severe
11 disability. And obviously a foot bunion would not --
12 would be a non-severe disability. So they would be in
13 two separate categories.
14     Q   **So let's take away quadriplegic, but potentially**
15 **a foot bunion -- And I understand that you're not**
16 **willing to assume that a foot bunion could substantially**
17 **limit someone's walking. But let's take the assumption**
18 **that somebody answering it -- answering this study says,**
19 **yes, my foot bunion substantially affects my walking.**
20 **And they could potentially be classified in a class of**
21 **people who are amputees, for example, who do not**
22 **necessarily have problems with self-care or going**
23 **outside the home, but they would have selected yes to**
24 **that physical classification and no to the rest of the**
25 **five?**

Page 100

1      A   I disagree. As a rehabilitation counselor, I
2  can professionally state that a person who is an amputee
3  will most likely have difficulties with either self-care
4  or going outside the home.
5      Q   **But that's the problem, Doctor. It's not what**
6  **you as a vocational expert think, it's what the**
7  **individual answering the question thinks when he reads**
8  **the question, correct?**
9      A   Yes, but it is my opinion that somebody who's
10 trained in disability, that somebody would not answer
11 with your construed hypothetical.
12     Q   **And what's the basis of that, other than you**
13 **just said in your experience? Other than your**
14 **experience, what's the basis of that?**
15     A   I'm trained in rehabilitation counseling. I
16 have a Master's degree in rehabilitation counseling. I
17 am an author that has been recognized by the U.S. Census
18 Bureau on his expertise on the census data, the
19 disability data, that's published by the ACS.
20     Q   **So would that give you an expertise to opine as**
21 **to what every single individual with an amputation, how**
22 **they would answer that question?**
23     A   No, it gives me the expertise to say in general
24 how people will answer on what is considered a
25 limitation and what isn't.

Page 101

1      Q   **In your opinion, do you believe it's reasonable**
2  **to assume that there's no probability that Mr. Perrin**
3  **will -- Well, strike that. Let me go back.**
4          **Your report assumes Mr. Perrin has a**
5  **disability, correct?**
6      A   Yes. I mean, my -- It's more than an
7  assumption. An assumption is something that you're
8  making with no background or no support. Here, with the
9  opinions of the medical professionals I've seen, he has
10 a disability.
11     Q   **So based on the opinions of plaintiffs' other**
12 **experts, your -- Okay. In your opinion, do you believe**
13 **it's reasonable to assume that there's zero probability,**
14 **no chance, that he ever becomes non-disabled?**
15     A   You're asking me to go outside my area of
16 expertise. So you're asking me to say whether the
17 medical doctors are right or wrong, or the
18 neuropsychological in this case would be right or wrong.
19 I don't have a basis for giving you that.
20     Q   **You don't have an expertise as a vocational**
21 **rehabilitation expert to know whether individuals get**
22 **better?**
23     A   I know people get better, but that doesn't mean
24 that if a person who is identified as having a permanent
25 limitation overcomes that permanent limitation.

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 102..105

Page 102

1   Q  So your sole basis for saying no is Dr. Santa
2  Maria's opinion?
3   A  Dr. Santa Maria and also for -- It will differ
4  by plaintiff, but Perrin, also Dr. Leitch.
5   Q  You haven't seen the reports yet, but what if
6  the defense experts disagree?  Do you have to consider
7  that as well?
8   A  I don't know.  That's a question that will be
9  somewhat up to the Rapoport firm on what they ask me to
10  value.  I've been asked to evaluate the data that they
11  present.  If they never present me with that data,
12  there's nothing I could do.
13   Q  But it would be outside your expertise to say
14  whether or not he would be disabled or not.  So if you
15  have two conflicting experts, one saying disabled
16  forever, one saying non-disabled forever --
17   A  I can't referee between the two.
18   Q  Right.  Going back to the Kruger article, they
19  present some methodology and they present some data that
20  individuals do in fact go from disabled to non-disabled
21  generically, correct?
22   A  Yes.  There very well can be that there are
23  people that answer the ACS that -- Let's say they had a
24  broken leg and that leg has laid them up for a long-term
25  recuperation process and would indicate that they do

Page 103

1  have a disability at that time.  My assumption is that
2  their employment impact of persons that reported that
3  disability is accurate for those persons while they have
4  the disability.
5   It very well could be that some of those people
6  do have a temporary disability and that disability goes
7  away.  But I only apply it in cases where the medical
8  opinion is that person has a permanent disability.
9   Q  The medical opinion of the plaintiff's expert?
10   A  The medical opinion that I'm working with.
11   Q  We've talked a little bit earlier about whether
12  these worklife expectancy -- I think we talked about it
13  in this context, correct me if I'm wrong, but whether
14  the worklife expectancy figures are generally accepted
15  in your field?
16   A  Yes.
17   Q  Are you aware of the 2009 NAFE Survey of
18  Forensic Economists?
19   A  Yes.
20   Q  Do you know what percentage of forensic
21  economists favored using the Gamboa-Gibson WorkLife
22  Expectancy Tables?
23   A  I don't.
24   Q  Would it surprise you if only 17.6 percent did?
25   A  No, it wouldn't.

Page 104

1   Q  As opposed to 61 percent who were opposed?
2  Would that surprise you?
3   A  No, it doesn't.
4   Q  I want to go back to some specific facts now
5  about Mr. Perrin.  And I wanted to circle back on his
6  difficulty with prolonged standing and sitting.  Does it
7  shock you that a 350 pound man had difficulty with
8  prolonged standing?
9   A  The nature of the prolonged standing was
10  standing in one place, not being on his feet.  So, yes,
11  it would shock me that he can't be stationary.
12   Q  What's the difference you're distinguishing?
13   A  The aspersion that you're casting is that he has
14  trouble being on his feet by being so heavy, and that's
15  not what he's reported.  He's talking about his
16  difficulty as maintaining a steady position.
17   Q  Have you -- Where does it say steady position on
18  your notes?
19   A  It doesn't.  That's what prolonged standing
20  refers to when I'm talking to him.  When I ask him that
21  question, I'll say do you have -- excuse me, do you have
22  difficulty standing in one place for a long period of
23  time.  That's exactly what I would ask him.
24   Q  Have you seen any medical records that would
25  indicate he has difficulties standing -- he had

Page 105

1  difficulty standing in one place prior to his work at
2  Fraser Shipyards?
3   A  No.
4   Q  Are you aware that when Mr. Perrin injured his
5  back at Fraser like in the first week or two he worked
6  there, he experienced numbness in his fingers and had
7  difficulty lifting after that?
8   A  Yes.
9   Q  And are you discounting that injury simply
10  because Mr. Perrin said he thought he'd get better?
11   A  And because, to my understanding, there's
12  nothing to indicate that he would not.  So I -- Just as
13  I look for a medical opinion that identifies limitations
14  he has now, I don't have any medical opinion that
15  indicates he would have had any limitations from that
16  beforehand.
17   Q  Is there any medical opinion that said he would
18  get better?
19   A  No.
20   Q  The absence of that doesn't make it so, correct?
21   A  Well, the fact that he continued and improved
22  all the time after that would seem to indicate that that
23  was true.
24   Q  But he's still alleging -- You know, your report
25  says he had reduced lifting ability and numbness and

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 106..109

Page 106

1  tingling.
2      A   And that's according to Dr. Leitch as a result
3  of the lead exposure.
4      Q   So what you're saying is basically we should
5  talk to Dr. Leitch about that?
6      A   Yes.
7      Q   In your report, and you can look at page 2, in
8  the nature of the injury you say neuro-cognitive
9  disorder as a result of a work-related toxic lead
10 exposure.  What is a toxic lead exposure?
11     A   Exposure to lead is toxic.
12     Q   So what threshold are you considering to be
13 toxic and non-toxic?
14     A   I don't pretend to get that.  It's my
15 understanding that that's the nature of the claim.  I'm
16 not an expert to say that it was toxic or it was not
17 toxic.
18     Q   But you said in your report it was toxic.
19     A   That's my understanding of the nature of the
20 injury.  As I indicated before, I'm not giving an
21 opinion there.
22     Q   Right.  You're not giving an opinion -- You have
23 no basis for it, right?
24     A   That's right.
25     Q   But you include it in your report anyways.

Page 107

1      A   I'm reporting why I'm being asked to do an
2  analysis.
3      Q   Well, so on page 4, under Annual Earning
4  Capacity, it's the third sentence, you say, after the
5  toxic lead exposure.  So you have it there again.  So
6  you're not just -- so you're repeating that same
7  statement that you have no basis for, correct?
8      A   I'm repeating the same cause for why I'm
9  producing a report, that's correct.
10     Q   But you have no -- you have no basis, as you
11 just said, to conclude that any exposure he had was,
12 quote, toxic?
13     A   That's right.  And I don't claim to.
14     Q   Did anyone suggest that you include the word
15 toxic in your report?
16     A   No.
17     Q   In that same paragraph we were just looking at,
18 the last sentence, you're talking about some of Dr.
19 Santa Maria's opinions with respect to Mr. Perrin's
20 cognitive abilities.  And the last sentence says, this
21 may potentially adversely impact his overall earning
22 potential over time.  What does may potentially mean?
23     A   That was repeating Dr. Santa Maria's opinion.
24     Q   Okay.  Do you know what may potentially means?
25     A   Well, to me, the presence of the limitations

Page 108

1  mean that they will likely impact his overall earning
2  potential.
3      Q   It doesn't say those are Dr. Santa Maria's
4  words.  You just included the words may potentially, and
5  it's in your report.  So I just wanted to know what may
6  potentially means.
7      A   Oaky.  I say it's Dr. Santa Maria's opinion.  So
8  I think that pretty much makes it clear that it's coming
9  from her.
10     Q   So you don't know what makes -- So we should ask
11 Dr. Santa Maria what made him --
12         MS. O'BRIEN:  Him.
13         MR. MANNO:  Him.
14         THE WITNESS:  I'm sorry, I did that again,
15 didn't I?
16         MR. MANNO:  We've done it --
17         THE WITNESS:  It's the Maria that keeps on
18 dragging that out of me.
19 BY MR. MANNO:
20     Q   We've done it ourselves.  So we should talk to
21 Dr. Santa Maria about what may potentially means?
22     A   Yes.
23     Q   Okay.  If Mr. Perrin is still being selected as
24 a foreman, I think we talked about, about 50 percent of
25 the time, does that indicate to you that he's excelling

Page 109

1  at his job?
2      A   No more than he did before.  That means that
3  he's recognized as somebody who has a lot of experience.
4      Q   Someone who is doing a bad job wouldn't be
5  selected as a foreman 50 percent of the time, right?
6      A   Well, it depends.  I mean, that's an
7  accumulative experience.  And so if he is experiencing
8  less and less calls for foreman, that would come to
9  fruition over time.  It wouldn't be instantaneous.
10     Q   There's no evidence that he's getting less and
11 less calls as foreman, correct?
12     A   Well, I don't know about that.  He is earning
13 less money.  That's why I provide two different
14 analyses.  I show that his earnings in 2016 and 2017 are
15 substantially less than what they have been from either
16 the five-year or the ten-year average.
17     Q   Let me try it like this.  Do you have any
18 evidence that he is being called on less as a foreman
19 today than he was, you know, prior to working at Fraser?
20     A   No.
21     Q   Do you know if Mr. Perrin's currently seeking
22 treatment?
23     A   To my knowledge, no.
24     Q   Do you know the last time Mr. Perrin sought
25 medical treatment?

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 110..113

Page 110

1    A   I know this is discussed in his deposition.  I
2  don't think I recorded it though.
3    Q   Well, let me -- I'm not trying to trick you.
4  Would it surprise you if -- Oh, I thought I had it
5  written down.  Would it surprise you if it was sometime
6  in mid-2016?
7    A   No, it wouldn't.
8    Q   You stated that Mr. Perrin missed a week of work
9  while he was at Fraser, correct?
10   A   Yes.
11   Q   Did you see any medical records that diagnosed
12  him with pneumonia during that week?
13   A   I don't know if I saw the medical records.  I
14  saw a discussion of it.
15   Q   Do you know whether he had what was diagnosed
16  as -- Do you know whether he was diagnosed with
17  pneumonia during that week?
18   A   I don't.
19   Q   Do you know whether that pneumonia has any
20  relation to any alleged lead exposure?
21   A   I don't.
22   Q   Sorry I'm bouncing around a bit.  I'm trying
23  to -- Turn back to your evaluee interview form for
24  Mr. Perrin.  On the fourth page, source of injury's on
25  there again as toxic exposure, and we've talked about

Page 111

1  that.  But let me ask you this.  Does it make any
2  difference -- Oh, sorry.
3    A   The fourth page I have should be the other case
4  notes.
5    Q   I'm looking at this page.  Okay, the page before
6  that.
7    A   Okay.  Thank you.
8    Q   So we talked about -- It says, other source of
9  injury toxic exposure, and we've talked about.  I don't
10  want to ask you about that again.  But for the purpose
11  of your opinion, it really doesn't matter the source of
12  the injury, correct?
13   A   That's right.
14   Q   You had a statement in there under the Notes
15  that says his levels peaked at 42.7 age --
16   A   I'm sorry, where are you?
17   Q   Notes.  It's just below that, the box, the first
18  box.
19   A   53.7?
20   Q   I said 42.7.  Am I on the right guy?  Sorry, let
21  me make sure.  Oh, no, never mind.  I'll save that
22  question for -- I was looking at -- I was getting
23  confused.
24   A   Okay.
25   Q   Okay.  I'll save that for later.

Page 112

1      Okay.  Here's where I wanted.  Right, right.
2  So here's where I'm at.  Lead level 53.7, and then you
3  have it in Notes above 5 is bad.  What's that mean?
4    A   That was merely as reported I believe by Dr.
5  Santa Maria.  I can't state which doctor, but, to me, it
6  really doesn't play a factor in there.  That's their
7  analysis of toxic exposure.
8    Q   So we should talk to -- Okay.  We should talk to
9  the other doctors in the case about that?
10   A   Yes.
11   Q   Do you know how lead is measured?  Do you know
12  what above 5 is measured as?
13   A   No.
14   Q   I want to talk about the fringe benefits you've
15  assumed for Mr. Perrin.  Was it 49 percent?  You can
16  correct me.  What fringe benefits did you assume?
17   A   I used three different rates depending upon what
18  the earning capacity was.  For using the five-year
19  average compared to a $60,000 earning capacity, I have
20  49 percent.  For the 10-year average it goes to 44
21  percent.  And for the reduced post-injury earnings at
22  57,000 I have 50 percent.
23      The reason they vary has to do with the -- One
24  of the components of the fringe benefits is the
25  provision of health insurance, and that health insurance

Page 113

1  I'm saying is a percentage of the wage.  So as the wage
2  changes, that percentage also changes.
3    Q   Okay.  Do you calculate the $14.20 that goes to
4  the union hall into that fringe benefit analysis?
5    A   No.  The only part of that that I consider in
6  there is the annuity component, which is $4.75.  That
7  goes directly to his benefit.  And so that is
8  essentially 12.8 percent of the overall 40 some percent
9  that I have in here.
10      But the other parts, rather than using the full
11  amount that the employer has to pay towards his health
12  insurance, I look at the value of his health insurance
13  to him as opposed to buying it on the open market.  And
14  that value is about $18,000.
15   Q   But the annuity -- that 4.75 annuity, is that
16  going towards his pension?
17   A   No.  There's two separate contributions.  One is
18  the defined contribution pension, which I analyze
19  separately, and the other is the annuity, which is like
20  a 401-K.
21   Q   Okay.  What else is part of those fringe -- So
22  we've talked about health insurance.  We've talked about
23  that.  What else is part of a fringe benefit?  What
24  makes that number up?
25   A   Just using the 49 percent as our working model,

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 114..117

Page 114

1  the health insurance for $18,000 comprises 30 percent.
2  So that's the biggest component.  After that, there's
3  the annuity, which is 12.8.  Then there's legally
4  required benefits, generally legally required, which
5  would be worker's comp and unemployment insurance, at
6  3.9.  I'm not sure if that's using data from the Bureau
7  of Labor Statistics.  And then there's Social Security
8  contributions, which are 6.2 percent.  And then from all
9  those, after I add them up, I take out 4.3 percent for
10 union dues.  So the net of all those for the $60,000
11 earning scenario is 49 percent.
12      Q  So included in that number is -- So included in
13 that number is the FICA amount, is that right, or no?
14      A  Not the full FICA.  The FICA amount is Social
15 Security plus Medicare.  I exclude Medicare.  But I do
16 have Social Security in there.
17      Q  Do you later readjust your numbers for when he
18 would be receiving Social Security?
19      A  No.  You mean do I do a present value analysis
20 of what his Social Security benefit would be?
21      Q  Right.  What I guess I want to know is if we're
22 double dipping by including FICA and then also including
23 Social Security.
24      A  No, no.  Social Security, 6.2 percent, is the
25 only thing I include.  So the only other thing I

Page 115

1  analyze -- Maybe you're thinking of pension, which I do
2  analyze separately.  That's an additional component.
3  But the only way I include Social Security at all is by
4  the 6.2 percent.
5      Q  So you include the 6.2 percent, but he's going
6  to end up getting his Social Security benefits, right?
7      A  Yes.
8      Q  So he's going to -- So in this analysis you're
9  giving him 6.2 percent, and then you're also later on in
10 his life giving him Social Security benefits, right?
11      A  I'm not later giving him his Social Security.
12      Q  Well, he's going to get Social Security
13 benefits?
14      A  He will.  And the amount he gets will depend
15 upon how many years he works and this 6.2 percent future
16 contributions.
17      Q  So how is that not a double recovery if you're
18 giving him 6.2 percent now, but later on in his life
19 he's going to recover Social Security?  Should we
20 discount -- What I'm saying is, shouldn't we discount
21 the Social Security amounts that you're giving him, the
22 6.2 percent, upfront?
23      A  No, because the amount -- the 6.2 percent is
24 included in the pre-injury and the post-injury fringe
25 benefit.  And so what it's doing is essentially saying

Page 116

1  that by having either shorter years worked, he's going
2  to have less going into Social Security, and, therefore,
3  decrease what his Social Security benefit is, or by
4  having -- in some of the analyses, by having fewer years
5  worked and lower earnings, he's going to have fewer
6  contributions on the post-injury side.
7          So by having it in there on the pre-injury side
8  unimpaired and the post-injury side with some
9  impairment, varying on what the impairment is, it's
10 showing what the degradation is on how much is going in
11 to build up his benefit.
12      Q  Did you subtract for taxes at all that
13 Mr. Perrin would pay?
14      A  I did not.
15      Q  Do you know how much that would lower your
16 number, or numbers, or range?
17      A  Yes, just a ballpark.  I didn't do the
18 computation for him, but I would say about 20 percent.
19      Q  And you'd agree he'd have to pay those taxes had
20 he been working --
21      A  Yes.
22      Q  -- for that wage?
23         That's all I've got for Perrin.
24      MS. O'BRIEN:  Daryl, do you have anything?
25      MR. FUCHIHARA:  No, I don't have any questions

Page 117

1  for Mr. Gibson right now.  Thank you.
2      THE WITNESS:  Can I put Perrin away?
3      MS. O'BRIEN:  You can.  I just have a couple
4  of quick questions.
5      THE WITNESS:  On Perrin?
6      MS. O'BRIEN:  No, it's not specific to Perrin.
7      THE WITNESS:  Okay.
8      RE-EXAMINATION CONDUCTED BY MS. O'BRIEN:
9      Q  As part of your work as an expert, are you asked
10 to come up with ways to retrain somebody for a different
11 position?
12      A  Let me silence this.
13      Q  Or is it strictly to come up with the losses?
14      A  Yes, I am not -- Yes, I mean, in a case like
15 this, it wouldn't be appropriate because I'm opining he
16 continue working, just reduced worklife, but -- like
17 with Mr. Holden or somebody like that.
18         Then it's a question of an ethical violation,
19 of wearing two hats.  Where if I'm working with a person
20 as somebody who's helping them as a counselor, it
21 violates -- my forensic involvement violates the
22 confidentiality and nature of the counseling
23 relationship.  And so the Code of Ethics of the
24 International Association of Rehabilitation
25 Professionals prohibits me from wearing two hats.

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 118..121

Page 118

1    Q   Okay.  And I understand that, but giving
2   opinions are different than counseling someone.
3        Do you ever give opinions as to what somebody
4   can do to retrain -- For instance, even in somebody like
5   Mr. Holden, who we know he's on his phone all the time
6   and researching the Internet and doing all those kinds
7   of things, is there anything that you ever give opinions
8   in that regard?
9    A   In Mr. Holden's case, had I felt that he had an
10  earning capacity or had some residual ability to work
11  and earn money, then I would give an opinion on here's
12  the type of work or the level of income I think that he
13  can earn.  But based upon the dire projections provided
14  by the medical experts, I did not have that opinion.
15   Q   Okay.  Let's take a look at Mr. Holden then.
16       MR. MANNO:  Can I follow up on one?  I have a
17  couple general that makes more sense now.
18       MS. O'BRIEN:  Yes, go ahead.
19       RE-EXAMINATION BY MR. MANNO:
20   Q   I never got this question out I don't think.
21  But those Gamboa-Gibson --
22   A   Gamboa-Gibson.
23   Q   -- Gamboa-Gibson tables, have they been
24  published?
25   A   Yes.

Page 119

1    Q   Have they been published in a peer-reviewed
2   periodical?
3    A   No, it's not peer-reviewed, but, I mean, they've
4   been published by two different sources.  By Vocational
5   Economics themselves and by Trial Guides, Incorporated.
6    Q   What is Trial Guides Incorporated?
7    A   A legal publisher.
8    Q   Does it have a particular audience?
9    A   I don't know.
10   Q   Would it surprise you if its particular audience
11  were plaintiffs' lawyers?
12   A   No.
13   Q   And Vocational -- You said the other one was
14  Vocational Rehabilitation?  I'm sorry, what was the --
15   A   Vocational Economics.
16   Q   Vocational Economics, is that peer reviewed?
17   A   Vocational Economics is the company I work for.
18   Q   Oh, I'm sorry.  I'm sorry.  So you're just
19  putting it online basically?
20   A   Right.
21   Q   Why have you not tried to peer review those
22  tables?
23   A   I had no need to.
24   Q   You don't think it would be easier in answering
25  questions from people like me if they were peer

Page 120

1   reviewed?
2    A   We've actually had the tables replicated by a
3   research group from Northeastern University where
4   they've replicated the process and written articles
5   included in the tables themselves confirming that they
6   did what they said they would.
7        Then we've also provided the means for anybody
8   to replicate the same dollars -- the same employment
9   rates that are used to compute the worklife
10  expectancies.
11   Q   Right, but it's never been published in a
12  peer-reviewed article?
13   A   No.  It's not an article.  Nobody would publish
14  a 1,000 page document as an article.
15   Q   I think Barb touched on this a little bit, but
16  when you made that 50 percent reduction for Mr. -- And
17  we talked about the 50 percent --
18   A   Continuum between a no disability and -- I'm
19  sorry.
20   Q   Okay, we'll call it that.  Is there any sort of
21  peer-reviewed or published literature that you looked at
22  in making that analysis?
23   A   No, that was my professional judgment.
24       MR. MANNO:  I'm good.
25

Page 121

1        CONTINUED EXAMINATION CONDUCTED BY MS. O'BRIEN:
2    Q   Okay.  So if we can move on to Mr. Holden.
3    A   We can.
4    Q   Okay.  The first thing that you did with
5   Mr. Holden was that -- not the first thing, but one of
6   the initial things was to get some information from
7   him --
8    A   Yes.
9    Q   -- under the evaluee information form?
10       (Document marked as Deposition
11       Exhibit 10 for identification.)
12   Q   I'll show you what's been marked Exhibit 10.  Is
13  that the form for Mr. Holden?
14   A   It is.
15   Q   Okay.  I just want to run through a couple of
16  things.  In the upper right-hand corner, ICF, is that
17  consent, that he's given an informed consent?
18   A   It kind of is an informed consent form that we
19  send to the attorney that either the attorney or the
20  plaintiff could sign, but it's basically noting that
21  we're talking to him as a forensic expert and not as a
22  counselor.
23   Q   Under education, it says high school Brookhaven
24  High School, 2000 year completed.  So that means that he
25  graduated from high school?

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 122..125

Page 122

1    A   Yes.
2    Q   Okay.  And is that your understanding, that he
3 graduated from high school?
4    A   Yes.
5    Q   Have you seen medical records -- Strike that.
6        Have you seen any educational records to show
7 that he didn't graduate from high school?
8    A   No.
9    Q   In fact, you read his deposition where he
10 indicated that he graduated with honors from high
11 school?
12   A   Yes.
13   Q   Do you recall seeing that?
14   A   Yes.
15       (Document marked as Deposition
16        Exhibit 11 for identification.)
17   Q   I'm going to show you Exhibit 11, which is the
18 transcript of Mr. Holden's high school and ask you to
19 take a look in the right-hand corner.  And if you can
20 tell me what it says with regard to the graduation
21 facts.
22   A   I'm sorry, I'm trying --
23   Q   In the right-hand corner.
24   A   The lower right-hand corner?
25   Q   Please.

Page 123

1    A   Graduation facts, completed Carnegie units
2 certificate.  It doesn't give -- It doesn't fill in any
3 of the data.
4    Q   In fact, it says completed other prescribed
5 program, right?
6    A   It does.
7    Q   Okay.  Did you do anything to see whether or not
8 Mr. Holden completed his high school?
9    A   No.
10   Q   And you were not provided with these documents?
11   A   That's right.
12   Q   Turning to page 2 of the evaluee information
13 form, before the injury it says he was scheduled to go
14 to another shipyard in Florida, had others possible.
15 Did he tell you what shipyard?
16   A   He may have.  I did not record it.
17   Q   Did he tell you he stopped working because of
18 his symptoms?
19   A   No.  As far as Fraser you mean?
20   Q   Correct.
21   A   I mean, eventually he's saying he can't work
22 because of his symptoms, but as far as leaving Fraser,
23 no.  He reported a misunderstanding or an argument with
24 his boss where he -- according to him at least, he left
25 voluntarily.

Page 124

1    Q   Did you see any employment records from
2 Tradesmen with regard to -- Tradesmen or Fraser with
3 regard to Mr. Holden's employment and if in fact that's
4 what happened?
5    A   I had Tradesmen.  I don't think I had anything
6 from Fraser directly.
7    Q   Did you see anything in the file with regard to
8 the fact that he thinks he was punished with labor
9 assignments so he left?
10   A   I know that was his claim.  I'm trying to recall
11 whether I saw that in the file.  I am -- I may have
12 overlooked it, but I don't see anything dealing with
13 termination of employment.  Most of the document deals
14 with his applications and the paperwork he filed.
15   Q   Under General Notes at the bottom of that second
16 page, it says, has been unable to work since his work at
17 Fraser Shipyards.  Is that something he told you?
18   A   Yes.
19   Q   Do you know whether he had any symptoms or
20 problems at all before he received notice that there was
21 a potential lead exposure?
22   A   To my knowledge, no.
23   Q   He did not have any symptoms --
24   A   Correct.
25   Q   -- until he received a letter saying potential?

Page 125

1    A   That he had not noted, that's correct.
2    Q   And, in fact, he had been in and reported that
3 he had no symptoms.  Do you recall seeing medical
4 records to that effect?
5    A   I recall seeing discussion at least in his
6 deposition.  I don't recall the medical records.
7    Q   Then on the next couple of pages there is
8 information about places that he worked.
9    A   Yes.
10   Q   Nothing with regard to how much he was making or
11 the benefits that he received, anything like that?
12   A   That's right.
13   Q   And is that because you don't have his W2s?
14   A   Well, because of that and because he didn't
15 recall the information to provide it.
16   Q   He recalled that he was the leadman and he
17 supervised a crew at least at the -- at Trinity?
18   A   Correct.
19   Q   Okay.  Did you review Trinity records to see if
20 that was the case?
21   A   No.
22   Q   Under the pre-existing, which is on the next
23 page, I guess page 4, do you see that?
24   A   Yes.
25   Q   Okay.  Pre-existing limitations, depression as a

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 126..129

Page 126

1  teen.  What does that tell you as far as a limitation?
2      A   Nothing, other than he reported that he had
3  depression then, but nobody had identified it as
4  limiting him in terms of the work that he did.
5      Q   How about the shoulder pain bilateral due to
6  rotator cuff tears?
7      A   That was an ongoing complaint of his.  He said
8  it didn't impact his work at all.  But I did use that as
9  a potential reduction of his earnings.
10     Q   But you didn't have any medical provider telling
11 you that there was a limitation in that regard?
12     A   Right, because the reason I used it anyhow is
13 that he reported that it was ongoing, that he still had
14 that pain even without the lead exposure coming out.
15     Q   Did you ask him about his depression and whether
16 he continued to have depression?
17     A   And there, no, he did not.
18     Q   And where do you say that?
19     A   I would have recorded it if there was anything
20 ongoing.
21     Q   Well, where do you say that his shoulder pain
22 was ongoing?
23     A   I guess I don't say it there.  I just remember
24 that it was, and that's why I did the analyses that it
25 would be continuing.

Page 127

1      Q   Okay.  He had degenerative arthritis knee pain.
2  You say it didn't impact his work.  Is that something he
3  told you?
4      A   Yes.
5      Q   But he told you that with regard to his shoulder
6  pain as well?
7      A   Yes.
8      Q   So did you factor in the degenerative arthritis
9  knee pain?
10     A   The analysis that I do that adjust for
11 pre-existing limitations are for physical limitations.
12 That will adjust for limitations with any physical
13 condition, such as -- or physical requirement, such as
14 reaching, walking, climbing stairs, things of those
15 natures.
16     Q   Okay.  So if he would fall in a disability -- a
17 pre-existing disability under the ACS?
18     A   Correct.
19     Q   And is that a non-severe pre-existing
20 disability?
21     A   It is.
22     Q   Do you know whether that would have stayed a
23 non-severe disability or if it would have continued to
24 get worse to make it a severe disability?
25     A   I don't.  My assumption is it would be

Page 128

1  continuing on the same level it was.
2      Q   Is that normally how degenerative arthritis
3  works?
4      A   It would -- Without a -- Degenerative arthritis,
5  it says it's going to get worse, but that doesn't mean
6  it's going to be severe.
7      Q   You don't know?
8      A   That's right.
9      Q   You talked about left arm goes numb, hand cramps
10 and mild neuro-cognitive disorder.  Are those things
11 from a report that you obtained or --
12     A   I'm sorry, where are you?
13     Q   I'm sorry, I'm under the nervous system in the
14 brain under injury --
15     A   Oh, I see.  Yes.  So, I'm sorry, what was your
16 question again?
17     Q   Sure.  Are those something that came from a
18 report or --
19     A   Those would come from the report.  And I think
20 the discussion of his left arm going numb, the hand
21 cramps, came from him during the interview.  But the
22 neuro-cognitive disorder obviously came from -- well,
23 actually, from Dr. Santa Maria who said it would not be
24 mild, that she phrased that as major.
25     Q   So your notes here are wrong?  It's not mild

Page 129

1  neuro-cognitive disorder, but, rather, it's major
2  neuro-cognitive disorder?
3      A   True.
4      Q   And is that coming out of Santa Maria's reports?
5      A   Santa Maria phrased it -- Here it is.  Actually,
6  I don't recall how he phrased it exactly.  I mean, the
7  gist of what he's saying is that, but I don't see where
8  he puts that into those words.
9          He talks about lacking capacity to handle
10 employment, lacking capacity to handle his finances, all
11 those, which would indicate a major neuro-cognitive
12 disorder, but I don't see the words.
13     Q   Where would the mild neuro-cognitive disorder
14 come from?  Could it have been from his medical records?
15     A   I don't believe so.  I believe the only -- the
16 only opinion we have at that time, well, still in terms
17 of neuro-cognitive issues, would be Dr. Santa Maria.
18     Q   Did you see any of his psychiatrist records?
19     A   I had actually Dr. Ochberg's opinion, report.
20     Q   Dr. Ochberg is one of the paid plaintiffs.  Did
21 you see any of the treating psychiatrist records?
22     A   We've already talked about that.  No, I haven't.
23     Q   Okay.  I didn't know with regard to Holden.
24     A   We specified for any of the plaintiffs have I
25 seen any treating doctors, and I said no.

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 130..133

Page 130

1    Q    Okay.  Well, you have medical records in your
2    folders.
3    A    We've talked about those, too.  Medical records
4    aren't medical opinions.
5    Q    Okay.  But you still review the medical records
6    I'm assuming if they come to you?
7    A    Right, but they don't provide opinions on what
8    one person's limitations are.
9    Q    Okay.  I'm asking, though, do you believe a mild
10   neuro-cognitive disorder could have come from one of the
11   medical records that came in to you?
12   A    No.
13   Q    Under surgeries, multiple for muscle pain.  What
14   does that mean?
15   A    No, no, you're misreading it.  Surgeries is
16   none.  Medications is --
17   Q    Okay.  Multiple?
18   A    Yes.
19   Q    PT completed.  Is that physical therapy?
20   A    Yes.
21   Q    Okay.  You noted that he sees a psychiatrist.
22   A    Yes.
23   Q    And is that something that he told you?
24   A    Yes.
25   Q    He applied for Social Security Disability, but

Page 131

1    was rejected?
2    A    Yes.
3    Q    Future treatment expected, possible arm surgery
4    and knee surgery.  Is that something that he told you?
5    A    It is.
6    Q    That's not something that you gleaned from the
7    medical records?
8    A    No.
9    Q    Okay.  I want to go to the one that talks about
10   pain.
11   A    Well, I'm sorry, I do have it in these notes
12   that Dr. Santa Maria did say major neuro-cognitive
13   disorder.  So it's just a typo I believe in the other
14   notes -- I'm sorry, limitations.
15        MS. O'BRIEN:  Just one second.  Can we just
16   take five minutes so I can look at these quick?  I just
17   want to quickly see if I can pull this out.
18        (Recess was taken.)
19   BY MS. O'BRIEN:
20   Q    Turning now to the pain page.  Are you there?
21   A    Limitations, yes.
22   Q    Okay.  So the prolonged standing, is that
23   something he said, he can stand in one area for five
24   minutes?
25   A    Yes.

Page 132

1    Q    And he can only walk less than a block?
2    A    Correct.
3    Q    Did you do anything to verify either one of
4    those?
5    A    No.
6    Q    Strength is less than 10 pounds and limited to 1
7    pound per hand in physical therapy.  What does that tell
8    you?  Is that something that he told you?
9    A    Yes.
10   Q    Then under the psychological limitations, you
11   have depression, anxiety, negative impact kids, lost
12   interest in activities, sports with kids, and shooting.
13   What is shooting?
14   A    With a gun.  So, I mean, not hunting, but
15   actually -- I take it's targets and whatever else.
16   Q    But he can't do that anymore?
17   A    Not necessarily that he can't, but he has
18   trouble doing it.
19   Q    Depression, one of the limitations, did that
20   impact on your -- did that have any impact on your
21   analysis?
22   A    It likely did, but only through the opinions of
23   Drs. Ochberg and Santa Maria in that it likely impacted
24   the opinions I gave.
25   Q    And then under annual earning capacity, the

Page 133

1    next --
2    A    Didn't we talk about this page before with
3    Perrin?  This page isn't part of the interview itself,
4    but it will be attached to all three of the interviews.
5    This is what I prepare after the interview's over to
6    identify how I want to do the analysis.
7    Q    You're talking about the pain page?
8    A    No, the next page that you were starting on that
9    had the annual.  So this is not part of the interview,
10   but this is something that's like an internal
11   communication on setting up the spreadsheets.
12   Q    Okay.  So you had one spreadsheet that says no
13   disability pre, but I know that you did some analysis
14   with a disability.
15   A    Which is the next page.  You don't have a next
16   page.  Oh, yes, you do.
17        So, yes, you'll notice that the next page looks
18   like it's empty, but note that it says make the
19   following changes to analysis one.  And so the only
20   thing that changed is using the disability status for
21   the worklife expectancy there and also for the earnings.
22   Q    Okay.  Under -- On the previous page you have
23   note, lack of earnings history, use proxy of welders.
24   A    Correct.
25   Q    What does that mean?

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 134..137

Page 134

1    A   That when we first did our report -- We issued
2  the report on August 7th, and at that time we didn't
3  have those W2s that came in for 2014.  After we got the
4  2014 we modified it and reissued the report on August
5  9th.  So it was the one that was modified to have the
6  earning information.
7    Q   Okay.  And then you only used the 2014?
8    A   Correct.
9    Q   Did you see where he claims to be a welder for
10 13 years?
11   A   Yes.
12   Q   Did you see evidence in his W2s where he was a
13 welder for 13 years?
14   A   No.
15   Q   How many years was he a welder?
16   A   Yes, I can't tell.  I can see places he's worked
17 for.  That doesn't tell me what he did for those.  But I
18 know that many of those he would not be doing welding.
19 Bear with me, I'm trying to find it.  There it is.
20       So obviously he worked for West Steakhouse and
21 would not be doing work as a welder.  But for the
22 majority of these, I can't tell the type of work that he
23 was doing for them.  All I know is how much he earned.
24   Q   Okay.  And it wasn't very much up until 2014?
25   A   Right.  In 2013 is when it started climbing, but

Page 135

1  2014 was definitely higher than 2013.
2    Q   And what about 2015?
3    A   In 2015 it dropped from 2014.
4    Q   Why?
5    A   I'm trying to recall.  Oh, Trinity shut down.
6  He was out of work after Trinity shut down.
7    Q   Do you know when Trinity shut down?
8    A   I don't.  It's somewhere in the middle of the
9  year, but I don't have the exact date.
10   Q   And is that something he told you, that it shut
11 down in the middle of the year?
12   A   Yes.
13   Q   Do you know in 2015 when he actually earned the
14 35,000?
15   A   Other than the first part of the year, no, I
16 don't know how many months were included in that.  And I
17 say Trinity because that's how he reported it, but the
18 W2 is called Gulf Coast Shipping.
19   Q   And how do you know his job shut down in the
20 middle of the year?
21   A   By what he told me.
22   Q   And is that some place here?
23   A   Yes.  I don't have the date in there.  I just
24 leave it open as a general '15.  I don't give the exact
25 month because he didn't have it.

Page 136

1    Q   So it could have shut down in December; you
2  don't know?
3    A   It's possible.
4    Q   And so maybe all he earned then was that 35,000
5  for 2015?
6    A   Potentially.
7    Q   It's not something you investigated to see?
8    A   That's right.
9    Q   But decided still to use the 2014 number?
10   A   That's right, because that's the only year I
11 know is a full year.
12   Q   How do you know 2014 is a full year?
13   A   Because he obviously was working there in 2013
14 and 2015.  So he was employed there for -- through --
15 starting in 2013, ending in 2015, which left him there
16 for all of 2014.
17   Q   Do you know whether he was laid off at all
18 during 2014?
19   A   I don't.
20   Q   It's not something you asked him?
21   A   That's right.
22   Q   What did he do in 2016?
23   A   In 2016 his only employment was through
24 Tradesmen.
25   Q   And as you look at his Social Security earnings,

Page 137

1  does he have other earnings besides just Tradesmen for
2  2016?
3    A   In terms of Social Security, no.  However, he
4  did have other earnings doing landscaping work that year
5  that showed up on a Schedule C.  The Social Security
6  records that you obtained only showed W2s.  It doesn't
7  show any earnings that would have come from
8  self-employment.
9    Q   Well, I'm looking at a Social Security
10 Administration certificate -- certification extracted
11 from records, and mine is showing 2016 of $9,405.
12 $9,405.
13   A   Okay.  Let's see.  Oh, it does show
14 self-employment.  I didn't think it did.  And so that is
15 consistent with what I had on the tax returns.  I didn't
16 notice that it had that up there.
17       So for the tax returns I show that year as
18 being $10,185.  So they are slightly different.  I don't
19 know why Social Security has a different number than
20 what he filed.
21   Q   So Mr. Holden was able to earn almost $10,000
22 doing landscaping work in 2016?
23   A   That's right.
24   Q   But he reported to you that he hadn't worked
25 since working at Fraser Shipyards?

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 138..141

Page 138

1   A   That's right.
2   Q   Do you know when he did the landscaping?
3   A   No.
4   Q   Okay.  Do you know where he did the landscaping?
5   A   Other than around his home, because that's where
6   he shows the W2, but I don't know who he did it for.
7   Q   Okay.  You understand that Fraser Shipyards is
8   up in Superior, Wisconsin?
9   A   I do.
10  Q   So Mr. Holden was not being honest with you when
11  he said he has not worked since working at Fraser?
12  A   I don't think he was being dishonest.  I think
13  he's considering being -- working as being employed when
14  he was unemployed.
15  Q   Did you ask him whether he had earned any money
16  in any other position?
17  A   I did not -- I did not break that out and ask is
18  there a possibility that maybe you were self-employed as
19  opposed to being an employee.
20  Q   Did you ask Mr. Holden whether he can work as a
21  landscaper in 2017 or 2018?
22  A   I asked him what he could do now, and he
23  reported that his current muscle weakness, shoulder,
24  knee, and cognitive limitations kept him from doing
25  anything.

Page 139

1   Q   When did that start?
2   A   I don't know.
3   Q   It certainly didn't start in 2016 if someone's
4   doing landscaping work, right?
5   A   That's correct.
6   Q   Do you have loss of earnings on your report for
7   Mr. Holden in 2016?
8   A   The analyses for Mr. Holden start on March 2016.
9   Q   Let's mark your report.
10      (Document marked as Deposition
11      Exhibit 12 for identification.)
12  Q   I'm showing you Exhibit 12.  Is that the report
13  that you have for Mr. Holden?
14  A   It is.
15  Q   And where do I find in your tables that you did
16  factoring in the amount of money that Mr. Holden earned
17  in 2016?
18  A   You don't.  I show starting in March of 2016
19  what he would have earned had he continued -- had he
20  worked as a welder or had he worked under his 2014
21  earnings levels.
22  Q   He doesn't have to work as a welder, because
23  your tables apply to everybody, not just welders, right?
24  The ACS looks at anybody, not just welders?
25  A   We're talking about earnings.  We're not talking

Page 140

1   about probabilities of employment.  You're asking me
2   earnings.
3   Q   Okay.  Let me ask you earnings then.  Did you
4   factor in anywhere with regard to his earnings the fact
5   that he earned $10,000 in 2016?
6   A   I did not.
7   Q   Okay.  So is your table that you came up with
8   erroneous with regard to 2016?
9   A   It would be.
10  Q   Did you explore at all with him about his
11  ability to landscape?
12  A   I did not.  His abilities to do anything were
13  called into question pretty severely by both experts
14  that I saw.  And my discussion with him confirmed that
15  he found his ability to find and maintain constant
16  employment was non-existing.
17  Q   Okay.  But you got the records, and the records
18  show that he did maintain employment in 2016.
19  A   For part of the year, yes.  That he maintained
20  self-employment.
21  Q   And you didn't explore that whatsoever to see if
22  that was something that he could continue to do?
23  A   That's right.
24  Q   Because that would reduce his loss of earnings,
25  wouldn't it, if he continued to work as a landscaper?

Page 141

1   A   It would if he was able to do that.  However, it
2   would be contrary to the medical opinions on what he
3   should be doing.
4   Q   Because they basically find he's got no strength
5   and he can't do anything?
6   A   Well, I don't know that they basically find he
7   has no strength, but he has no capacity to be doing any
8   work.
9   Q   Did you read Dr. Santa Maria's reports and his
10  testing where he basically finds he has less than 1
11  percent of the strength of anybody?
12  A   I don't know that that's how I would phrase it,
13  but he definitely talked about decreased strength.
14  Q   Okay.  Would a landscaper in your expert opinion
15  as a vocational expert be someone who has a substantial
16  decrease in strength?
17  A   For most landscaping activities, no.
18  Q   Okay.  Now that you know that, would that be
19  something that you'd want to explore to see if
20  Mr. Holden could do some landscaping work?
21  A   No.
22  Q   You don't think he can do any landscaping work
23  based upon Dr. Santa Maria's report and Dr. Ochberg's
24  report?
25  A   I don't think he should be attempting to do any

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 142..145

Page 142

1  employment such as that based upon the reports.
2     Q   Based upon the reports?
3     A   That's right.
4     Q   So we know that Mr. Holden did not graduate from
5  high school, even though he told you he did.  We know
6  that he -- contrary to what he told you, he couldn't
7  work since Fraser, we know that he did, right?
8     A   He did.
9     Q   Do you ever factor credibility into your
10 opinions when you come up with an opinion that someone
11 has a loss of earnings of 900 to $1.3 million?
12    A   I do.  I rely upon Dr. Santa Maria especially,
13 who has done extensive testing of Mr. Holden, who has --
14 I'm trying to think of the phrases she would use.  But
15 there's building components to the tests that she
16 applies that tests to the credibility and the
17 believability of the scores that she's obtaining.
18    Q   And when you say that, what is the basis of you
19 saying that there are things that she's using to test
20 the credibility?
21    A   Just my knowledge of neuropsychological tests
22 that I've seen in the past.
23    Q   What are those?
24    A   I can't tell you.  Again, that's why I'm saying
25 you need to talk to Dr. Santa Maria.

Page 143

1     Q   Okay.  And so if Dr. Santa Maria did not use
2  those kinds of tests in his testing of Mr. Holden, we
3  might have a credibility issue here?
4     A   Potentially.  You'd have to ask Dr. Santa Maria
5  on how that impacts his opinion.  I'm relying upon his
6  opinion.
7     Q   You interviewed Mr. Holden, right?
8     A   I did.
9     Q   You spent an hour with him?
10    A   Yes.
11    Q   You took notes on what he told you?
12    A   Yes.
13    Q   You went through the records that were provided
14 to you?
15    A   Yes.
16    Q   You know that there were things that he told you
17 that were not credible?
18    A   Yes.
19    Q   Okay.  Did you do anything at that point to
20 follow up with Dr. Santa Maria or Dr. Ochberg or anybody
21 with regard to Mr. Holden to see if what he had told you
22 was credible before you give an opinion that he has a
23 potential loss of $1.3 million?
24    A   I saw no need to.
25    Q   And, again, just so I understand, you used 2014,

Page 144

1  even though you don't know for sure whether 2015 was
2  payment and earnings for a full year or a partial year?
3     A   That's right.
4     Q   Is there any reason why you didn't go back
5  further and average out based upon five years or 10
6  years?
7     A   I'm looking for a full year's worth of earnings.
8  2014 was the best measure that I can see that was a full
9  year of earnings.  I take a full year and then decrease
10 that for the probability of not working.
11       So the probability of employment and worklife
12 expectancy will then take whatever I use for a full year
13 of earning and decrease for the fact that he's likely
14 not to be working full years.
15    Q   How do you know these other years were not full
16 year earnings?
17    A   Because working for a minimum wage for a full
18 year would pay more than he had in many of these other
19 years.
20    Q   Okay.  Let's go through them and tell me which
21 ones.  What about 2005?
22    A   In 2005 he made $23,000.  That could be a full
23 year.  If I restated that to 2018 terms, it would
24 probably be about $40,000 or more.
25    Q   For present value?

Page 145

1     A   In -- That's not necessarily present value, but
2  that's in common year terms.
3     Q   How about 2007?
4     A   In 2007 he earned $16,000, which potentially
5  could have been a full year.
6     Q   How about 2013?
7     A   2013 was when he started at Gulf Coast, or,
8  forgive me, what's the name that he referred to it as?
9  Trinity.  And that was the bulk of his earnings.  But he
10 also had two other employers that year that totaled 29,
11 almost 30,000.
12    Q   And so did you factor in that number?  Did you
13 use that number?
14    A   No.  As I explained before, because he started
15 at Gulf Coast in 2013, ended in 2015, couldn't remember
16 the exact start date, but it's felt that they are
17 partial years and I used the full year.
18    Q   Where does it say he felt it was partial years?
19    A   Because he wasn't able to give the exact date.
20 If he knew the exact date that he started, he would have
21 provided it, or I would have written them down.
22    Q   So you just assumed that it wasn't a full year?
23    A   Yes.
24    Q   You have no idea if that's true?
25    A   I have a reasonable idea that that's true

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 146..149

Page 146

1  because he said he could not think of the date and he
2  thought it was partial years.
3      Q   How many of these analyses do you do in a month?
4      A   A month, it will vary widely.  But in a year I
5  do about 120 new cases, but not all of them would be
6  loss of earnings cases.  But 120 new cases in total.
7      Q   Okay.  So is that about, what, 10 a month?
8      A   If averaged, yes.  I mean, again, it would vary
9  widely from month to month.
10     Q   Okay.  And you interviewed Mr. Holden back in
11 July?
12     A   Yes.
13     Q   And you recall your conversation with Mr. Holden
14 and the fact that he told you he thought he started in
15 the middle of the year?
16     A   That's what we've established.  I know how I
17 take my notes.
18         If he knows a month, I will write the month
19 down.  If he says, oh, I started sometime in 2013, I
20 can't remember the exact date, that means I don't have
21 an exact date.  I will put 2013 in general.  If he knew
22 that he was there for the full year, I would definitely
23 put January 2013.
24     Q   Similarly, you haven't seen any doctor that
25 placed any work restrictions on Mr. Holden?

Page 147

1      A   That's right.
2      Q   Did you see any doctors' records that showed
3  that Mr. Holden got better when he took his medication
4  and was able to function?
5      A   No, no.  I mean, there may be -- I do have
6  medical records in here, but I don't see an evaluation
7  of an improvement over time.
8          But it's the potential that some of the records
9  cover medications.  And I know that Dr. -- maybe it's
10 both doctors, but at least Dr. Santa Maria talks about
11 the need of calibrating his medication because they
12 don't believe he's reliable to remember what he's taking
13 and when he's taking it.
14     Q   Did you review Dr. Ochberg's deposition?
15     A   No, I haven't seen depositions for Ochberg or
16 Santa Maria.
17     Q   Would you want to see those?
18     A   Yes.
19     Q   For what purpose?
20     A   To confirm that the information I'm gleaning
21 from the reports is correct.
22     Q   Okay.  And if it's not correct, that would
23 affect your numbers?
24     A   Maybe.
25     Q   Well, certainly if Mr. Holden is able to work

Page 148

1  like he was in 2016, that affects your numbers?
2      A   Yes.
3      Q   Okay.  That is all I have.  I have one other one
4  for Perrin, but we'll get to that.
5      A   You mean Pekkala, right?
6      Q   I have one for Perrin still to go back to.  I'm
7  sorry, that was my fault.
8          MR. MANNO:  I have one to go back to.  We'll
9  do that at the end.
10         MS. O'BRIEN:  Okay.
11         MR. MANNO:  Ready to keep going?
12         THE WITNESS:  Yes.
13     CONTINUED EXAMINATION CONDUCTED BY MR. MANNO:
14     Q   Okay.  I'm going to -- Do you have the 2016 tax
15 return in front of you of Mr. Holden?  I have a copy
16 here.
17         MS. O'BRIEN:  I have an extra copy.
18         MR. MANNO:  I have two copies actually because
19 I'm going to mark it as an exhibit.
20         THE WITNESS:  I do have it.
21         MR. MANNO:  Can you mark this as 13.
22         (Document marked as Deposition
23          Exhibit 13 for identification.)
24 BY MR. MANNO:
25     Q   You can look at that.  Is Exhibit 13 the tax

Page 149

1  return that is in your file?
2      A   Yes.
3      Q   I want you to go ahead and turn to the Schedule
4  C that Ms. O'Brien had talked about earlier.
5      A   Okay.
6      Q   Part 2, under expenses, there's line 8,
7  advertising.
8      A   Yes.
9      Q   $600?
10     A   Yes.
11     Q   What is that?
12     A   I don't know.  I can't tell you specifically
13 what he spent on any of these items, but that should
14 cover if he put an ad in the paper or if he just
15 distributed leaflets, anything along those lines.
16     Q   So it's not just that he's working on
17 landscaping in 2016, he's actually advertising for his
18 business in 2016, correct?
19     A   He's trying to get work, yes.
20     Q   Do you know if he's done any landscaping in
21 2017?
22     A   Not to my knowledge.
23     Q   Have you seen any 2017 tax returns?
24     A   No.
25     Q   Do you know if he's done any landscaping in

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 150..153

Page 150

1 2018?

2 A  Not to my knowledge.

3 Q  I want to mark this as an exhibit.

4 (Document marked as Deposition

5 Exhibit 14 for identification.)

6 Q  So I'm handing you what's been marked as Exhibit

7 14.  Exhibit 14 appears to be correspondence from Mary

8 Reid, who works for Rapoport Law Office to you, correct?

9 A  Yes.

10 Q  What's the date of that?

11 A  July 26th of 2018.

12 Q  Okay.  And that correspondence is just sending

13 you Mr. Holden's tax returns or at least a partial

14 version of the tax returns?

15 A  Correct.

16 Q  So as of July 26, 2018, plaintiffs' counsel had

17 a copy of Mr. Holden's tax returns, correct?

18 A  Yes, I'm trying to remember -- I believe

19 that's -- that that's '15, '16.  I can't say.  It

20 doesn't identify which ones they were, but the only tax

21 returns I have would be '15, '16.

22 Q  And that's fine.  I'm actually trying to make a

23 broader question.  So they had some sort of tax returns

24 as of at least July 26th, 2018, correct?

25 A  Yes.

Page 151

1 Q  Do you know -- I don't think you know the answer

2 to this, but you don't know when the defendants got a

3 copy of Mr. Holden's tax returns, do you?

4 A  No.

5 Q  I should go back to my outline before I get

6 mixed up.

7 We talked a little bit about you used 2014, I

8 think you said, because it was the only one you thought

9 was a full year of earnings, correct?

10 A  Correct.

11 Q  So, in your opinion, if Mr. Holden had only one

12 full year of earnings in this large timespan where he

13 alleges to have been a welder, how is it reasonable for

14 you to assume that he would continue to have four years

15 of earnings the rest of his life?

16 A  I'm looking at modern times.  I mean, I don't

17 base earnings going back to the beginning of time.

18 There are years and years that could be half years.

19 For instance, I think it was 2005 that your

20 co-counsel mentioned where I said that if I use that and

21 increase it, it would probably be close to $40,000.  But

22 then using modern times, it shows what he was

23 demonstrating in earning capacity starting with Gulf

24 Coast or Trinity Yards -- Trinity Yachts, I'm sorry,

25 whichever one it was, earning pretty consistently there,

Page 152

1 and then having the full year in 2014, I felt it was

2 reasonable.

3 Q  So the Gulf Coast Shipyards, you say earning

4 pretty consistently.  That was essentially two to three

5 years --

6 A  Yes.

7 Q  -- of his career?

8 A  Yes.

9 Q  Prior to that, though, very inconsistent

10 earnings, correct?

11 A  Yes.

12 Q  But your analysis assumes he has consistent

13 earnings, correct?

14 A  No.  I take those earnings and then reduce them,

15 as I talked about before, for the periods or gaps of

16 employment he's likely to have.

17 MS. O'BRIEN:  How big of gaps?

18 THE WITNESS:  Well, it depends on the

19 analysis.  My reports, going back to the worklife

20 probability schedules, use -- The two that deal with the

21 2014 earnings will probably be the easiest to look at

22 right now.

23 BY MR. MANNO:

24 Q  What page are you on now?

25 A  48 and 50.  And there I'm allowing for gaps

Page 153

1 starting out with no disability of being gone 15 percent

2 of the year to start with and then increasing as he

3 ages.  The one that allows for a lesser likelihood with

4 a physical disability allows for a 30 percent gap to

5 start with.

6 Q  So part of that gap is because you're saying he

7 has a physical disability, correct?

8 A  In the latter one, yes.

9 Q  In the latter one.  In the first one you just

10 picked 15 percent?

11 A  That's right.

12 Q  Why did you pick 15 percent?

13 A  Because that's -- I didn't pick 15 percent.

14 That's what the statistics are for no disability.

15 Q  Oh, okay.  So you're comparing Mr. Holden to

16 every non-disabled male with the same education as him?

17 A  That's right.

18 Q  Does every non-disabled male, the same education

19 as him, have such an inconsistent earning history?

20 A  No.

21 MS. O'BRIEN:  So to follow, that's not

22 factored in then to your numbers?

23 THE WITNESS:  That's factored in if you

24 attribute the fact -- the possibility that the reason

25 that he was as inconsistent is due to pre-existing

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 154..157

Page 154

1  limitations, which is what the second analysis does by
2  using the --
3        MS. O'BRIEN:  But the first one does not?
4        THE WITNESS:  That's right.
5  BY MR. MANNO:
6    Q   In here, the second one only does because of
7  what you allege is an injury that he has now, right?
8    A   No.
9    Q   The second analysis is an injury, shoulder and
10 knee, right?
11   A   Yes, but not that he had because of the
12 exposure.
13   Q   I'm just saying, you're saying -- You don't know
14 he had that injury and that's why he was missing work
15 previously?
16   A   Well, I am -- That's what that whole analysis is
17 saying, is that he had a pre-existing limitation and
18 that that did impact him in the past and will impact him
19 in the future.
20   Q   But what I'm saying is, you have no idea whether
21 he had a pre-existing shoulder injury in the year 2010?
22   A   That's right.
23   Q   He could have just decided he didn't want to
24 work as much that year, right?
25   A   Potentially.

Page 155

1    Q   Did you ask him?
2    A   About 2010?  No.
3    Q   What about 2011, 2012, 2013?
4    A   I asked him about the recent years, 2013, 2012,
5  going forward.
6    Q   And, conveniently, the reason here was the
7  highest -- the reason here you used was the highest
8  year, right?
9    A   A full year of employment will always be higher
10 than a partial year.
11        MS. O'BRIEN:  You don't know that.
12 BY MR. MANNO:
13   Q   I wanted to go to your report.  And we've talked
14 about the pre -- And we're calling the pre-existing
15 disability the shoulder and the knee, right, just for
16 clarity?
17   A   Yes.
18   Q   The pre-lead exposure?
19   A   Yes.
20   Q   Going to your report, under Reported Problems,
21 there's a few I want to talk to you about.
22        For example, constant pain, how do you know
23 that the constant pain isn't related to his shoulder or
24 his knee?
25   A   I don't.  If there are pre-existing limitations

Page 156

1  and that pain's continuing, there's no way that I have
2  to segregate how much of that or what percentage of that
3  had to do with those limitations.
4    Q   Okay.  I'm going to ask a few -- the same
5  question for walking on even ground.  You don't know
6  that that's related to the pre-existing or what you're
7  calling a post-injury, right?
8    A   That's right.
9    Q   Climbing stairs and ladders, the same thing,
10 correct?
11   A   Yes.
12   Q   A lifting limitation of less than 10 pounds, the
13 same thing, correct?
14   A   Yes.  Definitely I can't segregate.  I'm
15 confident that there is a component that's identified by
16 the doctors that has to do with what they feel is the
17 lead exposure, but, you're right, that if there is a
18 pre-existing limitation, that would also come into play.
19   Q   Have you seen any records from his treating
20 physicians that put a 10 pound -- specifically his
21 rotator cuff physician, that puts a lifting limitation
22 of less than 10 pounds on him?
23   A   Again, I've seen no opinions from treating
24 doctors.
25   Q   Limited range of motion.  The same question, the

Page 157

1  same answer?
2    A   Yes.
3    Q   Limited use of both hands and arms.  The same
4  question, the same answer?
5    A   Yes.
6    Q   Limited grip strength.  The same question, the
7  same answer?
8    A   Yes.
9    Q   Holding/carrying items.  The same question, the
10 same answer?
11   A   Yes.
12   Q   Working overhead.  Certainly the same question,
13 the same answer?
14   A   Yes.
15   Q   What's cold intolerance?
16   A   Meaning that exposure to cold weather makes --
17 exacerbates his complaints.
18   Q   The same question, the same answer for cold
19 intolerance?
20   A   Yes.
21   Q   If you used the same statements that you do in
22 Mr. Perrin's report about toxic lead exposure and high
23 levels of lead, would the answers be the same that we
24 talked about for Mr. Perrin as they do for Mr. Holden?
25   A   Yes.  I do use the same statement, don't I?

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 158..161

Page 158

1    Q   You do.

2    A   Okay.

3    Q   Memorial Medical Oncology at Cedar Lake medical

4    records, are those in your file?

5    A   If they are, they're not titled with that name.

6    So they could be.

7    Q   Well, I'm going to show you these.  You may have

8    seen them, you may have not.  We'll make this an

9    exhibit.

10          (Document marked as Deposition

11          Exhibit 15 for identification.)

12   Q   I want you to turn to I think it's the back

13   page.  There's an addendum by Ashley Miller, RN,

14   November 21st, 2016.

15   A   Okay.

16   Q   And it states, plaintiff states he needs a

17   letter stating that his lead level is higher now than

18   when he started working on his job.  I advised him that

19   we can only write a letter stating the facts based on

20   the information we have.  His lead levels are in normal

21   range.

22          So in November of 2016 Mr. Holden's calling his

23   medical providers trying to get them to report a higher

24   blood lead level than he actually has, correct?

25   A   Yes.

Page 159

1    Q   Does that appear to be consistent with some of

2    the other misstatements he may have made in this

3    litigation?

4    A   I mean, I don't really know what he said about

5    lead levels.  I didn't pay any attention to what -- I

6    wouldn't have asked him about lead levels.

7    Q   The question is not about his lead level itself,

8    but about him trying to get his provider to put a

9    different number down than what's actually there.

10   A   And I can't speak to any other examples where he

11   may have done that.

12   Q   Can you think of any other examples where he may

13   be misleading people?

14   A   No.

15   Q   Let's mark this one.

16          (Document marked as Deposition

17          Exhibit 16 for identification.)

18   Q   This is a Memorial Physician Clinics Neurology

19   Pass Road record.  And it looks like the physician or

20   the person signing it is Diane Ross, MD.

21   A   Oh, you're right.  I was looking at reviewed by.

22   Yes.

23   Q   And he basically -- What it's saying, I'll read

24   it here, patient came back in yesterday to report there

25   was a typo in the ROS which was correct.  The typing

Page 160

1    came out no SOB and should have said he had SOB.  And he

2    goes on to complain about another error that's in his

3    medical record.

4          So the gist of this record from this physician

5    is that Mr. Holden's reading his medical records and

6    coming back to her with typos in the records, correct?

7    A   Yes.

8    Q   Is that consistent with somebody who has such a

9    major cognitive disability that he can no longer work,

10   that he's able to catch typos in a physician's medical

11   record?

12   A   That would indicate somebody who has trouble

13   with perseverance, which would be difficulty with a

14   brain injury.

15   Q   So catching typos in medical records is

16   considered such a major cognitive disability that he

17   can't work anymore?

18   A   I didn't say that.  Made him unable to work

19   anymore.  There are other disabilities other than that,

20   other limitations, but I'm saying that this is not

21   inconsistent from somebody who has significant cognitive

22   limitations.

23   Q   How so?

24   A   As I said, it's an indication of perseverance.

25   Q   Okay.  But if he's able to go on and read and

Page 161

1    find typos, you don't think he's able to do some sort of

2    job?

3    A   I would, again, accept the limitations as

4    identified by the doctor.

5    Q   He could have been an editor, right?

6    A   I don't think so.  At one point you're claiming

7    he has less education than he claimed and now you're

8    saying he'd be an editor.

9    Q   Did you review in his deposition where he was

10   able to get from Mississippi to Chicago?

11   A   I recall that he did.  I don't recall any

12   specifics on that at all.

13   Q   Is that significant to you, that someone's able

14   to get on a plane, maybe change planes, maybe not, get

15   there on time, get to his destination, take his

16   deposition, get back to the plane, get back home?  Is

17   that significant to you as far as someone's cognitive

18   ability?

19   A   No.

20   Q   How is that not significant?

21   A   How is it?  I don't understand.

22   Q   Well, if someone's able -- Let me do it this

23   way.  If somebody's able to do all of that, wouldn't

24   they be able to do some sort of job?

25   A   I don't know the equation of getting on a plane

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 162..165

Page 162

1  on time to being able to work and earn money.
2     Q   Being able to navigate an airport.
3     A  I'm sorry, I don't see that.
4     Q   So someone who is 100 percent disabled and
5  cannot work you're saying can do these things with no
6  problem?
7     A  I didn't say they can do them with no problem,
8  but I don't see any inconsistency with the fact that he
9  was able to meet his schedule.
10     Q   Did you factor in your analysis Mr. Holden's use
11  of marijuana?
12     A  I didn't.
13     Q   Do you think his use of marijuana would be
14  relevant to his worklife expectancy?
15     A  It could.  I have nothing that would indicate
16  that it was a problem.  But if it was a problem that
17  impacted his performance on the job or his dependability
18  as far as being on the job, then, yes.
19     Q   What would you define as a problem?
20     A  That he was -- had habitual warnings,
21  terminations due to that condition.
22     Q   What if somebody -- So what if somebody was
23  smoking marijuana and just wasn't motivated to go find a
24  job, would that affect their worklife expectancy?
25     A  It would definitely affect their ability to find

Page 163

1  a job, yes.
2     Q   Or their motivation to go to work?
3     A  That's right.
4     Q   Did you factor -- did you factor in the fact
5  that Mr. Holden takes hydrocodone into your worklife
6  expectancy analysis?
7     A  No.
8     Q   And it's the same type of question with the
9  marijuana, but that could be relevant if it affected his
10  ability to or motivation to work --
11     A  That's right.
12     Q   -- correct?
13     Your fringe benefit analysis of Mr. Holden was
14  24.1 percent I think?
15     A  For one of the analysis.  I think it was 24.1
16  based upon his 2014 earnings, but 21.4 based upon the
17  proxy.
18     Q   Why is the -- why is there a difference?
19     A  The difference comes in that in the proxy
20  obviously we don't know who the employer would be.  So
21  for that analysis I'm just using the average rate of
22  fringe benefits paid to United States non-union workers
23  from the Bureau of Labor Statistics.
24     For the 2014, that was based on Trinity Yachts,
25  based on his report to me that he had health insurance

Page 164

1  that I valued for an individual at $4,348, which comes
2  to about 11 percent of his earnings.
3     And then I factored in the other components of
4  retirement, legally required and Social Security and the
5  national average.  So doing that raises the overall
6  health benefit up slightly, which raises the overall
7  fringe benefits.
8     Q   Did you include -- There's a note in your report
9  about 401-K retirement.  Did you factor that into --
10     A  I include retirement, a contribution of
11  retirement, and that's just at the national average.  I
12  don't know -- If you're talking about my notes for
13  Trinity Yachts --
14     Q   And your report just says 24.1 percent
15  accounting for employer contributions to single health
16  insurance.
17     A  Right.
18     Q   I'm sorry, that was fast.  And 401-K retirement
19  plan.
20     A  So he reported that he did have a 401-K that the
21  employer contributed to.  He did not know the amount
22  that they contributed.  So rather than speculate on what
23  it was, I just used the national average.
24     Q   Was it -- I mean, do you know whether it was a
25  match at that employer?

Page 165

1     A  That's what he said, yes.
2     Q   Do you know if he actually made the match?
3     A  He said he did, but I don't have any detailed
4  earnings records that show that.
5     Q   Did you see anything on his -- You do have some
6  tax returns.  Did you see anything on his tax returns
7  that he claimed a contribution to 401-K?
8     A  Tax returns won't show that.
9     Q   Well, okay.  Sorry.  You have some W2s.  Did you
10  see anything on the W2s?
11     A  Yes, W2, on the other hand, does support that
12  there's something there.  There is a difference between
13  his Social Security wages and his taxable wages.  The
14  difference is only $160, but it does indicate that the
15  employer is contributing in to a retirement plan.  He
16  has a check in the box at 13 there.  He doesn't say how
17  much the employer contributes.
18     Q   Okay.  So if it's a match plan, it would be
19  logical to say 160 bucks?
20     A  Not necessarily.  There's two types of matches.
21  One is like exactly how you're describing it.  It is a
22  match based upon how much the employee puts in.  The
23  other is more of a profit sharing where the employer
24  puts in regardless of how much the employee puts in.
25     Q   We don't know which plan it is?

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 166..169

Page 166

1    A    That's right.
2    Q    So the national average, what was that
3 percentage?
4    A    4.1 I think.
5    Q    And we just don't know one way or another
6 whether he actually had employers contribute 4.1 percent
7 to his 401-K or not, right?
8    A    Yes.
9    Q    All right.  Are you aware that Mr. Holden's not
10 currently under any sort of supervision or group home
11 assistance?
12    A    Yes.
13    Q    You haven't done any sort of vocational analysis
14 for Mr. Holden, have you?
15    A    I mean --
16    Q    And if you're concerned about answering -- Let
17 me rephrase it because I think you're concerned about --
18 Well, let me ask it this way.  You haven't done any sort
19 of an analysis to say Mr. Holden could do these type of
20 jobs based on this disability or he could do this type
21 of rehab to get back into the workforce, right?
22    A    I have, but only to the degree that says that
23 anybody with the profound limitations identified by Dr.
24 Santa Maria and Ochberg, I keep forgetting his name, and
25 also outlined within the lifecare plan would not be able

Page 167

1 to maintain employment.
2    Q    So if some defense experts finds a problem with
3 those, that may call into question that, that he has
4 such a profound injury, right?
5    A    Are you asking should an expert say those
6 limitations aren't as bad as what Santa Maria and
7 Ochberg said, then that can change that opinion?
8    Q    Right.
9    A    Yes.
10    Q    Or non-existent?
11    A    Yes.
12         MR. MANNO:  Okay.  That's all I have on
13 Holden.
14         Do you want to ask the clean-up Perrin
15 questions, or do you want to do it at the end?
16         MS. O'BRIEN:  I don't care.  Let's see if --
17         MR. MANNO:  Oh, yes.
18         MS. O'BRIEN:  Do you have, Daryl, any
19 questions?
20         MR. FUCHIHARA:  No questions at this point.
21 Thanks.
22         THE WITNESS:  So do I put Holden away?
23         MS. O'BRIEN:  I just wanted to quickly ask you
24 about the lifecare plan.  I'm looking for my copy of the
25 lifecare plan.

Page 168

1         MR. MANNO:  I've got it here.
2         CONTINUED EXAMINATION BY MS. O'BRIEN:
3    Q    Okay.  One quick question.  In your file are the
4 OSHA sampling results.  Did you use those at all in
5 forming any of your opinions?
6    A    Oh, no, no.  That's right.  No, I did not.
7    Q    So one of the things -- Let's mark this.
8         (Document marked as Deposition
9         Exhibit 17 for identification.)
10    Q    One of the things that you were asked to do for
11 Mr. Holden was to do a present value of his future
12 health and medical care costs?
13    A    Yes.
14    Q    Okay.  And that is your report in that regard as
15 Exhibit 17?
16    A    Yes.
17    Q    So to do that, did you review the lifecare plan
18 prepared by Nurse Schwieger?
19    A    Yes.
20    Q    And in there she does an extensive review of all
21 the medical records that at least she has, correct?
22    A    Correct.
23    Q    You don't have those same medical records in
24 your file?
25    A    That's right.

Page 169

1    Q    You just have a few of them.  How is it that you
2 got certain ones and not others?
3    A    I don't really request medical records because
4 I'm looking for opinions.  She needs medical records to
5 determine that the -- type of treatment in the past
6 and to make that consistent with what she's projecting
7 in the future.  So it's common for a lifecare planner to
8 rely heavily on medical records while I usually don't.
9    Q    And I understand that.  I'm wondering why you
10 have certain records and didn't get other records?
11    A    I can't explain.
12    Q    It's not something that you said don't give me
13 the records and they still showed up?
14    A    Well, actually, in the -- There's a form we
15 looked at earlier where we send the attorney saying
16 here's ideally what we'd like and we suggest there don't
17 send treatment records.
18    Q    In any event, when you were reviewing Dr. --
19 Strike that.
20         When you were reviewing Nurse Schwieger's
21 report, you saw some of the same medical entries that
22 we've discussed here today, right?
23    A    Yes.
24    Q    The fact that he's calling and saying there's a
25 typo and all that kind of stuff, right?

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 170..173

Page 170

1    A   Yes.
2        Oh, did we drop him?
3        MS. O'BRIEN:  Yes.  Are you on?
4        MR. FUCHIHARA:  Hello.
5        MS. O'BRIEN:  Okay, sorry.  I don't know what
6    happened.
7        MR. FUCHIHARA:  I think my phone might have
8    timed out at four hours there and it automatically
9    dropped the call.
10   BY MS. O'BRIEN:
11       Q   Okay.  You would have seen the note in her
12   report that Mr. Holden is an extremely poor historian?
13       A   Yes.
14       Q   You would have seen the note, which I think I
15   asked you about earlier, the fact that he's on
16   medication, he's feeling better and doing much better?
17       A   Yes, yes.
18       Q   It didn't factor into your opinions because you
19   only based it on Santa Maria and Ochberg?
20       A   Yes.
21       Q   And you would have noted, and perhaps this is
22   where it came from in your evaluee form, where Dr. James
23   stated that there's mild cognitive impairment?
24       A   Oh, possibly.
25       Q   So at least we have another doctor, a

Page 171

1    psychiatrist, who's saying mild cognitive impairment
2    versus severe cognitive impairment, but that didn't
3    factor into your opinions in this case?
4        A   That's right.
5        Q   Did you review in here where he was refused
6    medication because of his history of a drug habit?
7        A   Yes.
8        Q   Did you factor it at all into your opinion?
9        A   No.
10       Q   Okay.  And when you then made the determination
11   with regard to the present value for his future health
12   and medical care costs, it's the same amount that Nurse
13   Schwieger came up with?
14       A   No.  The current value is.  So I give two
15   different numbers:  One is the current cost, which
16   should be identical to what Nurse Schwieger has, and
17   then the present value, which would be slightly -- Oh,
18   actually, I take that back.  It is very slightly
19   different from hers.
20           But, in this particular case, the vast
21   majority of her items fall within either the
22   professional services item or more importantly, the
23   compensation index, and both of those would be a pure
24   offset.  But there are some costs that result in a
25   slight variation from her current cost when I get to

Page 172

1    present value.
2        Q   A thousand dollars?
3        A   Yes.
4        Q   So I'm correct if I say the numbers you came up
5    with for the present value of the future health and
6    medical care costs are virtually the same that Nurse
7    Schwieger came up with --
8        A   Virtually, yes.
9        Q   -- for today's costs?
10       A   That's right.
11       Q   This has to be the first time that I've ever
12   seen somebody -- an economist come up with a number that
13   really doesn't have a discount rate of 1-and-a-half,
14   something like that, for purposes of a lifecare plan.
15       A   Actually, I do have discounts made of 1 percent,
16   but it's the net discount rate that is coming through.
17       Q   And I understand that.  But I'm talking about
18   the net discount rate, because any time I've ever in my
19   31 years of practice had a lifecare plan involved in a
20   case, the economist has always discounted the number.
21   You don't do that in this case.
22       A   I do discount the number.
23       Q   You don't discount the number such that there's
24   any kind of reduction in the value of the future health
25   and medical care costs?

Page 173

1        A   It depends on the item.
2        Q   And the only one that you reduce, it looks like,
3    is the --
4        A   I reduce anything that's identified as medical
5    commodities or general items.  In Ms. Schwieger's plan,
6    she doesn't have anything that would qualify other than
7    that that I would discount.  But those are all small
8    items.
9        Q   So the only one you really did was the
10   commodities, medical?
11       A   And general items.
12           MR. MANNO:  So you discounted $28,000 out of
13   the $6 to $7 million in the plan, correct?
14           THE WITNESS:  That's all she had in that
15   category.
16           MS. O'BRIEN:  I don't have anything further
17   with regard to Mr. Holden.  Do you have anything, Daryl?
18           MR. FUCHIHARA:  No, I don't.  Thanks.
19           MS. O'BRIEN:  Okay.  I'm almost done, believe
20   it or not.  This one's going to go really fast.
21           MR. MANNO:  Off the record a second.
22           (Recess was taken.)
23   BY MS. O'BRIEN:
24       Q   So let's go on to Pekkala.  We have the same
25   evaluee form, right?

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 174..177

Page 174

1    A   Yes, and this one I think you marked earlier.
2   There was one you marked very early on.
3    Q   It wasn't Perrin's?
4    A   No, no.  There was one -- For example, yes, you
5   marked -- No, I'm sorry, you might have been right.  No,
6   there it is.  The very bottom one is Brandon Pekkala's,
7   Exhibit 6.
8    Q   Oh, yes, great.  Thank you so much.  So I'll let
9   you -- You have your own version, but Exhibit 6 is the
10  evaluee form for Brandon Pekkala?
11   A   That's right.
12   Q   Thank you.  You noted on the first page that he
13  attended special education classes.  Do you know what
14  for?
15   A   I don't recall.  I believe he did discuss those
16  in his deposition, but I don't recall.
17   Q   Have you seen his education records as to how
18  many classes he had of special education?
19   A   I do have the education records.  Bear with me.
20  I don't know -- In terms of high school -- Oh, wait.  I
21  do have high school.  Here we go.
22       (Document marked as Deposition
23        Exhibit 18 for identification.)
24   Q   I'll show you Exhibit 18.  It might help.
25   A   It looks like -- I'm trying to tell whether all

Page 175

1   these are high school or not.  On the high school
2   scholastic record it indicates grades for 9th grade --
3    Q   Sir, let me show you what's been marked Exhibit
4   18.  It's a little bigger, and there is -- You will see
5   if you page through it there is some grade school,
6   middle school, and I think like the fourth page is the
7   high school.
8    A   Right, that's the one I was trying to sort out.
9   I see -- Like the top left-hand corner is 9th grade.
10  The top right-hand corner seems to be 9th grade.  The
11  bottom left-hand corner is -- it might be 11th grade,
12  but I don't know what the bottom right-hand corner is.
13  So I don't see anything that talks about 10th grade or
14  12th grade.
15   Q   Do you know that Mr. Pekkala was sent away to
16  some other --
17   A   Yes, I know that he went to an alternative high
18  school, and that -- I don't have the name of that.
19  Somewhere in there I know I've seen it.
20   Q   Why did --
21   A   Oh, there it is.  Riverside Alternative High
22  School, and this is not -- Oh, this isn't Riverside.
23  Okay.  That's why.
24   Q   Why did he go to an alternative high school?
25   A   Behavioral problems.

Page 176

1    Q   Okay.  Such as?
2    A   Acting up, as he described in his deposition,
3   being the class clown.
4    Q   Do you know that his mom sent him there because
5   he was huffing gasoline on a regular basis and was
6   addicted to huffing gasoline?
7    A   No.
8    Q   How about huffing bottles of Glade and bottles
9   of Pledge?
10   A   No.
11   Q   You didn't know that, and that's the reason that
12  he was sent away?
13   A   I didn't.
14   Q   Do you know whether he had any addictions during
15  that time to anything else?
16   A   No.
17   Q   Do you know whether he has an alcohol
18  dependency?
19   A   No.
20   Q   That would be relevant in determining his
21  worklife, correct?
22   A   Potentially, but I don't know whether that it
23  would.  What would be relevant would be any limitations
24  that stemmed from them.
25   Q   Well, and we know that he's had a DUI at least

Page 177

1   in 2018.
2    A   Yes.
3    Q   Okay.  He's had drug violations, disorderly
4   conduct?
5    A   Yes.
6    Q   And that's what he reported to you?
7    A   Correct.
8    Q   Going back to my question in high school, do you
9   know why he had special education classes?
10   A   No.
11   Q   Do you know what kind of classes those were at
12  all?
13   A   Well, again, that's going back to the sheet that
14  I was trying to decipher.  They don't identify the type
15  of class they are.  All they say is special ed.
16   Q   And what kind of classes can special ed be?
17   A   It can be any number of things, depending upon
18  where the person has limitations.  It could be having to
19  do with mathematics, with English, with any of the core
20  requirements of a high school degree.
21   Q   And if he had limitations, would you want to
22  know what those were?
23   A   Not necessarily.  I mean, he's out working
24  productively as a boilermaker.  So the academic
25  requirements in high school obviously didn't impede him

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 178..181

Page 178

1  from getting the boilermaker journeymanship, and I don't
2  project them to having any impact on him being a
3  boilermaker.
4     Q   But you don't know whether those limitations
5  might affect his worklife expectancy because you don't
6  know what the limitations are?
7     A   Only if there's a cognitive limitation that's
8  been identified that he had a permanent limitation in
9  the definition of cognitive disability.
10    Q   Okay.  But you don't know that?
11    A   I have seen no indication from the review by Dr.
12  Santa Maria.
13    Q   Right.  But we know that there was something in
14  his records; you just didn't explore what that
15  limitation was?
16    A   That's right.
17    Q   Going down, he says he has trouble with tremor
18  in his arms and hands when he's doing physical work.
19    A   What page are you on?
20    Q   I'm sorry, page 2.
21    A   Okay.  Yes.
22    Q   Okay.  You didn't see him, so you don't know
23  whether he has any kind of tremors in his hands when
24  he's doing anything, right?
25    A   That's right.

Page 179

1     Q   Did you see any results of testing that would
2  demonstrate tremors in his arms and hands?
3     A   No.  Dr. Santa Maria did not indicate anything
4  in the testing I see from her as far as a decrease in
5  the manual dexterity.
6     Q   Or him.
7     A   I'm sorry, I did that again.  I'm sorry, that
8  she didn't.  I missed it.  Impaired to borderline in
9  finger tapping group peg process.  So that that would
10  indicate some difficulty in manual dexterity.  It
11  doesn't necessarily break it out to the tremors and
12  things.
13    Q   You didn't see her -- You didn't see him report
14  tremors in his hands?
15    A   I didn't.
16    Q   Then the next page is talking about pre-existing
17  limitations.  And I think we've touched on that a bit
18  earlier, right?
19    A   We did.
20    Q   Okay.  In 2004 he had -- Strike that.
21        In 2013 he ruptured disks in his back --
22    A   Yes.
23    Q   -- at Erickson Logging.
24        Did you factor that in to worklife expectancy?
25    A   Again, from his self-report, after treatment for

Page 180

1  that, he had no ongoing limitations and I saw nothing
2  that indicated that he would.
3     Q   What was his treatment for ruptured disks?
4     A   I don't recall.  I know it was discussed in his
5  deposition, on page 119 of his deposition.  Actually,
6  that's where they discuss -- he discussed the injury,
7  but I don't see where there was a follow-up discussion
8  about treatment for the disk.  It then goes into other
9  entries it looks like after that.  So I don't know.
10    Q   As an expert, a vocational expert, do you handle
11  cases where people with ruptured disks in their back
12  have some shortened worklife capacity?
13    A   Yes, there's a medical opinion that at maximum
14  medical improvement those ruptured disks result in
15  permanent limitations.
16    Q   Did you ask to see any of the medical records to
17  see if there was some kind of permanency put on
18  Mr. Pekkala?
19    A   I asked in the information requested from --
20  from Rapoport's office for any relevant medical
21  opinions.
22    Q   You would expect that if there is a worker's
23  comp injury, that there would be some kind -- some kind
24  of report from a doctor with regard to a limitation from
25  ruptured disks in a back?

Page 181

1     A   Yes.
2     Q   Okay.  You didn't see that?
3     A   That's right.
4     Q   You'd want to see that if there is one that
5  exists?
6     A   If there is long-term permanent limitations,
7  yes.
8     Q   Okay.  And did you ask him whether he collected
9  any worker's comp for that injury?
10    A   I did not, no.
11    Q   What about the injury to his left hand?
12  Lacerated two fingers.  Was that work related?
13    A   It was.
14    Q   And did he collect anything for worker's comp
15  for that?
16    A   He may have.
17    Q   And was there any kind of permanency put on that
18  injury?
19    A   To my knowledge, no.
20    Q   You didn't see the records anyway?
21    A   That's right.
22    Q   It says under Work off work 3-8-16 to 4-19-16.
23  Did you factor that in to your evaluation?
24    A   It depends on which analysis we're looking at.
25  The analyses that I do that factor only worklife in does

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 182..185

Page 182

1  not factor that in at all.  But for the analyses that I
2  do that also factor earnings in, it would have that in
3  there implicitly, in that I show the start date of my
4  analysis in January of 2016.  So I show the full year of
5  2016, but then back out what he actually earned during
6  that year.  So if his earnings were reduced for that
7  period that I missed, then that would have that in as
8  part of that loss.
9       Q   Do you know whether he was paid for that month?
10      A   I don't.
11      Q   That would be important to know, right?
12      A   No, because if he was paid for that month, then
13  it would be included in the earnings I'm subtracting.
14      Q   Can you tell me what page you're on?
15      A   For this particular one I'm on page 46.
16      Q   Okay.  And we're looking at the earnings
17  reduction --
18      A   Yes.
19      Q   -- for 2016?
20      A   So there on the pre-injury side showing what his
21  average earnings had been for 2015, '16, adjusted for
22  unreimbursed expenses, and then for post-injury showing
23  what his actual earnings were just for 2016 as a
24  reduction.
25      Q   And where do you get those numbers from for the

Page 183

1  post-injury?
2       A   From -- Bear with me.  Here it is.  Let's see.
3  For 2016 that comes from his wages, his W2, of $66,085.
4  But then I substract what he showed on his tax return
5  for unreimbursed expenses of 25,836.  So the net is what
6  you see there of 40,249.
7       Q   Where were you looking at for that?  On your
8  sheet cheat?
9       A   Actually, no, that comes from that supporting
10  computations document that I did for all three of them.
11  But from the cheat sheet you can also decipher that.
12          If you looked on page 2 of the cheat sheet,
13  there the 2016 tax return shows earnings of the $66,000
14  and the unreimbursed expenses of the 25,836.
15      Q   And the 2017 tax returns show wages of $49,888.
16  Did he have any unemployment compensation in there?
17      A   It wouldn't be in that number.  But your
18  question I think is did he have any that year, and that
19  answer is yes.
20      Q   And how much is that?
21      A   13,000.
22      Q   Okay.  So if you added those two together, is he
23  making pretty much the same that he made in 2016?
24      A   If you added those together, which I would not
25  do, but -- No, because if I did the same thing for 2016,

Page 184

1  his earnings that year would have been $76,000.
2       Q   And is he working now that you know of?
3       A   Or at least at the time of my interview.  Oh,
4  that's right, he was in Hawaii at the time I interviewed
5  him and working there.
6       Q   Okay.  So at least based upon the numbers that
7  you have here, he had a great year in 2016 despite the
8  exposure to lead?
9       A   He had an okay year, but it's down from what he
10  had been earning on his historical average.
11      Q   So in 2014 he earned 33,000?
12      A   I'm sorry, '14.  You're on the cheat sheet.
13  Okay.  So in 2014, $33,000, but that's before adjusting
14  it for the fact that he had a big reduction for
15  apprenticeship.
16      Q   And then 2015, 51,065.  So he's going up?
17      A   Yes.
18      Q   And then 2016, 66,085?
19      A   That's right.
20      Q   And then 2017, he's at 49,888.  Why?
21      A   He's not working as much.  Not as much work
22  available.
23      Q   And did you ask him about that?  Did it have
24  anything to do with his condition or his injuries that
25  he claims?

Page 185

1       A   Well, his statement there is that he's not as
2  able to work as much, as much overtime, that he's got
3  extreme fatigue.  He talked about that at his
4  deposition.  Loss of energy.  So, to some degree, it
5  would have to do with how much he's able to work.
6       Q   Tell me where you just said he's not able to
7  work as much.
8       A   That's in the bottom of page 2 on the impact.
9       Q   The bottom of page 2.  Under the -- Oh, so you
10  are talking to him in 2018, but what about 2017?  Did
11  you ask him specifically about 2017?
12      A   I don't split it out by year.
13      Q   So when he said he passed some days on job due
14  to lack of energy, you don't know whether that's for
15  2018 or 2017?
16      A   My understanding is it's been since the injury,
17  but I don't attempt to break it out by year.
18          MR. MANNO:  Are you aware that in 2017 he
19  worked more overtime than he ever had before?
20          THE WITNESS:  No.
21          MR. MANNO:  Would that change your opinion?
22          THE WITNESS:  No.  I'm using his actual
23  earnings to do the projections.
24          MR. MANNO:  But earnings could be dependent on
25  whether there are jobs available as well, correct?

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 186..189

Page 186

1    THE WITNESS: That's right. That's why I did
2 it two different ways. I did one that assumes his
3 earnings are constant and another one that assumes that
4 the decline in his earnings that we've seen since the
5 exposure is due to the injury.
6    MR. MANNO: So if he's working 469 overtime
7 hours between 2016 and '17, that's showing that he's
8 working a pretty substantial amount of overtime, right?
9    THE WITNESS: Yes and no. I mean, just saying
10 the number of overtime hours doesn't talk about the
11 total number of hours he's working. So it could be that
12 he's working fewer days in total and then trying to get
13 overtime in, which is a lot different from working fewer
14 overtime and working all year round.
15    MR. MANNO: But if he's working fewer days in
16 total and getting more overtime in, that would not
17 reflect fatigue, correct?
18    THE WITNESS: Yes.
19    MR. MANNO: Well, it could also reflect there
20 are less jobs available, right?
21    THE WITNESS: It could, and that's why, again,
22 as I said, I'm doing it two different ways: One
23 assuming that it doesn't impact his earnings and one
24 assuming that the decline is due to the injury.
25 BY MS. O'BRIEN:

Page 187

1    Q  What did he earn in 2013?
2    A  In 2013 -- Oh, I don't know. Let me see. So in
3 2013 he wasn't working as a boilermaker yet. And I
4 don't have any earnings from that.
5    The first year of earnings I have for them --
6 And, I'm sorry, in 2013 he was unemployed, so he had --
7 His last work before that was at Erickson Logging, and
8 that ended in 2012. In 2013 he was unemployed and in
9 2014 was when he started as a boilermaker.
10    Q  Why was he unemployed?
11    A  He was unable to find employment after losing
12 the job as a process operator.
13    Q  Is that what he told you?
14    A  Yes.
15    Q  Is that noted some place?
16    A  That's why there's a gap in the history there on
17 page 2 where I show Erickson Logging for 2012.
18    Q  Could it be -- Could it be because of his injury
19 and the slipped disks in his back?
20    A  Not -- It could be, but not to my knowledge.
21    Q  You have no idea?
22    A  That's right.
23    Q  So based upon your -- the evaluation, does
24 Mr. Pekkala fall in the non-severe cognitive disability?
25    A  Yes.

Page 188

1    Q  And so he falls in that non-severe cognitive
2 disability despite the fact that he's been able to
3 achieve journeyman since this incident?
4    A  Yes.
5    Q  Okay. What did he have to do to attain
6 journeyman status with the boilermakers?
7    A  Essentially continue to work until he completed
8 that apprenticeship.
9    Q  Okay. And he was able to do that?
10    A  Yes.
11    Q  Does that require a certain amount of work?
12    A  I don't know what the requirements are for their
13 apprenticeship program. For most apprenticeship
14 programs it will have a minimum number of hours that
15 they have to work per year. I don't know what that
16 would be for the boilermakers.
17    Q  And do you get rated on your work?
18    A  Usually. And I did -- I don't recall whether it
19 was this file or if I'm confusing it with another case,
20 but it seems like I did see work evaluations that
21 commented on how well he was doing in the
22 apprenticeship. I may be wrong. If I am, jump on me.
23    Q  And was that how well he was doing even since he
24 was allegedly exposed to lead?
25    A  Yes.

Page 189

1    Q  Okay. And so we know even with this alleged
2 disability he's able to attain journeymanship and he's
3 getting good reviews as an apprentice to reach that?
4    A  Yes.
5    Q  And so when Dr. Santa Maria says that his future
6 jobs, it's more likely that he'll have to take less
7 demanding, lower-paying welding job assignments, we know
8 at least that hasn't been true since the accident?
9    A  No, we don't know that. So the welding jobs are
10 also within the boilermaker union, also within
11 journeyman work, but it's -- She's talking about
12 potentially not being able to do as much as a
13 boilermaker.
14    Q  But that hasn't been the case since 2016?
15    A  That's right.
16    Q  And that's my point. At least up until now what
17 Dr. Santa Maria -- and it's a he -- says, that hasn't
18 been the case to date?
19    A  That's right.
20    Q  For a period of almost three years?
21    A  Correct.
22    Q  Almost four years. 2016 --
23    A  Oh, no, '16, '17, '18.
24    Q  Okay.
25    MR. MANNO: It feels like 14 years -- four

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 190..193

Page 190

1  years.
2  BY MS. O'BRIEN:
3      Q  I probably asked you this.  Is the worklife
4  expectancy of a welder any lower than anyone else?
5      A  No, only to the degree that welders are
6  typically of lower levels of education.  So, I mean,
7  again, worklife expectancies are driven by levels of
8  education, not by occupation.  And that's what we talked
9  about before.  And so to the degree that a welder is
10  more likely to have lower levels of education, they're
11  going to have a lower work level.
12      Q  I mean, lower levels of education can be a
13  receptionist.  Would you expect a receptionist to have
14  the same worklife as a welder?
15      A  In general, yes.  But I do modify the welder
16  worklife, as I indicated before, by truncating the
17  period of time that I'd look at employment, both for --
18  well, for all three of them really, but truncating it at
19  the age of 66, where normally you would compute a
20  worklife expectancy up to the age of 89.
21      Q  That's good for you, not for me.
22      A  Well, actually, for you even more.
23      Q  I understand what you're saying.
24      A  No, you don't.  Professionals --
25      Q  I do.

Page 191

1      A  Lawyers up until the age of 90, we still have 20
2  percent employed.
3      Q  Right.  I have a father who just retired.
4      A  Okay.
5          MR. MANNO:  Don't count me in that 20 percent.
6          MS. O'BRIEN:  Me either.
7          And I guess my last question with regard to
8  Mr. Pekkala is you didn't based upon all his -- based
9  upon his prior injuries and his subsequent injuries from
10  the exposure to lead, you didn't find him with a
11  non-severe physical disability?
12      A  That's right.
13          MS. O'BRIEN:  That's all I have.
14          CONTINUED EXAMINATION CONDUCTED BY MR. MANNO:
15      Q  Mr. Gibson, the reason Mr. Pekkala and -- the
16  reason that you believe Mr. Pekkala and Mr. Perrin have
17  non-severe cognitive disabilities is largely based on
18  their scoring on the neuropsychological testings by Dr.
19  Santa Maria, right?
20      A  Indirectly, but directly upon the evaluation by
21  Dr. Santa Maria.
22      Q  And Dr. Santa Maria is using the scoring to make
23  that determination, correct?
24      A  Yes.
25      Q  And the ACS data that is being used to compare

Page 192

1  these individuals, you don't have any information about
2  any individual in that ACS survey, their test results on
3  similar tests, correct?
4      A  That's right.
5      Q  In fact, we're just lumping Pekkala and Perrin
6  in with everybody else in that group with no
7  consideration of the testing results, correct?
8      A  I don't know if that's correct, because I'm
9  considering -- I'm considering the evaluation of those
10  test results in my placement of where they are in the
11  continuum of disability.
12      Q  There's no way that you can make comparisons of
13  their test results to anyone else's test results?
14      A  Well, since I don't know anybody else's test
15  results, that's true.
16      Q  You're just lumping them into a general
17  non-severe cognitive disability category, right?
18      A  And enhancing that by saying that they're
19  halfway between non-severe and severe.
20      Q  One of the reasons why is because they're
21  working, right?
22      A  Yes.
23      Q  Because whether somebody with a disability is
24  working is an important factor to talk about as we
25  discussed earlier, right?

Page 193

1      A  Yes.
2      Q  When you and Ms. O'Brien were talking about
3  Mr. Pekkala's special education in high school, you
4  seemed to be able to discount the special education
5  because of his productivity as a welder, at least for
6  his job performance; is that right?
7      A  Yes, and I guess I would phrase it more that how
8  he did academically I'm not factoring in because his
9  academics didn't come into play to his ability to become
10  a journeyman -- a journeyman boilermaker.
11      Q  Okay.  So because of any academic deficiency
12  that he had didn't leap over to his work in becoming a
13  journeyman, we're able to -- I don't want to use the
14  word discount, but it seems that we're able to just put
15  those to the side; is that right?
16      A  Yes.
17      Q  Okay.  Then why if none of these alleged
18  cognitive deficits that Dr. Santa Maria opines about are
19  affecting his job performance, why are we not putting
20  that aside with his academic deficiencies?
21      A  I don't know that I would agree that they're not
22  impacting his job performance.  As I said before, it's
23  quite possible that they are in that he's talking about
24  how they impact him on the job, and there is a noted
25  difference in how much he earned in the most recent

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 194..197

Page 194

1  years from how much he was earning in the earlier years
2  of his journeymanship.
3         And, further, the opinions of Dr. Santa Maria
4  indicate that the limitations that he's exhibiting --
5  I'm trying to remember her words -- they would, as you
6  would expect, compromise the efficiency in work duties
7  with associated risks.
8     Q   Is there one example?  And we can go through
9  them because I have them.  Is there one example in the
10  performance reviews that he's received, even currently
11  into 2018, that he is not being efficient as a welder?
12    A   No, but none of those are comparing him to how
13  efficient he was as a welder before the exposure.
14    Q   That's not true.  We can look at his prior
15  records and see that he actually gets worse scores
16  before, which, by the way, is logical because it's the
17  beginning of his apprenticeship program, right?
18    A   Right.  And my point is nothing rates him where
19  he has the same person reviewing him, looking at his
20  abilities before and what his abilities are now.
21    Q   But you don't know what his abilities would be
22  if he didn't have an academic cognitive disability.
23        Earlier we discounted that because we said he's
24  doing fine in his job.  And now we have evidence he's
25  doing fine in his job, but we're refusing to discount

Page 195

1  any potential -- discount his alleged cognitive
2  deficits.  Do you see the inconsistency?
3     A   No, because I don't see anything that indicates
4  that he had a cognitive disability beforehand.  He had
5  some difficulties with academics.  That's not a
6  cognitive disability.
7     Q   Have you seen his writing and his spelling?
8     A   No.
9     Q   Okay.  But going back to my point, we don't know
10  if any of that actually impacted what his total ceiling
11  could have been, right, because he never welded before?
12        I guess here's where I'm going with this.  We
13  don't have any evidence of welding, taking aside the
14  education, his cognitive, or his education defects?
15  That's a really bad question.  Let me strike that.  Let
16  me strike that.
17        Actually, I think I'm good.
18    A   You mean no question?
19    Q   No question.  Well, let me think about that for
20  a second.
21        You don't disagree that Mr. Pekkala has a
22  number -- in fact, almost all very high scores for his
23  welding after Fraser Shipyards into 2018 where we have
24  records, right?
25    A   I don't.

Page 196

1     Q   I want to go back to some statements in your
2  reports.  I just want to ask you -- And these are
3  similar to what we talked about earlier.
4         Under the reported problems, he has constant
5  pain in there.  Is there any way for you to determine
6  whether the constant pain is the cause of the number of
7  actual -- the number of car accidents he's been involved
8  versus lead exposure?  There's no way for you to parse
9  that out, correct?
10    A   I mean, according to -- He reported no ongoing
11  pain before the exposure.  So, I mean, anything --
12  That's the only way I can parse it out, is not having a
13  report of pain before.
14    Q   He was in a pretty substantial car accident
15  though in between, right?
16    A   Oh, okay.  So you're talking about the ones
17  after the --
18    Q   Right, right.
19    A   I thought you were going back to 2004 and --
20  Okay.  But he's reporting also from those car accidents
21  that he had no long -- no ongoing after the recovery
22  from the car accident pain.
23    Q   How could he know if it was pain from the car
24  accident or pain from the lead?  He's just reporting
25  constant pain.

Page 197

1     A   True.  I can't answer for him.
2     Q   So -- And, by the way, talking about the car
3  accident, do you know the circumstances of that car
4  accident?
5     A   You mean the one in November of last year?
6     Q   Yes.
7     A   I don't.
8     Q   Do you know that he had been drinking before
9  getting in the car?
10    A   Is that the rollover accident?
11    Q   That's the rollover I believe.
12    A   Okay.  Yes.
13    Q   Did you factor Mr. Pekkala's history of meth
14  into your analysis?
15    A   I did not.
16    Q   And the same thing we talked about earlier with
17  Mr. Holden, but certainly the use of meth could affect
18  someone's motivation or ability to work in the future,
19  correct?
20    A   It can.
21    Q   How about his use of cocaine?
22    A   No.  The same answer.
23    Q   The same answer.  Just circling back on the
24  education records, I don't think this point was made
25  out, but his class rank was listed as 107 out of 109,

DAVID S. GIBSON, MBA, MRC, - 09/19/2018 Pages 198..201

Page 198

1  correct?
2      A   Yes.
3      Q   That seems pretty low from an academic
4  standpoint, right?
5      A   Definitely.
6          MR. MANNO:  I think that's all I have.
7      CONTINUED EXAMINATION CONDUCTED BY MS. O'BRIEN:
8      Q   I just have one hypothetical.  If someone has a
9  hand tremor say for the last 20 years, can they be a
10  welder?
11     A   I'm sorry, for the last 20 years?
12     Q   Well, let's just say they have had a hand tremor
13  for a long, long time.  Can they be a welder?
14     A   I guess it depends how significant the tremor is
15  and how the tremor manifests itself or can be
16  controlled.
17         So, for instance, if using two hands to hold
18  the torch could mediate or alleviate that tremor, then
19  obviously it's not going to matter that much.  But if
20  the tremor is going to impact your ability to hold the
21  torch constant, then I would expect that they would have
22  difficulties maintaining employment as a welder.
23         MS. O'BRIEN:  That's all the questions I have.
24  Do you have any, Daryl?
25         MR. FUCHIHARA:  I do not.

Page 199

1  MS. O'BRIEN:  All right.
2  MR. KOJS:  I'm good.
3  MS. O'BRIEN:  We're out of here.  Thank you.
4  (Whereupon, the deposition concluded
5  at 5:45 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 200

1  STATE OF ILLINOIS  )
                      )  SS:
2  COUNTY OF C O O K  )
3
4          The within and foregoing deposition of the
5  aforementioned witness was taken before NADINE J.
6  WATTS, C.S.R., R.P.R. and Notary Public, at the place,
7  date and time aforementioned.
8          There were present during the taking of the
9  deposition the previously named counsel.
10         The said witness was first duly sworn and was
11  then examined upon oral interrogatories; the questions
12  and answers were taken down in shorthand by the
13  undersigned, acting as stenographer and Notary Public;
14  and the within and foregoing is a true, accurate and
15  complete record of all of the questions asked of and
16  answers made by the forementioned witness, at the time
17  and place hereinabove referred to.
18         Before completion of the deposition, review of
19  the transcript { } was {X} was not requested.  If
20  requested, any changes made by the deponent (and
21  provided to the reporter) during the period allowed are
22  appended hereto.
23         The undersigned is not interested in the
24  within case, nor of kin or counsel to any of the
25  parties.

Page 201

1          Witness my official signature and seal as
2  Notary Public in and for Cook County, Illinois on the
3  2nd day of October, A.D.2018.
4
5
           NADINE J. WATTS CSR, RPR
6           Notary Public
           License No. 084-002736
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

DAVID S. GIBSON, MBA, MRC, - 09/19/2018          i1

## $

**$1,100**
15:12

**$1,500**
17:20,21

**$1.3**
142:11 143:23

**$10,000**
137:21 140:5

**$10,185**
137:18

**$14.20**
113:3

**$16,000**
145:4

**$160**
165:14

**$18,000**
113:14 114:1

**$2,500**
15:15

**$23,000**
144:22

**$28,000**
173:12

**$33,000**
184:13

**$4,348**
164:1

**$4.75**
113:6

**$40,000**
144:24 151:21

**$49,888**
183:15

**$5,200**
15:10 16:11

**$58,000**
82:9 84:10

**$6**
173:13

**$60,000**
112:19 114:10

**$600**
149:9

**$66,000**
183:13

**$66,085**
183:3

**$7**
173:13

**$76,000**
184:1

**$84,190**
81:25

**$9,405**
137:11,12

## 0

**0.8**
83:3

**02**
81:3

**06**
49:17

## 1

**1**
5:24 6:1 24:13 41:12
78:21 81:22 132:6
141:10 172:15

**1,000**
120:14

**1,100**
16:22 17:4

**1-and-a-half**
172:13

**1.--**
85:18

**1.49**
85:20,22,24

**10**
59:5 71:25 121:11,12
132:6 144:5 146:7
156:12,20,22

**10-year**
112:20

**100**
162:4

**107**
197:25

**109**
197:25

**10th**
175:13

**11**
10:13 122:16,17 164:2

**119**
180:5

**11th**
175:11

**12**
139:11,12

**12.8**
113:8 114:3

**120**
146:5,6

**12th**
175:14

**13**
40:7 42:2,9 47:24 58:18
87:13 134:10,13 148:21,
23,25 165:16

**13,000**
183:21

**13.3**
59:16 91:21 92:1

**13.331**
92:1

**14**
36:20 150:5,7 184:12
189:25

**14th**
13:2 15:2

**15**
42:2 135:24 150:19,21
153:1,10,12,13 158:11

**16**
36:19 88:20 150:19,21
159:17 182:21 189:23

**160**
165:19

**16th**
38:12 61:3

**17**
36:20 75:10 89:13 91:8
168:9,15 186:7 189:23

**17,350**
88:24 89:1

**17.6**
103:24

**18**
88:20 89:13 174:23,24
175:4 189:23

**19**
58:15,16,17,21

**1979**
6:8

**1996**
40:21

**1999**
40:20

## 2

**2**
8:12,14 12:18 42:9 48:10
68:14 78:20 79:3 82:21
106:7 123:12 149:6
178:20 183:12 185:8,9
187:17

**2,500**
16:17 17:4

**20**
88:22 116:18 191:1,5
198:9,11

**20,000**
88:23

**2000**
121:24

**2004**
179:20 196:19

**2005**
49:17 144:21,22 151:19

**2007**
6:20 10:12 47:21 48:11
145:3,4

**2008**

42:7 49:20,21

**2009**
47:21,22 103:17

**2010**
154:21 155:2

**2011**
81:20 89:14,16 155:3

**2012**
155:3,4 187:8,17

**2013**
40:6 134:25 135:1
136:13,15 145:6,7,15
146:19,21,23 155:3,4
179:21 187:1,2,3,6,8

**2014**
8:19 16:10 39:22,23
40:22 134:3,4,7,24
135:1,3 136:9,12,16,18
139:20 143:25 144:8
151:7 152:1,21 163:16,
24 184:11,13 187:9

**2015**
39:25 40:1,2 81:20
89:15,16 135:2,3,13
136:5,14,15 144:1
145:15 182:21 184:16

**2016**
75:8,10 88:18 89:13,25
90:4,7,9 91:8 109:14
136:22,23 137:2,11,22
139:3,7,8,17,18 140:5,8,
18 148:1,14 149:17,18
158:14,22 182:4,5,19,23
183:3,13,23,25 184:7,18
186:7 189:14,22

**2017**
75:4,6 89:24 90:3,6,11
109:14 138:21 149:21,23
183:15 184:20 185:10,
11,15,18

**2018**
8:20 13:2 15:2 81:3,4
87:1 88:8 90:10,11,13,14
138:21 144:23 150:1,11,
16,24 177:1 185:10,15
194:11 195:23

**21**
58:15

**21.4**

163:16

**21st**
158:14

**22**
10:15

**24.1**
163:14,15 164:14

**25,836**
183:5,14

**26**
150:16

**260**
20:25

**26th**
150:11,24

**27th**
65:2

**28**
82:6

**29**
87:9,11 145:10

**2nd**
72:14

---

**3**

**3**
13:19 14:2,14,21 18:13
49:1 78:24 79:3

**3-8-16**
181:22

**3.5**
41:14

**3.9**
114:6

**30**
20:12 82:1,4 114:1 153:4

**30,000**
145:11

**31**
87:12,13 172:19

**33,000**
184:11

**332**
87:17

**347**
64:11

**35,000**
135:14 136:4

**350**
41:14 104:7

---

**4**

**4**
13:19 14:3,14 78:23 79:4
107:3 125:23

**4-19-16**
181:22

**4.1**
166:4,6

**4.3**
114:9

**4.75**
113:15

**40**
113:8

**40,249**
183:6

**401-K**
113:20 164:9,18,20
165:7 166:7

**42.7**
111:15,20

**44**
76:4 77:7 91:18 112:20

**45**
78:5 83:1 86:8,9

**46**
83:1 88:14 182:15

**469**
186:6

**48**
86:7 152:25

**49**
85:19,20,21 112:15,20
113:25 114:11

**49,888**
184:20

---

**5**

**5**
13:19 14:3,14,24 18:13
112:3,12

**5,200**
16:14,21

**5,300**
17:4

**5.7**
58:23

**50**
34:8,19,25 77:8 78:10
79:12,20 83:1 84:25 85:6
86:9 108:24 109:5
112:22 120:16,17 152:25

**51,065**
184:16

**51,543**
90:16

**520**
15:18 17:19,20 20:24

**53,867**
90:18

**53.7**
111:19 112:2

**54**
77:7

**55**
10:15

**56,523**
83:2

**56,988**
83:2

**57,000**
112:22

**58**
90:22

**58,000**
83:4

**58,933**
82:8

**580**
17:17

DAVID S. GIBSON, MBA, MRC, - 09/19/2018                i3

**59,404**
83:5

**59,642**
90:15

**59,821**
81:18 85:24

**5:45**
199:5

---

**6**

**6**
36:4,5 66:19 174:7,9

**6,300**
16:23,25

**6.2**
114:8,24 115:4,5,9,15,
18,22,23

**6.7**
59:11

**61**
59:16,18,20,23 104:1

**63**
61:19

**647**
26:20

**65**
9:6

**66**
58:10,12,13,14,25 59:10,
12,14 87:1,4 190:19

**66,085**
184:18

**664**
86:3

**67**
98:3

---

**7**

**7**
49:9,12

**7,700**
16:19

**70**

**9:6** 59:16

**720**
15:19

**75**
80:17

**750**
9:3

**79**
85:24

**7th**
134:2

---

**8**

**8**
60:22,23 66:20,21 81:2,4
149:6

**85**
11:17

**887**
85:16,23

**89**
59:3 190:20

**894**
81:12

---

**9**

**9**
75:16,17

**9.653**
92:1

**9.7**
91:20,21 92:2

**90**
98:4 191:1

**900**
142:11

**992**
81:6,9

**9th**
134:5 175:2,9,10

---

**A**

**abilities**
25:25 26:15 27:1 39:15
107:20 140:12 194:20,21

**ability**
7:25 21:25 29:17 35:9
56:25 64:6 70:7,10 88:16
99:7,8 105:25 118:10
140:11,15 161:18 162:25
163:10 193:9 197:18
198:20

**able**
28:15,23 29:4 32:7 64:8,
9 71:22 88:24 95:22
96:10 98:4 137:21 141:7
145:19 147:4,25 160:10,
25 161:1,10,13,22,23,24
162:1,2,9 166:25 185:2,
5,6 188:2,9 189:2,12
193:4,13,14

**absence**
105:20

**absolute**
70:1,4

**absolutely**
53:3 96:11

**absurd**
96:12

**academic**
6:13 177:24 193:11,20
194:22 198:3

**academically**
193:8

**academics**
193:9 195:5

**accept**
39:14 161:3

**accepted**
55:22 56:14 103:14

**accepting**
99:5

**accident**
35:18 36:17,20 189:8
196:14,22,24 197:3,4,10

**accidents**
35:15 36:9 196:7,20

**account**
94:4 95:18

**accountant**
6:9

**accounting**
6:11 94:25 164:15

**accrued**
76:17

**accumulated**
17:13

**accumulating**
17:9

**accumulative**
109:7

**accurate**
103:3

**accurately**
45:7

**achieve**
188:3

**achievement**
29:8

**acquired**
69:7 70:19

**ACS**
41:5 42:3,4 44:8 45:18
46:12,18,21 47:4,24
48:6,24 49:22,25 50:3,6,
9 51:24 52:16,21 53:9,
10,15 54:3 55:21,24
56:15,22 68:4,15 69:20
71:13 77:11 86:5 87:25
88:1,5 92:9 100:19
102:23 127:17 139:24
191:25 192:2

**Acting**
176:2

**activities**
132:12 141:17

**actual**
23:23 29:25 30:1 82:20
89:8 182:23 185:22
196:7

**ad**
149:14

**add**

59:15,16 85:22 114:9

**added**
183:22,24

**addendum**
158:13

**addicted**
176:6

**addictions**
176:14

**adding**
59:21 85:17

**addition**
15:11 30:17

**additional**
16:16,22 17:2 115:2

**address**
48:1

**adjust**
79:8 82:8,14 86:13
127:10,12

**adjusted**
83:9,10 85:15 89:25
90:12,16,23 182:21

**adjusting**
97:25 184:13

**administer**
29:8

**Administration**
40:17 137:10

**administrative**
31:8

**adverse**
67:19 69:12

**adversely**
107:21

**advertising**
149:7,17

**advised**
158:18

**affect**
44:13 71:17,20 147:23
162:24,25 178:5 197:17

**affiliation**
22:19

**Afternoon**
38:15

**age**
43:3 44:19,22 59:10,12,
17,21,23 82:17,24,25
83:1,11,15,16 85:9,11
86:7,8 111:15 190:19,20
191:1

**age-by-age**
82:15

**age-related**
82:9

**ages**
82:13 153:3

**ago**
12:3 40:13,17

**agree**
116:19 193:21

**agreement**
12:25 15:1,3,4

**ahead**
64:7 92:14 118:18 149:3

**airport**
162:2

**albeit**
39:16

**alcohol**
176:17

**alive**
92:4

**allege**
154:7

**alleged**
110:20 189:1 193:17
195:1

**allegedly**
88:9 188:24

**alleges**
151:13

**alleging**
105:24

**alleviate**
198:18

**allow**
7:22 39:20 59:8 96:22

**allowed**
53:22 54:12

**allowing**
59:6,13 86:15 152:25

**allows**
50:14 58:22 153:3,4

**alternative**
175:17,21,24

**ambulatory**
98:16

**American**
41:8 78:1 82:19

**amount**
21:13 26:6,21,24 47:12
74:7 113:11 114:13,14
115:14,23 139:16 164:21
171:12 186:8 188:11

**amounts**
115:21

**amputation**
100:21

**amputee**
100:2

**amputees**
99:21

**analyses**
11:13 109:14 116:4
126:24 139:8 146:3
181:25 182:1

**analysis**
15:9,13 20:3 21:8 81:19
88:10,13,17 89:10 90:8
107:2 112:7 113:4
114:19 115:8 120:22
127:10 132:21 133:6,13,
19 152:12,19 154:1,9,16
162:10 163:6,13,15,21
166:13,19 181:24 182:4
197:14

**analyze**
23:6,10,14 113:18 115:1,
2

**and/or**
24:25

**annual**
10:6 23:12 46:15,17 47:9
107:3 132:25 133:9

**allowed**
53:22 54:12

**annuity**
113:6,15,19 114:3

**answer**
35:18 37:24 42:22 43:5,
24 45:4,8 50:18 56:9
74:14 77:11 93:14,15,21
94:2 100:10,22,24
102:23 151:1 157:1,4,7,
10,13,18 183:19 197:1,
22,23

**answered**
28:13 44:11 73:1

**answering**
28:12 45:2 77:17 99:18
100:7 119:24 166:16

**answers**
28:18 157:23

**anticipate**
17:23

**anxiety**
60:9 132:11

**anybody**
22:17 30:19 43:18 50:2
55:16 56:4 64:18 99:3
120:7 139:24 141:11
143:20 166:23 192:14

**anymore**
132:16 160:17,19

**anyway**
181:20

**anyways**
106:25

**apparently**
63:25

**appear**
159:1

**appears**
150:7

**applicable**
92:20

**application**
94:21

**applications**
124:14

**applied**
82:20 87:6 130:25

DAVID S. GIBSON, MBA, MRC, - 09/19/2018          i5

**applies**
142:16

**apply**
83:3 94:16 99:4 103:7
139:23

**applying**
83:10

**appointments**
6:13

**apprentice**
189:3

**apprenticeship**
26:9 61:11 76:10 77:2,4
184:15 188:8,13,22
194:17

**approach**
21:5

**appropriate**
117:15

**Approximately**
10:14 28:10

**arbitrations**
8:25

**area**
25:22 26:12 101:15
131:23

**areas**
19:20

**aren't**
34:9 48:8 80:2,5 130:4
167:6

**arena**
25:24 56:5,10

**argument**
123:23

**arisen**
35:11

**arm**
128:9,20 131:3

**arms**
73:15 157:3 178:18
179:2

**arthritis**
127:1,8 128:2,4

**article**

45:11 46:13,20 47:16,25
48:4,14 95:13 96:24
102:18 120:12,13,14

**articles**
120:4

**ASEC**
47:10,15 48:21 52:23

**Ashley**
158:13

**aside**
193:20 195:13

**asked**
14:18 18:2,4,5 35:10,16
37:24 42:18 51:2 62:17
74:12 96:5 102:10 107:1
117:9 136:20 138:22
155:4 159:6 168:10
170:15 180:19 190:3

**asking**
5:8 23:24 74:25 92:21
94:20 101:15,16 130:9
140:1 167:5

**asks**
42:14

**aspects**
67:15 69:8,9 70:19 71:8

**aspersion**
104:13

**assess**
29:22

**assessing**
27:17

**assessment**
26:16,25 27:7 29:13
60:10

**assign**
64:2

**assignments**
124:9 189:7

**assistance**
14:16 166:11

**associated**
194:7

**association**
67:13 69:7 117:24

**assume**
21:7 27:19,21,23,25
57:11 99:16 101:2,13
112:16 151:14

**assumed**
112:15 145:22

**assumes**
101:4 152:12 186:2,3

**assuming**
24:21 42:3 130:6 186:23,
24

**assumption**
88:11,15 99:17 101:7
103:1 127:25

**attached**
133:4

**attain**
188:5 189:2

**attempt**
93:3 185:17

**attempting**
141:25

**attended**
174:13

**attending**
6:22

**attention**
52:8 159:5

**attorney**
34:12,13 121:19 169:15

**attorney's**
12:4

**attorneys**
11:21 30:25 31:4 34:11

**attribute**
153:24

**audience**
119:8,10

**August**
8:19 36:19 72:14 86:19,
25 87:9 88:8 90:14
134:2,4

**author**
100:17

**authors**

95:17 98:13

**automatically**
170:8

**available**
26:2 33:7 184:22 185:25
186:20

**average**
79:1 81:25 89:4,9,14
91:5,8 109:16 112:19,20
144:5 163:21 164:5,11,
23 166:2 182:21 184:10

**averaged**
146:8

**aware**
17:25 18:7 52:1,7 53:6
65:24 103:17 105:4
166:9 185:18

---

**B**

**back**
12:1 31:5 39:4 40:18,19,
20,21 41:18 46:22 50:18
51:5 63:6 64:15 73:3,15
75:24 78:13,24 88:17
91:18 97:11 101:3
102:18 104:4,5 105:5
110:23 144:4 146:10
148:6,8 151:5,17 152:19
158:12 159:24 160:6
161:16 166:21 171:18
177:8,13 179:21 180:11,
25 182:5 187:19 195:9
196:1,19 197:23

**background**
25:2 101:8

**backwards**
89:11

**bad**
34:22 109:4 112:3 167:6
195:15

**ballpark**
116:17

**Baltimore**
53:17 55:3 97:12

**Barb**
5:6 92:13 120:15

**base**

15:12 24:3 83:6 85:16
90:15,18 151:17

**based**
65:13 81:17,18 89:13
91:4 101:11 118:13
141:23 142:1,2 144:5
158:19 163:16,24,25
165:22 166:20 170:19
184:6 187:23 191:8,17

**basically**
18:12 94:21 106:4
119:19 121:20 141:4,6,
10 159:23

**basing**
34:20

**basis**
10:7 34:6 48:19 63:15
79:22,25 80:1 82:15 85:8
100:12,14 101:19 102:1
106:23 107:7,10 142:18
176:5

**bathing**
99:8

**bathroom**
91:10

**Bear**
134:19 174:19 183:2

**becoming**
193:12

**beginning**
151:17 194:17

**Behavioral**
175:25

**believability**
142:17

**believe**
5:16 8:24 9:15 10:11,24
11:24 12:11 16:6 20:20,
21 35:15 36:25 40:21
52:6 54:9 71:10,19 79:6,
19 101:1,12 112:4
129:15 130:9 131:13
147:12 150:18 173:19
174:15 191:16 197:11

**beneficial**
92:25 93:2,19

**benefit**
29:8 85:21 113:4,7,23

114:20 115:25 116:3,11
163:13 164:6

**benefits**
15:11 16:22 24:4 25:1
85:17,20 112:14,16,24
114:4 115:6,10,13
125:11 163:22 164:7

**best**
49:18 54:22 60:16 79:20
144:8

**better**
32:9 54:24 77:21 79:6,10
80:11,14 83:22 101:22,
23 105:10,18 147:3
170:16

**beyond**
19:5 29:11

**big**
152:17 184:14

**bigger**
175:4

**biggest**
114:2

**bilateral**
126:5

**bill**
15:17 17:12

**billed**
15:12,14 17:10,11,17

**billing**
16:4 17:5

**bit**
8:11 19:5 82:10 97:4
103:11 110:22 120:15
151:7 179:17

**block**
132:1

**blood**
22:10 158:24

**boilermaker**
39:20 61:11 84:2 177:24
178:1,3 187:3,9 189:10,
13 193:10

**Boilermaker's**
26:20

**boilermakers**

25:15 26:11 188:6,16

**boilerplate**
19:12

**borderline**
179:8

**boss**
123:24

**bottles**
176:8

**bottom**
66:5 124:15 174:6
175:11,12 185:8,9

**bouncing**
110:22

**box**
36:22 61:25 111:17,18
165:16

**boys**
61:9

**brain**
51:3 128:14 160:14

**Brandon**
5:21 174:6,10

**Brault**
45:11 48:11

**break**
91:10 138:17 179:11
185:17

**breaks**
7:9

**bring**
25:3,10,13

**broad**
54:14,15

**broader**
150:23

**broken**
102:24

**Brookhaven**
121:23

**brought**
52:8

**bucket**
94:25

**buckets**
94:21

**bucks**
165:19

**build**
116:11

**building**
142:15

**bulk**
145:9

**bunion**
98:23 99:3,6,11,15,16,19

**bunions**
98:17

**Bureau**
41:9 45:6,19 47:6,7
48:17 100:18 114:6
163:23

**business**
7:13 149:18

**busy**
46:23

**buying**
113:13

_____

**C**

**calculate**
24:9 113:3

**calculation**
91:22

**calendar**
18:9

**calibrating**
147:11

**call**
28:7 79:21 120:20 167:3
170:9

**called**
5:2 13:6 36:22 46:9 47:9
78:7 82:17 84:21,22
97:6,7 109:18 135:18
140:13

**calling**
155:14 156:7 158:22
169:24

**calls**
109:8,11

**can't**
7:20 11:5 12:4 17:13
20:16 28:20 29:14 34:24
51:9 52:2,16 54:11 55:13
56:25 57:1 60:10 62:22
63:6,9 74:9,10,22 75:1
87:19 102:17 104:11
112:5 123:21 132:16,17
134:16,22 141:5 142:24
146:20 149:12 150:19
156:14 159:10 160:17
169:11 197:1

**capacity**
19:21 20:4,7 23:13 72:3
107:4 112:18,19 118:10
129:9,10 132:25 141:7
151:23 180:12

**Capstan**
5:7

**captured**
57:23

**car**
35:15,17 36:9,20 196:7,
14,20,22,23 197:2,3,9

**card**
25:18

**care**
24:5 41:22 65:3 167:16
168:12 171:12 172:6,25

**career**
61:18 152:7

**Carnegie**
123:1

**carry**
26:14

**case**
5:7,18 8:2,6,7 10:19,23
11:10,11 12:3,8,13,14,
20,21 13:4 14:19 15:1,5,
24 17:15,24 18:7,8,22
20:9 21:5,6,7 22:16 23:6,
10 29:9 31:6 35:5 36:24,
25 37:20 39:2,13 43:9
50:11,24 52:24 54:1,9
55:3,19 66:11,16,24
67:5,23 69:1 73:12
97:13,18,24 101:18
111:3 112:9 117:14

118:9 125:20 171:3,20
172:20,21 188:19
189:14,18

**cases**
10:24 11:2,4,5,11,23
13:1 18:6 23:22 24:22
29:2 34:5 52:13,14 53:5
55:13,17 103:7 146:5,6
180:11

**cash**
23:20

**casting**
104:13

**catch**
160:10

**catching**
160:15

**categories**
99:13

**category**
43:21,23 76:23 173:15
192:17

**cause**
35:5 107:8 196:6

**causes**
44:11 47:14

**caveat**
31:24 48:7

**Cedar**
158:3

**ceiling**
195:10

**census**
41:9 45:6,19 47:6 48:17
95:14 98:16 100:17,18

**certain**
18:19 22:1 44:6,7 169:2,
10 188:11

**certainly**
139:3 147:25 157:12
197:17

**certainty**
34:24

**certificate**
123:2 137:10

**certification**
137:10

**certifications**
6:6

**certified**
6:8

**chance**
101:14

**change**
25:5 29:14 58:9 87:7,10,
21 95:4,5 161:14 167:7
185:21

**changed**
23:16 42:7 133:20

**changes**
18:3 50:16 62:8 82:20
84:1 113:2 133:19

**charge**
15:13 20:23

**charged**
48:5

**charges**
15:7

**charging**
15:5

**chart**
14:13

**cheat**
13:24 183:8,11,12
184:12

**check**
165:16

**checked**
62:1,4

**Chicago**
12:17 161:10

**child**
24:22

**chronometer**
79:7

**circle**
104:5

**circling**
197:23

**circumstances**
197:3

**cite**
30:22

**cited**
45:10

**claim**
106:15 107:13 124:10

**claimed**
35:5 161:7 165:7

**claiming**
161:6

**claims**
134:9 184:25

**clarifying**
65:23

**clarity**
155:16

**class**
77:2 99:20 176:3 177:15
197:25

**classes**
6:22 7:3,11 76:18,22
174:13,18 177:9,11,16

**classification**
98:21 99:24

**classified**
77:19 99:20

**classify**
99:5

**clean-up**
167:14

**clear**
108:8

**climbing**
98:25 127:14 134:25
156:9

**Clinics**
159:18

**close**
8:17 94:3 151:21

**closed**
11:6

**clown**
176:3

DAVID S. GIBSON, MBA, MRC, - 09/19/2018          i8

co-counsel
151:20

Coast
135:18 145:7,15 151:24
152:3

cocaine
197:21

Code
117:23

cognitive
21:23 42:11,24 43:14,24,
25 44:3,15,25 45:1 50:25
51:1 68:1,5,15 69:3,8
70:19 71:6 77:9,10,17,22
78:19 80:8 107:20
138:24 160:9,16,21
161:17 170:23 171:1,2
178:7,9 187:24 188:1
191:17 192:17 193:18
194:22 195:1,4,6,14

cognitively
44:9

cold
157:15,16,18

collect
181:14

collected
181:8

college
6:16 58:5 59:25 76:6,7,
24 77:3,5 78:18,22
82:10,23

column
78:19,21,23,24 79:2,3,4
82:21 86:3,6

columns
81:2 91:25

combination
34:21

combines
88:2

come
14:6 18:4 24:12,23
27:23,24 42:4 43:11 48:5
55:5 64:12 77:25 79:17
82:18 86:4 87:24 93:11
97:21,22 109:8 117:10,
13 128:19 129:14 130:6,

10 137:7 142:10 156:18
172:12 193:9

comes
21:6 27:25 32:18 41:10
81:25 82:6 88:5 163:19
164:1 183:3,9

comfortable
32:17

coming
28:1 83:10 108:8 126:14
129:4 160:6 172:16

commented
188:21

commodities
173:5,10

common
44:21,23,24 45:3 50:10,
22 51:3,15,17 145:2
169:7

communicating
66:12

communication
133:11

community
41:8 78:1 82:19 84:2

comp
114:5 180:23 181:9,14

company
119:17

compare
80:7 96:23 191:25

compared
30:4 80:9 112:19

comparing
96:16,17 153:15 194:12

comparisons
192:12

compensation
34:17 171:23 183:16

competitive
8:10 40:5

complain
160:2

complaint
126:7

complaints
157:17

complete
61:15

completed
26:9,10 61:2 66:11 76:21
121:24 123:1,4,8 130:19
188:7

completion
67:17 69:11

component
113:6 114:2 115:2
156:15

components
112:24 142:15 164:3

comprises
114:1

compromise
194:6

computation
98:8 116:18

computations
78:7 82:16 183:10

compute
24:11 54:1 92:3 120:9
190:19

computed
91:23 98:4

computer
18:14 38:4,20

computing
24:10 59:20

concentrating
42:16 44:7 68:11 69:23
70:25 71:4

concept
71:21

concerned
166:16,17

concerning
60:5

conclude
107:11

concluded
199:4

concludes
97:1

conclusion
97:3

condition
42:15 44:11 50:24 65:5,
13 68:10 127:13 162:21
184:24

conditions
65:17,21

conduct
29:4 39:6 177:4

conducted
5:5 47:6 92:15 117:8
121:1 148:13 191:14
198:7

conducting
29:5

confident
23:4 156:15

confidentiality
117:22

confirm
36:5 147:20

confirmed
67:4 140:14

confirming
20:15 120:5

conflicting
102:15

confused
111:23

confusing
188:19

consent
121:17,18

consider
60:8 64:4 87:20 102:6
113:5

consideration
192:7

considered
44:8 100:24 160:16

considering
30:14 106:12 138:13

DAVID S. GIBSON, MBA, MRC, - 09/19/2018    i9

192:9

**consistent**
15:17 40:11 68:4,13,14,
18 72:20 73:2 82:4
137:15 152:12 159:1
160:8 169:6

**consistently**
151:25 152:4

**constant**
15:9 73:16,17,19 140:15
155:22,23 186:3 196:4,6,
25 198:21

**constitute**
11:11

**construct**
93:25

**construction**
57:16

**construed**
100:11

**contains**
8:22

**contents**
14:1 18:12

**context**
103:13

**continue**
27:1 34:2 39:16 57:7,13
117:16 140:22 151:14
188:7

**continued**
58:25 105:21 121:1
126:16 127:23 139:19
140:25 148:13 168:2
191:14 198:7

**continues**
87:8

**continuing**
126:25 128:1 156:1

**continuum**
79:8,15 98:1 120:18
192:11

**contrary**
141:2 142:6

**contribute**
166:6

**contributed**
164:21,22

**contributes**
165:17

**contributing**
165:15

**contribution**
113:18 164:10 165:7

**contributions**
113:17 114:8 115:16
116:6 164:15

**control**
18:8

**controlled**
198:16

**conveniently**
29:3 155:6

**conversation**
28:11 37:13 38:18
146:13

**conversations**
21:3

**cooperation**
47:6

**copied**
72:15

**copies**
13:11,14 148:18

**copy**
6:1 69:5 148:15,17
150:17 151:3 167:24

**core**
177:19

**corner**
36:12 121:16 122:19,23,
24 175:9,10,11,12

**Corporation**
5:7

**correct**
5:15,22 8:21 16:7,18,20,
24 17:1,6 24:1 61:24
62:5 65:20,23 75:23
79:23 83:13 86:2 88:6
90:17 93:15 94:15,22
95:2 96:3,24 97:2,22
100:8 101:5 102:21

103:13 105:20 107:7,9
109:11 110:9 111:12
112:16 123:20 124:24
125:1,18 127:18 132:2
133:24 134:8 139:5
147:21,22 149:18 150:8,
15,17,24 151:9,10
152:10,13 153:7 156:10,
13 158:24 159:25 160:6
163:12 168:21,22 172:4
173:13 176:21 177:7
185:25 186:17 189:21
191:23 192:3,7,8 196:9
197:19 198:1

**correctly**
81:2 93:14

**correspondence**
150:7,12

**cost**
171:15,25

**costs**
24:5 168:12 171:12,24
172:6,9,25

**couldn't**
53:20 63:8 142:6 145:15

**counsel**
20:8 23:1 30:18 150:16

**counseling**
6:18 7:8,14,18 100:15,16
117:22 118:2

**counselor**
70:22 100:1 117:20
121:22

**counselors**
51:16

**count**
48:16 77:1,3 191:5

**counted**
77:13

**couple**
8:25 10:21 33:1 35:15
52:9 53:13 97:25 117:3
118:17 121:15 125:7

**court**
8:23 12:10,15 51:21,24
53:5,19

**courts**
52:12

**cover**
147:9 149:14

**covered**
19:10

**covers**
16:1

**CPS**
46:11 47:8 48:1,6,19,21,
22,23 49:2,13

**cramps**
128:9,21

**created**
49:16

**credential**
26:13

**credibility**
29:22,25 142:9,16,20
143:3

**credible**
30:6 143:17,22

**credits**
76:17

**crew**
125:17

**criteria**
42:3 44:17 56:23 71:13
77:12,17

**criticism**
96:15

**criticized**
54:16

**criticizing**
56:18

**cuff**
126:6 156:21

**cure**
32:7

**curing**
96:9

**current**
6:3 46:9,16,19 47:5,17,
19,22 59:17,21 93:13
138:23 171:14,15,25

**currently**
11:2 32:2 61:25 62:9,19

DAVID S. GIBSON, MBA, MRC, - 09/19/2018                    i10

93:1,20 94:7 95:20
109:21 166:10 194:10

**customary**
18:1

**customize**
98:5

**customized**
97:23

**CV**
6:2

---

**D**

**daily**
73:18

**Daryl**
116:24 167:18 173:17
198:24

**data**
45:20,25 46:15 49:13
52:14,20,25 53:9,10,21,
22,24 54:17,24,25 55:1
57:6 68:4 78:3,5 88:2
93:5 97:18,19,21 98:8
99:6 100:18,19 102:10,
11,19 114:6 123:3
191:25

**date**
15:2 57:12 58:16 59:2
61:4 72:13 88:17 135:9,
23 145:16,19,20 146:1,
20,21 150:10 182:3
189:18

**dates**
15:16

**David**
5:1,11

**day**
13:3 62:7 87:21

**days**
74:7 185:13 186:12,15

**deal**
20:6 78:3 152:20

**dealing**
43:8 54:24 124:12

**deals**
19:22 124:13

**December**
136:1

**decided**
136:9 154:23

**decipher**
177:14 183:11

**decisions**
42:17 68:12 69:23 71:1,5

**decline**
186:4,24

**declining**
82:13

**decrease**
90:12 116:3 141:16
144:9,13 179:4

**decreased**
58:7 89:11 141:13

**defects**
195:14

**defendants**
151:2

**defense**
11:15,19 55:17 102:6
167:2

**deficiencies**
193:20

**deficiency**
193:11

**deficits**
193:18 195:2

**define**
162:19

**defined**
113:18

**definitely**
50:11 87:19 94:11 135:1
141:13 146:22 156:14
162:25 198:5

**definition**
98:16,24 178:9

**degenerative**
127:1,8 128:2,4

**degradation**
116:10

**degree**
26:4 41:6 57:24 58:4
68:3 70:6 76:24 80:6
97:23 100:16 166:22
177:20 185:4 190:5,9

**delineation**
50:14

**demand**
27:6

**demanding**
189:7

**demonstrate**
26:14 179:2

**demonstrated**
39:15

**demonstrates**
25:25 27:4

**demonstrating**
151:23

**dep**
20:12

**Department**
47:7

**depend**
115:14

**dependability**
162:17

**dependency**
176:18

**dependent**
185:24

**depending**
26:2 43:9 112:17 177:17

**depends**
19:4,6,19 33:9 52:13
55:12 109:6 152:18
173:1 181:24 198:14

**deposition**
5:15,23 8:13 12:15,16
13:18,25 14:6 16:4 17:11
18:11 19:2 20:18 22:15
36:3 37:1,3 49:8 60:21
63:4,7 75:15 110:1
121:10 122:9,15 125:6
139:10 147:14 148:22
150:4 158:10 159:16
161:9,16 168:8 174:16,

22 176:2 180:5 185:4
199:4

**depositions**
8:22 9:1,6,18 18:2 20:1,9
24:15 25:6 147:15

**depression**
60:8 125:25 126:3,15,16
132:11,19

**derive**
80:1

**described**
176:2

**describing**
165:21

**description**
19:9 21:17,23 69:21

**designated**
5:17

**despite**
184:7 188:2

**destination**
161:15

**detail**
81:24 91:23

**detailed**
19:6 165:3

**details**
53:13

**determination**
56:15 171:10 191:23

**determine**
29:17 63:9 67:8 83:14
169:5 196:5

**determined**
53:20

**determining**
22:23 53:7 176:20

**developing**
23:8 48:9 49:19

**dexterity**
179:5,10

**diagnose**
7:20

**diagnosed**
37:5 110:11,15,16

DAVID S. GIBSON, MBA, MRC, - 09/19/2018        i11

**diagnoses**
60:11,12

**diagnosis**
60:14

**Diane**
159:20

**Dictionary**
39:10

**didn't**
30:7 31:19 37:12 48:3
63:8 76:22 77:1,10,11
97:19 108:15 116:17
122:7 125:14 126:8,10
127:2 129:23 133:2
134:2 135:25 137:14,15
139:3 140:21 144:4
153:13 154:23 159:5
160:18 162:7,12 169:10
170:18 171:2 176:11,13
177:25 178:14,22 179:8,
13,15 181:2,20 191:8,10
193:9,12 194:22

**differ**
46:11 102:3

**difference**
23:20 91:7 104:12 111:2
163:18,19 165:12,14
193:25

**different**
11:12 12:22 13:9 14:23
19:20 25:19,23 26:1 27:9
31:15 46:18 47:3 57:21
69:6 76:23 96:14 98:9
109:13 112:17 117:10
118:2 119:4 137:18,19
159:9 171:15,19 186:2,
13,22

**differs**
68:25

**difficult**
28:12,16 43:3,4

**difficulties**
71:9 100:3 104:25 195:5
198:22

**difficulty**
28:21 32:18 33:14,17
42:16 44:6 68:11 70:25
71:4 74:5 98:25 104:6,7,
16,22 105:1,7 160:13
179:10

**diminished**
67:16 69:10 71:16 72:3
92:11

**dipping**
114:22

**dire**
118:13

**directly**
36:23 38:19 63:2,15
72:15 113:7 124:6
191:20

**disabilities**
43:17 57:17 160:19
191:17

**disability**
7:20,24 21:9 27:19,22
42:3 43:10,13,18,25
44:17,25 45:2,14 46:3
47:11,18 49:14 50:25
53:2,4 54:17,24,25 55:1
56:4,23 57:8,12,13,22
58:18 59:25 63:20,21
71:13 77:11,17,22,23
78:19,23 79:10 82:23
93:10 94:12,18,19 95:15
96:2,7,11,13,21 98:16
99:11,12 100:10,19
101:5,10 103:1,3,4,6,8
120:18 127:16,17,20,23,
24 130:25 133:13,14,20
153:1,4,7,14 155:15
160:9,16 166:20 178:9
187:24 188:2 189:2
191:11 192:11,17,23
194:22 195:4,6

**disabled**
43:11 44:9 77:9 86:24
93:18 94:5,9,10,15,17,
22,24,25 95:1,18 102:14,
15,20 162:4

**disagree**
56:11 98:18 100:1 102:6
195:21

**disallowed**
54:13

**discern**
82:24

**disclosure**
22:15

**disclosures**
25:7

**discount**
24:2,11 80:24 115:20
172:13,16,18,22,23
173:7 193:4,14 194:25
195:1

**discounted**
172:20 173:12 194:23

**discounting**
105:9

**discounts**
172:15

**discuss**
36:17 37:2 174:15 180:6

**discussed**
72:10 110:1 169:22
180:4,6 192:25

**discussion**
96:9 110:14 125:5
128:20 140:14 180:7

**dishonest**
138:12

**disk**
180:8

**disks**
179:21 180:3,11,14,25
187:19

**disorder**
106:9 128:10,22 129:1,2,
12,13 130:10 131:13

**disorderly**
177:3

**dispute**
99:4

**distance**
6:24

**distinguish**
51:7

**distinguishing**
104:12

**distributed**
149:15

**divorce**
32:2

**divorced**
61:8

**doctor**
22:17 33:10 34:1 53:2
100:5 112:5 146:24
161:4 170:25 180:24

**doctors**
22:25 33:3 101:17 112:9
129:25 147:10 156:16,24

**doctors'**
64:23 147:2

**document**
5:23 8:13 19:4,6,19 22:9
36:3 49:8,12,21 50:2
60:21 75:15 78:7,11
82:16 120:14 121:10
122:15 124:13 139:10
148:22 150:4 158:10
159:16 168:8 174:22
183:10

**documentation**
24:25 40:8 66:14

**documented**
45:11

**documents**
13:18 14:25 18:24 19:5,
18 20:6 23:8 31:9,22
40:8 56:3 123:10

**doesn't**
9:14 22:11 24:23 27:24
36:24 48:15,16 51:11
55:18 61:22 70:1,14 87:7
101:23 104:3,19 105:20
108:3 111:11 112:6
123:2 128:5 134:17
137:6 139:22 150:20
165:16 172:13 173:6
179:11 186:10,23

**doing**
10:18,19 16:22 17:23
24:16 27:1 46:1 55:12
57:16 59:10,19 74:5 80:1
86:15,17 109:4 115:25
118:6 132:18 134:18,21,
23 137:4,22 138:24
139:4 141:3,7 164:5
170:16 178:18,24 186:22
188:21,23 194:24,25

**dollars**
120:8 172:2

**don't**
5:14 9:5,10 10:6 11:4,24
12:11,12 16:2,6 18:8
20:1,21 23:6 24:7 27:22,
25 29:6,24 31:10 33:6,22
34:7 36:1,11 37:16 41:22
43:19,20 48:23 51:18
52:6 54:9,16 55:13,16
56:1 57:6 59:13 60:1
62:20 68:6 69:2,3 70:6,9
71:18,24 74:1,25 76:16,
20 78:14 79:6 80:17 82:2
86:10 91:12 94:12 95:3,
24 97:9 101:19,20 102:8
103:23 105:14 106:14
107:13 108:10 109:12
110:2,13,18,21 111:9
116:25 118:20 119:9,24
124:5,12 125:6,13
126:23 127:25 128:23
129:6,7,12,15 130:7
133:15 135:8,9,16,23,24
136:2,19 137:18 138:6,
12 139:2,18 141:6,12,22,
25 144:1 146:20 147:6,
12 149:12 151:1,2,16
154:13 155:11,25 156:5
157:25 159:4 161:1,6,11,
21,25 162:3,8 163:20
164:12 165:3,25 166:5
167:16 168:23 169:3,8,
12,16 170:5 172:21,23
173:16,18 174:15,16,20
175:12,13,18 176:22
177:14 178:1,4,5,10,22
180:4,7,9 182:10 185:12,
14,17 187:2,4 188:12,15,
18 189:9 190:24 191:5
192:1,8,14 193:13,21
194:21 195:3,9,13,21,25
197:7,24

**Donald**
5:21

**door**
16:2

**double**
114:22 115:17

**doubt**
98:14

**download**
78:3

**Dr**

8:8 16:8 19:14 22:19
53:11 68:16,22,24 69:25
70:10,13,24 71:11,15,19,
22,24 72:10,12,15 73:2
77:16 80:5 102:1,3,4
106:2,5 107:18,23 108:3,
7,11,21 112:4 128:23
129:17,19,20 131:12
141:9,23 142:12,25
143:1,4,20 147:9,10,14
166:23 169:18 170:22
178:11 179:3 189:5,17
191:18,21,22 193:18
194:3

**dragging**
108:18

**dressing**
99:7

**drinking**
197:8

**driven**
190:7

**drop**
64:8,10 170:2

**dropped**
62:24 135:3 170:9

**Drs**
132:23

**drug**
171:6 177:3

**due**
21:8 32:1 51:2 74:23
98:17 126:5 153:25
162:21 185:13 186:5,24

**dues**
114:10

**DUI**
176:25

**duly**
5:2

**duties**
63:24 194:6

────────────────

**E**

────────────────

**earlier**
9:13 72:18 103:11 149:4
169:15 170:15 174:1

179:18 192:25 194:1,23
196:3 197:16

**early**
21:11 174:2

**earn**
23:12 84:23 88:16 89:6
118:11,13 137:21 162:1
187:1

**earned**
40:7 83:7 134:23 135:13
136:4 138:15 139:16,19
140:5 145:4 182:5
184:11 193:25

**earning**
19:21 20:4,7 23:12
39:21,23 69:13 81:17
90:15,18 107:3,21 108:1
109:12 112:18,19 114:11
118:10 132:25 134:6
144:13 151:23,25 152:3
153:19 184:10 194:1

**earnings**
10:21 15:8,12 19:23 21:8
23:18,19 24:3,7,9,19,21,
24 26:18 30:1 32:14,16
39:20 40:2,5 46:3 50:16
51:2 54:6 64:7,8,9 65:18
66:1 67:19 68:6 81:20
82:11,17,21,22 83:2,4,6,
10,11,16 85:9,11,15,17
89:3,8,16,22,25 90:12,
16,23 109:14 112:21
116:5 126:9 133:21,23
136:25 137:1,4,7 139:6,
21,25 140:2,3,4,24
142:11 144:2,7,9,16
145:9 146:6 151:9,12,15,
17 152:10,13,14,21
163:16 164:2 165:4
182:2,6,13,16,21,23
183:13 184:1 185:23,24
186:3,4,23 187:4,5

**earns**
63:18

**easier**
119:24

**easiest**
152:21

**economic**
46:15,17 47:9 71:21
83:19

**economics**
5:19,20 52:10 53:12
95:7,11 119:5,15,16,17

**economist**
52:24 96:13 172:12,20

**economists**
51:17 55:5 103:18,21

**ed**
177:15,16

**editor**
161:5,8

**education**
6:16 25:21 51:14 57:24
58:4 77:1 121:23 153:16,
18 161:7 174:13,17,18,
19 177:9 190:6,8,10,12
193:3,4 195:14 197:24

**educational**
25:2 26:3 76:11 122:6

**effect**
33:16 60:1 125:4

**efficiency**
67:16 69:10 71:16 194:6

**efficient**
194:11,13

**either**
12:14 18:19,22 20:15,16
25:6 35:11 58:4 91:4,6
100:3 109:15 116:1
121:19 132:3 171:21
191:6

**else's**
192:13,14

**emotional**
42:15 44:11 50:24 68:10

**empirically**
97:2

**employed**
54:4 58:21,25 59:3,4,10,
24 62:7 81:11 92:4,24
93:1,18,20 94:5,7 95:19,
20 136:14 138:13 191:2

**employee**
19:23 32:4 138:19
165:22,24

**employer**
113:11 163:20 164:15,

DAVID S. GIBSON, MBA, MRC, - 09/19/2018          i13

21,25 165:15,17,23

**employers**
32:25 145:10 166:6

**employment**
26:3 27:5 32:23 46:2
50:16 57:25 58:8,22,24
68:8 78:16,17,21 79:9
86:4,7,9,16,24,25 87:24
88:1,5 92:5,9 93:12,13
96:4 103:2 120:8 124:1,
3,13 129:10 136:23
140:1,16,18 142:1
144:11 152:16 155:9
167:1 187:11 190:17
198:22

**empty**
133:18

**ended**
145:15 187:8

**energy**
185:4,14

**English**
177:19

**enhance**
64:7

**enhancing**
192:18

**enter**
38:5

**entire**
30:10

**entree**
27:4

**entries**
169:21 180:9

**entry**
25:18

**equal**
69:19

**equally**
98:17

**equate**
77:16

**equates**
71:3

**equation**
25:4 161:25

**Erickson**
179:23 187:7,17

**erroneous**
140:8

**error**
160:2

**especially**
142:12

**essence**
53:23

**essentially**
13:24 47:3 79:1 113:8
115:25 152:4 188:7

**established**
146:16

**estimate**
17:14 32:5,21 49:18 56:2
82:1

**estimated**
89:18

**ethical**
117:18

**Ethics**
117:23

**evaluate**
7:23 102:10

**evaluated**
54:7

**evaluating**
8:3,4,9

**evaluation**
35:20,22 147:6 181:23
187:23 191:20 192:9

**evaluations**
188:20

**evaluee**
36:6,13 60:20 62:4 66:18
110:23 121:9 123:12
170:22 173:25 174:10

**event**
23:14,16 27:23 169:18

**eventually**
28:16 32:6 82:12 123:21

**everybody**
139:23 192:6

**evidence**
37:16 67:16 69:10
109:10,18 134:12 194:24
195:13

**evolved**
22:12 23:15

**exacerbates**
157:17

**exact**
10:6 46:20 47:23 52:2
135:9,24 145:16,19,20
146:20,21

**exactly**
17:14 28:20 54:20 79:7
87:20 104:23 129:6
165:21

**examination**
5:5 29:6 92:15 121:1
148:13 168:2 191:14
198:7

**examine**
51:2

**examined**
5:3

**example**
19:8 31:14 52:24 98:11,
15 99:21 155:22 174:4
194:8,9

**examples**
74:25 159:10,12

**excelling**
108:25

**exception**
15:18

**exclude**
43:15 114:15

**excluded**
97:12

**Excluding**
11:8

**excuse**
11:20 25:7 104:21

**exhibit**
5:24 6:1 8:12,14 12:18

13:19 14:2,21 36:4,5
49:9,12 60:22,23 66:19
75:16,17 121:11,12
122:16,17 139:11,12
148:19,23,25 150:3,5,6,7
158:9,11 159:17 168:9,
15 174:7,9,23,24 175:3

**exhibiting**
194:4

**exhibits**
14:14 18:13

**exist**
48:2,3,17 70:21

**existed**
47:19 49:24 52:21

**exists**
181:5

**expect**
63:14,17 64:17 71:22,25
72:5 73:14 85:1,5 180:22
190:13 194:6 198:21

**expectancies**
27:2 51:8 54:2 55:6 58:7
95:23 120:10 190:7

**expectancy**
20:4 23:13 27:10,11,15,
18 44:14 53:7 54:5,8
60:4 71:21,23 81:6 92:22
94:14 98:3 103:12,14,22
133:21 144:12 162:14,24
163:6 178:5 179:24
190:4,20

**expectation**
65:2

**expected**
37:4 131:3

**expenditure**
32:21

**expense**
89:18

**expenses**
19:23 32:4 40:3 82:1
149:6 182:22 183:5,14

**experience**
60:6 82:12 85:3 100:13,
14 109:3,7

**experienced**

DAVID S. GIBSON, MBA, MRC, - 09/19/2018          i14

105:6

**experiencing**
109:7

**expert**
5:17 7:18 8:2 21:19 25:7
53:1 55:18,19 100:6
101:21 103:9 106:16
117:9 121:21 141:14,15
167:5 180:10

**expertise**
100:18,20,23 101:16,20
102:13

**experts**
18:2 25:7 29:20 34:6,10,
21 101:12 102:6,15
118:14 140:13 167:2

**explain**
21:5 169:11

**explained**
145:14

**explicitly**
18:5

**explore**
58:13 140:10,21 141:19
178:14

**exposed**
64:22 188:24

**exposure**
27:14 35:8 36:18 38:21
39:1 57:4 65:1,19,22
66:8 73:7 106:3,10,11
107:5,11 110:20,25
111:9 112:7 124:21
126:14 154:12 155:18
156:17 157:16,22 184:8
186:5 191:10 194:13
196:8,11

**extensive**
29:10 142:13 168:20

**extra**
148:17

**extracted**
137:10

**extreme**
185:3

**extremely**
170:12

**eye**
36:21

---

**F**

**fact**
27:18,25 68:1 71:12
84:17 86:13 94:9 102:20
105:21 122:9 123:4
124:3,8 125:2 140:4
144:13 146:14 153:24
162:8 163:4 169:24
170:15 184:14 188:2
192:5 195:22

**factor**
57:15 84:8 93:3,9,12
95:24 112:6 127:8 140:4
142:9 145:12 162:10
163:4 164:9 170:18
171:3,8 179:24 181:23,
25 182:1,2 192:24
197:13

**factored**
84:10 153:22,23 164:3

**factoring**
58:20 139:16 193:8

**facts**
104:4 122:21 123:1
158:19

**fairly**
10:21 82:7

**fall**
36:19 43:20 127:16
171:21 187:24

**falls**
188:1

**familiar**
39:9 95:6,13 96:20

**fantastic**
32:9

**far**
29:10 40:18 88:25 94:14,
20 123:19,22 126:1
161:17 162:18 179:4

**farcical**
96:8

**fast**
71:19 164:18 173:20

**father**
191:3

**fatigue**
185:3 186:17

**fault**
148:7

**favored**
103:21

**Federal**
48:15

**fee**
12:25 14:25 15:3,4 16:1,
11

**feel**
43:2 156:16

**feeling**
170:16

**feels**
33:10 189:25

**fees**
15:24

**feet**
104:10,14

**felt**
118:9 145:16,18 152:1

**fewer**
116:4,5 186:12,13,15

**FICA**
114:13,14,22

**field**
7:7 55:24 95:10 103:15

**fifth**
78:13

**fighting**
56:6

**figure**
42:9 48:10

**figures**
65:10 103:14

**file**
13:6,23 14:1,6,9,12
18:12,15 19:18 30:10
124:7,11 149:1 158:4
168:3,24 188:19

**filed**
124:14 137:20

**files**
18:19 32:23

**fill**
41:17 123:2

**filling**
41:11

**final**
40:12,14

**finances**
129:10

**find**
23:20 35:14 71:12 82:16
84:19 134:19 139:15
140:15 141:4,6 161:1
162:23,25 187:11 191:10

**finding**
80:12 86:24

**finds**
141:10 167:2

**fine**
69:18 71:25 72:2 78:15
150:22 194:24,25

**finger**
96:19 179:9

**fingering**
21:23

**fingers**
105:6 181:12

**firm**
9:24 10:2,10,16 11:3,24
12:5 20:19,22 52:4 102:9

**firms**
11:14,15,22 20:20

**first**
5:2,9 10:11 13:3,23 21:7,
11 33:21 60:19 72:24
76:2 77:7 78:8 98:21
105:5 111:17 121:4,5
134:1 135:15 153:9
154:3 172:11 174:12
187:5

**fish**
74:20

**fishing**

DAVID S. GIBSON, MBA, MRC, - 09/19/2018                i15

74:17,21

**fit**
68:9

**fits**
71:12

**five**
8:17 10:7 44:4 52:3 72:2
77:14 81:20 99:25
131:16,23 144:5

**five-year**
89:4,9,14 91:5 109:16
112:18

**flat**
15:24,25 16:11 97:1

**flip**
88:13

**floor**
55:19

**Florida**
123:14

**focus**
69:24

**focusing**
23:8

**folders**
130:2

**follow**
22:3 71:11 86:8 118:16
143:20 153:21

**follow-up**
180:7

**following**
133:19

**follows**
5:4

**folly**
79:18 80:18,20

**foot**
98:17,23 99:2,3,6,11,15,
16,19

**footnote**
78:4

**forearm**
73:4

**forecast**
95:22

**forecasting**
92:23 93:17 94:5 95:18

**forego**
7:11

**foreman**
62:24 63:12,25 64:6,10
84:4,6,8,21 108:24
109:5,8,11,18

**foreman's**
83:24

**forensic**
95:11 103:18,20 117:21
121:21

**Forensics**
95:7

**forever**
102:16

**forgetting**
166:24

**forgive**
40:9 69:22 89:14 145:8

**form**
10:25 21:18 23:5 30:12
31:3 36:6,13 43:8,15,18
60:24 61:2 62:4 66:18
110:23 121:9,13,18
123:13 169:14 170:22
173:25 174:10

**formal**
76:25

**forming**
168:5

**forms**
30:11

**formula**
87:5

**forward**
30:2 55:20 84:12 87:22
155:5

**found**
30:8 45:14,17 53:6 73:1
79:12 140:15

**four**
8:16 11:9 151:14 170:8

189:22,25

**four-year**
61:11

**fourth**
86:5 110:24 111:3 175:6

**fraction**
90:22

**Fraser**
105:2,5 109:19 110:9
123:19,22 124:2,6,17
137:25 138:7,11 142:7
195:23

**frequently**
51:2,4 62:8 75:1

**fringe**
24:25 85:17,20,21
112:14,16,24 113:4,21,
23 115:24 163:13,22
164:7

**front**
18:14 31:17 38:4 41:24,
25 53:19 148:15

**fruition**
109:9

**FUCHIHARA**
116:25 167:20 170:4,7
173:18 198:25

**full**
40:4 59:18,20 76:16
87:9,11 90:6,21 113:10
114:14 136:11,12 144:2,
7,8,9,12,14,15,17,22
145:5,17,22 146:22
151:9,12,18 152:1 155:9
182:4

**full-time**
7:6

**function**
147:4

**functional**
21:21 47:13 50:10

**functions**
21:24

**further**
8:11 40:21 78:12 144:5
173:16 194:3

**future**
21:14 25:5 27:20 28:1
54:20,21 58:15,16 65:5,
13 86:16,21 87:14,17,21
88:12 91:20 92:24 93:19
95:23 115:15 131:3
154:19 168:11 169:7
171:11 172:5,24 189:5
197:18

**G**

**G-I-B-S-O-N**
5:12

**Gamboa**
53:11

**Gamboa-gibson**
103:21 118:21,22,23

**Gamboa-gibson-**
97:7

**gap**
58:22 153:4,6 187:16

**gaps**
58:7 152:15,17,25

**gasoline**
176:5,6

**gender**
51:14

**general**
32:3 39:20 47:12 53:15,
22 54:13 55:1 57:23
100:23 118:17 124:15
135:24 146:21 173:5,11
190:15 192:16

**generally**
18:6 51:13 55:22 56:14
80:10 92:20 103:14
114:4

**generated**
13:1 15:3 16:8 57:10

**generation**
15:25

**generic**
31:3 54:5

**generically**
102:21

**gentleman**

53:17

**getting**
8:17 13:25 23:7 36:21
43:3 109:10 111:22
115:6 161:25 178:1
186:16 189:3 197:9

**Gibson**
5:1,6,11 13:6 14:9 18:23
92:16 117:1 191:15

**gist**
129:7 160:4

**give**
9:6 31:22 52:2,25 76:3
96:14 98:13 100:20
118:3,7,11 123:2 135:24
143:22 145:19 169:12
171:14

**given**
5:13 9:2 23:15 27:13
28:21 74:14 121:17

**gives**
25:18 32:16 98:23,25
100:23

**giving**
14:6 22:10 34:10 101:19
106:20,22 115:9,10,11,
18,21 118:1

**Glade**
176:8

**glasses**
69:2

**gleaned**
131:6

**gleaning**
147:20

**go**
12:17 14:12 19:3,5 22:2
24:16 28:11 30:11 35:25
40:18,19,20,21 42:11
51:11 58:3,12 61:19,22
62:25 64:7 75:24 83:2
87:12,16 91:21 92:14,18
97:11 99:9 101:3,15
102:20 104:4 118:18
123:13 131:9 144:4,20
148:6,8 149:3 151:5
155:13 160:25 162:23
163:2 173:20,24 174:21
175:24 194:8 196:1

**go-outside-the-home**
43:16

**goes**
16:1 18:7 69:16 78:4
94:19 103:6 112:20
113:3,7 128:9 160:2
180:8

**going**
7:2 14:24 18:18 19:15
30:11 35:25 37:20 39:4
43:6,17 48:9 49:11 54:4
58:15 59:3 63:6 65:12
70:16 71:20 72:1,2,3,6
78:11,24 81:11,14 85:3,
5,6 87:3 89:11 91:2,18
92:17,21 94:13,18 95:4
96:10 98:23 99:3,22
100:4 102:18 113:16
115:5,8,12,19 116:1,2,5,
10 122:17 128:5,6,20
148:11,14,19 151:17
152:19 155:5,20 156:4
158:7 173:20 177:8,13
178:17 184:16 190:11
195:9,12 196:19 198:19,
20

**gold**
56:4

**good**
48:8 63:16 89:10 91:9
92:13 120:24 189:3
190:21 195:17 199:2

**government**
45:21 48:15

**grab**
41:22

**grade**
175:2,5,9,10,11,13,14

**grades**
175:2

**graduate**
61:17 122:7 142:4

**graduated**
61:16 121:25 122:3,10

**graduation**
122:20 123:1

**great**
174:8 184:7

**grip**
157:6

**gross**
32:18 89:18,22

**ground**
156:5

**group**
50:17 56:22 120:3
166:10 179:9 192:6

**growth**
24:11 80:23 84:14

**guess**
19:6,8,20 33:9 36:20
41:21 52:13 81:3 114:21
125:23 126:23 191:7
193:7 195:12 198:14

**Guides**
119:5,6

**Gulf**
135:18 145:7,15 151:23
152:3

**gun**
132:14

**guy**
111:20

**guys**
91:12

**H**

**habit**
171:6

**habitual**
162:20

**hadn't**
137:24

**half**
84:7,9

**halfway**
77:23 79:2 192:19

**hall**
113:4

**hand**
34:1,2 62:22 63:9 128:9,
20 132:7 165:11 181:11
198:9,12

**handing**
150:6

**handle**
34:5 129:9,10 180:10

**handling**
21:23

**hands**
157:3 178:18,23 179:2,
14 198:17

**handwritten**
38:17

**happened**
27:22 90:11 124:4 170:6

**harder**
44:23

**hasn't**
189:8,14,17

**hats**
117:19,25

**haven't**
18:5 75:20 76:20 102:5
129:22 146:24 147:15
166:13,18

**Hawaii**
184:4

**he'd**
105:10 116:19 161:8

**he'll**
81:7 91:6 189:6

**he's**
26:2 32:2,5,20 58:24
59:3,4,6 61:8 62:8,19
63:12,25 64:9,11 65:16,
17 70:20 72:2 73:10
74:9,20,22 75:2 77:18,21
79:7,19 81:11,14 84:8,25
85:3,4,5 86:11,12,13,17,
18,23 87:3 91:2 94:13
104:15 105:24 108:25
109:3,10 115:5,8,12,19
116:1,5 118:5 121:17
123:21 129:7 134:16
138:13 141:4 144:13
147:12,13 149:16,17,19,
20,25 152:16 160:10,25
161:1 169:24 170:15,16
176:25 177:3,23 178:18,
24 184:16,20,21 185:1,2,
5,6 186:6,7,11,12,15

188:2 189:2 193:23
194:4,10,23,24 196:7,20,
24

**head**
57:3

**health**
112:25 113:11,12,22
114:1 163:25 164:6,15
168:12 171:11 172:5,24

**hear**
46:22,24 50:18

**hearing**
42:10

**heart**
22:10

**heavier**
98:5

**heavily**
169:8

**heavy**
104:14

**Hello**
170:4

**help**
174:24

**helpful**
34:4

**helping**
48:5 117:20

**helps**
7:23 24:20 26:14 31:12

**here's**
112:1,2 118:11 169:16
195:12

**hey**
48:8

**Hi**
92:16

**high**
27:14 58:4 61:15,16
82:22 121:23,24,25
122:3,7,10,18 123:8
142:5 157:22 174:20,21
175:1,7,17,21,24 177:8,
20,25 193:3 195:22

**higher**
55:4,7,8 57:25 135:1
155:9 158:17,23

**highest**
155:7

**highlighted**
18:19 19:2,5,14

**highlighting**
18:25

**highlights**
19:16

**highly**
25:16

**hired**
11:16 22:17,25

**historian**
170:12

**historical**
24:20 184:10

**Historically**
83:18

**history**
25:24 26:3 30:2 39:22,23
61:25 84:24 133:23
153:19 171:6 187:16
197:13

**hold**
6:5,13,15 62:22 63:9
198:17,20

**Holden**
5:21 14:4 15:13 16:9,14
25:23 28:11 31:20 33:1
34:1,2 39:18,19 41:2
43:11 58:4 80:7 117:17
118:5,15 121:2,5,13
123:8 129:23 137:21
138:10,20 139:7,8,13,16
141:20 142:4,13 143:2,7,
21 146:10,13,25 147:3,
25 148:15 151:11 153:15
157:24 163:5,13 166:14,
19 167:13,22 168:11
170:12 173:17 197:17

**Holden's**
10:23 31:6,15 32:8 118:9
122:18 124:3 150:13,17
151:3 158:22 160:5
162:10 166:9

**Holding/carrying**
157:9

**home**
42:12,20 99:9,23 100:4
138:5 161:16 166:10

**honest**
138:10

**honors**
122:10

**hopefully**
32:6

**hour**
15:18,19 16:5 20:24
28:10 143:9

**hourly**
15:17

**hours**
17:16 74:7 170:8 186:7,
10,11 188:14

**house**
41:10,11

**huffing**
176:5,6,8

**huge**
50:14

**hundred**
49:2 59:4

**hunt**
74:20 75:10

**hunting**
74:17,20 75:4,6 132:14

**hydrocodone**
163:5

**hypothetical**
100:11 198:8

---

**I**

**I'D**
19:22 41:11,17 87:20
190:17

**I'LL**
16:7 17:12 21:7 23:5
35:14 42:1 60:23 104:21
111:21,25 121:12 159:23
174:8,24

**I'M**
5:8 8:7 9:19,20 10:21
11:16 12:2,21,25 13:25
14:21,24 15:21 17:25
18:9 19:20 20:1,5,6,14
21:11,17,21 22:14,19
23:4,8,10,13 24:21 29:5,
24,25 30:14 31:3,6,25
32:3,14,17 33:13,22
38:24 39:9,13,15 42:3
43:8,25 44:6 45:3,25
47:22 49:11 50:12 51:1
53:9,13 55:17 58:14,17
59:5,6,13,14,16,19,20
62:6,18 63:22 65:24 66:4
69:16 70:16 74:25 75:5
77:20,22 78:17,23 79:14
82:22 83:20 84:11 86:15,
16 89:9 90:3,8 91:11
92:17,21 94:1,18,20
95:13 96:6 98:4,23
100:15 103:10,13 104:20
106:15,20 107:1,8
108:14 110:3,22 111:5,
16 112:2 113:1 114:6
115:11,20 117:15,19
119:14,18 120:18,24
122:17,22 124:10
128:12,13,15 130:6,9
131:11,14 134:19 135:5
137:9 139:12 142:14,24
143:5 144:7 147:20
148:6,14,19 150:6,18,22
151:16,24 152:25
154:13,20 156:4,14
158:7 160:20 162:3
163:21 164:18 167:24
169:4,9 172:4,17 173:19
174:5,25 178:20 179:7
182:13,15 184:12 185:22
186:22 187:6 188:19
192:8,9 193:8 194:5
195:12,17 198:11 199:2

**I'VE**
11:4,23,25 17:9 23:17
31:5 34:15 45:16 52:10
64:24 72:20 87:14 89:11,
17 101:9 102:10 116:23
142:22 156:23 168:1
172:11,18 175:19

**ICF**
121:16

**idea**
38:16 57:2 75:7,9,11

DAVID S. GIBSON, MBA, MRC, - 09/19/2018                    i18

145:24,25 154:20 187:21

**ideally**
  21:18 169:16

**identical**
  171:16

**identification**
  5:24 8:14 13:20 20:2
  36:4 49:9 60:22 75:16
  121:11 122:16 139:11
  148:23 150:5 158:11
  159:17 168:9 174:23

**identifications**
  60:11

**identified**
  8:5,8 31:24 70:11,21
  78:4 101:24 126:3
  156:15 161:4 166:23
  173:4 178:8

**identifies**
  80:8 105:13

**identify**
  13:21 44:24 45:1 46:1
  133:6 150:20 177:14

**Illinois**
  6:9

**IME**
  34:16

**impact**
  8:9 21:13 35:9 44:16
  51:6 62:22 65:25 67:19
  68:3 70:12,16 71:23
  103:2 107:21 108:1
  126:8 127:2 132:11,20
  154:18 178:2 185:8
  186:23 193:24 198:20

**impacted**
  88:15 132:23 162:17
  195:10

**impacting**
  60:9 193:22

**impacts**
  7:19 20:4 25:5 69:12,24
  143:5

**impaired**
  88:11 179:8

**impairment**
  57:13,22 69:3 116:9

170:23 171:1,2

**impede**
  177:25

**implicitly**
  182:3

**important**
  182:11 192:24

**importantly**
  43:15 171:22

**improved**
  105:21

**improvement**
  147:7 180:14

**incident**
  188:3

**Incidentally**
  76:6

**include**
  7:18 16:3 19:12 44:18
  47:23 89:19,20 106:25
  107:14 114:25 115:3,5
  164:8,10

**included**
  17:4 43:6 108:4 114:12
  115:24 120:5 135:16
  182:13

**including**
  114:22

**income**
  118:12

**inconsistency**
  162:8 195:2

**inconsistent**
  152:9 153:19,25 160:21

**Incorporated**
  119:5,6

**increase**
  82:24 83:3,4,15,19,20,22
  84:20,22 85:1,6 89:25
  151:21

**increases**
  68:7 82:9,11 83:18 84:12
  85:11

**increasing**
  153:2

**incredible**
  30:8

**independent**
  69:18

**index**
  96:18 171:23

**indicate**
  42:24 102:25 104:25
  105:12,22 108:25 129:11
  160:12 162:15 165:14
  179:3,10 194:4

**indicated**
  38:19 60:3 64:23 72:18
  106:20 122:10 180:2
  190:16

**indicates**
  37:17 61:17 77:20
  105:15 175:2 195:3

**indication**
  160:24 178:11

**indirectly**
  63:3 191:20

**individual**
  92:24 93:1,18,20 94:5,6
  95:19,20 96:23 97:24
  100:7,21 164:1 192:2

**individually**
  13:16 60:15

**individuals**
  22:24 25:12 28:3 29:17
  31:23 33:4 36:1 101:21
  102:20 192:1

**industry**
  83:23

**information**
  18:16 19:22 22:5,6 23:18
  24:17,20 25:1 30:14
  31:18 32:15 33:7 37:1
  38:7 40:10 48:25 54:3
  59:22 60:5,20 63:11 65:9
  93:7 121:6,9 123:12
  125:8,15 134:6 147:20
  158:20 180:19 192:1

**informed**
  121:17,18

**initial**
  40:8 121:6

**incredible**
  30:8

**initially**
  82:11

**injured**
  96:18 105:4

**injuries**
  35:5,8 51:5 184:24 191:9

**injury**
  22:13 27:12,13,25 35:13,
  16 36:12 51:3 57:12
  64:14 65:1 88:8 105:9
  106:8,20 111:9,12
  123:13 128:14 154:7,9,
  14,21 160:14 167:4
  180:6,23 181:9,11,18
  185:16 186:5,24 187:18

**injury's**
  110:24

**instance**
  30:3,8 35:14 50:23 57:20
  98:1 118:4 151:19
  198:17

**instantaneous**
  109:9

**instantly**
  99:4

**insurance**
  112:25 113:12,22 114:1,
  5 163:25 164:16

**interest**
  132:12

**interfere**
  7:25 21:25 99:7,8

**interferes**
  63:21

**internal**
  133:10

**International**
  33:2 117:24

**Internet**
  46:4 118:6

**interplay**
  7:24 21:25

**interpreting**
  70:17

**interrogatories**
  5:3

DAVID S. GIBSON, MBA, MRC, - 09/19/2018          i19

**intervening**
27:23

**interview**
28:2,4,5 29:5 30:12
35:21 36:13 61:5 66:14,
18 72:17 110:23 128:21
133:3,9 184:3

**interview's**
133:5

**interviewed**
30:9 61:7 143:7 146:10
184:4

**interviews**
133:4

**intolerance**
157:15,19

**invalid**
97:2

**investigated**
136:7

**investigation**
30:19

**involve**
10:20

**involved**
8:3 9:19 10:22,25 11:23
172:19 196:7

**involvement**
117:21

**involving**
69:8

**isn't**
33:17 36:16 63:16 83:19,
25 86:22 100:25 133:3
155:23 175:22

**issue**
45:22 143:3

**issued**
134:1

**issues**
37:8 129:17

**it's**
7:6 8:4,17,19 9:3 11:12,
21 16:2 18:1,9,22 24:8
26:11,13 28:6 29:3,7
30:5 34:8,10,12 36:23

37:23 39:2 40:20 41:8
43:3,22 44:23 45:3,14,25
47:16 48:14 51:17,18
54:17 56:3,5,9 62:1
63:23 65:2 66:13,14,20,
23 68:19 69:6 70:1,3,16
72:10 73:18 78:15 79:8
80:20 84:1,16 85:5 87:5
88:22,24 89:13 90:5
92:10 93:7 97:23 100:5,6
101:1,6,13 106:14 107:4
108:5,7,8,17 111:17
115:25 116:9 117:6,18
119:3 120:11,13 121:20
128:5,6,25 129:1 131:13
132:15 133:18 135:8
136:3,7,20 145:16 147:8,
9,22 149:16 158:12
159:23 160:24 163:8
165:18 169:7,12 171:12
172:16 175:4 184:9
185:16 189:6,11,17
193:22 194:16 198:19

**item**
171:22 173:1

**itemization**
17:7

**items**
19:6 149:13 157:9
171:21 173:5,8,11

**its**
119:10

---

**J**

**jack-of-all**
26:1

**James**
170:22

**January**
8:19 64:15 65:2 146:23
182:4

**job**
8:10 58:1 61:25 62:12,
14,18 63:24 64:1,9
83:23,24 84:15,19,20
109:1,4 135:19 158:18
161:2,24 162:17,18,24
163:1 185:13 187:12
189:7 193:6,19,22,24
194:24,25

**job-by-job**
63:15

**jobs**
22:1 25:19 26:1 39:7
62:8,10 84:18 166:20
185:25 186:20 189:6,9

**Joe**
92:17

**John**
5:21

**joint**
92:3

**journal**
95:7,8

**journals**
48:16

**journeyman**
26:5,8,19 27:24 39:8
61:13 73:15 83:15,19
85:4 188:3,6 189:11
193:10,13

**journeymanship**
178:1 189:2 194:2

**journeymen**
25:15 26:8 27:18 39:14,
16 85:13

**judge**
54:11,12

**judgment**
79:19,21 120:23

**July**
38:12 61:3 146:11
150:11,16,24

**jump**
188:22

**June**
13:2 15:2

**justify**
65:17

---

**K**

**keep**
31:9,25 68:19 73:21
74:10 148:11 166:24

**keeps**

108:17

**Kentucky**
6:16

**kept**
31:8 52:4 138:24

**key**
23:17

**kids**
132:11,12

**kind**
6:13 21:13 25:25 27:19
28:2 30:18 31:2 39:6
45:22 47:12 57:6,17 60:5
63:20 65:4 75:21 88:19
121:18 169:25 172:24
177:11,16 178:23
180:17,23 181:17

**kinds**
30:24 118:6 143:2

**knee**
127:1,9 131:4 138:24
154:10 155:15,24

**knew**
31:16 35:13 145:20
146:21

**knock**
7:8 76:25 99:10

**know**
5:13 9:5,10 10:6 11:4
12:5,11,20 19:11 23:6
29:24 32:8,18 33:3,6,8,
12 34:7 35:14,17 37:15,
19 38:3 40:19,24 45:5
49:16 52:16 54:16 56:1
59:13 60:7 61:13,15
62:7,11,14 63:5 64:21
65:4,14,16 70:9 71:18
73:9 74:25 76:14,17,18
77:9 90:10 91:12 92:25
93:19 96:9 98:12,15
101:21,23 102:8 103:20
105:24 107:24 108:5,10
109:12,19,21,24 110:1,
13,15,16,19 112:11
114:21 116:15 118:5
119:9 124:10,19 127:22
128:7 129:23 133:13
134:18,23 135:7,13,16,
19 136:2,11,12,17
137:19 138:2,4,6 139:2

---

141:6,12,18 142:4,5,7
143:16 144:1,15 146:16
147:9 149:12,20,25
151:1,2 154:13 155:11,
22 156:5 159:4 161:25
163:20 164:12,21,24
165:2,25 166:5 170:5
174:13,20 175:12,15,17,
19 176:4,11,14,17,22,25
177:9,11,22 178:4,6,10,
13,22 180:4,9 182:9,11
184:2 185:14 187:2
188:12,15 189:1,7,9
192:8,14 193:21 194:21
195:9 196:23 197:3,8

**knowing**
57:5

**knowledge**
51:23 65:6 109:23
124:22 142:21 149:22
150:2 181:19 187:20

**known**
83:22

**knows**
146:18

**KOJS**
199:2

**Kruger**
95:14 102:18

---

**L**

---

**labor**
22:1 25:3 47:7 48:17
114:7 124:8 163:23

**Lacerated**
181:12

**lack**
35:2 133:23 185:14

**lacking**
129:9,10

**ladders**
156:9

**laid**
62:9,19,23 63:12 102:24
136:17

**Lake**
158:3

**landscape**
140:11

**landscaper**
138:21 140:25 141:14

**landscaping**
137:4,22 138:2,4 139:4
141:17,20,22 149:17,20,
25

**language**
19:12 53:8

**large**
151:12

**largely**
191:17

**larger**
48:24,25 58:7

**Law**
9:24 10:2 11:3 150:8

**lawyer**
57:20

**lawyers**
11:19 119:11 191:1

**laying**
63:16,19

**layoff**
84:20 86:18

**lead**
27:13 57:4 64:22 106:3,
9,10,11 107:5 110:20
112:2,11 124:21 126:14
156:17 157:22,23
158:17,20,24 159:5,6,7
184:8 188:24 191:10
196:8,24

**leadman**
125:16

**leads**
25:22

**leaflets**
149:15

**leap**
70:7 193:12

**learn**
13:3

**learned**
52:10

**leave**
51:10,12 135:24

**leaving**
123:22

**left**
69:17 123:24 124:9
128:9,20 136:15 181:11

**left-hand**
175:9,11

**leg**
102:24

**legal**
119:7

**legally**
114:3,4 164:4

**legitimate**
53:6

**Leitch**
72:13 102:4 106:2,5

**Leitch's**
16:9 22:19 72:10,12,16
73:2

**lesser**
26:4 153:3

**let's**
13:14 32:24 53:8 60:15
75:12 76:2 80:23 81:3
87:12 99:14,17 102:23
118:15 137:13 139:9
144:20 159:15 167:16
168:7 173:24 183:2
198:12

**lets**
93:5,12

**letter**
124:25 158:17,19

**letters**
37:10

**level**
25:21 39:17 51:14 70:3
112:2 118:12 128:1
158:17,24 159:7 190:11

**levels**
58:3 93:10 111:15
139:21 157:23 158:20
159:5,6 190:6,7,10,12

**license**
75:4,6

**licensed**
26:12

**licenses**
6:5

**life**
81:6 87:6 88:3 92:7,8
115:10,18 151:15

**lifecare**
10:22,24 15:14 16:16
166:25 167:24,25 168:17
169:7 172:14,19

**lifetime**
10:21 23:18,19 60:6

**lifting**
105:7,25 156:12,21

**light**
30:15

**liked**
29:12

**likelihood**
46:2 57:7 59:2 79:9
84:20 153:3

**likes**
74:20

**limit**
45:19 65:5 99:17

**limitation**
21:12,16,18,20,22 22:12
23:5 25:4 37:17 42:25
43:8,14 44:15 47:12,14
51:1 60:9,13 64:25
69:21,22 70:11 75:2
100:25 101:25 126:1,11
154:17 156:12,18,21
178:7,8,15 180:24

**limitations**
7:23 8:3,7 20:2,7 22:8,24
23:15 30:13,16 33:4,11,
24 35:11,17 36:10,16,22
37:8 43:16 45:18,22
46:6,15 49:13 50:3,10,12
57:18 60:6,12,13 64:18,
19,22 67:8 68:2,5 70:10,
21,22 72:19 74:18,23
80:2,4,5,8 105:13,15
107:25 125:25 127:11,12
130:8 131:14,21 132:10,

DAVID S. GIBSON, MBA, MRC, - 09/19/2018                    i21

19 138:24 154:1 155:25
156:3 160:20,22 161:3
166:23 167:6 176:23
177:18,21 178:4,6
179:17 180:1,15 181:6
194:4

**limited**
93:6,7 132:6 156:25
157:3,6

**limiting**
21:8 126:4

**line**
27:2 67:12 149:6

**lines**
149:15

**list**
8:15

**listed**
12:18 37:22 83:11,15
197:25

**lists**
13:25

**literature**
120:21

**litigation**
11:21 56:5,10,14 159:3

**little**
8:11 19:5 40:7,9 82:10
90:4 97:4 103:11 120:15
151:7 175:4

**live**
81:7

**living**
32:21 69:18

**Local**
26:20

**located**
29:3

**Logging**
179:23 187:7,17

**logical**
165:19 194:16

**long**
10:9 23:12 28:9,20 40:24
61:22 74:6 77:4 98:6
104:22 196:21 198:13

**long-term**
93:8 102:24 181:6

**longer**
28:19,22 95:1 160:9

**longitudinal**
93:5,8

**look**
21:15 25:6,9 30:3 36:2
43:13 51:4 60:15,19 64:7
67:9 68:24 75:12 77:7
78:9 80:23 84:24 105:13
106:7 113:12 118:15
122:19 131:16 136:25
148:25 152:21 190:17
194:14

**looked**
86:6 120:21 169:15
183:12

**looking**
8:7 10:23 14:21 18:15
19:17,20,22 20:2,6
21:11,15,17 22:14 23:10,
13 29:25 31:6 33:13,14,
22 46:23 50:12 58:14
81:21 86:16 89:1 107:17
111:5,22 137:9 144:7
151:16 159:21 167:24
169:4 181:24 182:16
183:7 194:19

**looks**
31:11 36:14 42:2,6 57:7
69:4 78:8 88:22 89:24
90:24 133:17 139:24
159:19 173:2 174:25
180:9

**losing**
187:11

**loss**
10:20 15:8,11 21:8 23:21
24:3,4,7,9 51:2 55:7 66:1
87:16,17 88:20 139:6
140:24 142:11 143:23
146:6 182:8 185:4

**losses**
88:8 117:13

**lost**
132:11

**lot**
5:13 25:18 51:18 64:2
87:18 109:3 186:13

**low**
198:3

**lower**
58:3,6 89:12 116:5,15
122:24 190:4,6,10,11,12

**lower-paying**
189:7

**lumping**
192:5,16

**lung**
36:19 37:5

**M**

**main**
20:5

**maintain**
32:20 64:9 140:15,18
167:1

**maintained**
140:19

**maintaining**
86:24 104:16 198:22

**major**
128:24 129:1,11 131:12
160:9,16

**majority**
10:20 18:6,25 98:7
134:22 171:21

**making**
26:7 42:17 56:15 59:6
67:22 68:12 69:23 71:1,5
101:8 120:22 125:10
183:23

**male**
59:25 78:18,22 82:22
153:16,18

**males**
82:10

**man**
104:7

**manager**
18:8,22 37:20 66:11,25

**manifests**
198:15

**Manno**

91:9,14 92:13,15,17
108:13,16,19 118:16,19
120:24 148:8,11,13,18,
21,24 152:23 154:5
155:12 167:12,17 168:1
173:12,21 185:18,21,24
186:6,15,19 189:25
191:5,14 198:6

**manual**
179:5,10

**March**
36:19 47:8,20 48:1 90:8
139:8,18

**Margaret**
18:23

**Maria**
8:8 68:20 69:25 70:13,24
71:12,16,19,22,24 77:16
80:5 102:3 108:11,17,21
112:5 128:23 129:5,17
131:12 132:23 142:12,25
143:1,4,20 147:10,16
166:24 167:6 170:19
178:12 179:3 189:5,17
191:19,21,22 193:18
194:3

**Maria's**
19:14 68:16,22,24 70:11
102:2 107:19,23 108:3,7
129:4 141:9,23

**Marian**
76:8,12,15,19

**marijuana**
162:11,13,23 163:9

**mark**
13:8,11,14,16 42:17 49:6
75:14 139:9 148:19,21
150:3 159:15 168:7

**mark-off**
93:4,6 95:21

**marked**
5:23 6:1 8:12,13 13:18
14:2 36:3 49:8,11 60:21,
23 75:15,17 121:10,12
122:15 139:10 148:22
150:4,6 158:10 159:16
168:8 174:1,2,5,22 175:3

**market**
8:10 22:1 25:3 27:5,6
113:13

DAVID S. GIBSON, MBA, MRC, - 09/19/2018                i22

**marketplace**
25:10,13

**Mary**
150:7

**Master's**
6:15,17 100:16

**match**
164:25 165:2,18,22

**matches**
50:11 165:20

**mathematics**
177:19

**matter**
111:11 198:19

**mature**
24:22

**maximum**
180:13

**MBA**
5:1

**MD**
159:20

**mean**
22:4 29:2,24 33:23 36:24
37:19 40:15 42:23 43:2
45:19 48:21 51:11 52:18
53:24 54:14 55:7 65:19
66:7 71:18 74:4 80:3
84:24 86:12 101:6,23
107:22 108:1 109:6
112:3 114:19 117:14
119:3 123:19,21 128:5
129:6 130:14 132:14
133:25 146:8 147:5
148:5 151:16 159:4
164:24 166:15 177:23
186:9 190:6,12 195:18
196:10,11 197:5

**Meaning**
157:16

**means**
74:5 92:2 107:24 108:6,
21 109:2 120:7 121:24
146:20

**measure**
45:14 47:11 51:9 54:20,
22 79:20 80:13,19,20
144:8

**measured**
51:13 112:11,12

**measurement**
26:18 83:25 84:1

**measurements**
50:15

**measures**
50:9

**measuring**
83:20 86:22

**median**
82:22

**mediate**
198:18

**medical**
7:16,17,19 8:5 19:25
21:19 22:5,7,14,16,18,25
24:5 25:6,7 29:5 30:15
37:12,16,22 64:13 65:5,
13,16,21 66:13,24 70:6,7
72:20 73:11 94:11,13,18
95:3 96:12 101:9,17
103:7,9,10 104:24
105:13,14,17 109:25
110:11,13 118:14 122:5
125:3,6 126:10 129:14
130:1,3,4,5,11 131:7
141:2 147:6 158:3,23
160:3,5,10,15 168:12,21,
23 169:3,4,8,21 171:12
172:6,25 173:4,10
180:13,14,16,20

**Medicare**
114:15

**medication**
147:3,11 170:16 171:6

**medications**
130:16 147:9

**meet**
20:8 162:9

**meeting**
21:1

**members**
31:17

**Memorial**
158:3 159:18

**memory**

67:15 69:9,24 70:20
71:8,17

**mental**
42:15 44:10 50:24 68:10

**mention**
96:9

**mentioned**
53:12 63:3 151:20

**merely**
68:1 78:23 112:4

**met**
20:12 92:16

**meth**
197:13,17

**method**
50:5,7 95:21

**methodology**
53:15 93:25 94:1,4,9
95:17 96:21 97:1 102:19

**mid-2016**
110:6

**middle**
135:8,11,20 146:15
175:6

**mild**
128:10,24,25 129:13
130:9 170:23 171:1

**Miller**
158:13

**million**
41:14,15 49:1 142:11
143:23 173:13

**Milwaukee**
11:22,23,24 12:2,12

**mind**
63:23 111:21

**mine**
39:3 137:11

**minimum**
144:17 188:14

**minutes**
20:12 131:16,24

**minutia**
23:7

**misleading**
159:13

**misreading**
130:15

**missed**
66:9 110:8 179:8 182:7

**missing**
154:14

**Mississippi**
161:10

**misstatements**
159:2

**misunderstanding**
123:23

**misused**
52:15,19

**mixed**
151:6

**mobility**
42:11 51:6 98:24

**model**
50:8 113:25

**models**
93:3

**modern**
151:16,22

**modified**
134:4,5

**modify**
190:15

**mom**
176:4

**money**
26:6,21,24 32:20 88:16
109:13 118:11 138:15
139:16 162:1

**month**
9:4,7,22,25 12:3 76:14
135:25 146:3,4,7,9,18
182:9,12

**monthly**
46:19 47:5,8,22 48:21,23

**months**
135:16

morning
9:12 38:15

motion
156:25

motivated
162:23

motivation
163:2,10 197:18

motor
69:8 70:20 71:6,7

move
84:15 91:13 121:2

Movement
74:2

movements
73:24

moving
73:22 74:11

MRC
5:1

multiple
26:1 130:13,17

multiplied
88:4

multiply
85:22 90:22

multiplying
54:6

muscle
130:13 138:23

**N**

NAFE
103:17

name
5:6,10,11 12:2,4 92:17
145:8 158:5 166:24
175:18

national
164:5,11,23 166:2

nature
31:19 33:9 34:3,17 39:2
83:24 85:9 97:24 104:9
106:8,15,19 117:22

natures
127:15

navigate
162:2

Nebraska
52:24

necessarily
21:22 34:12 35:22 48:15
99:22 132:17 145:1
165:20 177:23 179:11

necessary
31:22

need
26:2 29:6 40:9 59:8
98:14 119:23 142:25
143:24 147:11

needs
73:21 74:10 93:23
158:16 169:4

negative
132:11

neither
37:23

nervous
128:13

net
40:3 83:4 114:10 172:16,
18 183:5

neuro-cognitive
106:8 128:10,22 129:1,2,
11,13,17 130:10 131:12

Neurology
159:18

neuropsychological
8:6 21:19 29:10 101:18
142:21 191:18

never
39:19 49:24 55:15
102:11 111:21 118:20
120:11 195:11

new
20:15 49:19 146:5,6

news
20:17

nice
29:4 32:10

nodule
36:19 37:5

non-disabled
86:23 94:22 95:2 101:14
102:16,20 153:16,18

non-existent
167:10

non-existing
140:16

non-limiting
37:10,20,21,23 38:5,9

non-severe
43:9,13,25 68:6 77:9,10,
18,22,24 78:19 79:16
96:22 99:6,10,12 127:19,
23 187:24 188:1 191:11,
17 192:17,19

non-toxic
106:13

non-union
163:22

nonsensical
96:8

normal
158:20

normally
98:3 128:2 190:19

Northeastern
120:3

notation
36:8

note
24:4 59:1 62:20 64:11
69:1 133:18,23 164:8
170:11,14

noted
6:8 37:2 58:9 125:1
130:21 170:21 174:12
187:15 193:24

notes
13:6,24 14:6,10,13,20
15:1 21:3 35:21 38:3,17,
21 66:16 67:5 81:21
104:18 111:4,14,17
112:3 124:15 128:25
131:11,14 143:11 146:17
164:12

notice
36:18 91:24 124:20
133:17 137:16

noticed
18:18

notification
66:8

noting
12:25 62:19 65:2 121:20

November
36:20 158:14,22 197:5

numb
128:9,20

number
10:6 32:25 36:11 52:2
59:11 76:3 113:24
114:12,13 116:16 136:9
137:19 145:12,13 159:9
172:12,20,22,23 177:17
183:17 186:10,11 188:14
195:22 196:6,7

number's
90:4

numbers
14:23 55:4 59:15 64:5
87:23 114:17 116:16
147:23 148:1 153:22
171:15 172:4 182:25
184:6

numbness
105:6,25

Nurse
168:18 169:20 171:12,16
172:6

**O**

O'BRIEN
5:5,6 46:22 47:1 49:6,10
50:18,21 91:11,15,17
92:12,14 108:12 116:24
117:3,6,8 118:18 121:1
131:15,19 148:10,17
149:4 152:17 153:21
154:3 155:11 167:16,18,
23 168:2 170:3,5,10
173:16,19,23 186:25
190:2 191:6,13 193:2
198:7,23 199:1,3

**Oaky**
108:7

**obese**
64:11

**observations**
50:15

**observe**
24:20 28:23 63:8

**observed**
24:24

**obtain**
30:13

**obtained**
6:20 63:1 128:11 137:6

**obtaining**
142:17

**obviously**
24:23 25:23 99:10,11
128:22 134:20 136:13
163:20 177:25 198:19

**occasion**
10:18

**Occasionally**
73:16

**occasions**
10:5 52:1

**occupation**
60:4 190:8

**Occupational**
39:10

**occupations**
98:5

**occurred**
64:15 88:9

**Ochberg**
129:20 132:23 143:20
147:15 166:24 167:7
170:19

**Ochberg's**
129:19 141:23 147:14

**office**
150:8 180:20

**official**
88:3

**offset**
23:25 80:24 171:24

**oh**
9:14 15:19 25:20 31:8
34:15 66:6 67:21 71:25
78:12 90:4 91:11 110:4
111:2,21 119:18 128:15
133:16 135:5 137:13
146:19 153:15 159:21
167:17 168:6 170:2,24
171:17 174:8,20 175:21,
22 184:3 185:9 187:2
189:23 196:16

**okay**
5:11,17 6:18 8:11,22 9:8
10:15 13:8 14:5,9 15:4
16:14,21 17:17,20 18:18
19:1 21:11 22:22,23
23:10 29:16 31:7 35:23,
24 36:8,22 37:7 39:1
40:18 41:3,20 42:6,9
43:24 44:2,5,13 45:13
47:2 48:23 53:5,11 56:13
59:22 60:15,18 62:3,11,
22 67:11,15 69:4 72:15,
21 73:3,11 75:20 76:5
77:15 78:9,14 80:23
81:1,6,9,17,23 82:7 83:9
85:23 87:13 88:4,19
89:1,7 90:10,15,24 91:19
92:8,12,19 97:11 98:20
101:12 107:24 108:23
111:5,7,24,25 112:1,8
113:3,21 117:7 118:1,15
120:20 121:2,4,15 122:2
123:7 125:19,25 127:1,
16 129:23 130:1,5,9,17,
21 131:9,22 133:12,22
134:7,24 137:13 138:4,7
140:3,7,17 141:14,18
143:1,19 144:20 146:7,
10 147:22 148:3,10,14
149:5 150:12 153:15
156:4 158:2,15 160:25
165:9,18 167:12 168:3,
14 170:5,11 171:10
173:19 175:23 176:1
177:3 178:10,21,22
179:20 181:2,8 182:16
183:22 184:6,9,13 188:5,
9 189:1,24 191:4 193:11,
17 195:9 196:16,20
197:12

**old**
52:14,20

**older**
82:11,13

**once**
23:17 40:2

**Oncology**
158:3

**one's**
173:20

**ones**
9:24 144:21 150:20
169:2 196:16

**ongoing**
27:5,22 35:17 57:25
64:17 68:7 126:7,13,20,
22 180:1 196:10,21

**online**
6:23,24 119:19

**open**
11:6 113:13 135:24

**operator**
187:12

**opine**
100:20

**opines**
193:18

**opining**
117:15

**opinion**
18:3 23:9 29:14 33:25
39:3 52:25 55:21 65:25
68:22,24,25 94:13,19
95:3 96:12,14 100:9
101:1,12 102:2 103:8,9,
10 105:13,14,17 106:21,
22 107:23 108:7 111:11
118:11,14 129:16,19
141:14 142:10 143:5,6,
22 151:11 167:7 171:8
180:13 185:21

**opinions**
19:25 22:8 25:8 30:15
31:22 33:23 34:6,10,20
35:1,4 39:12 41:5 48:20
64:24 66:13,23 67:10,22
68:21 72:20 94:11 96:15
101:9,11 107:19 118:2,3,

7 130:4,7 132:22,24
141:2 142:10 156:23
168:5 169:4 170:18
171:3 180:21 194:3

**opposed**
34:21 88:8 104:1 113:13
138:19

**opposes**
56:12

**oral**
5:3

**OSHA**
168:4

**outline**
151:5

**outlined**
166:25

**outside**
42:11 48:1 56:5 99:9,23
100:4 101:15 102:13

**overall**
25:2 26:25 67:19 68:3
69:13,24 80:10 87:15
107:21 108:1 113:8
164:5,6

**overcomes**
101:25

**overhead**
157:12

**overlooked**
124:12

**override**
94:12,18

**overtime**
185:2,19 186:6,8,10,13,
14,16

**owe**
15:20

---

**P**

**p.m.**
199:5

**page**
14:23,24 30:12 36:15
38:24 42:2,9 45:10 47:24
61:18 62:4 64:11 66:10,

11,15 72:6,18 76:3,4
77:7 78:4,5,8,12,13
81:22 82:17 88:14 91:18
106:7 107:3 110:24
111:3,5 120:14 123:12
124:16 125:23 131:20
133:2,3,7,8,15,16,17,22
152:24 158:13 174:12
175:5,6 178:19,20
179:16 180:5 182:14,15
183:12 185:8,9 187:17

**pages**
31:12 36:11 78:8 125:7

**paid**
29:20 34:6,10,18,20,22
56:19 129:20 163:22
182:9,12

**pain**
72:6 73:15 126:5,14,21
127:1,6,9 130:13 131:10,
20 133:7 155:22,23
196:5,6,11,13,22,23,24,
25

**pain's**
156:1

**paper**
98:13,14 149:14

**paperwork**
124:14

**paragraph**
45:11 67:9 68:9,14,17
69:5 70:24 71:3 107:17

**paraplegic**
96:10

**parse**
43:1,4,7 196:8,12

**part**
8:1 28:17 30:9 66:13
84:5 113:5,21,23 117:9
133:3,9 135:15 140:19
149:6 153:6 182:8

**part-time**
7:5

**partial**
90:5,7,13,20 144:2
145:17,18 146:2 150:13
155:10

**participation**
78:15,17 86:6,9

**particular**
10:19 35:13 39:13 50:5,7
62:7 81:19 88:10 119:8,
10 171:20 182:15

**particularly**
67:12 69:7

**parts**
113:10

**pass**
76:22 77:1 159:19

**passed**
76:18 185:13

**patient**
159:24

**pay**
113:11 116:13,19 144:18
159:5

**paying**
15:20,21

**payment**
144:2

**peaked**
111:15

**peer**
96:24 119:16,21,25

**peer-reviewed**
48:16 95:8 119:1,3
120:12,21

**peg**
179:9

**Pekkala**
5:21 14:3 15:10 16:25
19:10 25:14 31:16 32:25
35:23 36:6 37:4,8 38:8,
11,18,23 43:10 58:5
80:6,8,11,12,15 82:4,6
148:5 173:24 174:10
175:15 180:18 187:24
191:8,15,16 192:5
195:21

**Pekkala's**
174:6 193:3 197:13

**pending**
11:2

**pension**
15:11 16:22 19:9 24:4,25
31:19 59:18,20 113:16,

18 115:1

**people**
7:7 11:25 28:13 31:25
43:1,7,14,15 44:18,21
45:7 49:1,3 51:10,18
52:15 54:2,16 55:24
56:10 57:16 60:12 64:3
72:19 85:10 99:21
100:24 101:23 102:23
103:5 119:25 159:13
180:11

**perceive**
45:8

**percent**
11:17 24:2,13 34:8,19,25
41:12 59:4,5 77:8 78:10
79:13,20 80:17 82:1,5,6
83:3 84:25 85:6,21 87:1,
4 103:24 104:1 108:24
109:5 112:15,20,21,22
113:8,25 114:1,8,9,11,24
115:4,5,9,15,18,22,23
116:18 120:16,17 141:11
153:1,4,10,12,13 162:4
163:14 164:2,14 166:6
172:15 191:2,5

**percentage**
34:7 79:11 82:20 83:11
84:12,14 86:14 103:20
113:1,2 156:2 166:3

**performance**
162:17 193:6,19,22
194:10

**performed**
34:16

**period**
74:6 92:25 93:19 94:6
95:19 104:22 182:7
189:20 190:17

**periodical**
119:2

**periods**
89:20 152:15

**permanency**
180:17 181:17

**permanent**
20:2 21:12,16 22:8,24
23:5 33:24 94:12,17
96:13 101:24,25 103:8
178:8 180:15 181:6

**Perrin**
5:21 14:3,22 15:10 16:8,
21 19:10 25:14 31:16
32:24 43:10 58:5,9
60:16,25 61:5 64:21 65:4
66:20 71:12 72:9,22
75:18,22 76:6 80:9,10
82:2 84:3,23 91:12,18
98:3 101:2,4 102:4 104:5
105:4,10 108:23 109:24
110:8,24 112:15 116:13,
23 117:2,5,6 133:3
148:4,6 157:24 167:14
191:16 192:5

**Perrin's**
31:25 32:1,11 41:23,24,
25 42:10 71:17 75:12
80:14 92:18 107:19
109:21 157:22 174:3

**perseverance**
160:13,24

**person**
20:3 21:13 23:11 25:1
28:23 29:3,6 33:11
42:16,24 47:13 48:3,4
53:2,11 54:7,25 58:8
68:11 77:22 78:22 79:10
94:10,17 95:2 100:2
101:24 103:8 117:19
159:20 177:18 194:19

**person's**
7:25 21:25 22:9 25:2
55:12 99:8 130:8

**personal**
28:5

**persons**
12:1 43:17 46:3 57:24
68:5 98:16 103:2,3

**pertains**
14:2,3 49:23

**phone**
118:5 170:7

**phrase**
63:23 141:12 193:7

**phrased**
128:24 129:5,6

**phrases**
142:14

**physical**

DAVID S. GIBSON, MBA, MRC, - 09/19/2018                i26

42:15 44:10 50:24 57:17
64:2 68:10 96:16 99:24
127:11,12,13 130:19
132:7 153:4,7 178:18
191:11

**physician**
156:21 159:18,19 160:4

**physician's**
160:10

**physicians**
34:9 75:21 156:20

**pick**
153:12,13

**picked**
153:10

**piece**
15:10

**pieces**
23:17

**pipefitter**
26:20

**place**
49:19 74:10 104:10,22
105:1 135:22 187:15

**placed**
33:4 75:21 146:25

**placement**
192:10

**places**
125:8 134:16

**plaintiff**
11:16 22:20 34:18 54:18,
19,21,23 102:4 121:20
158:16

**plaintiff's**
22:17 34:13,14 103:9

**plaintiffs**
11:14,19 13:10 29:23
34:11 35:7 41:4 57:11
129:20,24

**plaintiffs'**
20:8 23:1 29:20 30:18
101:11 119:11 150:16

**plan**
10:22,24 15:14 16:16
19:9 31:19 164:19

165:15,18,25 166:25
167:24,25 168:17
172:14,19 173:5,13

**plane**
161:14,16,25

**planes**
161:14

**planner**
169:7

**plans**
19:12

**play**
24:23 26:16,23 27:3,23
39:12 43:12 63:17 65:10
112:6 156:18 193:9

**player**
25:24

**plays**
26:17,25

**please**
13:17,22 50:19 122:25

**Pledge**
176:9

**plus**
16:22 114:15

**pneumonia**
110:12,17,19

**point**
16:2,3 20:1 28:1 54:21
58:2 79:8 83:11 84:11,12
86:22 97:22 143:19
161:6 167:20 189:16
194:18 195:9 197:24

**points**
79:16

**pool**
48:24

**poor**
170:12

**population**
41:13 43:6 46:9,16,19
47:5,17,19,22 54:23 55:1

**portions**
19:3

**position**
8:2 84:4 104:16,17

117:11 138:16

**positively**
43:5 45:4

**possibility**
138:18 153:24

**possible**
40:20 123:14 131:3
136:3 193:23

**possibly**
19:16 33:9 34:8 47:17
170:24

**post**
92:10

**post-2008**
49:25

**post-injury**
23:19 35:12 77:8 78:25
79:4 86:1,15 87:15 89:5
90:1,18 91:21 92:1,9
112:21 115:24 116:6,8
156:7 182:22 183:1

**potential**
51:8 57:15,21 67:19
69:13,25 70:15,18
107:22 108:2 124:21,25
126:9 143:23 147:8
195:1

**potentially**
33:19,20 44:5,13,16 62:6
65:10,11 67:16,18 69:10,
12 70:13 85:2 96:17
99:14,20 107:21,22,24
108:4,6,21 136:6 143:4
145:4 154:25 176:22
189:12

**pound**
104:7 132:7 156:20

**pounds**
64:12 132:6 156:12,22

**practice**
51:15,17 172:19

**practiced**
6:11

**pre**
92:10 133:13 155:14

**pre-**
87:15

**pre-2008**
49:24

**pre-dep**
20:21

**pre-existing**
36:16,17,22 37:9 125:22,
25 127:11,17,19 153:25
154:17,21 155:14,25
156:6,18 179:16

**pre-injury**
23:19 35:11 78:25 86:14
87:6,23 89:4,7 90:15
91:21,25 115:24 116:7
182:20

**pre-lead**
155:18

**precise**
79:18

**precisely**
80:19

**predict**
54:19

**predicting**
92:23 93:17

**preferably**
21:18

**premises**
99:5

**preparation**
16:4 17:15

**prepare**
13:24 14:9,13 18:13
133:5

**prepared**
168:18

**preparing**
17:3,10 18:10

**prescribe**
7:20

**prescribed**
123:4

**presence**
47:11 107:25

**present**
10:23 15:14 23:20,22,25
24:8,10,12 55:18 95:17

DAVID S. GIBSON, MBA, MRC, - 09/19/2018          i27

96:8 102:11,19 114:19
144:25 145:1 168:11
171:11,17 172:1,5

**presenting**
55:19

**pressure**
22:10

**presumption**
98:22 99:2

**pretend**
106:14

**pretty**
40:11 56:3 63:2 82:4
108:8 140:13 151:25
152:4 183:23 186:8
196:14 198:3

**previous**
133:22

**previously**
154:15

**print**
31:12 78:8

**prior**
20:9 32:25 45:10 73:6
89:12 105:1 109:19
152:9 191:9 194:14

**probabilities**
46:1 50:15 58:6,20 68:7
93:10 98:2 140:1

**probability**
54:3 57:25 58:13 59:1,7,
9,24 81:7,11,14,15
86:16,21,23,25 87:3,6,
23,24 88:1,2,5 91:24
92:3,5,7,8,9 95:25 101:2,
13 144:10,11 152:20

**probable**
81:6 86:4

**probably**
8:24 10:7 11:8,17 18:24
49:17 144:24 151:21
152:21 190:3

**problem**
43:2 56:18 100:5 162:6,
7,16,19 167:2

**problematic**
93:9

**problems**
65:12 98:17 99:22
124:20 155:20 175:25
196:4

**proceed**
23:5

**process**
24:17,18 93:4,6,8 98:8
102:25 120:4 179:9
187:12

**processing**
69:9 70:20 71:6,7

**produced**
53:21

**producing**
107:9

**product**
41:9

**productively**
177:24

**productivity**
68:3 193:5

**profession**
51:10,12

**professional**
6:5 8:5 26:12,13 57:24
79:18 120:23 171:22

**professionally**
100:2

**professionals**
8:6 52:9 101:9 117:25
190:24

**professions**
51:8

**profile**
83:12,16,17

**Profiles**
82:17

**profit**
165:23

**profound**
80:2,3 166:23 167:4

**program**
6:23,24 7:6,7,10 26:9
123:5 188:13 194:17

**programs**
188:14

**progress**
85:10

**progression**
85:11

**progressions**
85:9

**prohibits**
117:25

**project**
23:18,21 178:2

**projected**
39:19

**projecting**
30:2 39:15 169:6

**projections**
118:13 185:23

**prolonged**
73:21,25 74:3 104:6,8,9,
19 131:22

**promotions**
85:10

**provide**
78:16 109:13 125:15
130:7

**provided**
20:16 30:5 61:20 93:24
118:13 120:7 123:10
143:13 145:21

**provider**
22:18 126:10 159:8

**providers**
158:23

**provides**
50:9 79:4

**provision**
112:25

**proxy**
133:23 163:17,19

**psychiatric**
21:19

**psychiatrist**
129:18,21 130:21 171:1

**psychological**
74:17 132:10

**psychosocial**
7:19

**PT**
130:19

**public**
6:8,11

**publication**
48:13

**publications**
48:15,18

**publish**
120:13

**published**
46:20 100:19 118:24
119:1,4 120:11,21

**publisher**
119:7

**pull**
14:12 131:17

**pulled**
46:4,5

**PUMS**
78:5

**punished**
124:8

**pure**
23:25 80:24 171:23

**purely**
53:15

**purpose**
20:13 34:17 111:10
147:19

**purposes**
18:10 53:7 172:14

**put**
7:9 35:20 37:11 38:7,22
45:21,24 48:7 50:2
55:19,20 73:24 74:15
76:14,23 77:5 93:5 117:2
146:21,23 149:14 156:20
159:8 167:22 180:17
181:17 193:14

**puts**
129:8 156:21 165:22,24

DAVID S. GIBSON, MBA, MRC, - 09/19/2018                    i28

**putting**
18:15 66:23 79:2 97:25
119:19 193:19

---

**Q**

**quadriplegic**
96:16,18 98:11 99:14

**quadriplegics**
98:18

**qualification**
93:24

**qualified**
60:14

**qualifies**
7:17 77:15

**qualify**
173:6

**quantify**
24:20 32:3 71:22 74:9

**quantifying**
19:21

**question**
22:3 34:22 37:24 42:17
43:5 45:2 50:1 51:6 56:6
72:24 93:15 100:7,8,22
102:8 104:21 111:22
117:18 118:20 128:16
140:13 150:23 156:5,25
157:4,6,9,12,18 159:7
163:8 167:3 168:3 177:8
183:18 191:7 195:15,18,
19

**questions**
5:8 23:11,14 28:12 41:21
42:4,10,14,18 45:7,8
46:11,18,20 47:10,18,23
48:2,5,8,9,24 49:4,19
91:12 92:17,22 94:2
116:25 117:4 119:25
167:15,19,20 198:23

**quick**
117:4 131:16 168:3

**quickly**
75:12 84:19 131:17
167:23

**quite**
33:1 34:8 40:20 79:14

193:23

**quote**
98:13,15 107:12

---

**R**

**radiology**
76:8

**Raglin**
45:12 48:11

**raises**
164:5,6

**range**
10:7 29:8 90:24 116:16
156:25 158:21

**rank**
197:25

**Rapoport**
9:24 10:2,16 11:3 20:19,
22 102:9 150:8

**Rapoport's**
180:20

**rarely**
22:8 33:23

**rate**
15:17 22:11 24:2 71:15,
18 79:3 85:22 86:7,9,10
93:12 163:21 172:13,16,
18

**rated**
188:17

**rates**
24:11,12 68:6 78:16,17,
21 79:2,4 112:17 120:9
194:18

**rationale**
56:3

**raw**
53:22,24 97:18,19,21

**RE-EXAMINATION**
117:8 118:19

**reach**
24:18 189:3

**reached**
84:3

**reaching**
127:14

**read**
45:16 50:20 69:19 122:9
141:9 159:23 160:25

**reading**
19:16 24:14 78:17 160:5

**readjust**
114:17

**reads**
100:7

**ready**
13:25 148:11

**realize**
13:9

**realized**
26:19

**really**
20:14 22:11 23:11 24:7
29:24 43:22 51:9 56:6
58:11 93:4 111:11 112:6
159:4 169:3 172:13
173:9,20 190:18 195:15

**reason**
56:20,21 112:23 126:12
144:4 153:24 155:6,7
176:11 191:15,16

**reasonable**
101:1,13 145:25 151:13
152:2

**reasons**
192:20

**recall**
12:4,11,12 33:2 38:1
62:6 90:3 122:13 124:10
125:3,5,6,15 129:6 135:5
146:13 161:11 174:15,16
180:4 188:18

**recalled**
125:16

**received**
16:8,10 31:21 34:16
40:12,16 72:12 76:9
124:20,25 125:11 194:10

**receives**
83:15

**receiving**
30:17 114:18

**receptionist**
190:13

**recess**
91:16 131:18 173:22

**recognition**
33:14

**recognize**
68:2

**recognized**
25:17 48:13,14 100:17
109:3

**recognizes**
26:8

**recollection**
30:7

**record**
5:25 15:23 35:14 37:22
49:7 50:20 92:16 123:16
159:19 160:3,4,11
173:21 175:2

**recorded**
110:2 126:19

**recordkeeping**
32:8

**records**
22:5,7 30:5,17,24 31:2
32:9 33:16,18,21,22,23
36:23 37:12 64:13 65:7
73:11 76:11,20 104:24
110:11,13 122:5,6 124:1
125:4,6,19 129:14,18,21
130:1,3,5,11 131:7
137:6,11 140:17 143:13
147:2,6,8 156:19 158:4
160:5,6,15 165:4 168:21,
23 169:3,4,8,10,13,17
174:17,19 178:14 180:16
181:20 194:15 195:24
197:24

**recover**
115:19

**recovery**
115:17 196:21

**recuperation**
102:25

DAVID S. GIBSON, MBA, MRC, - 09/19/2018                i29

**reduce**
53:3 59:11 140:24
152:14 173:2,4

**reduced**
27:15 39:17 52:25 59:2
105:25 112:21 117:16
182:6

**reduces**
58:22

**reducing**
58:24

**reduction**
86:14 120:16 126:9
172:24 182:17,24 184:14

**refer**
13:14 14:19

**referee**
102:17

**reference**
48:12

**referred**
47:17 145:8

**referring**
12:21 13:5 46:8,10
47:16,25 68:20

**refers**
104:20

**reflect**
186:17,19

**refused**
171:5

**refusing**
194:25

**regard**
5:20 8:2 27:10 36:9 50:2
64:19 75:18 118:8
122:20 124:2,3,7 125:10
126:11 127:5 129:23
140:4,8 143:21 168:14
171:11 173:17 180:24
191:7

**regardless**
165:24

**regards**
60:24

**regular**

176:5

**rehab**
51:18 55:5 166:21

**rehabilitation**
5:18 6:18 7:8,13,18
51:16 70:22 100:1,15,16
101:21 117:24 119:14

**Reid**
150:8

**reissued**
134:4

**rejected**
131:1

**related**
11:21 65:21 155:23
156:6 181:12

**relation**
110:20

**relationship**
117:23

**relevant**
69:17 162:14 163:9
176:20,23 180:20

**reliable**
45:14 95:10 147:12

**relied**
22:24 29:19

**relies**
93:6

**rely**
37:17 56:22 67:8 78:5
142:12 169:8

**relying**
29:25 143:5

**remember**
12:2 32:14 38:13 44:23
86:18 89:17 126:23
145:15 146:20 147:12
150:18 194:5

**remembering**
42:17 43:2 44:6,19,22
68:12 69:23 71:1,4

**reminds**
15:19

**remote**
59:8

**render**
35:1,4

**repeat**
46:25

**repeating**
28:17 107:6,8,23

**rephrase**
46:25 47:2 166:17

**replicate**
120:8

**replicated**
120:2,4

**report**
15:25 16:1,9,12 19:14
22:15 30:23 31:25 32:1
41:20,23 42:10 58:17
59:2 72:11,12,14,16,19
73:2 75:13,18 81:24
92:18 98:22 101:4
105:24 106:7,18,25
107:9,15 108:5 128:11,
18,19 129:19 134:1,2,4
139:6,9,12 141:23,24
155:13,20 157:22 158:23
159:24 163:25 164:8,14
168:14 169:21 170:12
179:13 180:24 196:13

**reported**
64:24 76:16 103:2
104:15 112:4 123:23
125:2 126:2,13 135:17
137:24 138:23 155:20
164:20 177:6 196:4,10

**reporting**
74:22 75:2 107:1 196:20,
24

**reports**
15:16 17:3 19:25 22:4,
16,25 24:14 25:6 41:4
55:15 66:24 67:2,5,8
79:12 102:5 129:4 141:9
142:1,2 147:21 152:19
196:2

**represent**
5:7 40:4 85:20

**represents**
84:14,17

**request**
169:3

**requested**
31:18 180:19

**require**
188:11

**required**
7:12 114:4 164:4

**requirement**
127:13

**requirements**
8:9 39:7,10 70:23
177:20,25 188:12

**research**
39:6 56:5 120:3

**researching**
118:6

**residual**
118:10

**resisted**
28:17

**resisting**
28:12

**respect**
107:19

**rest**
77:18 99:24 151:15

**restated**
144:23

**restriction**
21:22

**restrictions**
33:5,13 35:2 75:22
146:25

**result**
75:2 106:2,9 171:24
180:14

**results**
168:4 179:1 192:2,7,10,
13,15

**retained**
10:2,16 11:21,25 12:1,20
14:18 22:20 56:11

**retention**
11:24

**retired**
191:3

**retirement**
164:4,9,10,11,18 165:15

**retrain**
117:10 118:4

**return**
40:4 82:3 148:15 149:1
183:4,13

**returns**
19:22 32:2,11 62:20
137:15,17 149:23
150:13,14,17,21,23
151:3 165:6,8 183:15

**review**
13:6,23 14:9,19 18:3
19:1,2 22:4,16 30:19
32:23 55:15 119:21
125:19 130:5 147:14
161:9 168:17,20 171:5
178:11

**reviewed**
18:12 19:11 67:2 73:11
96:24 119:16 120:1
159:21

**reviewing**
36:25 169:18,20 194:19

**reviews**
18:23 189:3 194:10

**right**
7:4 14:22 28:24 30:10
35:3,6 36:13 37:6 45:3
49:5 50:1 57:9 60:17
63:10,23 65:8 66:17
73:20 77:19 80:21,24
81:10,13,16 85:14,25
86:1,21 87:2 88:4,25
90:25 95:3 96:19 97:8,
16,19,20 101:17,18
102:18 106:22,23,24
107:13 109:5 111:13,20
112:1 114:13,21 115:6,
10 117:1 119:20 120:11
123:5,11 125:12 126:12
128:8 130:7 134:25
136:8,10,21 137:23
138:1 139:4,23 140:23
142:3,7 143:7 144:3
147:1 148:5 152:22
153:11,17 154:4,7,10,22,
24 155:8,15 156:7,8,17
159:21 161:5 163:3,11
164:17 166:1,7,9,21

167:4,8 168:6,25 169:22,
25 171:4 172:10 173:25
174:5,11 175:8 178:13,
16,24,25 179:18 181:3,
21 182:11 184:4,19
186:1,8,20 187:22
189:15,19 191:3,12,19
192:4,17,21,25 193:6,15
194:17,18 195:11,24
196:15,18 198:4 199:1

**right-hand**
36:12 121:16 122:19,23,
24 175:10,12

**risks**
194:7

**Riverside**
175:21,22

**RN**
158:13

**road**
32:5,20 159:19

**role**
70:21 90:13

**rollover**
197:10,11

**ROS**
159:25

**Ross**
159:20

**rotator**
126:6 156:21

**rough**
67:21

**roughly**
17:20 82:7

**round**
186:14

**rules**
5:14

**run**
50:11,23 75:25 121:15

**ruptured**
179:21 180:3,11,14,25

---

**S**

**sample**
41:12 48:25 50:14 93:12

**samples**
49:1,2

**sampling**
168:4

**Santa**
8:8 19:14 68:16,20,22,24
69:25 70:10,13,24 71:11,
15,19,22,24 77:16 80:5
102:1,3 107:19,23 108:3,
7,11,21 112:5 128:23
129:4,5,17 131:12
132:23 141:9,23 142:12,
25 143:1,4,20 147:10,16
166:24 167:6 170:19
178:12 179:3 189:5,17
191:19,21,22 193:18
194:3

**satisfactorily**
26:10 76:21

**satisfied**
31:21

**satisfy**
77:10

**save**
111:21,25

**saw**
41:4,20 65:7 110:13,14
124:11 140:14 143:24
169:21 180:1

**saying**
9:21 33:21 34:23 37:20,
21,23 45:3 49:7 50:22,23
54:5,17 55:17 59:14
63:15 70:18 74:9 77:13
78:23 89:9 102:1,15,16
106:4 113:1 115:20,25
123:21 124:25 129:7
142:19,24 153:6 154:13,
17,20 159:23 160:20
161:8 162:5 169:15,24
171:1 186:9 190:23
192:18

**says**
34:1 36:13 37:7 45:14
61:15,22 62:9 64:17

66:3,15 67:12,15 69:6,25
70:13,18 73:3,21 74:2
92:1 95:4 99:18 105:25
107:20 111:8,15 121:23
122:20 123:4,13 124:16
128:5 133:12,18 146:19
164:14 166:22 178:17
181:22 189:5,17

**scale**
26:18 83:21,25

**scanning**
19:17

**scenario**
114:11

**schedule**
137:5 149:3 162:9

**scheduled**
62:14 123:13

**schedules**
152:20

**scholastic**
175:2

**school**
58:4 61:15,16 82:22
121:23,24,25 122:3,7,11,
18 123:8 142:5 174:20,
21 175:1,5,6,7,18,22,24
177:8,20,25 193:3

**Schwieger**
168:18 171:13,16 172:7

**Schwieger's**
169:20 173:5

**scientific**
48:14

**scores**
142:17 194:15 195:22

**scoring**
191:18,22

**second**
6:17 62:4 67:9 124:15
131:15 154:1,6,9 173:21
195:20

**section**
15:1 74:2

**sections**
19:13

DAVID S. GIBSON, MBA, MRC, - 09/19/2018          i31

**Security**
32:15 40:16 114:7,15,16,
18,20,23,24 115:3,6,10,
11,12,19,21 116:2,3
130:25 136:25 137:3,5,9,
19 164:4 165:13

**see**
15:2 18:3 29:6 30:3,5,7
31:5 32:24 37:12 40:1,9
47:23 48:10 55:13,16
56:10 63:11,14,17,19
64:8,18,23 67:13 69:21
72:1,3,8 73:4 76:11 79:2,
3 82:12,21 83:18 88:14,
24 94:2 110:11 123:7
124:1,7,12 125:19,23
128:15 129:7,12,18,21
131:17 134:9,12,16
136:7 137:13 140:21
141:19 143:21 144:8
147:2,6,17 162:3,8
165:5,6,10 167:16 175:4,
9,13 178:22 179:1,4,13
180:7,16,17 181:2,4,20
183:2,6 187:2 188:20
194:15 195:2,3

**seeing**
69:16 122:13 125:3,5

**seeking**
109:21

**seen**
30:9 46:6 64:24 72:20
75:20 76:20 101:9 102:5
104:24 122:5,6 129:25
142:22 146:24 147:15
149:23 156:19,23 158:8
170:11,14 172:12 174:17
175:19 178:11 186:4
195:7

**sees**
130:21

**segregate**
156:2,14

**segregation**
96:22

**select**
56:25

**selected**
99:23 108:23 109:5

**self-care**

42:11 43:16 99:22 100:3

**self-employed**
138:18

**self-employment**
137:8,14 140:20

**self-report**
179:25

**send**
31:4,15,16 41:17 121:19
169:15,17

**sending**
150:12

**sense**
45:17 53:3 91:14 96:17
97:16 118:17

**sent**
175:15 176:4,12

**sentence**
67:21 107:4,18,20

**separate**
49:24 99:13 113:17

**separately**
113:19 115:2

**September**
9:8,15

**serious**
42:16 68:11 70:25 71:4,9
98:25

**services**
171:22

**set**
14:2,25

**setting**
56:14 133:11

**settings**
67:17 69:11

**settled**
12:3

**severe**
43:17,20,23 44:4,8 79:16
96:22 99:6 127:24 128:6
171:2 192:19

**severely**
140:13

**sharing**
165:23

**she'll**
18:24

**she's**
142:17,19 169:6 189:11

**sheet**
13:24 177:13 183:8,11,
12 184:12

**Shipping**
135:18

**shipyard**
123:14,15

**Shipyards**
105:2 124:17 137:25
138:7 152:3 195:23

**shock**
104:7,11

**shooting**
132:12,13

**short**
93:23

**shortened**
180:12

**shorter**
116:1

**shoulder**
73:3 126:5,21 127:5
138:23 154:9,21 155:15,
23

**shoulders**
73:15

**shouldn't**
115:20

**show**
5:25 8:12 27:10 45:24
49:11 60:23 63:11 79:9
109:14 121:12 122:6,17
137:7,13,17 139:18
140:18 158:7 165:4,8
174:24 175:3 182:3,4
183:15 187:17

**showed**
40:3 137:5,6 147:2
169:13 183:4

**showing**

32:17 58:17 75:17 89:6
116:10 137:11 139:12
182:20,22 186:7

**shows**
26:10 54:3 61:7 68:5
90:14 91:25 138:6
151:22 183:13

**shut**
135:5,6,7,10,19 136:1

**side**
20:17 24:19 25:4 31:12
55:14,15,16 56:17 78:8
86:23,24 89:5,7 116:6,7,
8 182:20 193:15

**sides**
56:6

**sign**
121:20

**significant**
63:22,24 93:11 160:21
161:13,17,20 198:14

**significantly**
62:24

**signing**
159:20

**silence**
117:12

**similar**
14:23 45:25 49:21 50:1
66:10 82:7 98:7,8 192:3
196:3

**similarly**
59:8 93:17 146:24

**simply**
105:9

**single**
77:2 100:21 164:15

**Sir**
175:3

**sit**
17:25 29:4 38:1

**sitting**
38:4 73:25 74:3,6,11
104:6

**size**
48:25 50:14 93:12

**skewed**
90:4

**skilled**
25:16

**skills**
25:2,10,12,18 26:5 62:24

**skimmed**
19:13

**skipping**
63:23

**Skoog**
95:14

**slight**
171:25

**slightly**
27:15 31:15 89:13
137:18 164:6 171:17,18

**slipped**
187:19

**small**
16:7 173:7

**smaller**
59:9

**smoking**
162:23

**SOB**
160:1

**social**
32:15 40:16 46:15,17
47:9 74:18 114:7,14,16,
18,20,23,24 115:3,6,10,
11,12,19,21 116:2,3
130:25 136:25 137:3,5,9,
19 164:4 165:13

**sole**
34:5,6 102:1

**solely**
22:25 34:20

**somebody**
28:1 33:14,24 41:23
42:18 51:5 53:1 55:13
56:12,13,17 63:19 73:14
83:22 92:4 94:24 96:9,
10,12,18 98:1,4,22
99:10,18 100:9,10 109:3
117:10,17,20 118:3,4
160:8,12,21 162:22

172:12 192:23

**somebody's**
99:7 161:23

**someone's**
99:17 139:3 161:13,17,
22 197:18

**somewhat**
6:24,25 102:9

**soon**
76:4

**sooner**
62:23 63:12

**soreness**
65:1

**sorry**
9:19 20:11 38:24 47:22
59:16 66:4 75:5 82:23
91:11 94:1 108:14
110:22 111:2,16,20
119:14,18 120:19 122:22
128:12,13,15 131:11,14
148:7 151:24 162:3
164:18 165:9 170:5
174:5 178:20 179:7
184:12 187:6 198:11

**sort**
95:24 120:20 150:23
161:1,24 166:10,13,18
175:8

**sought**
109:24

**source**
27:12 95:10 110:24
111:8,11

**sources**
63:1 119:4

**speak**
70:8 159:10

**special**
174:13,18 177:9,15,16
193:3,4

**specific**
30:24 39:9 50:16 54:17,
18 55:2 79:22,25 80:1
85:12 104:4 117:6

**specifically**
14:19 32:3 35:19 37:13

38:1 51:13 57:6 60:1
62:16 68:16 149:12
156:20 185:11

**specification**
47:13

**specifics**
161:12

**specified**
129:24

**specify**
15:4

**speculate**
164:22

**speed**
69:9 70:20 71:7

**spelled**
5:12

**spelling**
195:7

**spend**
28:9 32:19

**spending**
32:4

**spent**
15:24 17:2,10 19:15
143:9 149:13

**split**
185:12

**sports**
132:12

**spreadsheet**
133:12

**spreadsheets**
133:11

**spring**
7:9

**stairs**
99:1 127:14 156:9

**stand**
74:10 131:23

**standard**
56:4

**standing**
73:21,25 74:3,5,9 104:6,
8,9,10,19,22,25 105:1

131:22

**standpoint**
198:4

**start**
5:9 60:16 81:4 82:13
84:10 88:7,17 92:21
139:1,3,8 145:16 153:2,5
182:3

**started**
20:12 81:2 134:25 145:7,
14,20 146:14,19 158:18
187:9

**starting**
47:21 84:11 86:8 90:8
133:8 136:15 139:18
151:23 153:1

**starts**
81:19 88:14

**state**
6:9 23:19 100:2 112:5

**stated**
110:8 170:23

**statement**
107:7 111:14 157:25
185:1

**statements**
157:21 196:1

**states**
41:9 158:16 163:22

**stating**
158:17,19

**stationary**
104:11

**statistical**
79:25

**statistics**
30:22 47:7 48:18 51:19
77:20,23,25 94:16 114:7
153:14 163:23

**stature**
84:2

**status**
93:13 133:20 188:6

**stayed**
127:22

**steady**
62:23 63:9 104:16,17

**Steakhouse**
134:20

**stemmed**
176:24

**Stern**
45:12 48:11

**sticking**
38:9

**stopped**
51:12 123:17

**straight**
32:1

**strength**
132:6 141:4,7,11,13,16
157:6

**stricken**
51:20,24 52:12,15,17
53:13,14 54:10 55:3

**strictly**
79:21 83:16 117:13

**strike**
12:7 41:1 94:1 101:3
122:5 169:19 179:20
195:15,16

**study**
45:17 99:18

**studying**
76:8

**stuff**
22:11 169:25

**subject**
22:13 23:14,16 36:1

**subsequent**
191:9

**substance**
98:7

**substantial**
141:15 186:8 196:14

**substantially**
99:16,19 109:15

**substantive**
20:17

**substract**
183:4

**subtract**
81:25 116:12

**subtracting**
182:13

**sufficient**
45:13,15,16

**suggest**
107:14 169:16

**summary**
19:9 40:17 68:17,22

**summer**
7:8

**summing**
92:3

**Superior**
138:8

**supervised**
125:17

**supervision**
166:10

**supplement**
46:16,17 47:8,9,10,20
48:1

**support**
79:24 101:8 165:11

**supporting**
78:7 82:16 183:9

**sure**
5:8 10:21 13:13 18:9
22:19 46:24 47:2 53:8,13
72:19 73:12 74:2,11
75:13 81:1 95:13 111:21
114:6 128:17 144:1

**surgeries**
130:13,15

**surgery**
131:3,4

**surprise**
103:24 104:2 110:4,5
119:10

**survey**
41:8,10 42:4,6,19 46:8,9,
10,16,19 47:5,15,18,19,
22 49:24 78:1 82:19

103:17 192:2

**surveyed**
56:23

**surveys**
47:3

**sustained**
21:13 27:13

**sustaining**
88:19

**sworn**
5:3

**symptoms**
123:18,22 124:19,23
125:3

**synonymous**
70:25

**system**
55:25 128:13

---

**T**

**table**
75:24 97:21 140:7

**tables**
51:7,20,24 53:6,9,18,20
54:9 57:10 58:12 88:3
92:22 97:5,7,9,12,19,22
103:22 118:23 119:22
120:2,5 139:15,23

**tabulations**
78:6

**take**
7:12 12:1 15:22 28:19
36:2 38:3 55:20 60:1,15,
19 67:9 68:24 70:3 75:12
76:2 78:9 80:23 85:23
89:18 91:9 94:4 99:14,17
114:9 118:15 122:19
131:16 132:15 144:9,12
146:17 152:14 161:15
171:18 189:6

**taken**
28:21 36:23 65:3 72:17
91:16 131:18 173:22

**takes**
95:18 98:2 163:5

**talk**

22:8,12 33:24 35:7 38:11
39:5 64:18 72:6 80:7
86:1 94:12 97:15 98:10
106:5 108:20 112:8,14
133:2 142:25 155:21
186:10 192:24

**talked**
24:16 38:22 48:25 67:7
86:19 97:4,10 98:2
103:11,12 108:24 110:25
111:8,9 113:22 120:17
128:9 129:22 130:3
141:13 149:4 151:7
152:15 155:13 157:24
185:3 190:8 196:3
197:16

**talking**
21:21 24:21 28:9 38:8
47:4 48:4 49:12 53:8
60:24 66:15 80:4 95:21,
22 96:1,6 98:11,12
104:15,20 107:18 121:21
133:7 139:25 164:12
172:17 179:16 185:10
189:11 193:2,23 196:16
197:2

**talks**
21:20 24:25 46:5 69:18
80:5 129:9 131:9 147:10
175:13

**tapping**
179:9

**targets**
132:15

**task**
67:17 69:10

**tax**
19:21 32:2,11 40:4 62:20
82:2 137:15,17 148:14,
25 149:23 150:13,14,17,
20,23 151:3 165:6,8
183:4,13,15

**taxable**
165:13

**taxes**
116:12,19

**tears**
126:6

**teen**
126:1

teleconferencing
7:1

telephone
61:4

telephonic
28:6

tell
5:14 9:8 17:13 28:20
33:22 56:13 57:1 68:25
69:6 78:10 87:14 122:20
123:15,17 126:1 132:7
134:16,17,22 142:24
144:20 149:12 174:25
182:14 185:6

telling
72:21 73:10 126:10

tells
83:2

temporary
103:6

ten-year
91:5 109:16

tend
84:22

termination
124:13

terminations
162:21

terms
23:20 126:4 129:16
137:3 144:23 145:2
174:20

test
29:8,9 142:19 192:2,10,
13,14

testified
5:4

testify
12:14

testimony
5:13 8:15,23 15:18

testing
29:10,16,19 45:6,9 50:13
141:10 142:13 143:2
179:1,4 192:7

testings

191:18

tests
142:15,16,21 143:2
192:3

Thank
111:7 117:1 174:8,12
199:3

Thanks
13:11 65:23 92:12
167:21 173:18

therapy
130:19 132:7

there's
10:21 12:2,22 13:9 15:8,
11,13 16:6 18:1,19 19:19
20:15 21:12 27:21 30:9,
12 31:3,11 33:25 34:15
36:11 37:17,21 41:14
42:10 46:9 47:3,4 52:20,
24 54:18,20 60:3 61:25
62:22 67:12 69:25 78:11
79:25 84:19 93:4,11
96:13,21 98:21 101:2,13
102:12 105:11 109:10
113:17 114:2,3,7 142:15
149:6 155:21 156:1
158:13 164:8 165:12,20
169:14,24 170:23 172:23
178:7 180:13 187:16
192:12 196:8

they'll
40:19 57:12 84:21

they're
25:16 26:10 27:6,18 45:2
54:4 56:11,19 57:25 58:1
68:13 72:20 80:3,9
84:16,17,18 89:12 94:14,
24 95:4,21,22 96:20 98:5
158:5 190:10 192:18,20
193:21

they've
26:9 27:13 30:1,4 35:8
83:7 119:3 120:4

thing
10:19 19:3 23:3 60:19
88:11 91:6 114:25 121:4,
5 133:20 156:9,13
183:25 197:16

things
18:19 19:14 25:5,9 31:19

43:2 44:6,7,19,22 50:22
67:7 75:1 87:10 97:25
99:9 118:7 121:6,16
127:14 128:10 142:19
143:16 162:5 168:7,10
177:17 179:12

think
20:5,14 23:24 31:3
34:23,24 35:23 36:14
44:7,10,18 46:8,10,14
56:20,21 61:22 63:22
68:13,19 71:24 72:2
78:14 79:17 80:10,14
91:14 92:21 97:5,6,9,12
100:6 103:12 108:8,24
110:2 118:12,20 119:24
120:15 124:5 128:19
137:14 138:12 141:22,25
142:14 146:1 151:1,8,19
158:12 159:12 161:1,6
162:13 163:14,15 166:4,
17 170:7,14 174:1 175:6
179:17 183:18 195:17,19
197:24 198:6

thinking
46:14 115:1

thinks
100:7 124:8

third
107:4

thought
28:13 39:5 44:5 105:10
110:4 146:2,14 151:8
196:19

thousand
17:21 49:2 172:2

three
9:22 11:8,9,10,11,12
12:21,23,24 13:2,9,10
14:22 15:8,9,18,20 17:16
22:23 25:12 28:4 31:22
33:4 43:20 47:3 52:3
54:2 61:8 66:11 71:7
112:17 133:4 152:4
183:10 189:20 190:18

three-fourths
90:6

threshold
106:12

time

10:11 11:16,17 15:19,22,
23 16:2 17:2,5,7,9,10,13,
15 19:15 34:7,20,25
38:8,13 46:13 47:20,21
48:3 55:11 58:2 61:7
62:10,11,15 64:25 67:19
69:13 74:6 76:8 84:5,7,9,
25 86:22 87:9,11 91:9
92:24 93:19 94:6 103:1
104:23 105:22 107:22
108:25 109:5,9,24 118:5
129:16 134:2 147:7
151:17 161:15 162:1
172:11,18 176:15 184:3,
4 190:17 198:13

timed
170:8

times
10:8,15 34:15 52:17
53:13,18 54:6 81:15
85:23,24 92:6 151:16,22

timesing
85:16

timespan
151:12

tingling
106:1

titled
78:15 158:5

Titles
39:11

today
9:20 14:7 18:11 19:2
38:2 59:5 86:17,18
109:19 169:22

today's
172:9

told
30:4 62:25 63:2 72:9,22,
25 84:13,25 124:17
127:3,5 130:23 131:4
132:8 135:10,21 142:5,6
143:11,16,21 146:14
187:13

tomorrow
59:3

top
13:6 36:15 57:3 91:20
175:9,10

DAVID S. GIBSON, MBA, MRC, - 09/19/2018          i35

**torch**
198:18,21

**total**
9:3 59:11 146:6 186:11,
12,16 195:10

**totaled**
145:10

**totally**
43:11 49:23

**totals**
91:25

**touched**
120:15 179:17

**toxic**
38:21 39:1 106:9,10,11,
13,16,17,18 107:5,12,15
110:25 111:9 112:7
157:22

**track**
16:2 52:4

**trades**
26:1

**Tradesmen**
33:2 124:2,5 136:24
137:1

**trained**
25:16 100:10,15

**training**
7:16,19 70:7 76:9

**transcript**
122:18

**transition**
95:1 96:11

**transitional**
95:24

**transitions**
95:14 96:1,6

**translate**
70:10,22

**treated**
22:10

**treating**
33:3,10 34:9,21 75:20
129:21,25 156:19,23

**treatment**

33:23 109:22,25 131:3
169:5,17 179:25 180:3,8

**treats**
98:16

**tremor**
178:17 198:9,12,14,15,
18,20

**tremors**
34:1,3 178:23 179:2,11,
14

**trial**
12:17 18:4,7 119:5,6

**trick**
110:3

**tried**
119:21

**Trinity**
125:17,19 135:5,6,7,17
145:9 151:24 163:24
164:13

**trouble**
44:19,21 104:14 132:18
160:12 178:17

**true**
5:16 13:6 24:5,6 37:18
52:16 70:2,9 105:23
129:3 145:24,25 189:8
192:15 194:14 197:1

**truncating**
190:16,18

**truthful**
30:6

**try**
109:17

**trying**
12:2 20:5,14 31:3,25
32:14 54:19 62:6 63:22
79:17 90:3 93:9 94:2
110:3,22 122:22 124:10
134:19 135:5 142:14
149:19 150:18,22 158:23
159:8 174:25 175:8
177:14 186:12 194:5

**turn**
110:23 149:3 158:12

**Turning**
123:12 131:20

**two**
9:16,19,20 10:7 15:21
16:7 20:5 23:11,16,17,21
26:4 27:9 31:12,17 37:10
43:22 56:6 77:11,14 78:8
79:1 81:15 91:1 93:7
94:21 98:1 99:13 102:15,
17 105:5 109:13 113:17
117:19,25 119:4 145:10
148:18 152:4,20 165:20
171:14 181:12 183:22
186:2,22 198:17

**two-and-a-half**
17:16

**two-year**
7:10

**type**
29:9 33:25 38:19 118:12
134:22 163:8 166:19,20
169:5 177:14

**types**
20:6 165:20

**typical**
9:5 46:2 77:21 79:10
82:9,24

**typically**
190:6

**typing**
159:25

**typo**
131:13 159:25 169:25

**typos**
160:6,10,15 161:1

---

**U**

**U.S.**
47:6 88:3 100:17

**unable**
32:2,3 124:16 160:18
187:11

**understand**
16:11 27:20 28:15 30:15
34:23 43:19 74:1 75:13
81:1 84:13 99:15 118:1
138:7 143:25 161:21
169:9 172:17 190:23

**understanding**

39:2 55:2 66:12 76:21
105:11 106:15,19 122:2
185:16

**understated**
87:14

**understood**
93:14

**unemployed**
138:14 187:6,8,10

**unemployment**
89:19,20 114:5 183:16

**unfair**
32:19

**unimpaired**
27:11 116:8

**union**
25:17 31:18 113:4
114:10 189:10

**United**
41:9 163:22

**units**
123:1

**university**
6:16,22 7:3 76:7,12,15,
19 120:3

**unreimbursed**
32:4 82:1 182:22 183:5,
14

**unrelated**
36:18

**up-to-date**
6:4

**update**
40:12,14

**updated**
40:10

**updates**
16:6,7

**upfront**
115:22

**upper**
36:12 121:16

**upside**
78:18

DAVID S. GIBSON, MBA, MRC, - 09/19/2018          i36

**use**
20:3 27:7,9 32:5,19 43:9
45:18,20 48:23 50:5,8,9
51:3,20 52:14,20 53:20,
22 54:16,22,24,25 55:21,
24 56:7,14 57:6 67:22,25
78:25 79:1,4,11,14,15,20
80:13 83:16 86:10 91:7
97:19 126:8 133:23
136:9 142:14 143:1
144:12 145:13 151:20
152:20 157:3,25 162:10,
13 168:4 193:13 197:17,
21

**uses**
45:22,24 46:6,14 49:13
50:2,22

**usually**
13:3 18:24 22:7,9,14
79:17 84:25 169:8
188:18

**utilize**
30:23

**utilized**
41:5

---

**V**

**valuation**
11:1

**value**
10:23 15:14 23:20,22,23,
25 24:8,10,12 90:21
102:10 113:12,14 114:19
144:25 145:1 168:11
171:11,14,17 172:1,5,24

**valued**
85:3 164:1

**variation**
171:25

**varies**
73:4 93:13

**various**
21:24 51:5 57:11 69:8

**vary**
9:6 82:15 112:23 146:4,8

**varying**
116:9

**vast**
18:6 98:7 171:20

**venued**
12:8

**verbal**
67:15 69:9 70:20 71:8,16

**verbatim**
69:5

**verify**
45:7 132:3

**version**
6:4 150:14 174:9

**versions**
13:9

**versus**
46:11 57:22 171:2 196:8

**videoconferencing**
6:25

**violates**
117:21

**violation**
117:18

**violations**
177:3

**virtually**
172:6,8

**vision**
42:11 61:18

**vocational**
5:18 51:16 52:10 53:1,12
55:5 60:9 100:6 101:20
119:4,13,14,15,16,17
141:15 166:13 180:10

**voluntarily**
123:25

---

**W**

**W2**
135:18 138:6 165:11
183:3

**W2s**
16:10 32:13,16 40:17
89:1,5 125:13 134:3,12
137:6 165:9,10

**wage**
26:18 113:1 116:22
144:17

**wages**
27:8 32:18 59:5 89:12,
17,18 165:13 183:3,15

**wait**
174:20

**walk**
132:1

**walking**
98:17,25 99:17,19
127:14 156:5

**want**
5:25 23:7 33:7,18 46:24
56:8 60:19 65:13 67:9
75:13 81:1 91:12 98:10
104:4 111:10 112:14
114:21 121:15 131:9,17
133:6 141:19 147:17
149:3 150:3 154:23
155:21 158:12 167:14,15
177:21 181:4 193:13
196:1,2

**wanted**
48:7 61:19 104:5 108:5
112:1 155:13 167:23

**warnings**
162:20

**wasn't**
7:2 74:11 86:17 134:24
145:19,22 162:23 174:3
187:3

**way**
54:8 57:5 59:20 66:12
79:8 86:12 92:2 93:11
95:23 96:13,21 99:5
115:3 156:1 161:23
166:5,18 192:12 194:16
196:5,8,12 197:2

**ways**
19:21 27:9 91:1 117:10
186:2,22

**we'd**
39:5 169:16

**we'll**
8:11 32:6 75:14 92:18
120:20 148:4,8 158:8

**we're**
24:21 30:11 35:25 36:1
39:4 47:4 48:8 53:8
54:19 60:17,24 63:16
72:1,3,18 86:7 98:12,24
114:21 121:21 139:25
155:14 181:24 182:16
192:5 193:13,14 194:25
199:3

**we've**
49:12 80:4 92:16 97:9
98:1,10 103:11 108:16,
20 110:25 111:9 113:22
120:2,7 129:22 130:3
146:16 155:13 169:22
179:17 186:4

**weakness**
138:23

**weaknesses**
69:7 70:19

**wear**
69:2

**wearing**
117:19,25

**weather**
157:16

**week**
9:11,13,17,18,20 40:12,
17 66:3,7,9 105:5 110:8,
12,17

**welded**
195:11

**welder**
26:19 39:7,21 40:24
57:7,22 73:14 134:9,13,
15,21 139:20,22 151:13
190:4,9,14,15 193:5
194:11,13 198:10,13,22

**welders**
26:11 39:14,16 56:24
57:1,4,16 59:12,23 60:2,
6 85:12 133:23 139:23,
24 190:5

**welding**
25:25 62:23,24 134:18
189:7,9 195:13,23

**well-known**
84:15,18

DAVID S. GIBSON, MBA, MRC, - 09/19/2018          i37

**went**
19:1 49:19 143:13
175:17

**weren't**
28:23

**West**
134:20

**what's**
6:1 26:2 49:11 60:23
68:25 69:17 74:7 75:17
82:21 85:8 90:23 100:12,
14 104:12 112:3 121:12
145:8 150:6,10 157:15
159:9 175:3

**whatsoever**
56:2 140:21

**whichever**
151:25

**who's**
18:22 26:1 42:18 73:14
100:9 117:20 171:1

**wide**
29:8

**widely**
9:7 146:4,9

**wife**
18:23 61:8

**willing**
99:16

**Wisconsin**
12:8 138:8

**witness**
5:2 46:24 108:14,17
117:2,5,7 148:12,20
152:18 153:23 154:4
167:22 173:14 185:20,22
186:1,9,18,21

**won't**
17:11 27:19 43:11 52:13
80:7 165:8

**wondering**
169:9

**word**
107:14 193:14

**words**
34:9 108:4 129:8,12
194:5

**work**
7:25 10:11 11:14,15,18
15:16 16:1 17:23,25
21:14,22 25:24 27:1
29:17 30:2 34:14 35:9
47:11,12 49:14 57:7,17
59:7,11,12,14,15,23
63:16 64:3 65:17,19
66:3,5 67:17 69:11 71:25
72:2 75:21 81:14,15
87:9,24 88:2 91:24 95:1
98:6 105:1 110:8 117:9
118:10,12 119:17 123:21
124:16 126:4,8 127:2
134:21,22 135:6 137:4,
22 138:20 139:4,22
140:25 141:8,20,22
142:7 146:25 147:25
149:19 154:14,24 160:9,
17,18 162:1,5 163:2,10
178:18 181:12,22 184:21
185:2,5,7 187:7 188:7,
11,15,17,20 189:11
190:11 193:12 194:6
197:18

**work-related**
106:9

**worked**
11:22 105:5 116:1,5
125:8 134:16,20 137:24
138:11 139:20 185:19

**worker**
24:22

**worker's**
34:16 114:5 180:22
181:9,14

**workers**
25:16 57:16 163:22

**workforce**
70:12,16,23 166:21

**working**
10:9 49:18 57:20 58:10,
18 62:1 69:11 86:11,12,
13,17,20 87:4,11 88:16
94:21 103:10 109:19
113:25 116:20 117:16,19
123:17 136:13 137:25
138:11,13 144:10,14,17
149:16 157:12 158:18
177:23 184:2,5,21 186:6,
8,11,12,13,14,15 187:3
192:21,24

**worklife**
20:4 23:13 27:2,10,11,
14,17 44:14,16 51:8,9,
12,13 52:25 53:3,7,20
54:1,5,7,13 55:6 58:7
59:21 60:3 71:17,20,21,
23 87:15,21 88:12,15
91:20 92:3,22 94:14
95:23 97:5,7,11 98:3
103:12,14,21 117:16
120:9 133:21 144:11
152:19 162:14,24 163:5
176:21 178:5 179:24
180:12 181:25 190:3,7,
14,16,20

**works**
115:15 128:3 150:8

**worse**
80:10 127:24 128:5
194:15

**worst**
43:10

**worth**
144:7

**wouldn't**
37:4 45:1 60:14 71:22
72:5 77:1 86:14 103:25
109:4,9 110:7 117:15
140:25 159:6 161:23
183:17

**write**
146:18 158:19

**writing**
195:7

**written**
67:4 68:21,25 110:5
120:4 145:21

**wrong**
46:8 52:19 63:19 87:8
101:17,18 103:13 128:25
188:22

**wrote**
48:3

_____

**Y**

_____

**Yachts**
151:24 163:24 164:13

**Yards**
151:24

**year**
9:5 10:8 11:5,7 38:12
40:2,4,22 41:13 47:9
49:2 54:4 63:18 76:7,16,
21 81:4,8 83:21 84:1
87:1 90:5,6,7,13,20,21,
22 92:4 121:24 135:9,11,
15,20 136:10,11,12
137:4,17 140:19 144:2,9,
12,16,18,23 145:2,5,10,
17,22 146:4,15,22 151:9,
12 152:1 153:2 154:21,
24 155:8,9,10 182:4,6
183:18 184:1,7,9 185:12,
17 186:14 187:5 188:15
197:5

**year's**
144:7

**year-and-a-half**
7:10

**years**
8:16,17 9:1 10:13 58:15,
16,17,19,21,23 59:11,16
71:25 72:2 81:3,20 85:4,
5 87:13 89:12 92:1 93:7
115:15 116:1,4 134:10,
13,15 144:5,6,14,15,19
145:17,18 146:2 151:14,
18 152:5 155:4 172:19
189:20,22,25 190:1
194:1 198:9,11

**yellow**
18:20

**yesterday**
159:24

**you'd**
33:17 34:20 65:13
116:19 141:19 143:4
181:4

**you'll**
15:2 24:4 36:18 59:1
82:12,16,21 88:14
133:17

**you're**
7:13 10:19 15:20 18:15
19:17 21:7,15 23:24
27:17 33:21 34:23 36:14
38:8,24 43:6 44:4 46:8,
10,14 47:16,25 48:4 49:7

50:22,25 53:6 54:23
58:15 66:15 83:6,9,10
85:15,16,17 87:8 92:23
93:9 94:25 95:13 96:16
99:15 101:7,15,16
104:12,13 106:4,22
107:6,18 115:1,8,9,17,21
119:18 130:15 133:7
140:1 153:6,15 154:13
156:6,17 159:21 161:6,7
162:5 164:12 165:21
166:16,17 182:14 184:12
190:23 192:16 196:16

**you've**
5:13,17 10:16 14:5 15:23
17:4 18:21 24:14,16 30:9
38:7 54:8 57:10 89:2
112:14

---

**Z**

---

**zero**
24:2 101:13